# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **AL BEAMER, et al.,** | | **Civil Action No.: 1-02-013** |
| | **:** | |
| **Plaintiffs,** | **:** | **Judge Spiegel** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **NETCO, INC., et al.,** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

---

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Donald J. Mooney, Jr. (0014202)
Jacqueline Schuster Hobbs (0068236)
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio  45202
(513) 762-6200
(513) 762-6245 (Fax)
dmooney@ulmer.com
jhobbs@ulmer.com

**Attorneys for Defendants**


**OF COUNSEL:**

Gregory A. Shoemaker (94815)
McMAHON, BERGER, HANNA,
LINIHAN, CODY & McCARTHY
2730 North Ballas Road, Suite 200
St. Louis, Missouri  63131-3039
(314) 567-7350
(314) 567-5698 (Fax)
shoemaker@mcmahonberger.com

<u>COMBINED TABLE OF CONTENTS</u>

Motion for Summary Judgment ................................................................. 1

Memorandum in Support of Motion ........................................................... 3

I.      Introduction ................................................................................. 3

II.     Statement of Uncontroverted Material Facts ............................... 3

        A.      Brief Description of the Title Insurance Industry .......... 3

        B.      Brief Description of the Founding and Structure of Defendant
                NETCO and Related Companies ..................................... 4

                1.  The beginnings of the Equity Title companies ......... 4

                2.  John and Bill Baumgart split ownership of the Equity Title
                    companies ................................................................ 5

                3.  Further expansion and the creation of NETCO ........ 5

                4.  The business and further expansion of Bill Baumgart's
                    company:  Transcontinental ...................................... 6

                5.  Bill Baumgart acquires an independent title insurance agency
                    in Ohio ..................................................................... 7

        C.      The Employment History of Plaintiff Al Beamer and his company,
                Plaintiff Title Marketing Company ................................. 8

                1.  Title Marketing Company ........................................ 8

                2.  Mr. Beamer's employment history prior to NETCO/Transcontinental .... 8

                3.  Mr. Beamer's NETCO/Transcontinental Employment History .............. 10

                    a.  Mr. Beamer's employment history prior to the split
                        of the companies ............................................. 10

                    b.  Mr. Beamer's employment history with NETCO ............... 11

                    c.  Mr. Beamer's employment history with Transcontinental ......... 13

        D.      The Formation of National and Subsequent Litigation in Ohio ............ 14

    1.  The formation of National ....................................................... 14

    2.  The lawsuit involving National ............................................ 17

E.    The End of Mr. Beamer's Employment with Transcontinental ................... 19

F.    Mr. Beamer's Allegations Regarding His Claims of Tortious Interference with Contract and Abuse of Process .......................... 20

    1.  John Baumgart's alleged input to terminate Mr. Beamer from Transcontinental ............................................................ 20

    2.  The alleged negotiated deal ................................................. 24

    3.  A settlement agreement is proposed during the National lawsuit with a covenant not to sue Transcontinental ............................. 26

    4.  Alleged deal to reimburse Bill Baumgart for any costs incurred from Mr. Beamer's termination ............................................. 28

    5.  Civil and criminal contempt motions are filed against Mr. Beamer and others in the National lawsuit ........................................... 30

G.    Mr. Beamer's Post-Transcontinental Employment ....................... 31

III.    Argument ......................................................................... 31

A.    Defendants are Entitled to Judgment as a Matter of Law with Respect to Plaintiffs' Claim of Tortious Interference with Contract ............. 32

    1.  No contract existed between Mr. Beamer, Title Marketing Company and Transcontinental ............................................. 33

As Mr. Beamer had been convicted of a felony, pursuant to federal law he was not permitted to work in the title insurance industry; thus, any contract he had with Transcontinental to perform work in that industry was void as against public policy and Plaintiffs' claim for tortious interference with contract must fail for lack of a valid contract. 18 U.S.C. §1033(e)(1); <u>Bryans v. English Nanny & Governess School</u>, 117 Ohio App. 3d 303, 318, 690 N.E.2d 582, 592 (Ohio 8th App. 1996); <u>Bell v. Horton</u>, 113 Ohio App. 3d 363, 365-366, 680 N.E.2d 1272, 1274 (Ohio 4th App. 1996).

2.  If a contract existed between Mr. Beamer and Transcontinental, it was terminable at will and therefore no breach of contract occurred ................................................................................................36

> When a contract is terminable at will, termination of the contract does not constitute a breach of contract; as a breach of contract is one of the elements of tortious interference, the tortious interference with contract claim must fail. <u>Sammarco et. al. v. Anthem Insurance Companies, Inc. et. al.</u>, 131 Ohio App. 3d 544, 556-557, 723 N.E.2d 128, 136-137 (Ohio 1st App. 1998); <u>Doe v. Lodi Community Hospital</u>, 2000 Ohio App. LEXIS 5802, *21-24 (Ohio 9th App. 2000).

3.  No evidence of tortious interference exists other than speculation and hearsay, and thus the claim must be denied ......................................37

> Mr. Beamer's only evidence of tortious interference with contract constitutes speculation and hearsay—John Baumgart asked Bill Baumgart to terminate Mr. Beamer, worked out deals where Mr. Beamer would be terminated and John Baumgart would reimburse Bill Baumgart for any costs associated with Mr. Beamer's termination, and Mr. Beamer received a settlement agreement that proposed that he agree not to sue Transcontinental—all of which has been refuted by reliable evidence; thus the tortious interference with contract claim must fail. <u>Rigby v. Falls Equipment Co, Inc.</u>, 150 Ohio App. 3d 155, 164-165, 79 N.E.2d 1056, 1063-1064 (Ohio 9th App. 2002); <u>El-Shiekh v. Northwest Ohio Cardiology Consultants</u>, 2000 Ohio App. LEXIS 4143, *1-2 (Ohio 6th App. 2000).

4.  As the tortious interference claim is essentially based upon defamatory statements that are in fact true, the claim must be denied .....40

> The privilege applicable in defamation cases applies to tortious interference cases that are based upon statements; Plaintiffs' case is based upon statements, and because Mr. Beamer was in fact competing against John Baumgart through the National company, John Baumgart's statements about Mr. Beamer were in fact true and privilege applies to defeat the instant tortious interference with contract claim. <u>A & B Abell Elevator Company, Inc. v. Columbus/Central Ohio Building Construction Trades Council</u>, 73 Ohio St. 3d 1, 14-16, 651 N.E.2d 1283, 1294-1295 (Ohio 1995); <u>El-</u>

<u>Shiekh v. Northwest Ohio Cardiology Consultants</u>, 2000 Ohio App. LEXIS 4143, *15 (Ohio 6th App. 2000).

5.  John Baumgart's conduct was justified and thus the tortious interference claim must be denied ............................................................41

    John Baumgart's alleged conduct—pressuring Bill Baumgart to terminate Mr. Beamer, negotiating a deal for Mr. Beamer's termination, making a deal to reimburse Bill Baumgart for any costs from terminating Mr. Beamer, and offering the settlement agreement proposal with the covenant not to sue Transcontinental—was justified by the competition that had arisen between John Baumgart and Mr. Beamer, and thus Plaintiffs cannot meet the fourth element of their tortious interference with contract claim and the claim must be denied. <u>Siegel Co. v. Arter & Hadden et. al.</u>, 85 Ohio St. 3d 171, 179, 707 N.E.2d 853, 860 (Ohio 1999); <u>Northeast Ohio College of Massotherapy v. Burek et. al.</u>, 144 Ohio App. 3d. 196, 209, 759 N.E.2d 869, 879 (Ohio 7th App. 2001).

B.  Defendants are Entitled to Judgment as a Matter of Law with Respect to Plaintiffs' Claim of Abuse of Process..........................................43

    Utilizing litigation strategy that may result in the termination of an employee, offering to dismiss claims in exchange for a general release of claims, or threatening to pursue a lawsuit are not events upon which a claim of abuse of process can be based, and such claims cannot be based upon hearsay comments and conclusory statements; as Plaintiffs' allegations constitute nothing more than the above, Plaintiffs' abuse of process claim fails. <u>American Process Design, Inc. v. DeBoer</u>, 1998 Ohio. App. LEXIS 5035, *7-8 (Ohio 1st App. Dist 1998); <u>Tilberry v. McIntyre</u>, 135 Ohio App. 3d 229, 241, 733 N.E.2d 636, 644 (Ohio 8th App. Dist. 1999); <u>Molten Metal Equipment v. Metaullics Systems, Co., L.P.</u>, 2000 Ohio App. LEXIS 2538, *12 (Ohio 8th App. 2000).

IV.  Conclusion..............................................................................................48

Certificate of Service ………………………………………………………………49

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| AL BEAMER, et al., | ) | **Civil Action No. : C-1-02-013** |
| | ) | |
| Plaintiffs, | ) | **Judge Spiegel** |
| | ) | |
| v. | ) | **DEFENDANTS' MOTION FOR** |
| | ) | **SUMMARY JUDGMENT WITH** |
| NETCO, INC., et al., | ) | **MEMORANDUM IN SUPPORT** |
| | ) | |
| Defendants. | ) | |

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, Defendants, NETCO, Inc. and John Baumgart, by and through their undersigned counsel, hereby move this Court for an Order granting them summary judgment on the claims asserted against them by Plaintiffs in this litigation. There are no genuine issues of material fact with respect to any of those claims and Defendants are entitled to judgment as a matter of law. Support for Defendants' Motion is set forth in the attached Memorandum. Further support for Defendants' Motion is contained in the deposition transcripts of Plaintiff Al Beamer and Defendant John Baumgart as well as the deposition transcripts of Bill Baumgart, William Andrews, Frank Skyrd, and Ian Gorman. Pursuant to Local Civil Rule 7.2(f), the essential portions of those deposition transcripts are attached hereto as Attachments 1 through 6 respectively.

Respectfully submitted,


    /s/ Jacqueline Schuster Hobbs
Donald J. Mooney, Jr. (0014202)
Jacqueline Schuster Hobbs (0068236)
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio  45202
(513) 762-6200
(513) 762-6245 (Fax)
dmooney@ulmer.com
jhobbs@ulmer.com

Attorneys for Defendants


OF COUNSEL:


    /s/ Gregory A. Shoemaker
Gregory A. Shoemaker (94815)
McMAHON, BERGER, HANNA,
LINIHAN, CODY & McCARTHY
2730 North Ballas Road, Suite 200
St. Louis, Missouri  63131-3039
(314) 567-7350
(314) 567-5698 (Fax)
shoemaker@mcmahonberger.com

**MEMORANDUM**

## I.    INTRODUCTION

On or about December 6, 2001, Plaintiffs Al Beamer and Title Marketing Company, Inc.[1] filed a three part Complaint in the Court of Common Pleas, Hamilton County, Ohio against NETCO, Inc., John Baumgart and William Andrews.  In their Complaint, Plaintiffs alleged tortious interference with contract (Count I), abuse of process (Count II) and intentional infliction of emotional distress (Count III).  The case was subsequently removed to the United States District Court for the Southern District of Ohio on the basis of diversity jurisdiction. Throughout the course of the lawsuit, Plaintiffs dismissed William Andrews from the lawsuit and dismissed the claim for intentional infliction of emotional distress.  The parties have concluded discovery and Defendants now bring their Motion for Summary Judgment with respect to the remaining claims of Plaintiffs' Complaint.

## II.   STATEMENT OF UNCONTROVERTED MATERIAL FACTS [2]

### A.    Brief Description Of The Title Insurance Industry

1.    Title insurance is issued by underwriters/title insurance companies, and agents sell the policies that the underwriters issue. (BBD 6-7). [3]

---

[1] Throughout this memorandum, unless otherwise indicated, references to Mr. Beamer are meant to include both Mr. Beamer and Title Marketing Company, Inc. and references to John Baumgart are meant to include both John Baumgart and NETCO, Inc.

[2] Defendants state that the following facts are uncontroverted solely for the purposes of deciding Defendants' Motion For Summary Judgment, and Defendants specifically reserve the right to contest any or all of the factual allegations contained herein should the Court deny any portion of the instant motion.

[3] "PD___" shall refer to specific pages of the deposition of Plaintiff Al Beamer, and all cited pages have been marked as Attachment 1 and are attached hereto; "JBD___" shall refer to specific pages of John Baumgart's deposition, and all cited pages have been marked as Attachment 2 and are attached hereto; "BBD___" shall refer to specific pages of Bill Baumgart's deposition, and all cited pages have been marked as Attachment 3 and are attached hereto; "WAD___" shall refer to specific pages of William Andrew's deposition, and all cited pages have been marked as Attachment 4 and are attached hereto.  "FSD___" shall refer to specific pages of Frank Skryd's deposition, and all cited pages have been marked as Attachment 5 and are attached hereto; "IGD___" shall refer to specific pages of Ian Gorman's deposition, and all cited pages have been marked as Attachment 6 and are attached hereto; "Attachment 7" shall refer to the Findings of Fact and Conclusions of Law from the Court of Common Pleas,

2.      Underwriters are the companies that have their name on the title insurance policy—they are the primary insurer of the risk of titles, as they have the money from which any claims made against the policy will be paid. (PD 30-31, 240).

3.      Underwriters do not need agents/title insurance agencies to issue title commitments, but use agents in order to receive more business.  (PD 31).

**B.      Brief Description Of The Founding And Structure Of Defendant NETCO And Related Companies**

**1.      The beginnings of the Equity Title companies**

4.      Bill Baumgart started Equity Title Company of Illinois in 1987.  (JBD 10-11; BBD 8).

5.      John Baumgart, Bill Baumgart's brother and a Defendant in this action, started working for Equity Title Company of Illinois in 1987; he obtained 25% ownership in that company and became Vice President in 1988.  (JBD 11-12; BBD 8).

6.      Equity Title Company of Illinois did work solely in Illinois at that time. (JBD 12-13).

7.      Equity Title Company of Missouri was started in 1989.  (JBD 13, PD 27).

8.      John Baumgart went to St. Louis to start Equity Title Company of Missouri. (JBD 13-14).

---

Hamilton County, Ohio, from a lawsuit before that court entitled NETCO v. Rivera, et. al., and all cited pages have been marked as Attachment 7 and are attached hereto; "Attachment 8" shall refer to the Judgment Entry of December 29, 2000 from the same case, and all cited pages have been marked as Attachment 8 and are attached hereto; "Attachment 9" shall refer to the deposition of Mr. Beamer taken in NETCO v. Rivera, et. al. on December 2, 1999, and all cited pages have been marked as Attachment 9 and are attached hereto; Pursuant to Local Rule 7.2(b)(4), all unreported and unofficially published cases which are cited in this memorandum are attached as Attachment 10 and have been provided to opposing counsel.

9.     Equity Southeast was started in October of 1989 and operated in Florida.  (JBD 15, 20).

10.    Equity Title Company of Wisconsin opened between 1990 and 1992.  (JBD 16).

11.    Equity Title Company of America was formed between 1990 and 1992 to provide support services to the other companies. (JBD 7-8, 17-18).

### 2.     John and Bill Baumgart split ownership of the Equity Title companies

12.    In 1990 Bill Baumgart moved to Florida and after that time essentially controlled the Florida company, Equity Southeast, while John Baumgart controlled the Midwest companies. (JBD 18).

13.    Therefore, through a deal finalized by January 1, 1994, John Baumgart bought his brother's interest in the Missouri, Illinois, and Wisconsin companies and sold to Bill Baumgart his interest in the Southeast company in Florida.  (JBD 19-20; PD 29).

14.    After the split, the companies operated as Equity Title, run by John Baumgart, and Equity Title Southeast, run by Bill Baumgart. (PD 54, 86, BBD 5-6; JBD 18-20).

15.    Southeast Equity Title operated solely in Florida at that time.  (JBD 20).

16.    Pursuant to their agreement, Bill Baumgart could not go into business in states that he had sold to John Baumgart; otherwise, every state was open for expansion.  (JBD 32-33).

### 3.     Further expansion and the creation of NETCO

17.    The name of the Equity Title companies that John Baumgart owned eventually changed to NETCO.  (JBD 58).

18.    Between 1994 and approximately 1999, John Baumgart expanded NETCO into additional states, including Indiana, Kentucky, Ohio, Texas and possibly Michigan. (JBD 25-27; PD 56-58).

19.    NETCO expanded into Ohio in 1996.  (JBD 87; PD 56-58).

20.    NETCO specializes in the refinance market, dealing with lenders or entities that provide loan products to buyers who want residential mortgages. (JBD 69).

21.    NETCO's customers are mortgage brokers, bankers, finance companies and lenders.  (JBD 71).

22.    There are currently four (4) NETCO companies, which are incorporated in Illinois, Ohio, Texas and Utah.  (JBD 8, 58).

23.    John Baumgart is currently employed as Chief Executive Officer, and is 100% owner, of Equity Title Company of America, which is incorporated in Illinois and provides support to NETCO.  (JBD 7-8).

24.    John Baumgart owns 100% of each NETCO entity, is the Chief Executive Officer of each entity, and is on the Board of each entity.  (JBD 8).

25.    William Andrews started with NETCO in November of 1997 as General Counsel. (WAD 11).

26.    Mr. Andrews worked for Equity Title Company of America until August of 2001. (WAD 8).

### 4.    The business and further expansion of Bill Baumgart's company: Transcontinental

27.    Transcontinental Title Company ("Transcontinental") is the current name of the company that used to be Equity Title Southeast, and the company is still owned by Bill Baumgart.  (BBD 5-6; JBD 18-20).

28.    Transcontinental focuses primarily on the refinancing business.  (BBD 26).

29.    Transcontinental currently does business in thirty five (35) states.  (BBD 6).

30.      Transcontinental has been licensed to do business in Ohio since approximately 2000.  (BBD 24).

### 5.      Bill Baumgart acquires an independent title insurance agency in Ohio

31.      In 1995 or 1996, Bill Baumgart acquired a company in Ohio which  was called Southeast Equity Title. (PD 87, 98-99).

32.      This company was separate from Transcontinental and was a separate investment for Bill Baumgart.  (PD 99, 100).

33.      This company was in Greenville, on the west side of the state, and had a geographic scope for business throughout the southern half of Ohio.  (BBD 10).

34.      This company, a title insurance agency, was involved in the realtor purchase market and sought business from realtors.  (PD 100-101).

35.      Bill Baumgart got involved in the company when the former owner stole money from the escrow account.  (BBD 10).

36.      Fidelity National, the underwriter, did not want to lose the business and offered to sell the company to Bill Baumgart for a contribution of working capital and an indemnification of losses. (BBD 10-11).

37.      Bill Baumgart sold Southeast Equity Title to Chris Hayes, the person running the business, through a purchase agreement finalized in July of 2000. (BBD 11-12).

38.      The transfer of ownership occurred around July or August of 2000.  (BBD 19).

39.      According to Mr. Beamer, Bill Baumgart told Mr. Beamer that Southeast Equity competed only in the county in which it was located. (PD 102).

40.      Mr. Beamer admits that he was not privy to contracts or any other materials when the company was purchased.  (PD 103).

41.     Mr. Beamer's software was not used at Southeast Equity Title.  (PD 100).

42.     According to Mr. Beamer, Bill Baumgart told him prior to December 1, 1999 that he had sold Southeast Equity. (PD 195).

**C.     The Employment History Of Plaintiff Al Beamer And His Company, Plaintiff Title Marketing Company**

**1.     Title Marketing Company**

43.     Mr. Beamer owns a company, Title Marketing Company, which he runs out of his home.  (PD 5-6, 8).

44.     Title Marketing Company was formed in 1987 or 1988.  (PD 22).

45.     Mr. Beamer runs Title Marketing Company jointly with his wife. (PD 22, 26).

46.     Through Title Marketing Company, Mr. Beamer sells title insurance production software to title agents that he meets through contacts with other title agents.  (PD 22-23).

47.     Title agents use software to accept title orders and produce the title insurance forms, title commitments and title policies that they produce as a part of their work.  (PD 23).

48.     Mr. Beamer provides the computerized forms, databases and software to make this procedure more efficient for title agents and underwriters.  (PD 23).

49.     The title agents to whom he sells software issue or sell title insurance, and Mr. Beamer establishes a continuing relationship with the title agents.  (PD 25).

50.      Although he does not have any significant classroom training with respect to computers, Mr. Beamer started working with computers in 1984 and attends seminars.  (PD 17-18, 20).

**2.     Mr. Beamer's Employment History Prior To NETCO/Transcontinental**

51.     Mr. Beamer graduated from law school in 1979. (PD 11).

52.    Mr. Beamer had approximately eight (8) years of experience in the title insurance business prior to starting to work for NETCO in 1993.  (PD 13-14, 19, 26, 27-28).

53.    Mr. Beamer entered a plea of guilty and was convicted of a felony, interstate transportation of stolen checks, in 1985.  (PD 15-16, 232).

54.    Mr. Beamer served a sentence of approximately two (2) years, including (1) one and a half years of incarceration and approximately six (6) months at a halfway house. (PD 9-10, 16, 233).

55.    Mr. Beamer voluntarily surrendered his law license due to his felony conviction. (PD 16-17).

56.    Starting in 1987, Mr. Beamer worked for Commonwealth Land Title Insurance, an underwriter, as the agency representative for Missouri, where he would travel to agents throughout Missouri to make sure they complied with Commonwealth's rules.  (PD 18-19; JBD 13-14).

57.    He was promoted to Agency Manager, with the same principal duties and a larger area of coverage.  (PD 20).

58.    John Baumgart first met Al Beamer when he went to St. Louis to start Equity Title Company of Missouri, when Mr. Beamer was an agency representative for Commonwealth Land Title.  (JBD 13-14).

59.    Around 1989, John Baumgart learned of Mr. Beamer's title production software system and signed a contract with Mr. Beamer through Title Marketing Company for use of the software. (PD 28; JBD 14).

60.    The software's use started with the St. Louis office and then expanded to other offices in Chicago, Milwaukee, Tampa and other cities.  (PD 28).

61.    Bill Baumgart first met Mr. Beamer in 1988 or 1989 when he decided to open a title insurance agency in St. Louis and thus contacted Mr. Beamer as an agency representative; they had continuous contact until 1993.  (PD 27; BBD 7-8).

62.    Mr. Beamer quit Commonwealth when he went to work for Equity Title Company of America (NETCO) in 1993.  (PD 26, 27-28; JBD 18).

### 2.    Mr. Beamer's NETCO/Transcontinental Employment History

#### a.    Mr. Beamer's employment history prior to the split of the companies

63.    Mr. Beamer signed an employment contract with Equity Title on May 21, 1993, and John Baumgart signed for the company.  (PD 44-45; JBD 21; 1993 Employment Agreement, Exhibit A to Plaintiff's Deposition).

64.    Mr. Beamer had the opportunity to review the contract prior to signing.  (PD 45-46).

65.    John Baumgart understood that Mr. Beamer would continue to sell his software to other agencies while employed for Equity Title, however, Mr. Beamer would provide notice when he was selling to any new entity.  (JBD 30).

66.    Since 1993, Mr. Beamer's title with NETCO was Executive Vice President of Information Systems.  (PD 32, 53).

67.    There was no formal statement of Mr. Beamer's duties, but he dealt with computers and information systems, dealt with underwriters in initiating or maintaining relationships with them, consulted with management on how to improve the business, negotiated contracts with underwriters, set up relationships in new states into which the company expanded, and fulfilled the necessary responsibilities for NETCO to be authorized to do business in these states.  (PD 29-30, 67-68).

68.     Mr. Beamer voluntarily signed another employment contract with Equity Title in 1994.  (PD 46-47; 1994 Employment Agreement, Exhibit B to Plaintiff's Deposition).

69.     After the split of the companies, Mr. Beamer worked for both companies as an employee.  (PD 53, 56).

70.     At the time of the split of the companies, Mr. Beamer was an employee of Southeast Equity Title/Transcontinental, also as Executive Vice President of Information Systems, a position which he retained until the end of his employment Transcontinental.  (PD 86, 111).

**b.      Mr. Beamer's employment history with NETCO**

71.     Mr. Beamer signed another employment contract with NETCO in January of 1999.  (PD 48-49; 1999 Employment Agreement, Exhibit C to Plaintiff's Deposition).

72.     Mr. Beamer read this contract prior to signing and had the opportunity to review drafts with an attorney while the contract was in negotiation, although he did not seek an attorney's opinion.  (PD 49, 50-51).

73.     The initial agreement was the standard agreement that covered NETCO's other employees.  (PD 49-50, 70).

74.     Mr. Beamer and Mr. Andrews discussed terms and customized this contract to fit Mr. Beamer's situation in regard to the company he owns.  (PD 49-50).

75.     The contract was changed to list permissible companies to which Mr. Beamer could disclose his software.  (PD 51-52).

76.     Mr. Beamer voluntarily signed this contract and understood its terms.  (PD 51).

77.     At some point, when discussing a new contract prior to Mr. Beamer's resignation from NETCO, Mr. Andrews discussed how Mr. Beamer's non-compete agreement operated and went through each provision of the agreement with Mr. Beamer.  (WAD 15-19, 20-22).

78.     Mr. Beamer was involved in high-level management meetings with John Baumgart and Mr. Andrews regarding NETCO's expansions, including Ohio, where the operational aspects of opening different offices were discussed.  (PD 56-58, 59-60; JBD 72-73, 79).

79.     Financial performance and means to improve profitability were also discussed at these meetings.  (PD 62, 65; WAD 61-62).

80.     In addition, business strategies and methodologies for serving the marketplace were discussed at these meetings.  (WAD 61-62).

81.     Furthermore, products and services were discussed at these meetings.  (PD 164).

82.     Mr. Beamer had access to <u>all</u> information about the company's finances, including revenue and profit that each market generated, the number of orders and cancellation rates of orders, how much particular clients were generating and which markets were generating closings.  (JBD 82-83).

83.     Mr. Beamer had access to monthly and quarterly reports with this financial information.  (JBD 83).

84.     Mr. Beamer knew who good clients were, what prices they were charged, and the client's expectations of NETCO.  (JBD 83).

85.     Mr. Beamer's software includes a database of NETCO customers.  (PD 63-64).

86.     Mr. Beamer resigned his employment with NETCO in roughly April of 1999. (PD 62, 93, 95; JBD 25).

87.     Prior to Mr. Beamer's resignation from NETCO, Bill Baumgart and Mr. Beamer had a conversation where Bill Baumgart stated that he would like Mr. Beamer to spend more of his time in Florida for the amount of compensation that he was receiving from Transcontinental. (PD 111-112).

88.     In a continuation of past attempts to negotiate a compensation increase from NETCO, Mr. Beamer tried to negotiate a compensation increase with NETCO in March of 1999. (PD 93, 112-113).

89.     This increase would have amounted to a substantial pay raise, as Mr. Beamer wanted a percentage increase equivalent to the company's increase in sales.  (JBD 26, 28).

90.     Mr. Beamer wanted a written compensation contract with NETCO similar to that which he had with Transcontinental and a raise, however, no agreement was reached with John Baumgart and therefore Mr. Beamer resigned.  (PD 92-95; JBD 25, 28-29).

91.     At the time of Mr. Beamer's resignation, John Baumgart understood that Mr. Beamer would continue to work for Bill Baumgart and sell software to other companies. (JBD 29-30).

92.     At the time of Mr. Beamer's resignation, John Baumgart thought Mr. Beamer's job performance was adequate for what he was paid.  (JBD 38-39).

c.     **Mr. Beamer's employment history with Transcontinental**

93.     Mr. Beamer signed a contract extension with Equity Title Southeast on July 12, 1996, which changed his employment status with that company from employee to independent contractor.  (PD 88-89; 1996 Contract Extension, Exhibit D to Plaintiff's Deposition)[4].

---

[4] To Bill Baumgart's knowledge, Mr. Beamer's initial contract with Equity Title Southeast/Transcontinental was destroyed when a plane crashed into Transcontinental's facility in Florida.  However, in all relevant respects this contract was similar to the June 14, 1994 employee agreement between Mr. Beamer and Equity Title Company of America, with a few changes specific to Florida law, such as the governing law provision which stated that the

94.     Mr. Beamer signed another contract extension in 1998 with Transcontinental. (PD 89; 1998 Contract Extension, Exhibit E to Plaintiff's Deposition).

95.     Mr. Beamer's relationship changed back to that of employee with Transcontinental with a contract amendment created in 1999.  (PD 91-92; 1999 Contract Amendment, Exhibit F to Plaintiff's Deposition).

96.     With this amendment, Mr. Beamer's compensation arrangement with Transcontinental changed from ¾ to 1 point of gross receipts over $1 million dollars. (PD 95-96; 1999 Contract Amendment, Exhibit F to Plaintiff's Deposition).

97.     Mr. Beamer signed another contract amendment in 1999 reducing his pay for three (3) months because the title insurance industry was down at that point and Bill Baumgart asked him to take the reduction.  (PD 97-98; Second 1999 Contract Amendment, Exhibit G to Plaintiff's Deposition).

98.     This was the final employment agreement that Mr. Beamer had with Transcontinental.  (PD 105).

99.     Throughout this time period, Title Marketing Company continued its independent contractor relationship with Equity Southeast/Transcontinental.  (PD 89, 91-92).

**D.      The Formation Of National And Subsequent Litigation In Ohio**

**1.      The formation of National**

100.    Towards the end of summer, 1999, shortly after leaving his employment with NETCO, Antonio Rivera, a former state manager for NETCO in Ohio who had run that operation for two (2) years, called Mr. Beamer to say that he had recently quit NETCO and was weighing his options as to what he wanted to do for employment.  (PD 124-125, 135, 162).

---

agreement would be construed and governed by the laws of the State of Florida.  Accordingly, this contract had a provision that Mr. Beamer's employment under the agreement "may be terminated by either party for any reason whatsoever at any time."  (DX B: 1994 Employment Agreement).

101.    At this time Mr. Rivera had various options he was examining, one of which was forming his own company.  (PD 124).

102.    According to Mr. Beamer, they did not discuss Mr. Beamer investing in a new company at that time.  (PD 126)

103.    Mr. Beamer and Mr. Rivera had a second conversation a few days later, but still did not discuss establishing a new business.  (PD 125, 127).

104.    Mr. Rivera decided upon opening his own title insurance company a few months after the end of his employment with NETCO, but Mr. Beamer is not certain when this occurred. (PD 128-129).

105.    Mr. Beamer met with Mr. Rivera and James Erwin, an attorney with little or no experience in the title industry, at some point in October of 1999, and they discussed the formation of an Ohio company at this time.  (PD 129, 130, 152, 261).

106.    Prior to this meeting, Mr. Beamer and Mr. Rivera discussed the possibility of opening a business, a discussion during which Mr. Beamer expressed interest in the idea and stated that he would see what Mr. Rivera was going to do.  (PD 130-131).

107.    Prior to this time, Mr. Rivera had not yet asked Mr. Beamer to provide financial assistance to a new company or to be a part of any new company.  (PD 130, 262-263).

108.    After this meeting, other conversations took place between Mr. Beamer, Mr. Rivera and Mr. Erwin.  (PD 132).

109.    Mr. Beamer decided to become part of the new company in October of 1999 in a phone conversation with Mr. Rivera at some point just prior to National opening for business. (PD 132, 133, 264-265).

110.    Mr. Rivera, however, had already filed Articles of Incorporation for National with the Secretary of State of Ohio on August 31, 1999.  (Attachment 7: Findings of Fact and Conclusions of Law, Court of Common Pleas, Hamilton County, Ohio, #31)

111.    According to Mr. Beamer, he does not know when National's Articles of Incorporation were filed, or if he knew prior to the meeting with Mr. Erwin that Mr. Rivera had filed the Articles.  (PD 133).

112.    Mr. Andrews and John Baumgart received a copy of the Articles of Incorporation. (WAD 25-26).

113.    On or around October 21, 1999, Mr. Rivera, Mr. Beamer, Damion Sichak and Mr. Erwin entered into a pre-organizational subscription agreement.  (PD 135-138, Attachment 7: Findings of Fact and Conclusions of Law, Court of Common Pleas, Hamilton County, Ohio, #31; Pre-Organizational Subscription Agreement, Exhibit J to Plaintiff's Deposition).

114.    On approximately October 27, 1999, Mr. Rivera prepared a document entitled "Business Plan," a document prepared for an underwriter to apply for an agency with the underwriter.  (PD 138-139; Attachment 7: Findings of Fact and Conclusions of Law, Court of Common Pleas, Hamilton County, Ohio, #26).

115.    According to Mr. Beamer, he did not see the document at the time it was prepared, and did not see that Mr. Rivera had listed NETCO as a major competitor until a later point in time.  (PD 138-140).

116.    National opened on November 1, 1999 in the Cincinnati area.  (PD 73, 148, 173).

117.    Mr. Beamer contributed $20,000 and his software to the new company, Mr. Erwin contributed $40,000, Mr. Rivera contributed $10,000, and Mr. Sichak contributed $10,000;  each

person was to have the same voting authority and owned 25% of the voting shares. (PD 134, 137).

118.    Mr. Sichak had been a Vice President with Transcontinental and quit his employment in late 1999 to join National. (PD 109-110, 268).

119.    As of November 1, 1999, Mr. Beamer considered NETCO to be a potential competitor, but according to Mr. Beamer he wanted to ensure that there was no competition for NETCO customers for the first few months of National's existence. (PD 139).

120.    According to Mr. Beamer, the plan of operation was to avoid NETCO customers in the first months of National's existence, during the term of Mr. Rivera's employment agreement, and then go after any available business. (PD 140).

121.    According to Mr. Beamer, Maria Sagrati, an employee of National and their salesperson, was not to contact any customers until she checked with Mr. Rivera to ensure that the entity was not a NETCO customer. (PD 141-143, 162).

122.    Mr. Beamer understood that Mr. Rivera knew or should have known who NETCO's customers were at that time. (PD 145).

### 2.    The Lawsuit Involving National

123.    NETCO filed suited against Mr. Rivera and National on November 9, 1999 in the Court of Common Pleas, Hamilton County, Ohio ("the National lawsuit"). (Attachment 7: Findings of Fact and Conclusions of Law, Court of Common Pleas, Hamilton County, Ohio, #1).

124.    The Court issued a temporary restraining order on November 10, 1999. (Attachment 7: Findings of Fact and Conclusions of Law, Court of Common Pleas, Hamilton County, Ohio, #2).

125.    On August 10, 2000, the Ohio Court entered a permanent injunction against Mr. Rivera and National that restrained them from soliciting or selling to NETCO's customers or competing with NETCO for six (6) months from the date of the judgment, and from disclosing or misappropriating confidential information. (Attachment 7: Findings of Fact and Conclusions of Law, Court of Common Pleas, Hamilton County, Ohio, p. 24-25; Attachment 8: Judgment Entry of December 29, 2000, Court of Common Pleas, Hamilton County, Ohio).

126.    In its Findings of Fact and Conclusions of Law, the Court found that Mr. Rivera admitted that he had violated the Competition provision of his Employment Agreement. (Attachment 7: Findings of Fact and Conclusions of Law, Court of Common Pleas, Hamilton County, Ohio, #16).

127.    Mr. Rivera admitted in a deposition in this lawsuit that he had agreed to establish a competing company on August 13, 1999. (Attachment 7: Findings of Fact and Conclusions of Law, Court of Common Pleas, Hamilton County, Ohio, #18).

128.    Mr. Rivera admitted at trial that he had done business with at least twenty-two (22) NETCO customers and had solicited other NETCO-related entities. (Attachment 7: Findings of Fact and Conclusions of Law, Court of Common Pleas, Hamilton County, Ohio, #21).

129.    Mr. Rivera admitted at trial that he was aware who NETCO's customers were in Ohio, and which customers were the most profitable.  (Attachment 7: Findings of Fact and Conclusions of Law, Court of Common Pleas, Hamilton County, Ohio, #29).

130.    Mr. Beamer is aware that the Court found that Mr. Rivera violated his contractual responsibilities to NETCO through Mr. Rivera's violation of his employment agreement.  (PD 154-155, 156).

131.    Mr. Beamer is aware that the court found that Ms. Sagrati had contacted numerous NETCO's customers.  (PD 143-145; Attachment 7: Findings of Fact and Conclusions of Law, Court of Common Pleas, Hamilton County, Ohio, #23, 24).

132.    Mr. Beamer does not remember if he was a named defendant in the lawsuit against National, but he was a shareholder of the company.  (PD 198, 209, 211).

133.    According to Mr. Beamer, his main duties with National were to provide software and to input forms, and he did not engage in relationships with underwriters as he had with Transcontinental.  (PD 146).

134.    Mr. Beamer's relationship with National ended when National agreed to cease operations and went out of business in late 200 or early 2001.  (PD 152, 234).

**E.      The End Of Mr. Beamer's Employment With Transcontinental**

135.    Mr. Beamer's employment with Transcontinental ended on December 6 or 7, 1999.  (PD 113).

136.    After his termination, Mr. Beamer sued Transcontinental in Florida for breach of contract, a case which settled in April of 2001.  (PD 113, 115, 118).

137.    The settlement agreement for that case provided that Transcontinental was authorized to use Title Marketing Company's software through August 31, 2001, and to pay a licensing fee for use after that date. (PD 119).

138.    Mr. Beamer filed suit against Transcontinental again in 2002 for violation of the settlement agreement for failure to pay the licensing fee.  (PD 121-122).

139.    This case settled in the spring of 2003, and the settlement allowed Transcontinental to continue to use the software indefinitely.  (PD 123).

**F.    Mr. Beamer's Allegations Regarding His Claims Of Tortious Interference With Contract And Abuse Of Process**

**1.    John Baumgart's alleged input to terminate Mr. Beamer from Transcontinental**

140.    According to Mr. Beamer, John Baumgart pressured his brother Bill Baumgart to terminate Mr. Beamer from his employment with Transcontinental. (PD 178-179).

141.    According to Mr. Beamer, Bill Baumgart had several conversations with Mr. Beamer where he told Mr. Beamer that John Baumgart was pressuring him to terminate Mr. Beamer. (PD 179).

142.    According to Mr. Beamer, the first conversation in which John Baumgart allegedly pressured Bill Baumgart took place around November 1, 1999.  (PD 183).

143.    According to Mr. Beamer, Bill Baumgart told him that John Baumgart had called and was upset that National was competing with him and wanted Bill Baumgart to terminate Mr. Beamer in order to hurt National.  (PD 183).

144.    According to Mr. Beamer, there were one or two more conversations where the same information was relayed to him by Bill Baumgart. (PD 184, 185).

145.    According to Mr. Beamer, his last conversation with Bill Baumgart regarding this topic occurred at dinner on December 1, 1999, the day before Mr. Beamer's deposition in Cincinnati in the National lawsuit.  (PD 184, 186-187).

146.    According to Mr. Beamer, a few weeks prior to this time he voluntarily told Bill Baumgart that he had an ownership interest in National and that he provided all computer software for National.  (PD 109, 111).

147.    According to Mr. Beamer, Bill Baumgart told Mr. Beamer that he was happy with Mr. Beamer's performance, he hoped their relationship would continue a long time, and that Mr. Beamer was a part of the success of Transcontinental.  (PD 107, 186).

148.    According to Mr. Beamer, at this meeting Bill Baumgart stated to Mr. Beamer that John Baumgart had come to Florida and one of his main purposes was to convince Bill Baumgart to terminate Mr. Beamer.  (PD 186-187).

149.    According to Mr. Beamer, Bill Baumgart told Mr. Beamer that he had told John Baumgart that Mr. Beamer was an employee of Transcontinental, he would continue to be, he was an important part of Transcontinental's success and he did not want to hear anything else regarding National.  (PD 187).

150.    According to Mr. Beamer, Bill Baumgart stated to him on December 1, 1999, that the issue of National competing with Transcontinental was a matter between Mr. Beamer and John Baumgart and that he was tired of hearing about the issue.  (PD 108).

151.    According to Mr. Beamer, John Baumgart's discussions with Bill Baumgart regarding terminating Mr. Beamer were very aggravating to Bill Baumgart. (PD 185).

152.    According to Mr. Beamer, Bill Baumgart did not ask him at dinner if National was competing with Transcontinental.  (PD 110).

153.    According to Mr. Beamer, Bill Baumgart never told Mr. Beamer that if Mr. Beamer were competing with him that he would be terminated.  (PD 110-111, 195).

154.    Bill Baumgart heard that Mr. Beamer was doing some work for a new title company in Ohio, spoke to Mr. Beamer about it one night when they went out for a beer, an event that occurred shortly before Bill Baumgart learned that Mr. Beamer was involved in the

business, and Mr. Beamer said that he was not involved and was <u>only</u> doing computer work for them. (BBD 20, 27-28).

155.    Bill Baumgart told Mr. Beamer that he had heard rumors that Mr. Beamer was a part owner of National and that this would be a serious problem if true. (BBD 20).

156.    Bill Baumgart later learned from a court case that Mr. Beamer was a part owner of the company and fired him. (BBD 20, 27-28).

157.    John Baumgart did not ask Bill Baumgart to fire Mr. Beamer. (BBD 22).

158.    Bill Baumgart felt that Mr. Beamer owning this company was a significant conflict of interest, and he did not want to do business with someone who had proprietary information regarding his company and was competing against him. (BBD 22).

159.    This was Bill Baumgart's opinion despite knowing that the sale of Southeast Equity Title in Ohio would be complete by the middle of 2000 because he did not know for certain whether the terms of the purchase would be completed or if he would, instead, retain ownership of the Company. (BBD 22).

160.    John Baumgart never asked Bill Baumgart to terminate Mr. Beamer, and did not instruct anyone on his behalf to speak to Bill Baumgart about terminating Mr. Beamer or to tell Mr. Beamer that if he did not disband National he would be terminated from Transcontinental. (JBD 39).

161.    Bill Baumgart told John Baumgart that he had terminated Mr. Beamer because Mr. Beamer lied to him about competing against him and was in fact competing against him. (JBD 44).

162.    John Baumgart does not remember when he learned that Bill Baumgart had terminated Mr. Beamer. (JBD 40).

163.    John Baumgart learned around September of 1999 that Mr. Rivera was starting National, and he called Bill Baumgart to inform him that Mr. Rivera was starting his own company. (JBD 45-46).

164.    John Baumgart investigated the formation of National by speaking to almost each and every one of his Ohio employees, and possibly some business contacts. (JBD 49-50).

165.    Bill Baumgart later told John Baumgart that he had talked to Mr. Beamer and asked him if he owned an interest in the company, and Mr. Beamer said that he did not. (JBD 44, 46-48).

166.    Mr. Beamer testified in his deposition in the National lawsuit that he had an ownership interest in National. (Attachment 9: Deposition of Mr. Beamer in NETCO v. Rivera, et. al., taken December 2, 1999, at 24, 31, 48-51).

167.    According to John Baumgart, one of the attorneys at Mr. Beamer's deposition told him that Mr. Beamer had testified that he had an ownership interest in National. (JBD 51; WAD 27, 29).

168.    John Baumgart told Bill Baumgart that Mr. Beamer had an ownership interest in National the day of Mr. Beamer's deposition in the National lawsuit; however, he did not suggest that Bill Baumgart terminate Mr. Beamer, and did not ask Bill Baumgart at all as to what he would do with this new information. (JBD 48, 50, 51, 42).

169.    Bill Baumgart stated that he was "pissed off" because Mr. Beamer had lied to him. (JBD 51, 98-99).

170.    Bill Baumgart did not say at this time that he was going to terminate Mr. Beamer. (JBD 99).

171.    Mr. Andrews stated that the existence of National and its principals was discussed with Bill Baumgart, who became upset that Mr. Beamer was involved with National. (WAD 38-40, 41).

172.    Mr. Andrews understood from that conversation that Mr. Beamer had told Bill Baumgart that he was not involved with National and was not competing with him in Ohio. (WAD 40).

### 2.     The alleged negotiated deal

173.    According to Mr. Beamer, Mr. Andrews spoke to him at a break in his deposition and told him that John Baumgart had asked him to tell Mr. Beamer that John Baumgart was in the process of working out a deal where Mr. Beamer would be terminated from Transcontinental unless Mr. Beamer had National immediately disbanded; there were no witnesses to this conversation, as Mr. Andrews had asked that they be left alone and that Mr. Fitch, Mr. Beamer's attorney, not participate.   (PD 179, 189, 190, 255).

174.    According to Mr. Beamer, Mr. Andrews told him that John Baumgart would spend any amount of money necessary to get Mr. Beamer regardless of the legal merits of the claim.  (PD 209).

175.    Contrary to the allegations in the Complaint, Mr. Beamer does not recall Mr. Andrews stating that John Baumgart would "exploit the family relationship between NETCO and Transcontinental." (PD 189).

176.    Neither John Baumgart, nor his agents, negotiated a deal with Bill Baumgart that resulted in Mr. Beamer's termination. (JBD 105-106).

177.    John Baumgart never said anything about "getting" Mr. Beamer.  (JBD 106-107).

178. Mr. Andrews did ask to speak privately to Mr. Beamer and at a break in the deposition a general discussion of settlement arose. (WAD 33-34, 35).

179. Mr. Andrews did not discuss Mr. Beamer's continued employment with Transcontinental during these discussions, did not tell Mr. Beamer that John Baumgart would talk to his brother about terminating him if National did not close, did not say that NETCO would exploit the family relationship to arrange for his termination, and did not say that John Baumgart would spend any amount of money to get him. (WAD 34, 45).

180. Mr. Beamer did not speak to Mr. Andrews again one-on-one until December 6, 1999. (PD 192).

181. According to Mr. Beamer, Mr. Andrews called him on December 6, 1999 and told him the deal was struck (he was terminated) and that he should contact Mr. Curphey, an attorney for Bill Baumgart. (PD 179, 192).

182. According to Mr. Beamer, when he spoke to Mr. Curphey, he said that Mr. Beamer was terminated and that Mr. Beamer could not talk to Bill Baumgart. (PD 179).

183. According to Mr. Beamer, at this time he asked Mr. Curphey to contact Bill Baumgart and say that he would like to speak to him, and Mr. Curphey called a few days later and said that Bill Baumgart refused to speak to him. (PD 194).

184. Mr. Beamer left messages with Bill Baumgart to call him. (PD 194).

185. Mr. Curphey told Mr. Beamer that he did not know if Bill Baumgart had given in to pressure from John Baumgart. (PD 200).

186. Mr. Beamer admits that Mr. Curphey did not state that he was terminated because John Baumgart had pressured Bill Baumgart. (PD 203-204).

187.    According to Mr. Andrews, Mr. Beamer called him to see if he was still working for Bill Baumgart because Bill Baumgart was not returning his calls.  (WAD 36-37).

188.    Mr. Andrews did not tell Mr. Beamer that John Baumgart negotiated a deal with Bill Baumgart to terminate his employment.  (WAD 44-45).

189.    Mr. Andrews told Mr. Beamer to speak to Mr. Curphey because he did not have the knowledge that Mr. Beamer wanted to know.  (WAD 37).

190.    Mr. Curphey called Mr. Andrews between Mr. Beamer's deposition and Mr. Beamer's telephone call to ask about the lawsuit, and Mr. Andrews gave him the procedural status of the lawsuit at that time; however, Mr. Andrews did not address Mr. Beamer's employment with Transcontinental.  (WAD 37-38).

191.    Bill Baumgart never had any conversations with Mr. Andrews regarding Mr. Beamer's termination.  (BBD 35-36).

192.    Bill Baumgart was very upset with Mr. Beamer at the time of his termination.  (BBD 36).

193.    Bill Baumgart does not know who told Mr. Beamer that he was terminated, as he was too upset to speak with him; instead, he cut off his pay and ignored him.  (BBD 36, 37-38).

### 3.    A settlement agreement is proposed during the National lawsuit with a covenant not to sue Transcontinental

194.    Mr. Beamer received a settlement agreement during the National lawsuit that proposed he waive any claim against Transcontinental and release his right to sue Transcontinental.  (PD 196-197; JBD 53-54; Proposed Settlement Agreement, ¶ 24, last sentence, Exhibit 1 to John Baumgart's Deposition).

195.    According to Mr. Beamer, Mr. Curphey stated in their December 6, 1999 conversation that the entire issue needed to be resolved during this case.  (PD 201).

196.    However, according to Mr. Beamer, Mr. Curphey did not say specifically what the settlement agreement was related to in the case against National, and did not say that they were all in on the deal.  (PD 204).

197.    According to Mr. Beamer, Mr. Curphey stated that he was only following orders and everything was up to Bill Baumgart.  (PD 203).

198.    According to Mr. Beamer, he called Mr. Andrews again to argue that he should not be terminated, and this was his final conversation with Mr. Andrews. (PD 201-202).

199.    According to Mr. Beamer, he was told by Mr. Fitch that NETCO's attorneys told Mr. Fitch that Mr. Beamer's unwillingness to waive any claim against Transcontinental was a "deal-breaker" and that settlement negotiations in the National matter were unsuccessful due to the release clause.  (PD 214-215).

200.    Bill Baumgart was not aware that a covenant not to sue him was being considered as a part of the settlement of the case, and John Baumgart never told him that he was trying to get a covenant not to sue from Mr. Beamer in this lawsuit.  (BBD 26).

201.    According to John Baumgart, it was brought to his attention that the possible settlement could close all matters together, as Mr. Beamer was negotiating with both John Baumgart and Bill Baumgart, and so everything could be done in one swoop.  (JBD 52-53; WAD 43-44).

202.    John Baumgart does not remember any discussions with Bill Baumgart regarding the non-suit covenant.  (JBD 53-54).

203.    Mr. Andrews never told anyone that the covenant not to sue Transcontinental was a "deal-breaker" if not included.  (WAD 45).

204.    John Baumgart never told anyone that the proposed covenant with Transcontinental was a "deal-breaker," and he certainly would have settled the National litigation without that covenant if the rest of the terms were the same. (JBD 107).

### 4.    Alleged deal to reimburse Bill Baumgart for any costs incurred from Mr. Beamer's termination

205.    According to Mr. Beamer, various Transcontinental employees told him there was a deal that John Baumgart would reimburse Bill Baumgart for any costs incurred in terminating Mr. Beamer's employment. (PD 180).

206.    According to Mr. Beamer, he called Frank Skryd, an employee of Transcontinental, in early 2000 and Mr. Skryd said that Ian Gorman, another employee of Transcontinental, was in a room when Bill Baumgart was on the phone with John Baumgart during the deal to reimburse Bill Baumgart for costs. (PD 103, 181).

207.    Mr. Beamer does not remember if Mr. Skryd told him that Mr. Gorman actually heard John Baumgart offer the deal or if he was just in the room when the Baumgarts were talking. (PD 181).

208.    According to Mr. Beamer, his conversation with Mr. Skryd occurred after Mr. Beamer's first settlement with Transcontinental. (PD 182).

209.    According to Mr. Beamer, he had another conversation with Mr. Skryd and Mr. Gorman when they met for a lunch meeting in 2000 or 2001. (PD 205-206).

210.    At this lunch, Mr. Beamer said that he could not believe that Bill Baumgart had made this deal with John Baumgart, and Mr. Gorman said that he could not believe it either, which was all Mr. Gorman said on the subject. (PD 207).

211.    Mr. Gorman is currently Senior Vice President with Transcontinental. (IGD 5).

212.    Mr. Gorman has never spoken with Bill Baumgart, Mr. Skryd or Mr. Beamer regarding Mr. Beamer's termination.  (IGD 8-9).

213.    Mr. Gorman was never present in Bill Baumgart's office when Bill Baumgart spoke to John Baumgart regarding Mr. Beamer's employment.  (IGD 10).

214.    Mr. Gorman has never told Mr. Beamer that he was present when a conversation was taking place regarding his employment, or that he understood that there was an agreement between Bill Baumgart and John Baumgart to reimburse Bill Baumgart for any incurred expenses resulting from Mr. Beamer's termination.  (IGD 10).

215.    Mr. Skryd is currently a Vice President with Transcontinental, a position he has held since approximately 1990.  (FSD 5-6, 17-18).

216.    Mr. Skryd never told Mr. Beamer that a deal had been made between John Baumgart and Bill Baumgart to terminate him, or that Mr. Gorman told him that such a deal had been struck.  (FSD 13, 15).

217.    Mr. Skryd was never in Bill Baumgart's office when he was on the phone with John Baumgart discussing Mr. Beamer's employment.  (FSD 15).

218.    Mr. Skryd does not recall speaking to Mr. Beamer about the circumstances of his termination at a dinner, but does recall that they did not discuss business or litigation at this dinner.  (FSD 13-14, 16-17).

219.    John Baumgart did not agree to indemnify Transcontinental for losses resulting from Mr. Beamer's termination.  (JBD 106).

220.    Mr. Beamer understands that John Baumgart did not reimburse Bill Baumgart for any of the costs associated with Mr. Beamer's termination, including any lawsuits Mr. Beamer brought against Transcontinental or Bill Baumgart.  (PD 182).

### 5.    Civil and criminal contempt motions are filed against Mr. Beamer and others in the National lawsuit

221.    Civil and criminal contempt motions were filed against Mr. Beamer and others in the National lawsuit, but Mr. Beamer was found not to be in contempt.  (PD 211-213; Attachment 8: Judgment Entry of December 29, 2000, Court of Common Pleas, Hamilton County, Ohio).

222.    The civil contempt motions were upheld as to Mr. Rivera, Mr. Sichak, Ms. Sagrati and National for violating the temporary restraining order and permanent injunction entered in the case.  (Attachment 8:  Judgment Entry of December 29, 2000, Court of Common Pleas, Hamilton County, Ohio).

223.    Mr. Beamer did not file for sanctions or attorney fees at that time.  (PD 213).

224.    John Baumgart allowed the attorneys working on the case to determine the best course of action, and did not oversee the "nuts and bolts" of what occurred in the lawsuit. (JBD 55-56).

225.    According to Mr. Beamer, Mr. Fitch told him that he had been told by someone with respect to the contempt motion that this issue was going to be made criminal and made bigger so as to get Mr. Beamer, and that Mr. Beamer would go to prison as a result. (PD 215-216).

226.    Mr. Andrews does not remember if he authorized the contempt motion, but thought Mr. Beamer was in contempt of the Court Order as he was a principal of a company that was in violation of the order and nothing was being done to stop the violation.  (WAD 47).

227.    Mr. Andrews understood that principals of a closely-held entity could be held responsible for failing to have their company comply with a court order. (WAD 49-50).

228.    According to Mr. Beamer, he was told by Mr. Fitch that NETCO's attorneys claimed on one occasion that they were going to go to a prosecutor and seek criminal charges on the basis of trade infringement, but he was never charged. (PD 207-208).

### G.    Mr. Beamer's Post-Transcontinental Employment

229.    Counselors Title Company was formed in 2001 by Mr. Erwin, and Mr. Beamer did computer work there for six (6) to eight (8) months with Mr. Sichak and Mr. Erwin. (PD 34, 235, 236, 269-270).

230.    Mr. Beamer's relationship with Residential Title Services, a title insurance agency, began in March of 2000 through a relationship with Title Marketing Company, and he became an employee there in August of 2002. (PD 35, 239-240, 285-286).

231.    Residential performs the work that most title insurance agencies cover, including purchases, refinances, and some commercial work. (PD 43-44).

232.    Mr. Beamer is currently employed with Residential, performing the following functions: overseeing computer operations, helping with underwriter relations (which includes contacting underwriters, discussing plans for new underwriter contracts, improving underwriter contracts, acquiring additional underwriter contracts and ensuring that Residential is in compliance with underwriter and legal standards) and planning/expansion plans, similar to his job duties with NETCO and Transcontinental. (PD 37, 38-39, 42, 239).

233.    According to Mr. Beamer, he does not write title policies for Residential, but formats the forms used to produce title policies. (PD 41-42, 240).

## III.    ARGUMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment shall be granted where there is no genuine issue as to any material fact, the moving party is entitled to

judgment as a matter of law, and reasonable minds can come to but one conclusion which is adverse to the party against whom the motion is made.   Fed. R. Civ. P. 56(c); see also LaPointe v. UAW, Local 600, 8 F.3d 376, 378 (6th Cir. 1993); U.S. v. TRW, Inc., 4 F.3d 417, 423 (6th Cir. 1993).

Applying this well-established standard to Defendants' Motion for Summary Judgment, it is clear that the Motion should be granted.   There are no genuine issues as to any of the materials facts in this litigation.   Likewise, reasonable minds can come to but one conclusion based upon the evidence in this case ? that Defendants are not liable to Plaintiffs for tortious interference with contract or abuse of process, the two (2) remaining claims that Plaintiffs have asserted against Defendants.   As such, Defendants are entitled to judgment as a matter of law and Plaintiffs' Complaint against them must be dismissed.

### A.    Defendants Are Entitled To Judgment As A Matter Of Law With Respect To Plaintiffs' Claim Of Tortious Interference with Contract

Tortious interference with a contract "generally occurs when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." A &B-Abell Elevator Company, Inc. v. Columbus/Central Ohio Building  Construction Trades Council, 73 Ohio St. 3d 1, 14, 651 N.E.2d 1283, 1294 (Ohio 1995); Davidson v. BP America Inc., 125 Ohio App. 3d 643, 655, 709 N.E.2d 510, 518 (Ohio 8th App. 1997).   The elements of tortious interference with contract are (1) the existence of a contract; (2) the tortfeasor's knowledge of the contract; (3) the tortfeasor's intentional procurement of the contract's breach; (4) lack of justification and (5) damages.  Siegel Co. v. Arter & Hadden et. al., 85 Ohio St. 3d 171, 176, 707 N.E.2d 853, 858 (Ohio 1999); UZ Engineered Products Company v. Midwest Motor Supply Co., Inc., 147 Ohio

App. 3d 382, 400, 770 N.E.2d 1068, 1083 (Ohio 10th App. 2001). For the reasons given below, neither John Baumgart, nor NETCO, tortiously interfered with Mr. Beamer's employment contract with Transcontinental, and thus Defendants are entitled to summary judgment on Count I of Plaintiffs' Complaint.

**1.    No contract existed between Mr. Beamer, Title Marketing Company and Transcontinental**

Mr. Beamer and his company, Title Marketing Company, ostensibly had a contract with Transcontinental for their computer services.  However, Mr. Beamer has a felony conviction on his record, and pursuant to federal law he should not have been working in the title insurance industry <u>at all</u>.  Stated another way, Mr. Beamer's employment in the insurance industry was illegal and a violation of federal law. 18 U.S.C. §1033(e)(1). Therefore, no legal contract existed between Mr. Beamer, Title Marketing and Transcontinental.  Accordingly, the claim of tortious interference fails as Plaintiffs cannot fulfill the first element of their case.

In Ohio, without an underlying contract, a claim for tortious interference with contract cannot stand, regardless of whether there is no legal contract because a contract was never created or an existing contract has been deemed void.  <u>Bryans v. English Nanny & Governess School</u>, 117 Ohio App. 3d 303, 318, 690 N.E.2d 582, 592 (Ohio 8th App. 1996) (no interference with contract when there was no evidence that plaintiff was under contract); <u>Meros v. Mazgaj</u>, 2002 Ohio App. LEXIS 2052, *12-13 (Ohio 11th App. 2002) (no interference with contract when contract was terminated due to a suspension from the practice of law); <u>Bell v. Horton</u>, 113 Ohio App. 3d 363, 365-366, 680 N.E.2d 1272, 1274 (Ohio 4th App. 1996) (no interference with contract when contract held unenforceable due to application of Statute of Frauds); <u>Garg v. Vekataraman</u>, 54 Ohio App. 3d 171, 174561 N.E.2d 1005, 1009 (Ohio 9th App. 1988) (no

interference with contract when contract held unenforceable due to application of Statute of Frauds).

To determine the status of a contract as either void or valid when the contract is created in another jurisdiction, here Florida, Ohio utilizes the conflict of law analysis of Restatement of Law 2d, Conflict of Laws (1971). Carrington Farms Development Co. v. Pulte Home Corp., 1998 Ohio App. LEXIS 2228, *6-8 (Ohio 6th App. 1998). Under the Restatement, the validity or illegality of a contract is determined by the law that is chosen by application of §187-188. Restatement of Law 2d, Conflict of Laws §200, §200 comment b, §202 (1971). Pursuant to §187, the law the parties choose in their contract to control their contractual rights governs the law that applies in most cases, with exceptions that are not relevant in the instant case. Restatement of Law 2d, Conflict of Laws §187 (1971).

Therefore, the law that controls in this instance is that of Florida, as Mr. Beamer's employment contract with Transcontinental stated that it would be construed and governed by Florida law. Alternately, absent a valid choice of law of the parties pursuant to §187, under §188 Florida law would still apply as the balance of factors weighs in favor of the application of Florida law—the contract was entered into in Florida, one of the parties was located in Florida, and the work that was the subject of the contract was centered in Florida where Transcontinental's headquarters is located.

Under Florida law, a contract is against public policy when it cannot be performed without violating a statutory or other legal provision, and such a contract grants no enforceable rights to the contracting parties and is void. Local No. 234 v. Henley & Beckwith, 66 So.2d 818, 821 (Fl. 1953); Umbel v. Foodtrader.com, Inc et. al., 820 So.2d 372, 374 (Fl. 3rd Dist. 2002); Harris et. al. v. Gonzalez et. al., 789 So.2d 405, 407-408, 409 (Fl. 4th Dist. 2001); Edwards v.

Trulis, 212 So.2d 893, 895, 897 (Fl. 1st Dist. 1968). Pursuant to federal law, "Any individual who has been convicted of any criminal felony involving dishonesty or a breach of trust…and who willfully engages in the business of insurance…or participates in such business, shall be fined...or imprisoned not more than 5 years, or both." 18 U.S.C. §1033(e)(1). For purposes of this section, the "business of insurance" includes "the writing of insurance" or "the reinsuring of risks," **"including all acts necessary or incidental to such writing or reinsuring and the activities of persons who act as, or are, officers, directors, agents or employees of insurers…."** 18 U.S.C. §1033(f)(1) (emphasis added). Therefore, if the performance of a contract results in conduct that violates this statute, under Florida law that contract is rendered null and void as against public policy, and such is the case in the instant lawsuit.

Mr. Beamer has a felony conviction for the interstate transportation of stolen checks, a crime that clearly involves dishonesty and a breach of trust. In addition, as an employee of Transcontinental, Mr. Beamer was an employee of an entity that was engaged in the business of insurance, and under the statute that is sufficient engagement in the "business of insurance" for the statue to apply. Alternatively, if merely being an employee of an entity engaged in the "business of insurance" is not sufficient under the statute, since Mr. Beamer may attempt to argue that he was nothing more than a simple computer technician, Mr. Beamer in fact performed work for Transcontinental that constituted "engaging" in the "business of insurance."

In this respect, Mr. Beamer initiated and maintained relationships with underwriters, he helped negotiate contracts with underwriters, he set up new relationships in new states when his employer expanded, and he determined what requirements needed to be fulfilled in order to do business in new states. Therefore, under either argument this statute applied to Mr. Beamer and he was unable to legally perform services within the title insurance field. As Mr. Beamer could

not work in the field, neither could any company he owned and operated through which he performed his work in this field. Accordingly, the same analysis applies to Plaintiff Title Marketing Company, which is owned and operated by Mr. Beamer.

As Mr. Beamer and Title Marketing's employment in the insurance field was prohibited by statute, any contract based upon their employment in the insurance field must be deemed to be null and void from its inception. Therefore, Mr. Beamer's and Title Marketing Company's employment and/or contractual agreement with Transcontinental was null and void and, without a valid legal contract, the claim of tortious interference with contract completely fails. Consequently, Defendants are entitled to summary judgment on Count I of Plaintiffs' Complaint.

### 2. If a contract existed between Mr. Beamer and Transcontinental, it was terminable at will and therefore no breach of contract occurred

Under Ohio law, when a contract is terminable at will—terminable at any time for any reason—then the termination of that contract cannot create a breach of contract upon which to base a tortious interference claim. For example, when an insurance company removed certain doctors from its provider list and the doctors sued the company for tortious interference, the court held there was no breach of contract upon which to support the claim when the contract between them provided for termination of the contract at any time for no cause. Sammarco et. al. v. Anthem Insurance Companies, Inc. et. al., 131 Ohio App. 3d 544, 556-557, 723 N.E.2d 128, 136-137 (Ohio 1st App. 1998). Likewise, when a contract stated that either party could terminate the contract with or without cause upon thirty (30) days notice and the sued party complied with the notice provision, regardless of the reason for the termination of the contract, there was no breach of contract and therefore no claim for tortious interference. Doe v. Lodi Community Hospital, 2000 Ohio App. LEXIS 5802, *21-24 (Ohio 9th App. 2000).

Thus, when a contract is at will, there can be no claim for breach of contract for the contract's termination regardless of the reason for the termination of the contract. Since Mr. Beamer's contract with Transcontinental was at will, in that it stated that employment under the agreement could be terminated "by either party for any reasons whatsoever at any time," the reason that Bill Baumgart terminated Mr. Beamer's employment is irrelevant to this lawsuit. Regardless of the reason for the termination, the termination could not, and did not, create a breach of the contract at issue. Therefore, Plaintiffs cannot fulfill the third element of their case, and Defendants are entitled to summary judgment on Count I of Plaintiffs' Complaint.

### 3.    No evidence of tortious interference exists other than speculation and hearsay, and thus the claim must be denied

Even taking Mr. Beamer's allegations as true, as Defendants must for purposes of summary judgment, Mr. Beamer has no admissible evidence that Defendants tortiously interfered with his contract with Transcontinental.  The only evidence Mr. Beamer has advanced in this regard is merely his own speculation and hearsay, and when that is the only evidence that supports a claim for tortious interference, the claim is not submissible and must be denied.

For example, when an employer allegedly harassed an employee's medical provider to stop treatment of the employee, thereby breaching the employee's contract with the medical care provider, the employee offered only hearsay statements from his doctor regarding the alleged harassment.  Rigby v. Falls Equipment Co., Inc., 150 Ohio App. 3d 155, 164-165, 79 N.E.2d 1056, 1063-1064 (Ohio 9th App. 2002).  The doctor later stated that there was no harassment, and thus as the employee had no evidence to support his claim but hearsay, his tortious interference claim failed.  Rigby, 150 Ohio App. 3d at 164-165, 79 N.E.2d at 1063-1064.

Furthermore, in El-Shiekh v. Northwest Ohio Cardiology Consultants, 2000 Ohio App. LEXIS 4143, *1-2 (Ohio 6th App. 2000), a cardiologist who had a contract with a college

received bad reviews from doctors connected with a company that had attempted to solicit the college to provide it with cardiac services. These reviews were provided to the college through letters and the head of the company referenced the reviews when speaking to a college representative, and the cardiologist was released from his contract. El-Shiekh, 2000 Ohio App. LEXIS 4143 at *3, 5. The court concluded that the cardiologist did not have a viable claim for tortious interference as the only evidence in his support was speculation that the head of the company was motivated to make the comments he did in order to get business. El-Shiekh, 2000 Ohio App. LEXIS 4143 at *10-11. See also Davidson v. BP America, Inc., 125 Ohio App. 3d 643, 655-656, 709 N.E.2d 510, 518 (Ohio 8th App. 1997) (when a former employee moved to a tax firm and stated he would take his former employer's tax discrepancies to the IRS, and the tax firm and former employer discussed his statements, the employee could not offer any evidence of tortious interference that overcame the former employer's denial of involvement in the employee's termination from the tax firm).

In this case, the only evidence adduced by Mr. Beamer that John Baumgart tortiously interfered with his contract with Transcontinental constitutes hearsay and conclusory statements that are effectively refuted by the testimony of John Baumgart, Bill Baumgart and other neutral witnesses. First, Mr. Beamer claims that John Baumgart pressured Bill Baumgart to terminate Mr. Beamer, and for his evidence in support states that Bill Baumgart told him on multiple occasions that John Baumgart wanted him to fire Mr. Beamer and had asked him to do so. John Baumgart and Bill Baumgart deny this claim, and Bill Baumgart has irrefutably explained why Mr. Beamer was terminated: Mr. Beamer was competing against his company and lied to him about it, which significantly upset Bill Baumgart. Thus, this evidence is insufficient to support Mr. Beamer's claim of tortious interference with the contract.

Similarly, Mr. Beamer claims that Mr. Andrews told him that John Baumgart had worked out a deal where Mr. Beamer would be terminated and that John Baumgart was out to "get" him. However, both Mr. Andrews and John Baumgart have denied this allegation.  In response to Mr. Beamer's claims that John Baumgart entered into a deal where he would reimburse Bill Baumgart for any costs associated with the termination, the only source of Mr. Beamer's knowledge of this alleged deal comes from two (2) hearsay comments from two (2) Transcontinental employees, who both absolutely refute the meritless allegation.  In addition, John Baumgart has denied that there was such a deal and Mr. Beamer admits that  he now believes that no such reimbursement ever occurred.  Like the rest of his allegations, Mr. Beamer cannot offer any evidence or witnesses to support his claims.

With respect to Mr. Beamer receiving a settlement agreement proposal with a covenant not to sue Transcontinental, Mr. Beamer can offer only his speculation that this was proposed in order to influence his termination.[5]  This speculation is countered by Mr. Andrew and John Baumgart's explanation as to why the covenant was proposed and Bill Baumgart's lack of knowledge that such a covenant had even been proposed.  In the end, Mr. Beamer can produce no concrete, admissible evidence that indicates that tortious interference with his contract occurred.  Without any other evidence to offer, his clam fails. Therefore, Defendants are entitled to the entry of summary judgment with respect to Count I of Plaintiffs' Complaint.

---

[5] Mr. Beamer's allegations pertaining to the filing of a civil and criminal contempt motion against him are not relevant to his claim for alleged tortious interference with contract.  The filing of the civil and criminal contempt motion occurred after Mr. Beamer's termination, after the conclusion of the National lawsuit in August 10, 2000, because various parties had failed to abide by the court's rulings in that matter.   Therefore, the filing of this motion did not play and could not have played a part in the termination of Mr. Beamer's employment with Transcontinental, the action upon which Mr. Beamer's tortious interference claim is based.

4.    **As the tortious interference claim is essentially based upon defamatory statements that are in fact true, the claim must be denied**

When a claim for tortious interference is based upon statements, the privileges that apply to a claim for defamation apply to the tortious interference claim. A & B-Abell Elevator Company, Inc. v. Columbus/Central Ohio Building  Construction Trades Council, 73 Ohio St. 3d 1, 14-16, 651 N.E.2d 1283, 1294-1295 (Ohio 1995); El-Shiekh v. Northwest Ohio Cardiology Consultants, 2000 Ohio App. LEXIS 4143, *15 (Ohio 6[h] App. 2000).  Therefore, the plaintiff must prove actual malice, that the defendant "knew [his statements] was false or acted with reckless disregard of whether they were true or false," to overcome the privilege. A&B-Abell, 73 Ohio St. 3d at 15, 651 N.E.2d at 1294, 1295; El-Shiekh, 2000 Ohio App. LEXIS 4143 at *15.

At its heart, Mr. Beamer's entire tortious interference case is based upon statements, such as John Baumgart told Bill Baumgart to fire Mr. Beamer, had others tell Mr. Beamer that he was attempting to arrange a deal involving Mr. Beamer's termination, and made other comments and threats regarding Mr. Beamer.  According to Mr. Beamer, however, John Baumgart's alleged motivation behind making these statements was that he believed Mr. Beamer was competing against him, as well as Bill Baumgart, and he wanted that competition ended.  In this situation, John Baumgart's statements were true, in that Mr. Beamer was in fact competing against him.  Mr. Beamer was a part owner of a company that was competing with John Baumgart's company as was ultimately determined by a court of law.  Therefore, the privilege applies and Plaintiffs' claim for tortious interference must be denied.

Mr. Beamer may argue that he was not aware that National was in fact competing with NETCO, or that those persons running National should not have been expected to remember each and every customer of National and thus their competition should be excused, but to a court

construing an unfair competition/breach of employment contract claim these considerations are irrelevant. National was in fact competing against NETCO and soliciting its customers. Mr. Beamer was admittedly an owner and shareholder of National. Since Mr. Beamer was an owner of National and could be held liable for that competition because National was a closely-controlled entity, Mr. Beamer was thus competing against NETCO and John Baumgart. As John Baumgart's alleged statements regarding wanting Mr. Beamer terminated due to Mr. Beamer's competition with him were true, or at a minimum John Baumgart did not act with reckless disregard as to the truth or falsity of his statements, the privilege applies and Defendants are entitled to summary judgment on Plaintiffs' claim of tortious interference.

### 5.    John Baumgart's conduct was justified and thus the tortious interference claim must be denied

The fourth element of a claim of tortious interference is the absence of justification on the part of the alleged tortfeasor. However, competition can provide justification and permit an actor to interfere with another's contract when the contract relationship is terminable at will and "(a) the relation concerns a matter involved in the competition between the actor and the other, (b) the actor does not employ wrongful means, (c) his action does not create or continue an unlawful restrain of trade and (d) his purpose is at least in part to advance his interest in competing with the other." Siegel Co. v. Arter & Hadden et. al., 85 Ohio St. 3d 171, 179, 707 N.E.2d 853, 860 (Ohio 1999); Northeast Ohio College of Massotherapy v. Burek et. al., 144 Ohio App. 3d. 196, 209, 759 N.E.2d 869, 879 (Ohio 7th App. 2001).

In the instant case, Mr. Beamer's contractual relationship with Transcontinental was terminable at will, and thus if the other elements are met, John Baumgart's alleged conduct—pressuring Bill Baumgart to terminate Mr. Beamer, negotiating a deal for Mr. Beamer's termination, making other threats against him, making a deal to reimburse Bill Baumgart for any

costs from terminating Mr. Beamer, and offering the settlement agreement proposal with the covenant not to sue Transcontinental—can be considered justified by the competition that arose between Mr. Beamer and John Baumgart.

Pursuant to the first element, Mr. Beamer's contractual relationship with Bill Baumgart involved a matter of competition between John Baumgart and Mr. Beamer. While continuing to work under the auspices of his contractual relationship with Transcontinental, Mr. Beamer was now competing against both John Baumgart and Bill Baumgart, completely behind the back of both of them. As John and Bill Baumgart were both operating in Ohio at the time, they were in competition with each other, and now they were in competition with Mr. Beamer as well. Permitting Mr. Beamer to continue to work for Transcontinental would only allow him to continue to receive a competitive edge in his competition with John Baumgart and Bill Baumgart, as he continued to gain knowledge and experience with Transcontinental that he could then use against them. Therefore, the first element of justification had been met.

With respect to the second element, John Baumgart's alleged conduct did not involve wrongful means as Mr. Beamer's contract with Transcontinental was at-will and thus could be terminated for any reason. John Baumgart's alleged conduct did not involve the creation or continuation of an unlawful restraint of trade, and thus the third element is met. Finally, as previously discussed, Mr. Beamer has admitted that John Baumgart's alleged conduct was motivated by John Baumgart's belief that Mr. Beamer was competing against him. Therefore, John Baumgart's alleged conduct was performed to advance his interest in competing against Mr. Beamer, and thus the fourth element is met. In light of the above, John Baumgart's alleged conduct against Mr. Beamer was justified, Mr. Beamer cannot meet the fourth element of his

tortious interference claim, and thus Defendants are entitled to summary judgment on Plaintiffs'

claim.

**B.    Defendants Are Entitled To Judgment As A Matter Of Law With Respect To Plaintiffs' Claim Of Abuse of Process**

The elements of abuse of process are: "(1) that a legal proceeding has been set in motion

in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to

accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has

resulted from the wrongful use of process." Robb v. Chagrin Lagoons Yacht Club, Inc., 75 Ohio

St. 3d 264, 270, 662 N.E.2d 9, 14 (Ohio 1996); Yaklevich v. Kemp, Schaeffer & Rowe, 68 Ohio

St. 3d 294, 298, 626 N.E.2d 115, 118 (Ohio 1994).  Abuse of process occurs when there is an

"act or threat not authorized by the process, or aimed at an objective not legitimate in the use of

the process." Yaklevich, 68 Ohio St. 3d at 298, 626 N.E.2d at 118.

Therefore, for the second element,  "[T]he improper purpose usually takes the form of

coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as

the surrender of property or the payment of money, by the use of the process as a threat or a

club…." Robb v. Chagrin Lagoons Yacht Club, Inc., 75 Ohio St. 3d at 271, 662 N.E.2d 9, 14

(Ohio 1996).  "In order to show the process was perverted to accomplish an ulterior purpose,

[plaintiffs] must show both an act committed during the process that was not proper in the

normal conduct of the proceeding and the…ulterior motive." Wolfe v. Little, 2001 Ohio. App.

LEXIS 1902 *7 (Ohio 2nd App. 2001).    However, "[T]here is no liability for abuse of process

where the defendant has done nothing more than carry out the process to its authorized

conclusion, even though with bad intentions." Yaklevich, 68 Ohio St. 3d at 298 n. 2, 626 N.E.2d

at 118 n.2; Professional Balance Co. v. Fulton & Associates Balance Co., 1999 Ohio App.

LEXIS 1692 *10 (Ohio 10th App. 1999); see Wolfe v. Little, 2001 Ohio. App. LEXIS 1902 *13-14.

Examples of improper actions include improper subpoenaing and submitting false affidavits.    Wolfe, 2001 Ohio. App. LEXIS 1902 *7.    Examples of improper collateral advantages include coercing payment of a settlement regardless of merit, extortion of money, preventing conveyances of property, or compelling surrender of possession of something of value.    Wolfe, 2001 Ohio. App. LEXIS 1902 *10.    However, utilizing litigation strategy that may result in the termination of an employee, offering to dismiss claims in exchange for a general release of claims, or threatening to pursue a lawsuit are not events upon which a claim of abuse of process can be based, and neither can such a claim be based upon hearsay comments and conclusory statements.

For example, in American Process Design, Inc. v. DeBoer, 1998 Ohio. App. LEXIS 5035, *2 (Ohio 1st App. Dist 1998), an employee left a company and the company filed suit against the employee for breach of a non-compete clause and the new employer for tortious interference.    During discovery the new employer terminated the employee, and the employee argued that the litigation was used improperly to cause his termination.    The employee argued that various strategies employed by the company proved his theory of improperly caused termination, including, *inter alia*, that the company refused to discuss settlement prior to the termination and after the termination stopped aggressively pursuing the claim against the new employer. American Process Design, Inc., 1998 Ohio. App. LEXIS 5035 *7.    The court concluded that this failed to raise an issue of material fact as to the second element, as "[These allegations] are readily attributable to proper litigation strategy and are such as could be made in conjunction with nearly any lawsuit." American Process Design, Inc., 1998 Ohio. App.

5035 *8.  In addition, for the same rationale, the court held that the company offering to dismiss its claims against the employee and new employer in exchange for the employee's general release of all claims against the old employer failed to raise an issue of material fact as to the second element.  American Process Design, Inc., 1998 Ohio. App. LEXIS 5035 *7-8.

In Tilberry v. McIntyre, 135 Ohio App. 3d 229, 241, 733 N.E.2d 636, 644 (Ohio 8th App. Dist. 1999), the court held that "A threat to pursue a civil action, even if such action would be entirely frivolous or brought in bad faith, does not constitute extortion" and thus does not support an abuse of process claim when there is no evidence that the purpose of pursuing the claim "was something other than to recover on each claim respectively."  In this case, a trade secret action, an attorney allowed a default judgment to be taken against his client, the defendant, and the client then sued the attorney for malpractice.  Tilberry, 135 Ohio App. 3d at 240, 733 N.E.2d at 644.  The attorney's client settled the trade secret case and as a part of the settlement assigned his malpractice claim to the other party.  Tilberry, 135 Ohio App. 3d at 240, 733 N.E.2d at 644.  The other party filed a motion for sanctions against the attorney, which was granted, and the other party then sought to negotiate a settlement of the sanction liability with the attorney's malpractice insurer.  Tilberry, 135 Ohio App. 3d at 240-241, 733 N.E.2d at 644.  The attorney argued this constituted abuse of process because the other party had filed the motion for sanctions in order to "extort" a settlement out of his malpractice insurer.  Tilberry, 135 Ohio App. 3d at 241, 733 N.E.2d at 644.

Finally, in Molten Metal Equipment v. Metaullics Systems, Co., L.P., 2000 Ohio App. LEXIS 2538, *12 (Ohio 8th App. 2000), the court concluded that abuse of process claims cannot be based upon inadmissible hearsay comments and unsupported conclusory statements. In this case, an employee left one company to become president of a different company and the first

company sued the employee/second company for patent infringement, misappropriation of trade secrets and breach of contract. Molten Metal Equipment, 2000 Ohio App. LEXIS 2538, *1-3. The employee/second company filed for abuse of process based upon the president of the first company allegedly demanding that the employee's company go out of business, threatening to drive the company out of business through litigation, and saying that he would file another lawsuit against the employee which would be used to ruin the reputation of his company. Molten Metal Equipment, 2000 Ohio App. LEXIS 2538, *3, 10-12. As noted, the court held that this failed to create a supportable case of abuse of process, and upheld the entry of summary judgment against the employee/second company. Molten Metal Equipment, 2000 Ohio App. LEXIS 2538, *1, 4, 12.

Therefore, taking into consideration the above law, Mr. Beamer's allegations against John Baumgart do not amount to an actionable abuse of process claim. Mr. Beamer makes six (6) general allegations against John Baumgart: (1) that he pressured Bill Baumgart to terminate Mr. Beamer due to Mr. Beamer's competition against him; (2) negotiated a deal for Mr. Beamer's termination; (3) was out to "get him," meaning Mr. Beamer, and would spend any amount of money to do so; (4) made a deal to reimburse Bill Baumgart for any costs that arose from terminating Mr. Beamer; (5) Mr. Beamer received the settlement agreement proposal with the covenant not to sue Transcontinental that influenced his termination; (6) and a civil and criminal contempt motion was filed against him and others as a result of National's failure to comply with the Court's orders at the resolution of that lawsuit. None of these allegations, however, even if combined, creates a viable abuse of process claim.

Litigation strategies that result in the termination of an employee are not actionable claims for abuse of process, as they constitute proper strategies that may be used in conjunction

with any lawsuit.  National was illicitly competing against John Baumgart's company, and thus John Baumgart allegedly applied leverage in an attempt to get the competition to stop.  The use of leverage is hardly unusual in a lawsuit, and thus the fact that it may have led to Mr. Beamer's termination does not create a valid claim.  Therefore, Mr. Beamer's allegations of pressure for his termination, negotiating a deal for his termination, and reimbursing for any costs of termination are insufficient to create a valid claim of abuse of process.[6]

Similarly, Mr. Beamer alleges that John Baumgart was out to get him and would spend any money necessary to do that, and filed a civil and contempt motion against him.  However, threatening to pursue or pursuing a civil action does not support a claim for abuse of process when there is no evidence that the purpose of making the claim was other than to recover on the claim.  Here, Mr. Beamer was competing against John Baumgart through National, and thus John Baumgart was justified in pursuing a claim against National, and thus derivatively against Mr. Beamer as well since Mr. Beamer was an owner of National.

Mr. Beamer may attempt to argue that he did not solicit customers himself, or did not help to form National and did not solicit customers during the six (6) months restriction that his employment agreement with NETCO put upon him, and thus John Baumgart was not justified in pursuing a lawsuit against him.  However, based upon Mr. Beamer's level of participation in NETCO, John Baumgart had a good faith belief that Mr. Beamer had violated his employment agreement by forming National and soliciting NETCO employees.  He also had a good faith belief that Mr. Beamer used NETCO's confidential information in forming National, and under his employment agreement Mr. Beamer was prohibited from doing so for three (3) years from

---

[6] With respect to the proposed settlement agreement that contained the covenant not to sue, offering a release of all claims does not provide evidence of abuse of process.  Therefore, this allegation is likewise insufficient to create a valid claim for abuse of process.

the end of his employment with NETCO.  In pursuing his claim against National and the civil and criminal contempt motion against Mr. Beamer, John Baumgart was only seeking to recover what he was entitled to recover based upon the facts as then known—the cessation of illegal competition with his company.  Therefore, such conduct cannot form the basis for an abuse of process claim.

Finally, as discussed previously in section A 3, the heart of Mr. Beamer's claims against John Baumgart comprise nothing more than hearsay and self serving speculation.  As hearsay and speculation are not proper bases for an abuse of process claim, this provides yet another reason why Mr. Beamer's claim for abuse of process is not well founded.  For all of the foregoing reasons, Mr. Beamer cannot satisfy the second element of his abuse of process claim because he has no evidence to support his claim that John Baumgart perverted the National lawsuit to accomplish an ulterior motive for which it was not designed.  Even pursuant to Mr. Beamer's allegations, John Baumgart did nothing more than carry out the litigation process to its authorized and permitted conclusions and seek what he was entitled to recover.  Therefore, Defendants are entitled to summary judgment on Plaintiffs' claim for abuse of process.

## IV.    **CONCLUSION**

Wherefore, for the foregoing reasons, this Court should grant Defendants' Motion for Summary Judgment and enter an Order dismissing Plaintiffs' Complaint.

Respectfully submitted,


   /s/ Jacqueline Schuster Hobbs   
Donald J. Mooney, Jr. (0014202)
Jacqueline Schuster Hobbs (0068236)
ULMER & BERNE LLP
600 Vine Street, Suite 2800
Cincinnati, Ohio  45202
(513) 762-6200
(513) 762-6245 (Fax)
dmooney@ulmer.com
jhobbs@ulmer.com

Attorneys for Defendants

OF COUNSEL:


   /s/ Gregory A. Shoemaker   
Gregory A. Shoemaker (94815)
McMAHON, BERGER, HANNA,
LINIHAN, CODY & McCARTHY
2730 North Ballas Road, Suite 200
St. Louis, Missouri  63131-3039
(314) 567-7350
(314) 567-5698 (Fax)
shoemaker@mcmahonberger.com


## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was filed electronically with the Court and served electronically upon Richard C. Haber, Esq., and Vince P. Antaki, Esq., REMINGER & REMINGER, Attorneys for Plaintiffs, 1400 Midland Building, 101 Prospect Avenue West, Cleveland, Ohio 44115-1093, this 5th day of January, 2004.


   /s/ Jacqueline Schuster Hobbs   

95164. 1

49