# DEFENDANTS'
# ATTACHMENT 1

CERTIFIED COPY

[Sheet 1, Page 1]

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

AL BEAMER, ET AL.,              )
                                )
            PLAINTIFFS,         )
                                )
v.                              )  NO. C-1-02-013
                                )
NETCO, INC., ET AL.,            )
                                )
            DEFENDANTS.         )

DEPOSITION OF AL BEAMER
TAKEN BY GREGORY A. SHOEMAKER, ESQ.
ON BEHALF OF THE DEFENDANTS
OCTOBER 27, 2003

VOLUME I

REPORTED BY TRACI BUTZ
CERTIFIED SHORTHAND REPORTER
CERTIFIED REALTIME REPORTER

RANKIN REPORTING & LEGAL VIDEO, INC.
1015 LOCUST STREET, SUITE 911
ST. LOUIS, MISSOURI 63101-1329
(314) 231-2202
(800) 285-2115

[Page 2]

1            IN THE UNITED STATES DISTRICT COURT
2                  SOUTHERN DISTRICT OF OHIO
                         WESTERN DIVISION
3
4    AL BEAMER, ET AL.,            )
                                   )
5              PLAINTIFFS,         )
                                   )
6    v.                            )  NO. C-1-02-013
                                   )
7    NETCO, INC., ET AL.,          )
                                   )
8              DEFENDANTS.         )
9
10
11
12
13          DEPOSITION OF AL BEAMER, VOLUME I, produced,
14    sworn and examined on the 27th day of October, 2003 at
15    the offices of McMahon, Berger, Hanna, Linihan, Cody &
16    McCarthy, 2730 North Ballas Road, in the City of St.
17    Louis, State of Missouri, before Traci Butz, Certified
18    Shorthand Reporter, Certified Realtime Reporter, in and
19    for the State of Missouri, in a certain cause now
20    pending in the United States District Court, Southern
21    District of Ohio, Western Division, between AL BEAMER,
22    ET AL., PLAINTIFFS, and NETCO, INC., ET AL.
23
24
25

[Page 3]

1                    A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFFS:
4          REMINGER & REMINGER
           Richard C. Haber, Esq.
5          1400 Midland Building
           101 Prospect Avenue, West
6          Cleveland, Ohio  44115-1093
7
8    ON BEHALF OF THE DEFENDANTS:
9          McMAHON, BERGER, HANNA, LINIHAN,
             CODY & McCARTHY
10         Gregory A. Shoemaker, Esq.
           2730 North Ballas Road
11         St. Louis, Missouri  63131
12
13   ALSO PRESENT:
14         Patrick Dignam, Esq.
           General Counsel, NETCO
15
16
17
18                      I N D E X
19
20   Examination by Mr. Shoemaker          Page  6
21
22
23
24
25

[Page 4]

1                    E X H I B I T S
2
3    Defendant's Exhibit A                 Page  44
         (Employment Contract)
4
     Defendant's Exhibit B                 Page  46
5        (Employee Agreement)
6    Defendant's Exhibit C                 Page  48
         (Employee Agreement)
7
     Defendant's Exhibit D                 Page  88
8        (Contract Extension and Amendment)
9    Defendant's Exhibit E                 Page  89
         (Contract Extension and Amendment)
10
     Defendant's Exhibit F                 Page  91
11       (Contract Amendment)
12   Defendant's Exhibit G                 Page  97
         (Contract Amendment)
13
     Defendant's Exhibit H                 Page  117
14       (Settlement Agreement)
15   Defendant's Exhibit I                 Page  117
         (Mutual Release)
16
     Defendant's Exhibit J                 Page  135
17       (Preorganization Subscription
          Agreement)
18
     Defendant's Exhibit K                 Page  213
19       (Itemized List of Services Rendered)
20
21
22
23
24
25

Defendants'
Attachment

1

*Deposition of Al Beamer*

[Sheet 2, Page 5]

```
 1              S T I P U L A T I O N
 2        IT IS HEREBY STIPULATED AND AGREED by and
 3    between counsel for the parties that this deposition may
 4    be taken in shorthand by Traci Butz, Certified Shorthand
 5    Reporter, Certified Realtime Reporter, and afterwards
 6    transcribed into printing, and signature by the witness
 7    is not waived.
 8                  AL BEAMER,
 9    of lawful age, being first duly sworn to tell the truth,
10    the whole truth and nothing but the truth, deposes and
11    says as follows:
12              MR. SHOEMAKER: First of all, I guess for the
13    record, if we can go around the table real quick to
14    state who all is here. If you want to start,
15    Mr. Beamer?
16              THE WITNESS: Al Beamer.
17              MR. HABER: Rich Haber.
18              MR. DIGNAM: Pat Dignam.
19              MR. SHOEMAKER: My name is Greg Shoemaker. A
20    couple of quick things for the record. This is
21    plaintiff Al Beamer's deposition in the case styled Al
22    Beamer -- actually, I don't even have the full name. I
23    think it's Al Beamer and Title Marketing -- help me
24    with the --
25              THE WITNESS: Corporation.
```

[Page 6]

```
 1              MR. SHOEMAKER: Corporation, sorry, v. NETCO,
 2    Inc.
 3              THE WITNESS: Company.
 4              MR. SHOEMAKER: That's actually what I
 5    thought it was.
 6              THE WITNESS: Title Marketing Company.
 7              MR. SHOEMAKER: Title Marketing Company --
 8              THE WITNESS: That's correct.
 9              MR. SHOEMAKER: -- v. NETCO, Inc., John
10    Baumgart, and William Andrews, Civil Action No.
11    C-1-02-013. In addition to that, we received some
12    supplemental discovery today from Mr. Haber that I have
13    very briefly reviewed. In addition to that, Mr. Haber
14    has represented that due to the fact that we received
15    this just on the morning of plaintiff's deposition, if
16    it is necessary to re-call Mr. Beamer at a later date
17    that he would consent to doing that, is that correct?
18              MR. HABER: That's correct.
19    EXAMINATION BY MR. SHOEMAKER:
20        Q.   All right. Mr. Beamer, I believe you have had
21    your depo taken before, is that correct?
22        A.   Yes.
23        Q.   And you are probably aware of the general
24    rules. I'll be brief about them, but as far as
25    answering yes or no to a question versus shaking your
```

[Page 7]

```
 1    head so Traci can copy your responses down, you're aware
 2    of that, correct?
 3        A.   Yes.
 4        Q.   If you need to take a break for any reason,
 5    obviously let me know. It looks like we have some
 6    coffee drinkers in this room, although you're not one of
 7    them. I'm sure we'll be taking a couple of breaks
 8    regardless, but if you need to take a break, let me
 9    know. I will allow you to do it. The only thing I
10    would ask is if it's in the middle of a question, I
11    would ask you to respond prior to doing that, okay?
12        A.   Yes.
13        Q.   Are you under any medication today?
14        A.   No.
15        Q.   Anything about you today that would interfere
16    with your comprehension of questions or anything along
17    those lines?
18        A.   No.
19        Q.   If you do not understand a question I ask you,
20    feel free to ask me to rephrase it. More often than
21    not, I will. I ask bad questions sometimes, not on
22    purpose. They're just sometimes not stated very well,
23    and I will do my best to rephrase them for you.
24    Obviously your attorney may object to certain things
25    that I ask. Unless he instructs you not to answer
```

[Page 8]

```
 1    specifically, then you still have to answer the
 2    question. Do you understand that?
 3        A.   Yes.
 4        Q.   Okay. What is your address, Mr. Beamer?
 5        A.   15760 Carriage Hill Court, Chesterfield.
 6    Missouri.
 7        Q.   Okay. And is that the address of Title
 8    Marketing Company as well?
 9        A.   Yes, it is.
10        Q.   So you run that business out of your home?
11        A.   Yes, I do.
12        Q.   And are you married, Mr. Beamer?
13        A.   Yes.
14        Q.   And what is your wife's name?
15        A.   Kathleen with a K.
16        Q.   How long have you been married?
17        A.   27 years.
18        Q.   Congratulations. And your wife is also a part
19    of Title Marketing Company, is that correct?
20        A.   Yes.
21        Q.   In addition, this is the first time we've
22    mentioned Title Marketing Company, but we have several
23    times throughout our discovery referred to Title
24    Marketing Company as TMC.
25              MR. SHOEMAKER: Is that correct, Mr. Haber?
```

*Deposition of Al Beamer*

```
1              MR. HABER: Yes.
2         Q.   (By Mr. Shoemaker)  So if that is stated, TMC,
3    that will represent Title Marketing Company.  In
4    addition, Transcontinental Title Company that we will be
5    talking about later has often been referred to as TTC,
6    so with -- with those abbreviations noted for the
7    record, we'll proceed.
8              Where were you born, Mr. Beamer?
9         A.   Bloomington, Illinois.
10        Q.   And how long have you resided at your
11   residence in Chesterfield?
12        A.   Approximately 15 years.
13        Q.   Okay.  Where did you live city-wise before
14   that?
15        A.   In Ellisville, Missouri.
16        Q.   At some point you lived up in Wisconsin, is
17   that correct?
18        A.   Yes.
19        Q.   When did you leave the state of Wisconsin as
20   far as residence?
21        A.   1985.
22        Q.   And you've resided in Missouri ever since
23   then?
24        A.   I've resided in Missouri since 1987.
25        Q.   Okay.  What state and city did you live in
```

[Page 10]

```
1    between there?
2         A.   Excuse me a second.  I'm sorry.  I was in
3    Duluth, Minnesota in between times.
4              MR. SHOEMAKER:  Okay.  We will briefly note
5    that -- obviously I heard what he mentioned, and we'll
6    briefly talk about that.
7         Q.   (By Mr. Shoemaker)  I wasn't trying to trick
8    you on that.
9         A.   I don't know.  I was just -- I don't know what
10   my residence is at the time that I'm -- if I was still a
11   resident of Wisconsin, I don't want to state it wrong.
12        Q.   For the record, Mr. Beamer was incarcerated
13   for a period of time that we'll get into at a different
14   date, and I believe that that is the time period you
15   were referring to as far as where you can't really state
16   a residence or you're not clear about a state, is that
17   correct?
18        A.   Yes.
19        Q. ~ Okay.  So after incarceration you moved to
20   Missouri; would that be accurate?
21        A.   Yes.
22        Q.   What high school did you graduate from?
23        A.   Normal Community High School.
24        Q.   In what city?
25        A.   Normal, Illinois.
```

[Page 11]

```
1         Q.   And did you attend college?
2         A.   Yes.
3         Q.   What college was that?
4         A.   I graduated from Illinois Wesleyan University.
5         Q.   Do you recall what --
6         A.   Bloomington, Illinois.
7         Q.   I apologize for interrupting you.  What year
8    did you graduate from there, do you recall?
9         A.   1976.
10        Q.   And what was your degree in?
11        A.   Business administration.
12        Q.   Did you attend any additional schooling after
13   that?
14        A.   Yes.
15        Q.   And what was that?
16        A.   I attended law school.
17        Q.   What law school?
18        A.   I started out at Vanderbilt University law
19   school in Nashville, Tennessee, and then I transferred
20   and graduated from Marquette University law school in
21   Milwaukee.
22        Q.   What year did you graduate from Marquette
23   University?
24        A.   1979.
25        Q.   Did you take the bar exam that year?
```

[Page 12]

```
1         A.   No.
2         Q.   Did you ever take the bar exam?
3         A.   No.
4         Q.   You never sat for a bar in any state?
5         A.   No.
6         Q.   Okay.  Did you practice law after 1979 when
7    you graduated from law school?
8         A.   Yes.
9         Q.   And what type of area did you practice in?
10        A.   General practice.
11        Q.   Were you with a firm or by yourself?
12        A.   I was with a firm.
13        Q.   What firm was that?
14        A.   The Ames Law Firm of Minocqua, Wisconsin.
15        Q.   Is there some reason you didn't sit for the
16   bar at that time?
17        A.   In Wisconsin it's not required.
18        Q.   All right.  That's a pretty good reason.  So
19   you were able to go into court and so forth even though
20   you didn't sit for the bar, is that correct?
21        A.   Yes.
22        Q.   Okay.  And did you do that at that job?
23        A.   Yes.
24        Q.   How long did you work at that law firm?
25        A.   A little over three years.
```

*Deposition of Al Beamer*

**[Sheet 4, Page 13]**

1    Q.  Did you work for any other law firms after
2    that time frame which puts us roughly around 1982 or so,
3    is that correct?
4    A.  No.  I didn't work for any other law firms.
5    Q.  Okay.  Did you practice law after 1982 when
6    you left that law firm?
7    A.  No.
8    Q.  Once you left the -- was it the Ames Law Firm;
9    is that what you stated?
10   A.  Yes.
11   Q.  Once you left there, where did you go to work?
12   A.  For Smith Barney, the brokerage firm.
13   Q.  Okay.  And how long did you work there?
14   A.  About a year, most of a year.
15   Q.  Where did you go to work at that point,
16   Mr. Beamer?
17   A.  Record Data, Inc.
18   Q.  What type of business was that?
19   A.  A title insurance agency.
20   Q.  Where was it located?
21   A.  Milwaukee.
22   Q.  How long did you work for Record Data, Inc.?
23   A.  About eight to ten months.
24   Q.  Do you recall what year you stopped working
25   there?

**[Page 14]**

1    A.  1984.
2    Q.  Okay.
3    A.  I believe.
4    Q.  Where did you go to work after that?
5    A.  Commonwealth Title -- Land Title Agency in
6    Brookfield, Wisconsin.
7    Q.  And what was your position there?
8    A.  I was a title examiner.
9    Q.  Okay.  How long did you work for them?
10   A.  About six or eight months.
11   Q.  Okay.
12   A.  This was a while ago.  I'm not -- these are
13   approximations.
14   Q.  I understand.  So that takes you what, to
15   roughly 1985?
16   A.  Yes.
17   Q.  Did you work for anyone else in 1985?
18   A.  I -- I worked for -- while I was working for
19   Commonwealth, I did -- I worked for another title agency
20   in the evenings.  I believe that was called Merrill
21   Lynch Title Agency of Milwaukee.  Then I -- after
22   leaving Commonwealth I did some work for a title agency
23   in Madison, Wisconsin and then some work for
24   Commonwealth Land Title in St. Louis.
25   Q.  What year was that?

**[Page 15]**

1    A.  Late '85 into early '86.  No.  No.  That
2    wouldn't be right.  It was 1985; during the year 1985.
3    Q.  Did you --
4    A.  Early '85, I believe.
5    Q.  Did you come to St. Louis to do your work
6    here?
7    A.  Yes.
8    Q.  So did you go back and forth between
9    Wisconsin --
10   A.  Yes.
11   Q.  -- and St. Louis at that time?
12   A.  I lived in Wisconsin, and I worked in St.
13   Louis for a period of six or eight weeks.
14   Q.  Okay.  Did you work for --
15   A.  Maybe four to six weeks.
16   Q.  Did you work for any other companies prior to
17   your incarceration that you haven't referenced?
18   A.  Not any substantial -- not any work over a
19   couple of days.
20   Q.  Okay.  What was the crime you were convicted
21   of, Mr. Beamer?
22   A.  I believe it was called interstate
23   transportation of stolen checks.
24   Q.  And you were actually convicted, correct?
25   A.  Yes.

**[Page 16]**

1    Q.  And did you enter a plea of guilty, or were
2    you found guilty after a trial?
3    A.  I entered a plea of guilty.
4    Q.  And you received a sentence of how long?
5    A.  Three years.
6    Q.  And did you serve those three years in a
7    penitentiary, or did you serve a portion of that?
8    A.  A portion of that.
9    Q.  Okay.  Can you tell me how long, roughly?
10   A.  It was roughly a year and a half, a year and
11   eight months in Duluth and four to six months in a
12   halfway house in St. Louis.
13   Q.  Okay.  So a total of about two years,
14   somewhere in that time range?
15   A.  A bit -- a bit more than two years.
16   Q.  Did the conviction have anything to do with
17   your work for any of these companies that we've
18   discussed?
19   A.  It had to do with my -- when I was in law
20   practice.
21   Q.  Back when you were with the law firm of Ames?
22   A.  Yes.
23   Q.  That's the time period that it covered?
24   A.  Yes.
25   Q.  Okay.  And did you lose your bar license over

*Deposition of Al Beamer*

[Sheet 5, Page 17]

1   the incident?

2       A.   Yes.

3       Q.   Did you voluntarily give that up, or did you

4   have a hearing on it?

5       A.   I voluntarily gave it up.

6       Q.   And have you ever reapplied for -- to sit for

7   the bar in any state since then?

8       A.   No.

9       Q.   In addition to law school, obviously you've

10  developed some experience in the title insurance

11  industry, correct?

12      A.   Yes.

13      Q.   Have you had any additional formalized

14  training regarding the title industry?

15      A.   Just seminars, things like that.  No -- no

16  attendance at any college or -- or grad school or

17  anything that had to do with title insurance.

18      Q.   Okay.  So no formal classes, but you've

19  certainly been to seminars.  I don't want to put words

20  in your mouth, but have you been to seminars

21  continuously from that 1987 range up to today?

22      A.   Yes.

23      Q.   How about regarding computers or computer

24  software?  Have you had any specialized training in that

25  area?

[Page 18]

1       A.   No, no classroom training.  No significant

2   classroom training.

3       Q.   Have you attended seminars and so forth on

4   those issues?

5       A.   Yes.

6       Q.   Is there an agency that runs these seminars

7   that you would attend in this area, or are they just

8   various agencies?

9       A.   Various agencies.

10      Q.   Do you update annually, basically -- or strike

11  that.

12           Do you attend these seminars annually

13  regarding computers or computer software to this date?

14      A.   I attend various seminars, but they're not

15  necessarily annually.  It's just whenever they're

16  available and they seem to be on point.

17      Q.   Okay.  But you continue to update your skills

18  in that area even through today, is that accurate?

19      A.   Yes.

20      Q.   All right.  After 1987, and we're talking

21  about the time after you -- well, when you were in the

22  halfway house in St. Louis, were you employed at that

23  point?

24      A.   Yes.

25      Q.   Who were you working for?

[Page 19]

1       A.   Commonwealth Land Title Insurance Company.

2       Q.   And that would have been approximately '87, is

3   that correct?

4       A.   Yes.

5       Q.   How long did you work for Commonwealth?

6       A.   A bit over six years.

7       Q.   What type of work did you perform for

8   Commonwealth in 1987?

9       A.   I was the agency representative for the state

10  of Missouri.  That was my principal job in 1987.

11      Q.   What type of duties did you do as agent

12  representative for the state of Missouri?

13      A.   I visited Commonwealth's agents throughout the

14  state of Missouri to make sure that they were in

15  compliance with Commonwealth's rules and to make sure

16  that they were doing as much business as they could with

17  Commonwealth.

18      Q.   So were you, in essence, a supervisor over

19  those people?  Did they report to you?

20      A.   No.  They were independent contractors that

21  had contracts with Commonwealth, and I had some sort of

22  audit authority over -- over them, but other than that,

23  I didn't have any supervisory authority.

24      Q.   Did you keep that same position throughout

25  that six years, or were you promoted at any time?

[Page 20]

1       A.   I was promoted and given the title of agency

2   manager and added the states of Kansas and Nebraska, and

3   that was my only other title while I was with

4   Commonwealth.

5       Q.   And when you got the promotion to -- did you

6   say agency manager?

7       A.   Yes.

8       Q.   Were you still doing the same types of things

9   as you referred to before, just in more states?

10      A.   As to my -- my work with the agents, that was

11  principally the work I was doing.  It was to work with

12  the agents, just in more states.  They didn't change my

13  title, but they also during the course of my employment

14  there added some computer responsibilities to my -- to

15  my job.

16      Q.   Is that the first time you really began

17  working with computers --

18      A.   No.

19      Q.   -- as far as employment-wise?

20      A.   No.  I started working with computers with the

21  Commonwealth Land Title agency in Milwaukee in 1984.

22      Q.   Okay.  What type of work did Commonwealth do?

23      A.   Which Commonwealth?

24      Q.   I'm sorry.  The Commonwealth that you were

25  working for after 1987.

*Deposition of Al Beamer*

[Sheet 6, Page 21]

1    A.   Commonwealth Land Title is a national company.
2  It's a title insurance underwriter, and that's what they
3  are.  They're a title insurance underwriter.  They also
4  have what's called a direct operation so that they
5  actually sold title insurance to consumers in St. Louis
6  as well as working through their agency network
7  throughout the country.
8    Q.   Okay.  Explain for me, if you would -- for the
9  record, when you say underwriter insurance, explain for
10  me the process as far as underwriting versus issuing
11  title insurance and so forth.
12    A.   Commonwealth is a title insurance underwriter.
13  Just as a State Farm agent writing life insurance, the
14  individual person would be the agent and State Farm
15  would be the -- the underwriter or the company that
16  actually is -- that has the money at risk for the life
17  insurance.  Commonwealth is the underwriter.  That's
18  their money that's at risk as to the title insurance
19  policies, and the title insurance agent or agency is a
20  person or company that -- that has authority to -- to
21  write title insurance commitments and policies for the
22  underwriter.
23    Q.   So ultimately the underwriter would be on the
24  hook financially if the title was defective in some way,
25  is that correct?

[Page 23]

1  to some of the agents that I met through my contacts
2  through Commonwealth and elsewhere.
3    Q.   Okay.  You said to sell title insurance, is
4  that correct?
5    A.   Not to sell title insurance.
6    Q.   What did you --
7    A.   To sell software that's -- to sell title
8  insurance production software.
9    Q.   Okay.  So it's all one thing, title insurance
10  production software, is that correct?
11    A.   Yes.
12    Q.   And explain to me how that works with a client
13  of TMC.
14    A.   The title insurance agent needs or uses
15  software to accept title orders and produce the title
16  insurance forms, title commitments, title policies that
17  are a part of them doing their job as title agents.
18    Q.   So you provided them the forms and so forth to
19  do this, is that correct?
20    A.   I provide them the computerized forms and
21  databases and pieces of the software that permit them to
22  enter the information in the computer and to hopefully
23  be more efficient than if they were to hand write all of
24  that or typewrite it.
25    Q.   Is that the same basic functions that TMC

[Page 22]

1    A.   Yes.
2    Q.   Okay.  Did you work for any other companies
3  from '87 to '93 while you were working at Commonwealth?
4    A.   Yes.
5    Q.   And who was that?
6    A.   Title Marketing Company --
7    Q.   Okay.
8    A.   -- was formed during that period.
9    Q.   When was Title Marketing Company formed?
10    A.   I believe it was 1987 or 1988.
11    Q.   And was that company formed at that time by
12  you and your wife Kathleen?
13    A.   Yes.
14    Q.   Did you have any other employees?
15    A.   Not at that time, no.
16    Q.   Have you ever had any other employees?
17    A.   I haven't had any employees.  I've had
18  independent contractors that I've used in various jobs,
19  but I haven't had any other employees, no.
20    Q.   Nobody directly on your payroll?
21    A.   Right.
22    Q.   So in 1987 when you established TMC, what was
23  the business plan of the company?  What were you setting
24  out to do?
25    A.   To sell title insurance, production software

[Page 24]

1  performs as to this date?
2    A.   Yes.
3    Q.   I can ask it another way.  Have you expanded
4  basically what you do at TMC since that time frame?
5    A.   I would say that title production software is
6  whatever the software needs of a title insurance agency
7  are, and so the -- the needs have grown.  There have
8  been other -- there was no e-mail in 1987.  There wasn't
9  things like that, so there have been other pieces added
10  as part of the software, certainly, since '87, but the
11  idea of providing the software that a title insurance
12  agent needs to -- to do their job is -- is what I still
13  do.
14    Q.   Okay.  When you sell this to a title insurance
15  agent, is this a continuing relationship you would have
16  with this person as far as updating these types of forms
17  and so forth throughout, you know, maybe yearly, and I
18  don't mean it has to be yearly but on a continuing
19  basis, or is it a one-time deal and you're done?
20    A.   It's a continuing relationship.
21    Q.   Okay.  So you establish relationships with
22  these clients and I would assume hope to continue to
23  improve what they're doing and satisfy any requests they
24  have, is that correct?
25    A.   Yes.

*Deposition of Al Beamer*

1          Q.    And the majority of these agents that you sell
2    this software to are engaged in issuing or selling title
3    insurance, is that correct?
4          A.    Yes.
5          Q.    Did Commonwealth know that you were forming
6    this company at that time?
7          A.    Yes.
8          Q.    Were you under an employment agreement with
9    Commonwealth?
10         A.    I don't believe I was under any written
11   employment agreement, but --
12         Q.    They were aware of it, is that correct?
13         A.    They were aware of it.
14         Q.    And they didn't have a problem with it. They
15   must not have.
16         A.    They were in agreement as to what I was doing,
17   both as their employee and as Title Marketing.
18         Q.    Okay. Do you have an official title at TMC?
19         A.    Not that I know of.
20         Q.    Does Kathleen have an official title?
21         A.    Yes.
22         Q.    And what is that?
23         A.    She's president.
24         Q.    So since she's president, you pretty much do
25   what she says, is that right? Just kidding. You don't

1    have to answer that, Mr. Beamer. She's -- she's
2    president, and you don't have a formal title, is that
3    accurate?
4          A.    That's accurate, yes.
5          Q.    Is it fair to say that you run the company
6    jointly with Kathleen, though?
7          A.    Yes.
8          Q.    Why did your employment end with Commonwealth
9    in 1993?
10         A.    I went to work for NETCO. Actually, I went to
11   work for Equity Title Company which was the predecessor
12   of NETCO and Transcontinental Title.
13         Q.    Eventually they split into two companies, is
14   that correct?
15         A.    They did.
16         Q.    Prior to your employment with -- we'll refer
17   to NETCO for purposes of the record even if we're
18   talking about 1993 realizing it's -- it was a different
19   name if that's acceptable.
20         MR. SHOEMAKER:   Is that fine with you, Mr.
21   Haber?
22         MR. HABER:   That's fine.
23         Q.    (By Mr. Shoemaker)  Prior to working for NETCO
24   in 1993, how much time were you devoting on a weekly
25   basis to your own company, TMC, versus working at

1    Commonwealth?
2          A.    I was working at Commonwealth at least a
3    40-hour week, and then I was working and doing my Title
4    Marketing Company work another -- I don't know. It
5    depended on the week, certainly; 20, 30 hours a week
6    often.
7          Q.    Okay. How did you first come into contact
8    with anyone at NETCO regarding that position?
9          A.    I had first come into contact with NETCO or
10   its predecessor, Equity, in I believe it was 19 -- early
11   '89, late 1988 when Bill Baumgart decided he wanted to
12   open up a title insurance agency in St. Louis, and he
13   contacted me as the Commonwealth agency representative
14   in St. Louis.
15         Q.    And that was when, 1988?
16         A.    '88 to '89.
17         Q.    Okay. So had you had continuous -- when I say
18   continuous, I don't mean daily or even weekly, but you
19   had some sort of continuous contact with Bill Baumgart
20   from that time until 1993?
21         A.    Yes.
22         Q.    When did they -- when did NETCO actually open
23   an office in St. Louis, do you know?
24         A.    In '89.
25         Q.    Okay. And so you obviously came to work there

1    four years later, roughly, in '93, is that correct?
2          A.    That's when I started being employed by them,
3    yes.
4          Q.    What type of relationship did you have with
5    them prior to '93 when you became an employee?
6          A.    They -- starting in 1989 I had a contract with
7    them through Title Marketing Company. Title Marketing
8    Company had a contract with them for software, and that
9    started with their St. Louis office in 1989 and expanded
10   to their other offices.
11         Q.    What other offices prior to '93 were you
12   working for or providing software for regarding NETCO?
13         A.    After the St. Louis office, then I did their
14   Chicago office. I don't remember whether they had other
15   offices at that immediate point, but soon -- during that
16   period from '89 to '93 they expanded into Milwaukee and
17   into Clearwater, Florida. Actually, Tampa, Florida,
18   yeah. It was Tampa, Florida and several other cities
19   that they -- wherever they expanded after that point,
20   they always put in my software.
21         Q.    Okay.
22         A.    Title Marketing software. I'm sorry.
23         Q.    When did they expand into the Cincinnati area?
24         A.    I would be guessing. I would say '97,
25   roughly.

*Deposition of Al Beamer*

[Sheet 8, Page 29]

1     Q.   When did that company split into two branches,
2  NETCO and TTC, which we'll discuss in more detail later?
3     A.   It was the beginning of a year. I don't
4  remember if it was the beginning of '94 or the beginning
5  of '95, but somewhere in that period.
6     Q.   So NETCO began doing business in Cincinnati
7  after the two companies split, is that accurate?
8     A.   Yes.
9     Q.   Okay. So in '93 when you became an employee
10  of NETCO, what -- in what capacity were you going to be
11  employed there? What were going to be your duties?
12     A.   My duties -- there wasn't any formal written
13  statement of what my duties would be. I understood my
14  duties to be dealing with computers, information systems
15  generally, and dealing with underwriters and sort of
16  consulting, bringing hopefully my experience in the
17  title industry.
18     Q.   Okay. Consulting with who?
19     A.   The management of Equity and later NETCO.
20     Q.   As far as consulting to provide ideas and
21  inputs on how to improve the business; is that what
22  you're talking about?
23     A.   That type of thing.
24     Q.   Okay. What about in dealing -- when you
25  say -- and I don't mean to misquote you, but you

[Page 30]

1  mentioned some reference to underwriters. What do you
2  mean in that regard? What were you doing?
3     A.   Well, like when they needed to negotiate a new
4  contract with their underwriter, I had been on the
5  underwriter's side, and I helped work on those
6  negotiations. When they wanted to open up in a new
7  state that they hadn't done business in previously, I
8  helped negotiate contracts and set up relationships in
9  the new states.
10     Q.   Are you talking about with like
11  government-type things as far as getting incorporated
12  there and setting up, or are you talking about the
13  individual businesses they dealt with in that state?
14     A.   More the individual underwriters. You have to
15  have an underwriter contract to do work in a particular
16  state, and when they were going to open up a new state,
17  Texas, that they had never been in or whatever other
18  state, then I often got involved in the negotiations and
19  in the -- in fulfilling the responsibilities that were
20  there in order to be authorized to do business in a new
21  state.
22     Q.   So describe for me, if you would, the
23  relationship NETCO would have with an underwriter. What
24  is the underwriter doing for NETCO? Why do they need
25  them?

[Page 31]

1     A.   NETCO was a title insurance agent. The
2  underwriter was the -- the company whose name was on the
3  paper of the title insurance policy that NETCO was
4  issuing. The underwriter was the one who had the -- the
5  money that was going to pay the claim, if any, that
6  NETCO had on any of the title insurance policies that
7  they issued, and so NETCO in order to continue to be
8  able to write for the -- for those underwriters had to
9  comply with the underwriter's various requirements.
10     Q.   So ultimately both companies needed each other
11  to get the deal done, is that correct?
12     A.   NETCO certainly needed the underwriter.
13  Again, the underwriters do business as company-owned
14  operations, and they don't -- they don't have to have an
15  agent in order to issue title commitments.
16     Q.   But they go through agents, obviously, to get
17  more titles, is that correct?
18     A.   Yes. Certainly.
19     Q.   So NETCO, in essence, as well as other title
20  agencies act as an agent to get the process complete, is
21  that correct?
22     A.   Yes.
23     Q.   Back in '93 when you started there, what types
24  of titles were -- I should say was NETCO targeting at
25  that time? Did they do refi's, or what exactly were

[Page 32]

1  they looking for?
2     A.   They did a lot of second mortgage work at that
3  point.
4     Q.   Okay. Did that target or focus change at some
5  point?
6     A.   Well, it was -- that was not the only target,
7  but they -- they accepted the purchase business,
8  certainly, but as it went on, they -- they still
9  principally targeted lender business as opposed to
10  realtor business.
11     Q.   What was your formal position in 1993 when you
12  were hired by NETCO?
13     A.   I believe my title was executive
14  vice-president of information systems.
15     Q.   Okay. So you were an officer of NETCO?
16     A.   I was not an officer. I was not a corporate
17  officer. That's just the title they gave me.
18     Q.   Were there corporate officers at that time?
19     A.   I believe John Baumgart and his family held
20  all the corporate offices, or John Baumgart may have
21  held them all himself. It was a very tightly held
22  corporation.
23     Q.   And Bill Baumgart was obviously there at the
24  time as well, correct?
25     A.   In '90 --

*Deposition of Al Beamer*

```
 1      Q.   3.
 2      A.   Let me back up.  In '93 it was a tightly held
 3  corporation by -- by Bill Baumgart, not John Baumgart,
 4  and as to at what point John Baumgart got involved as to
 5  stock ownership in Equity Title, I'm not sure.
 6      Q.   So Bill actually ran the company in '93?
 7      A.   Well, Bill had started the company, and then
 8  John became a part of it sometime later is my
 9  understanding.
10      Q.   Okay.  Before I go any farther into your
11  employment at NETCO, let me skip here so I don't forget.
12  After your employment ended at NETCO and after your
13  employment ended at TTC, were you employed by anyone
14  else from that time frame which would have been -- we'll
15  just say the beginning of January of 2000?  Were you
16  employed by anybody?
17      A.   Have I ever been employed by anybody since
18  January of 2000?
19      Q.   Correct.
20      A.   Yes.
21      Q.   And who was that?
22      A.   Residential Title Services.
23      Q.   And is that the only company you've been
24  employed by since January of 2000?
25      A.   No.  I was also employed by -- well, I don't
```

```
 1  Residential Title Services?  Is that the name of it?
 2      A.   Yes.
 3      Q.   When did you begin your employment there?
 4      A.   I became an employee of Residential Title
 5  Services in -- I don't remember if it was the end of
 6  2002 or the beginning of 2003.
 7      MR. HABER:  It's not the end of 2003, so --
 8      Q.   (By Mr. Shoemaker)  The beginning of 2003?
 9      A.   I'm sorry.  I misspoke.  Somewhere in 2002 to
10  2003.
11      Q.   Did you have a relationship with them prior to
12  that?
13      A.   Yes.
14      Q.   And what was that relationship, and when did
15  it begin?
16      A.   Beginning in roughly March of 2000 Title
17  Marketing Company had Residential Title Services as a
18  customer.
19      Q.   Would you consider -- would you have
20  considered them a large customer at that time?
21      A.   At what time?
22      Q.   All right.  That's a poor question.  That's
23  one of them I told you I may ask.  Let's start over.
24      You began doing that in roughly March of 2000.
25  Let's say during the year of 2000 was that a -- a large
```

```
 1  know how this works.  I was employed by ELM Corporation
 2  on behalf of Counselors Title Company.
 3      Q.   And is that in any way related to National
 4  Real Estate?
 5      A.   No.
 6      Q.   Is that a company run by James Erwin?
 7      A.   Yes.
 8      Q.   When were you employed by them?
 9      A.   During the year 2001 for a period of some
10  months.  I'm not sure exactly how long.
11      Q.   More than three months?
12      A.   Yes.
13      Q.   More than six months?
14      A.   I would guess that it's six months to six,
15  seven, eight months.
16      Q.   Okay.  When did you begin working -- well, let
17  me go back.  What was your position with Counselors
18  Title?
19      A.   It was -- I worked with their computers, their
20  software.  I don't believe I had a title.
21      Q.   Did you do anything else for them besides
22  software work?
23      A.   No.  It was principally software work.  I
24  don't remember doing anything else besides software.
25      Q.   Okay.  When did you begin working for
```

```
 1  customer of TMC's?
 2      A.   It was a growing customer of TMC's.  It wasn't
 3  very large at the beginning, no.
 4      Q.   Okay.  Did your sales to RTS increase from
 5  2000 to 2001?
 6      A.   Yes.
 7      Q.   Did they increase even further in 2002?
 8      A.   Yes.
 9      Q.   Did that precipitate the fact that you
10  actually became an employee of RTS?
11      A.   Yes.
12      Q.   When was RTS incorporated?
13      A.   I believe it was around 1997, '98.
14      Q.   Okay.
15      A.   I'm not certain.
16      Q.   But you did not perform any services for RTS
17  during your employment with NETCO or during your
18  employment with TTC, correct?
19      A.   Correct.
20      MR. HABER:  When you get a chance, I need to
21  use the restroom.
22      MR. SHOEMAKER:  We can take a break right now
23  if you want.
24      Off the record.
25      (There was a discussion off the record.)
```

*Deposition of Al Beamer*

[Sheet 10, Page 37]

1    Q.    (By Mr. Shoemaker)  We are back on the record,
2    and we were talking about Residential Title Services.  I
3    believe you stated you began your employment with them
4    at the end of 2002 or the beginning of 2003, is that
5    accurate?
6    A.    I know that I did a contract with them in 2002
7    and another one in 2003.  I don't remember whether -- I
8    know in 2003 that one specified employment.  I'm not
9    sure if the contract in 2002 specified employment or if
10   that was still just a contract between Title Marketing
11   Company and --
12   Q.    Okay.  Are you currently employed --
13   A.    Yes.
14   Q.    -- with Residential?
15   A.    Yes.
16   Q.    What is your current position?
17   A.    My current position is director of information
18   services.
19   Q.    What do you -- what are your duties at this
20   time?  What do you do for Residential?
21   A.    I'm in charge of their computer operations and
22   hardware and software.  I help with underwriter
23   relations.  I help with expansion plans, planning.
24   Q.    Similar to what you did at NETCO?
25   A.    Similar, yes.

[Page 38]

1    Q.    And have those duties that you've described to
2    me been fairly consistent from the beginning of your
3    employment with Residential through today?
4    A.    I would say at the very beginning it was more
5    computer-related, and today it's expanded a bit more
6    from that into the other -- into underwriting and other
7    general business responsibilities.
8    MR. HABER:  Greg, just to clarify for you
9    because I just took a look at it, we did provide to you
10   this morning the employment contract and software
11   license agreement with Residential, the first of which
12   employment agreement would have been effective August
13   1st, 2002.
14   MR. SHOEMAKER:  Okay.  Thank you.  I am
15   aware, actually, that I -- that I do have those, and
16   we'll probably discuss those a little bit later in
17   detail, but I appreciate you pointing that out.
18   Q.    (By Mr. Shoemaker)  So August 2002, for the
19   record, is when your first employment contract started;
20   would that be accurate?
21   A.    Yes.
22   Q.    When you say help with underwriter relations,
23   again, describe what you do for Residential in that
24   regard.
25   A.    I -- I contact underwriters, I discuss plans

[Page 39]

1    for Residential to get new underwriter contracts,
2    improve their underwriter contracts, get underwriter
3    contracts in additional states, and I ensure that we're
4    in compliance with underwriter rules and standards.
5    Q.    Legally; is that what you're talking about?
6    A.    Well, the underwriters often come out with new
7    forms.  Some of this connects to the computer
8    responsibilities.  An underwriter comes out with a new
9    form that they expect us to produce at Residential as a
10   part of the transaction.  I need to first certainly
11   understand the form from an under -- an underwriter
12   agency legal standpoint and then put it into practice
13   through the -- the agency, through the computers.
14   Q.    Okay.  So again, I'm certainly not getting at
15   anything to do with the unauthorized practice of -- of
16   law, Mr. Beamer, but what I'm asking you is in your
17   position there, these new forms and stuff you're talking
18   about, I assume either you or someone else tells you,
19   you know, these comply with -- with any new laws as
20   updated and so forth and you act based upon that, is
21   that correct?
22   A.    Yes.
23   Q.    What exactly does Residential Title Services
24   cover?  What aspects of the title insurance industry
25   does Residential cover?

[Page 40]

1    A.    They are a title insurance agent.
2    Q.    Do they actually -- and this gets back to, I
3    guess, other general questions that we've talked about,
4    but does Residential Title Services actually write the
5    title insurance contract?
6    A.    The title insurance policy --
7    Q.    Policy.  I apologize.
8    A.    -- not the title insurance contract, and yes,
9    any title insurance agent prepares the title insurance
10   policy on forms provided by the title insurance
11   underwriter.
12   Q.    Does your computer software that you utilize
13   not only with Residential but with other clients include
14   those forms required by the underwriters?
15   A.    Typically, yes.
16   Q.    If not initially, do you incorporate those
17   into the software as you go through the process with a
18   new client?
19   A.    There are some clients that they -- they fill
20   in a paper form provided by the title insurance
21   underwriter with the data from their computers, and for
22   others the entire form is in the computer, and it's
23   prepared and it's printed on blank paper, so --
24   Q.    Some clients you do, some clients you don't?
25   A.    So that's -- yes.  It ends up with the

*Deposition of Al Beamer*

1  production of the title insurance policy that -- that's
2  provided to the customer.
3      Q.   Regarding Residential Title Services, the
4  forms they currently use in that regard as well as other
5  forms, have you been responsible for either drafting or
6  incorporating those into their software program?
7      A.   Along with others, but yes, I -- I am one of
8  the people that puts forms into their system, yes.
9      Q.   It's part of your responsibilities there?
10     A.   Yes.
11     Q.   So the title insurance company drafts the
12  policy, and the underwriter ultimately is responsible
13  for the risk; would that be an accurate statement?
14     A.   Well, not entirely.  The title insurance
15  company in the -- in the business would be an
16  underwriter.  A title insurance agency is a company like
17  Residential Title, so it wouldn't be accurate to say the
18  title insurance company drafts it because I would be
19  saying that the underwriter prepares it.
20     Q.   Then let me restate it based upon that.  Is
21  the title insurance agent responsible for drafting the
22  policy?  Is that accurate?
23     A.   Yes.
24     Q.   So at Residential you or people within the
25  company are responsible for -- for drafting policies in

[Page 43]

1  Kevin Murphy are the -- who I know to be the
2  shareholders of Residential, the owners of Residential.
3      Q.   At the meetings that you attend, are those
4  people present?
5      A.   Some of them, yes.
6      Q.   Okay.  What types of meetings are they?  Well,
7  strike that.
8           In addition to those people at the meetings
9  that you would attend, what types of other positions are
10  included in those meetings?  Do you understand my
11  question?
12     A.   Yes, but it's so -- to -- to say what meetings
13  have I attended, meetings are constant.  Meetings are
14  forever, and to -- to generalize as to what meetings are
15  I don't think is possible.
16     Q.   All right.  Do you attend meetings where
17  strategic planning regarding operations are discussed?
18     A.   I guess the word strategic -- I attend
19  meetings where operations are discussed and planning of
20  operations is discussed.  I don't know about calling
21  them strategic.
22     Q.   All right.  One last question, I guess, on
23  Residential.  What type of area does Residential
24  specialize in regarding the title insurance industry, or
25  is there a specialized portion of it?

[Page 42]

1  general?
2      A.   Not me, but yes, other people within the
3  company do prepare title insurance policies.
4      Q.   You're involved in that process, though,
5  correct?
6      A.   Through my work with the computer system, yes.
7      Q.   Which supplies the forms they use and so
8  forth, correct?
9      A.   Yes.
10     Q.   As well as making sure that the forms that are
11  being used are in compliance not only with the
12  underwriter but also legal ramifications, correct?
13     A.   Generally, yes.
14     Q.   Okay.  Are you an officer at Residential?
15     A.   No.
16     Q.   Do you attend management meetings at
17  Residential?
18     A.   I attend meetings.  I don't --
19     Q.   Who is generally -- who is generally --
20     A.   I don't attend meetings of their corporate
21  board.
22     Q.   How many people are on their corporate board?
23     A.   I'm not certain.
24     Q.   Well, who runs Residential?
25     A.   Bob Reynolds, Andy Furhan, Brian Carrera, and

[Page 44]

1      A.   There's not one specialized portion of the
2  business.
3      Q.   They cover all aspects of the title insurance
4  industry?
5      A.   Well, they -- they cover purchases and refi's
6  and seconds and do some commercial work, so I guess
7  there are some niches that they wouldn't cover, but
8  they -- they're generally a title insurance -- a title
9  insurance agent that covers what most title insurance
10  agents cover, I would say.
11     Q.   Okay.
12          MR. SHOEMAKER:  Can I get this marked as I
13  guess Defendant's 1?  Is that fine?  Do you want me to
14  use letters?  Does it make any difference to you,
15  Mr. Haber?
16          MR. HABER:  It doesn't.  At trial you'll be
17  letters.
18          (Defendant's Exhibit A was marked for
19  identification.)
20     Q.   (By Mr. Shoemaker)  Back on the record.
21          Mr. Beamer, I have placed in front of you a
22  document titled Employment Contract that is marked as
23  Defendant's Exhibit A.  Are you familiar with this
24  document?
25     A.   Yes.

*Deposition of Al Beamer*

1    Q.    And can you tell me what it represents?

2    A.    It's an employment contract between myself and

3    Equity Title Company USA.

4    Q.    Did Equity Title Company USA ultimately become

5    NETCO?

6    A.    Equity Title Company USA was divided into two

7    companies, and one of those companies became NETCO.

8    Q.    Okay.  Is this the first employment contract

9    that you had with Equity Title Company USA?

10    A.    Yes.

11    Q.    And is it dated May 21, 1993?

12    A.    It is.

13    Q.    And you signed this contract, is that correct?

14    A.    I did.

15    Q.    Did John Baumgart sign it on behalf of Equity

16    Title?

17    A.    Yes.

18    Q.    Did you have an opportunity to review and make

19    any revisions to this contract that you desired?

20    A.    There was a revision made.  It was not at my

21    request --

22    Q.    Okay.  Let me rephrase that.

23    A.    -- if that's what you're talking about.

24    Q.    I'm not necessarily talking about the revision

25    on the document.  Did you have an opportunity to review

1    this contract and make any revisions prior to you

2    signing it?

3    A.    I had the opportunity to review it prior to

4    signing it, yes.

5    Q.    And you signed it -- go ahead.

6    A.    I don't know about an opportunity to make any

7    revisions.

8    Q.    Did you ask that any revisions be made on it?

9    A.    I don't recall.

10    Q.    Were there any revisions to this that you

11    discussed with anybody at Equity that were not included

12    in this?

13    A.    I don't recall.

14    Q.    But you signed the document voluntarily, is

15    that correct?

16    A.    Yes.

17          (Defendant's Exhibit B was marked for

18    identification.)

19    Q.    (By Mr. Shoemaker)  Mr. Beamer, I've placed in

20    front of you a document entitled Employment Agreement.

21    Again, it's marked as Defendant's Exhibit B.  Do you

22    recognize this document?

23    A.    I see that it's an employee agreement with

24    Equity Title Company of America and myself.

25    Q.    And on page 5, is that your signature on the

1    document along with John Baumgart's?

2    A.    Yes.

3    Q.    Did you have the opportunity to review and

4    revise this agreement prior to signing it?

5    A.    I don't recall.  It happened in 1994.

6    Q.    Did you sign this document voluntarily?

7    A.    Yes.

8    Q.    Pursuant to the conditions set forth in here

9    underneath recital, is that correct?

10    A.    I signed the contract voluntarily, yes.

11    Q.    And I assume you had an opportunity to review

12    all portions of this contract prior to signing it,

13    correct?

14    A.    I don't remember the circumstances under which

15    I signed this contract in 1994.

16    Q.    Well, that's not the question.  My question is

17    do you recall whether you reviewed all portions of this

18    contract prior to signing it?

19    A.    I do not recall.

20    Q.    Well, would you ever sign an employment

21    agreement without reading it, Mr. Beamer?

22    A.    I wouldn't now.

23    Q.    Well, to your knowledge, have you ever done

24    that?

25    A.    I know at the time of signing this agreement

1    that it was told to me that this was just something that

2    was being put on the books for all the Equity employees

3    and that I was asked to sign it, though it did not -- it

4    would not cover the -- my involvement with Title

5    Marketing Company and all of my other customers and

6    other software.

7    Q.    Okay.  But you're telling me here today that

8    you don't recall if you actually read this document

9    before you signed it?

10    A.    I am telling you it was nine years ago, and I

11    barely recall that there -- that I had signed such a

12    contract.  I don't recall what I did on June 14th, 1994.

13    Q.    Okay.

14          (Defendant's Exhibit C was marked for

15    identification.)

16    Q.    (By Mr. Shoemaker)  Mr. Beamer, in front of

17    you is Defendant's Exhibit C which is another employment

18    agreement.  Do you recognize this document?

19    A.    Yes, I do.

20    Q.    And the pages don't appear to be numbered, but

21    on the fourth page of this document, is that your

22    signature?

23    A.    Yes, it is.

24    Q.    And has John Baumgart signed this as well?

25    A.    Yes, he did.

*Deposition of Al Beamer*

[Sheet 13, Page 49]

1    Q.   This document has a date on page 1 that says
2  January blank of 1999.  Do you see that, Mr. Beamer?
3    A.   Yes, I do.
4    Q.   Was this document signed in January of 1999?
5    A.   I believe it was.
6    Q.   Did you have the opportunity to review drafts
7  of this agreement and make revisions to this agreement
8  prior to signing it?
9    A.   Yes.
10   Q.   Did you read this document prior to signing it
11 in January of 1999?
12   A.   Yes, I did.
13   Q.   All portions of the document?
14   A.   I believe so.
15   Q.   Did you have discussions with either John
16 Baumgart or William Andrews regarding the terms and
17 conditions of this agreement prior to you signing it?
18   A.   Yes, I did.
19   Q.   What terms specifically were revised from the
20 initial draft, if you know?
21   A.   Well, the -- they started with the employment
22 agreement that was given to the other employees at
23 Equity Title, and then we customized it to fit the
24 situation of -- of me and Title Marketing, so there were
25 several sections that were changed from the -- from the

[Page 50]

1  agreement that was put before the -- the other employees
2  of Equity, but as to whether they were changed in the
3  first draft or the second draft or whatever, I don't
4  recall.
5    Q.   Okay.  So is it safe to say that due to the
6  fact that you had your own company, TMC, that your
7  contract was different than the standard employee
8  contract for NETCO management or employees?
9    A.   Yes.
10   Q.   But you started out with that standard
11 contract for employees of NETCO, and you made revisions
12 to that document back and forth with the company to get
13 to this agreement, is that correct?
14   A.   When Bill Andrews and I started out, we
15 started marking up that contract with changes that
16 needed to be made to make it fit my situation.
17   Q.   Okay.  Did you have the opportunity to review
18 the terms and conditions of this employment agreement
19 with an attorney prior to signing it?
20   A.   No.
21   Q.   I'm not asking you if you did.
22   A.   Did I have the opportunity?  There -- this --
23 the negotiation to the extent that it was a negotiation
24 or the discussion, I guess, about this agreement went on
25 for a period of at least a couple weeks, so I guess you

[Page 51]

1  could say that there was the opportunity to -- to do
2  what I wanted to with the agreement.
3    Q.   Did you --
4    A.   I did not seek an attorney's opinion.
5    Q.   Okay.  And did you sign this document
6  voluntarily of your own free will?
7    A.   Yes.
8    Q.   And you understood the terms and conditions of
9  this agreement upon signing the document, is that
10 correct?
11   A.   As best I can, yes.
12   Q.   Well, was there something that you looked at
13 now that you didn't understand then that you can point
14 out?
15   A.   No.
16   Q.   Regarding paragraph 3 of this agreement titled
17 confidential information, was that fairly standard
18 language as far as the standard employment agreement, or
19 did you revise portions of this paragraph?
20   A.   It was changed at least to include the -- the
21 last sentence of that section 3.  I don't recall if
22 anything else in that section was changed, but --
23   Q.   Okay.  The last sentence being notwithstanding
24 the above, employee may disclose confidential
25 information comprising of only software created by

[Page 52]

1  employee to permissible companies, is that correct?
2    A.   Yes.
3    Q.   And does that sentence as well as a few others
4  throughout this document refer to the attachment which
5  is Exhibit 1 at the back of this document?
6    A.   It refers to the attachment and to the
7  statement about permissible companies and some other
8  section.
9         MR. HABER:  Paragraph 1.
10   Q.   (By Mr. Shoemaker)  Okay.
11   A.   It refers to paragraph 1, the permissible
12 companies there as stated.
13   Q.   Was paragraph 6 titled competition part of the
14 standard contract, or did you make specific revisions to
15 that paragraph?
16        MR. HABER:  For clarification purposes, when
17 you refer to the standard contract, you're referring to
18 the standard employment agreement that he then worked
19 off of?  Is that what you mean?
20        MR. SHOEMAKER:  Yes.
21        MR. HABER:  Okay.  Thanks.
22   A.   I don't see any obvious changes that were
23 made, but I don't recall whether there were any changes
24 made to that paragraph.
25   Q.   (By Mr. Shoemaker)  Okay.  I'll restate my

*Deposition of Al Beamer*

1    question. From reviewing it at this point, is there any

2    portions of paragraph 6 that you recall right now that

3    were revised at that time?

4        A.   I don't recall any such -- any changes being

5    made at that time.

6        Q.   Your employment with NETCO, and really Equity

7    Title, I guess, back in '93 -- Equity Title is correct

8    back in '93?

9        A.   Yes.

10       Q.   What was your title at that point upon being

11   hired in '93?

12       A.   The only title that I ever held at Equity

13   Title and then NETCO was executive vice-president of

14   information systems. I don't remember if that title

15   began on my first day of employment in '93 or if it was

16   something that was added later, but that's the only

17   title I ever had there.

18       Q.   Okay. And when -- you already stated some of

19   what you did at Equity. Once the company split -- what

20   year did you state you thought that was?

21       A.   Either the beginning of '94 or the beginning

22   of '95.

23       Q.   Okay. Once that split happened, did you

24   continue to work for NETCO at that time?

25       A.   I worked for both parts after the split.

1        Q.   Okay.

2        A.   It still wasn't called NETCO at that time.

3        Q.   What was it called at that time?

4        A.   I think it became Equity Title Company of

5    Illinois, and the -- and Bill Baumgart's part became

6    Southeast Equity Title.

7        Q.   When the company split, John Baumgart ran

8    Equity Title Company of Illinois or whatever that was

9    titled, and Bill Baumgart ran Transcontinental Title

10   which at that point may have been Southeast Equity

11   Title, correct?

12       A.   Correct.

13       Q.   You're not aware of any other owners of either

14   of those companies?

15       A.   I'm not.

16       Q.   What areas did the company that was run by

17   John Baumgart cover at that point in, say, '95?

18       A.   Geographical areas?

19       Q.   Yes.

20       A.   The Chicago area, St. Louis, Milwaukee, I

21   believe Kansas City was open at that point. That's all

22   that I know for sure.

23       Q.   Okay. How about the company that Bill ran,

24   Southeast Equity Title that later became TTC? What

25   areas geographically did Bill run at that time?

1        A.   He was all within Florida but in several

2    cities within Florida.

3        Q.   So neither of them were in Ohio at that time?

4        A.   Correct.

5        Q.   Okay. How much were you working for Equity

6    Title prior to the split? When I say how much, I mean

7    from a time standpoint on a weekly basis.

8        A.   30 hours plus a week, roughly.

9        Q.   And after the split did you work equally for

10   the two companies, or did you work for one of them more

11   than the other?

12       A.   I don't know at the exact time of the split,

13   but within the -- the year to two after the split I came

14   to work more for the company that would become NETCO

15   than for Transcontinental. I put in more time for them.

16       Q.   So would that roughly be around the 1997

17   range?

18       A.   By then it had reached that, yes.

19       Q.   So in 1997 how much did you work for NETCO on

20   a weekly basis, approximately?

21       A.   I worked a lot of hours. I divided it up by

22   days of the month, and I -- I worked for NETCO between

23   two and three weeks a month, so I don't know. Maybe if

24   you wanted to divide it up during the week, it would be

25   30 hours a week, maybe.

1        Q.   Okay. And at that same time frame around

2    1997, how much were you working for TTC?

3        A.   About a quarter of my -- I guess 10 or 12

4    hours a week.

5        Q.   And were you actually employed by TTC at that

6    time as well?

7        A.   Tell me at what time again.

8        Q.   1997.

9        A.   I believe in 1997 I was not an employee of --

10   of TTC or -- or that company.

11       Q.   Okay.

12       A.   I was contracted through Title Marketing.

13       Q.   When, to your knowledge, did you actually

14   become an employee of TTC?

15       A.   There were a couple of times during the period

16   '94 or '95, whenever the split was, through '99 that I

17   was -- that I became an actual employee of TTC. I

18   believe that at the -- at the time of the split I became

19   an employee of both, but at some time after that we

20   dropped the employment relationship with TTC and then it

21   was added back in in '99.

22       Q.   Okay. We'll go through some employment

23   agreements on that so we can clarify that.

24            So regarding NETCO, let's talk about the time

25   frame, say, from '96 to '99. Did NETCO expand into

*Deposition of Al Beamer*

1     other geographical areas?

2          A.     Yes.

3          Q.     Would you say that was an aggressive

4     transformation?

5          A.     Within the title industry, yes.

6          Q.     Okay.  What other states did they expand into?

7     You've mentioned to me Chicago, St. Louis, Milwaukee,

8     Kansas City.  What other geographic areas did NETCO

9     expand into in that time frame?

10          A.     They expanded into Indiana.  Some of these

11     might have been late '95.  I'm not sure if it was '96 or

12     '97 or what year, but they expanded into Indiana,

13     Kentucky, Tennessee, Texas.  If they weren't in Kansas

14     City before, they were in the Kansas City, Missouri area

15     at that point.  I believe they opened up a Madison

16     office in Wisconsin.  Those are the ones I can think of.

17          Q.     You haven't mentioned Ohio.  Were they in

18     Ohio?

19          A.     Oh.  And Ohio.  I'm sorry.

20          Q.     Where were the -- where was the NETCO office

21     in Ohio or offices?

22          A.     Cleveland, Cincinnati, and Columbus.

23          Q.     And when were those offices opened, to the

24     best of your knowledge?  I'm looking really for a year

25     more than a month.

1          A.     '97 or '98.

2          Q.     Were all three of them opened at about the

3     same time frame?

4          A.     Within the same year, anyway.  Within six to

5     eight months of each other.

6          Q.     Okay.

7          A.     I believe Cleveland came first.

8          Q.     Were you involved in the opening of these new

9     facilities in various states?

10          A.     I was certainly involved on the software and

11     computer side of making sure that they had the computer

12     equipment and that their software fulfilled the

13     underwriters' requirements for producing forms and all

14     that kind of stuff, yes.

15          Q.     So again, making sure in -- strike that.

16                 You were involved in making sure that the

17     forms utilized by NETCO in these areas complied with the

18     underwriters' requirements?

19          A. - Yes.

20          Q.     Were you solely responsible for that function?

21          A.     No.

22          Q.     Who else was responsible for it?

23          A.     Bill Andrews and the -- the managers of those

24     offices and the -- everyone within the company, I guess.

25     There was no one person whose business card or -- or

1     title said in charge of forms.

2          Q.     Okay.  Regarding the expansion of NETCO, were

3     you involved in meetings regarding such expansions with

4     John Baumgart and Bill Andrews as well as others?

5          A.     Yes.

6          Q.     And would that be from -- did those meetings

7     discuss the operational aspects of the expansion as well

8     as the goals in these areas and so forth?

9          A.     They -- they certainly involved the

10     operational aspects of getting the offices up and

11     running.  I don't --

12          Q.     Okay.

13          A.     -- understand goals and so forth.

14          Q.     That's fine.  Who else was in attendance in

15     these meetings besides yourself, John Baumgart, and Bill

16     Andrews?

17          A.     These meetings meaning the -- the meetings

18     about Ohio or meetings about expansion or --

19          Q.     Okay.  Let's specifically talk about Ohio;

20     regarding the expansion into Ohio.

21          A.     The meetings about Ohio I assume would have

22     involved John Baumgart and the -- the people who were

23     going to be managing the Ohio operations.

24          Q.     Do you know who those people were?

25          A.     The state manager was Kevin Murphy.

1          Q.     Is that the same Kevin Murphy you currently

2     work with at Residential?

3          A.     Yes, it is.

4          Q.     Okay.  Anyone else?

5          A.     Well, through the period -- if you're defining

6     meetings from '96 through '99 about the Ohio expansion,

7     there were certainly other people that were involved in

8     that, yes.

9          Q.     Okay.  Can you give me their names?

10          A.     Certainly not all of them.

11          Q.     Well, let me -- let me narrow that down for

12     you, Mr. Beamer.  If you want to answer that question,

13     you obviously can.  During that time frame when I'm

14     talking about meetings that you had with Bill Andrews

15     or -- or John Baumgart, I'm talking about -- you know,

16     I'm not putting a term on it such as corporate meetings

17     or something, but I'm talking about meetings where John

18     Baumgart was involved, more high level management-type

19     meetings.  You were involved in some of those, correct?

20          A.     He had meetings that were held roughly

21     quarterly --

22          Q.     Okay.

23          A.     -- that I attended.

24          Q.     And was there a quarterly meeting for the Ohio

25     offices, a quarterly meeting for Indiana, or are you

*Deposition of Al Beamer*

1    talking about one big quarterly meeting?

2        A.  One big quarterly meeting.

3        Q.  Okay.  In attendance at those type of meetings

4    roughly from '96 through '99, what types of positions

5    would be included in those meetings?

6        A.  The state managers were at those meetings.

7        Q.  Was there one manager for each state?

8        A.  Typically, yes.  I'm trying to remember.  I

9    believe for a while there was just one manager for some

10   of the expansion states like Kentucky and Tennessee and

11   things like that.  I don't know that they each had their

12   own specific manager.

13       Q.  Okay.  Besides the state managers, yourself,

14   Bill Andrews' and John Baumgart, who else would be in

15   attendance at those quarterly meetings?

16       A.  Ed Cook.  Typically the -- those quarterly

17   meetings were just the state managers.  They did hold

18   some meetings that included some of the second tier

19   people from the states, the managers of the individual

20   offices within those states.

21       Q.  What types of things were discussed at these

22   quarterly meetings from a topic standpoint?

23       A.  A lot of times it was talking about expansion

24   and whether there were going to be good people created

25   out of one operation that could then go be an office

[Page 62]

1    manager in some other operation.

2        Q.  Financial performance; was that discussed at

3    these meetings?

4        A.  Yes.

5        Q.  Means to improve operations to become

6    profitable; was that discussed?

7        A.  Generally, yes.

8        Q.  How about customers in general?  Were -- were

9    specific customers discussed at these meetings?

10       A.  Not typically, no.

11       Q.  How did your duties regarding the software

12   come into play in these meetings?  How did that tie in?

13       A.  Well, there were discussions as to wanting to

14   keep current with the technology available in the

15   marketplace, and so there was discussion about new --

16   new things that were available to us and whether it was

17   time for us to jump into those things at that particular

18   moment or whether we should wait or spend money or not

19   spend money.

20       Q.  Okay.  The computer software that we're

21   talking about, specifically for NETCO in this range of,

22   say, '95 through -- your employment ended roughly in

23   early April of '99, is that correct, with NETCO?

24       A.  Yes.

25       Q.  Do you recall the date specifically?

[Page 63]

1        A.  No.

2        Q.  But you did work in April of '99, right?

3        A.  Yes.

4        Q.  So from that time frame of '95 to '99, when we

5    talk about computer software, we discussed forms that

6    are utilized and those types of things.  Is that the

7    entire computer -- let me rephrase that.

8            Were there other computer programs that were

9    available to employees of NETCO to utilize, or is this

10   software program you're describing the whole database?

11   Does that make sense?

12       A.  I guess the answer is yes and yes.  There were

13   other -- other programs that were used as a part of some

14   of the employees' work at NETCO, but if you're saying

15   database, the principal database was within my software.

16       Q.  Okay.  And what was the name of your software?

17       A.  Title Works.

18       Q.  Is that still the name of it today?

19       A.  Yes, it is.

20       Q.  I assume that today's version is a little

21   different from the version back in '95, is that correct?

22       A.  I hope so, yes.

23       Q.  When we talk about the forms that underwriters

24   use and so forth, is there also -- was financial

25   information kept in this software program such as

[Page 64]

1    customer lists, financial performance, things like that?

2    Did it encompass all of those things?

3        A.  It included a database of customers, but it

4    did not include the financial performance of the

5    company, no.

6        Q.  Okay.  Let's say I work there and I want to

7    pull up and do a memo that I would do on Word or

8    something in my office.  Is that something I would have

9    done on your system, or would there have been another

10   vehicle for me to do that?

11       A.  Typically during the time I was there, it

12   would have been based on the software that -- on my

13   system --

14       Q.  Okay.

15       A.  -- as to a letter to someone, yes.

16       Q.  What about forecasting details regarding

17   expansions, things like that?  Those are things if

18   created by an employee or a manager, that would have

19   been on that system, correct?

20       A.  No.

21       Q.  Okay.  Why not?  Explain to me the difference.

22       A.  Because they were done on spreadsheets, and my

23   system was a database-based system.

24       Q.  How many other -- strike that.

25           Did you have access to any computer software

*Deposition of Al Beamer*

[Sheet 17, Page 65]

1  or database within NETCO during the time you were over
2  all the computer operations?
3      A.  Obviously, yes.
4      Q.  And you had access to that at your home in
5  Chesterfield, Missouri as well as at NETCO's office, is
6  that correct?
7      A.  When you say any, I'm saying -- you're saying
8  do you have access to any part of it, and I'm saying
9  yes.  I'm not saying I had access to every piece of
10  software in NETCO's computers.
11      Q.  Well, can you think of something you would not
12  have had access to?
13      A.  Yes.  Much of the spreadsheet work was -- was
14  done by John Baumgart on his personal computer, as far
15  as I understand it.  It was done outside of the realm of
16  my work.
17      Q.  Okay.  Spreadsheets regarding what?
18      A.  Financial performance of the company.
19      Q.  And would those -- those are the types of
20  things that would be discussed at meetings, correct?
21      A.  That -- that was -- one of the topics at
22  meetings was financial performance, yes.
23      Q.  But you didn't have specific access to what
24  John Baumgart kept on the spreadsheets; is that what
25  you're telling me?

[Page 66]

1      A.  That's true, yes.
2      Q.  Do you know what program or software he
3  utilized that you're referring to to keep these
4  spreadsheets?
5      A.  My guess is that it was Lotus 1-2-3, but I'm
6  not certain.
7      Q.  Anything other than that that you can think of
8  that you did not have access to within NETCO's computer
9  system?                       .
10      A.  I had -- anything other than what?
11      Q.  The spreadsheets that John Baumgart utilized
12  that we just discussed.
13      A.  Well, the spreadsheet programs that John
14  Baumgart used in conjunction with Ed Cook, so it was
15  also Ed Cook and possibly Bill Andrews at some point and
16  others that developed the -- the numbers.  My
17  involvement was sort of on the front end, and theirs was
18  on the back end.
19      Q.  When you say the front end, what do you mean
20  exactly?
21      A.  Just as to the order it came in, and we
22  figured out what the pricing was and issued the title
23  commitment and issued the policy, but as to how much was
24  being paid in rent and how much was being paid to
25  employees, the payroll system and that whole end of the

[Page 67]

1  business was not something that I was typically involved
2  in.
3      Q.  Was payroll kept on a different database?
4      A.  Yes.
5      Q.  And you're telling me you didn't have access
6  to that?
7      A.  No.  It was -- payroll was done by an outside
8  company --
9      Q.  Okay.
10      A.  -- as far as I know.
11      Q.  You mentioned the pricing, the order, the
12  issuing of the title insurance policy.  Those were all
13  things you were involved in that -- that you're talking
14  about the front end of it, is that correct?
15      A.  That's the front end.  That's what my software
16  provided for them to be able to do, yes.
17      Q.  Okay.  Did other people enter the data on
18  these things once the software was up and running?  Is
19  that how it works?
20      A.  Yes.
21      Q.  And then your continuing involvement is -- is
22  what, updating the systems, things like that?
23      A.  Yes.
24      Q.  And in addition to that at NETCO in that '95
25  to '99 time frame, you were also dealing with

[Page 68]

1  underwriters, correct?
2      A.  Yes.
3      Q.  You were trying to maintain or initiate
4  relationships with underwriters, correct?
5      A.  That's correct, yes.  Excuse me a second.  I
6  forgot to turn my phone back off.
7          MR. SHOEMAKER:  Do you want to take a quick
8  two- or three-minute break?
9          THE WITNESS:  Yes, please.
10          (A short break was taken.)
11      Q.  (By Mr. Shoemaker)  All right.  I want to
12  clarify something, Mr. Beamer, as far as employment at
13  NETCO, and I'll make the question a little more complex
14  by saying if it changes regarding NETCO, TTC,
15  Residential, let me know that as well.  When we talk
16  about your employment, that's you personally, Al Beamer,
17  that is employed or was employed by NETCO, is that
18  correct?
19      A.  That's what I'm intending, yes.
20      Q.  It's not TMC?
21      A.  Right.  TMC doesn't get employed.  It gets a
22  contract, but it doesn't become an employee of any
23  company.
24      Q.  Okay.  So like with Residential, they were
25  using the services of TMC up until August of 2002,

*Deposition of Al Beamer*

[Sheet 18, Page 69]

1    correct?

2        A.    Yes.

3        Q.    At that point you personally, Al Beamer,

4    became an employee of Residential, is that correct?

5        A.    Yes, that's correct.

6        Q.    Did they continue to use services provided by

7    TMC?

8        A.    Yes.

9        Q.    So you not only draw a salary from Residential

10   personally but TMC also receives sales, I assume on a

11   monthly basis, from Residential, is that correct?

12       A.    They receive revenue from them, yes.  They

13   receive a payment.

14       Q.    Okay.  And we'll get into TTC in a little more

15   detail, but while I'm on the topic so I'm clear, when

16   you were working for Transcontinental and you had your

17   commissions license or licensing agreement --

18       A.    Licensing agreement.

19       Q.    Licensing agreement.  You drew a salary from

20   TTC as an employee, correct?

21       A.    At some points during that period I did, yes.

22       Q.    Okay.  And your licensing agreement, then, was

23   that with you personally as well, or would that be

24   through TMC?

25       A.    Through TMC.

[Page 70]

1        Q.    We talked about the standard-type contract for

2    NETCO or what was previously NETCO that you stated this

3    employment agreement which is Defendant's Exhibit C kind

4    of derived from, is that accurate?  There was a --

5        A.    They started a round of wanting to do new

6    employment agreements with all employees, and there was

7    one standard and then there was one developed later for

8    me, yes.

9        Q.    So you were aware of the standard employment

10   agreement that NETCO had with its employees?

11       A.    With -- I was aware of this employment

12   agreement, yes.

13       Q.    Okay.  Do you know who Gannon Craig is?

14       A.    I know he was a NETCO employee in Ohio.  I

15   couldn't pick him out of a lineup, but I remember that

16   he was an employee in Ohio.

17       Q.    Did you ever speak with him?

18       A.    I'm sure I have.

19       Q.    Did you know what his position was with NETCO?

20       A.    I believe he was a salesperson.

21       Q.    Did you ever have any conversation -- well,

22   strike that.

23             Do you know if Mr. Craig had an employment

24   agreement with NETCO?

25       A.    No, I don't.

[Page 71]

1        Q.    Would you assume that he did due to his

2    position?

3        A.    I don't remember whether the sales people had

4    contracts or just the state managers.  I know it got at

5    least as far as state managers, but I don't know how

6    deep into -- I know that the lower tier employees, the

7    searchers and examiners did not.  I know that the -- the

8    state managers did, but I don't know at what point in

9    the middle they stopped pursuing employment agreements.

10       Q.    Okay.  Did you ever have any conversations

11   with Mr. Craig regarding the prospect of him leaving

12   NETCO to be employed by National Real Estate?

13       A.    Never.

14       Q.    Do you know if Mr. Rivera ever did?

15       A.    I don't know.

16       Q.    Did you ever discuss the employment of Gannon

17   Craig with Mr. Rivera?

18       A.    Not that I recall.

19       Q.    Do you know if Mr. Craig ever worked at

20   National Real Estate?

21       A.    Not as far as I know.

22       Q.    Do you know who Eduardo Carillo is?

23       A.    I believe so, yes.

24       Q.    And did he work at NETCO during the time frame

25   you worked at NETCO?

[Page 72]

1        A.    I'm not sure when he worked at NETCO.

2        Q.    What was his position with NETCO?

3        A.    My guess is that he was a searcher.  I -- I

4    didn't work with him certainly at NETCO.

5        Q.    What do you mean by a searcher?  What does

6    that position entail?

7        A.    It entails either going to the courthouse or

8    going to wherever title records are available and

9    searching the -- the records to see what documents

10   affect the property that we're being asked to insure as

11   the title agent.

12       Q.    Did Mr. Carillo work in the Ohio region, do

13   you know?

14       A.    I believe so.

15       Q.    And am I correct that you stated you do not

16   recall if Mr. Carillo worked for NETCO at the time you

17   left NETCO?

18       A.    Yes.  I -- I don't know when he started his

19   employment with NETCO or how long he was employed by

20   NETCO.

21       Q.    Well, did you initially meet or become aware

22   of Mr. Carillo during his employment with NETCO?

23       A.    No.

24       Q.    When did you meet Mr. Carillo?

25       A.    After he became employed with National Real

*Deposition of Al Beamer*

[Sheet 19, Page 73]

1    Estate.

2        Q.   And did he become employed with National Real

3    Estate on approximately November 1st, 1999?

4        A.   I don't remember.  That's when National Real

5    Estate first, to some extent, opened their doors, but I

6    don't remember if he was there on day one or -- it was

7    within the first month or two he came to work for

8    National Real Estate.

9        Q.   When did you become aware that Mr. Carillo

10   previously worked for NETCO?

11       A.   At some point during the lawsuit that involved

12   NETCO and National Real Estate.

13       Q.   So you're aware now that Mr. Carillo did

14   previously work for NETCO, is that correct?

15       A.   I -- I did become aware of that at some point

16   during the lawsuit, yes.  I don't remember exactly when.

17       Q.   Did you ever speak with Mr. Rivera regarding

18   the hiring of Mr. Carillo?

19       A.   Not that I recall.

20       Q.   How about Jeff Wind?  Do you know who he is?

21       A.   Yes.

22       Q.   And who is he?  Let me rephrase that.  Did he

23   previously work at NETCO?

24       A.   Yes.

25       Q.   Did he work at NETCO when you were employed at

[Page 74]

1    NETCO?

2        A.   Yes.

3        Q.   And what was his position at NETCO in January,

4    say, of '99?

5        A.   I believe at that time he was Missouri state

6    manager.

7        Q.   Okay.  After you left NETCO in April of '99,

8    did you ever have any conversations with Jeff Wind,

9    period?

10       A.   Yes.

11       Q.   When was the first conversation you had with

12   Mr. Wind after April of '99?

13       A.   I don't recall the -- the time.  I would guess

14   sometime in 2002, the summer or fall of 2002.

15       Q.   And where was he employed at that time?

16       A.   I don't believe he was employed at that time.

17       When did his employment end with NETCO?

18       A.   I don't remember specifically.  Prior to the

19   time that I met with him is all I remember.

20       Q.   Was it less than six months to that time that

21   you met with him, do you know?

22       A.   No, I don't.

23       Q.   You don't know?

24       A.   I don't know.

25       Q.   So did you not discuss that with Mr. Wind at

[Page 75]

1    that time?

2        A.   I certainly discussed that he had left NETCO,

3    but I was surprised that he left NETCO.

4        Q.   Do you know if he was under an employment

5    agreement at NETCO?

6        A.   I -- I would assume that he was in '99, but I

7    don't know -- I don't know what contract he was under

8    beyond that.

9        Q.   Did you discuss that with Mr. Wind when you

10   met with him?

11       A.   Probably.

12       Q.   What was the purpose of your meeting with

13   Mr. Wind in the summer or fall of 2002?

14       A.   We had lunch.

15       Q.   Who initiated the contact?

16       A.   I believe he did.

17       Q.   Did he call you, write you a letter, do you

18   remember?

19       A.   I believe he called me.

20       Q.   Did you discuss any future employment of

21   Mr. Wind when he called you?

22       A.   I think we talked just in -- in generalities

23   as to whether he was going to stay -- to try to stay in

24   the title business or whether he was going to look for

25   work elsewhere or what he was going to do.

[Page 76]

1        Q.   Were you with Residential Title Service at the

2    time you met with Mr. Wind?  Were you employed by them?

3        A.   I don't believe so.  It was about the time

4    when I -- if we're saying August of 2002, that was the

5    time that I became employed with them.  It would have

6    been in that -- in that summer or fall area, so it's

7    possible that it was after the time that I signed the

8    agreement.

9        Q.   Did you discuss his potential employment with

10   Residential Title Services when you met with him?

11       A.   No.

12       Q.   Not at all?

13       A.   No.

14       Q.   Where did you meet with Mr. Wind?

15       A.   Houlihan's on Manchester Road in St. Louis.

16       Q.   Did you meet with him again after that initial

17   meeting?

18       A.   I don't believe I met with him, no.

19       Q.   Have you had any contact with him since that

20   initial meeting?

21       A.   I called him once or twice just to see how he

22   was doing.

23       Q.   Did you discuss any potential employment of

24   Mr. Wind by Residential Title Services during any of

25   those phone conversations or meetings with Mr. Wind?

*Deposition of Al Beamer*

[Sheet 22, Page 85]

1    Q.    When did her employment with NETCO end?

2    A.    A couple of years before that.

3    Q.    Where was Miss Brown employed at the time that

4    you had the conversation with Miss Bolch?

5    A.    The title agency that's owned by Bank of

6    America.  I don't know the name of it.

7    Q.    So you never asked Miss Bolch if she wanted to

8    come work for Residential?

9    A.    No, not -- I asked if she knew of anybody who

10   was -- who would be available to -- to work for

11   Residential and she obviously wasn't.

12   Q.    Well, did she tell you that specifically?

13   A.    She said that she was still working for NETCO.

14   Q.    And that's my question.  After that did you

15   ever ask her whether she wanted to come work for

16   Residential or not?

17   A.    I did not ask her that.

18   MR. SHOEMAKER:  Do you want to take a break

19   for lunch?  Off the record.

20   (A lunch break was taken.)

21   Q.    (By Mr. Shoemaker)  Okay.  To begin with, I

22   want to clarify one thing regarding TMC.  Is your

23   clients -- are your clients, I should say, all title

24   agents from TMC?

25   A.    Title insurance agents or underwriters.

[Page 86]

1    Q.    One or the other?

2    A.    Yes.

3    Q.    Okay.  Let's talk about your employment with

4    Transcontinental Title or what I guess initially was

5    Southeast Equity Title.  Is that correct or not?

6    A.    Again, it grew from Equity Title, and then it

7    split.

8    Q.    Okay.

9    A.    And then they -- whatever they -- I believe

10   they became Southeast Equity Title either at the time of

11   the split or soon after and eventually became

12   Transcontinental.

13   Q.    And I want to talk about that company as of

14   the time of the split, what became Southeast Equity

15   Title and then Transcontinental Title, okay?

16   A.    I understand.

17   Q.    Initially at the split did you become an

18   employee of Southeast Equity Title, or were you just

19   doing consulting work?

20   A.    I was an employee.

21   Q.    Okay.  And what was your position there?

22   A.    I believe I kept the same title with -- with

23   them that I kept with the company that became NETCO

24   which was executive vice-president -- executive

25   vice-president of information systems.

[Page 87]

1    Q.    When they split, is that when this company

2    became Southeast Equity Title, or was that already a

3    company that was acquired by Bill?  Do you understand my

4    question?

5    A.    I believe so.

6    Q.    All right.

7    A.    The -- their -- the company that -- that split

8    became Southeast Equity Title at that point.  There was

9    another company named Southeast Equity Title that was

10   acquired by Bill that was a separate company.  I don't

11   know how they ended up with the same name, but they --

12   they had the same name.

13   Q.    Okay.  So this other company, where was --

14   where was this other company located, Southeast Equity

15   Title, the company you're talking about that was

16   acquired?

17   A.    That was in -- somewhere outside of -- in

18   rural Ohio.  I don't remember the name of the city.

19   Q.    Do you recall --

20   A.    It wasn't a major city.

21   Q.    Do you recall when Bill purchased that

22   company?

23   A.    No, not exactly.  It was in the '90s, the

24   early '90s, I believe.  The mid '90s.

25   Q.    Let me show you what I will mark as

[Page 88]

1    Defendant's Exhibit D.

2    (Defendant's Exhibit D was marked for

3    identification.)

4    Q.    (By Mr. Shoemaker)  Do you recognize that

5    document?

6    A.    Yes.

7    Q.    And what is it?

8    A.    It's a contract extension and amendment

9    between me and Equity Title Southeast, Inc. dated July

10   12th, 1996.

11   Q.    So that wasn't your first contract with Equity

12   Title/Southeast, is that correct?

13   A.    I -- I don't -- the names changed, and they --

14   we didn't do a contract extension or a contract

15   amendment each time the company's name changed.

16   Q.    You did not do one each time the name changed?

17   A.    No.

18   Q.    So paragraph 1 of this, though, in Exhibit D,

19   the relationship, it states the employer/employee

20   relationship is hereby replaced by an independent

21   contractor relationship, is that correct?

22   A.    Yes, it does.

23   Q.    So this contract basically terminated your

24   employee relationship with TTC at that time, is that

25   correct?

*Deposition of Al Beamer*

[Sheet 23, Page 89]

1       A.    With -- with Equity Southeast.

2       Q.    I apologize.

3       A.    With -- with that branch, with that company,

4    yes.

5       Q.    So your personal involvement, Al Beamer,

6    ceased as an employee of them at that time. However,

7    Title Marketing Company continued their relationship, is

8    that accurate?

9       A.    Yes.

10          (Defendant's Exhibit E was marked for

11    identification.)

12      Q.    (By Mr. Shoemaker)  Do you recognize

13    Defendant's Exhibit E, Mr. Beamer?

14      A.    Yes.

15      Q.    Can you tell me what this document represents?

16      A.    It's a contract extension and amendment

17    between Title Marketing Company and Transcontinental

18    Title dated August 1st, 1998.

19      Q.    And that's signed by yourself and

20    Mr. Baumgart, is that correct?

21      A.    Mr. Bill Baumgart, yes.

22      Q.    So explain to me the -- what the payments are

23    based on in paragraph 2, current payments of 45,000 per

24    year paid semi-monthly and a bonus.  What is the 45,000

25    per year for?

[Page 90]

1       A.    All of it is for all of the work that I did

2    for Transcontinental and the -- the rights to the

3    software and the whole thing.  It wasn't broken down as

4    to 45,000 was for something and the bonus was for

5    something else.

6       Q.    At some point later that 45,000 or that range

7    becomes your salary, is that correct?

8       A.    In the later contract, yes.

9       Q.    And then the bonus structure is -- is set up

10    similar to how this is set up for TMC, correct?

11      A.    Yes.

12      Q.    Why does the relationship change?

13      A.    The -- well, the relationship didn't change at

14    the time of this contract.  This merely extended it.

15      Q.    Okay.  Once it does change, and I'm not trying

16    to trick you into anything, but what transpires for

17    either yourself or TTC to want you to become an employee

18    versus this relationship?

19      A.    The reason for the change in July of

20    '96 was that although I was an employee, I was only --

21    there was no point of me being an employee of both

22    companies for the purpose of having health insurance and

23    things like that because at the time that the companies

24    divided, it was determined that I would get my health

25    insurance through the -- the company that became NETCO

[Page 91]

1    and that I would get my car allowance and some other

2    things through the company that became Transcontinental,

3    and I didn't need to be an employee of Transcontinental

4    in order to have that happen.

5       Q.    Okay.  Let me mark this as F.

6          (Defendant's Exhibit F was marked for

7    identification.)

8       Q.    (By Mr. Shoemaker)  Do you recognize this

9    document marked as Defendant's Exhibit F, Mr. Beamer?

10      A.    Yes.

11      Q.    And what is this document?

12      A.    It's an amendment to the previous contracts

13    between Title Marketing, Transcontinental, and myself or

14    just Title Marketing and Transcontinental, I guess.

15      Q.    And is this the contract amendment that would

16    have been the next contract subsequent to Defendant's

17    Exhibit E signed in August of '98?

18      A.    I believe so, yes.

19      Q.    Okay.  Does this amendment change the

20    relationship between yourself, TMC, and Transcontinental

21    Title?

22      A.    Yes.

23      Q.    And how did it change it?

24      A.    It changes it back to an employee/employer

25    relationship as -- as well as the independent contractor

[Page 92]

1    relationship between TMC and Transcontinental.

2       Q.    And was there a reason for that change?

3       A.    Yes.

4       Q.    What was the reason?

5       A.    So that I could get medical and dental

6    insurance through Transcontinental.

7       Q.    On 3/30 of '99 you were still employed with

8    NETCO, weren't you?

9       A.    I was in the -- last days of that.

10      Q.    Well, did your employment end there suddenly,

11    or was -- when you say the last days, was there a date

12    set that it ended or not?  I'm talking about at NETCO.

13      A.    Did it end suddenly?  Yes.  It ended suddenly.

14      Q.    Are you telling me you knew on March 30th of

15    1999 that your employment at NETCO was going to end?

16      A.    I had reason to expect that it would, yes.  I

17    was negotiating a -- or trying to negotiate a new

18    contract with NETCO, and it wasn't going well.

19      Q.    What do you mean by it wasn't going well?

20      A.    I had asked for a written compensation

21    contract.  I had asked for a raise in -- in salary, and

22    the initial responses that I had received from NETCO

23    were negative.

24      Q.    That reminds me of something I did want to ask

25    you.  Can you look at Exhibit C?  Do you still have that

*Rankin Reporting & Legal Video, Inc.  (314) 231-2202  (800) 285-2115*

*Deposition of Al Beamer*

[Sheet 24, Page 93]

1 in front of you, your employment agreement --

2     A.   Yes.

3     Q.   -- with NETCO?  And I believe you told me that

4 was signed in January of '99, is that correct?

5     A.   Yes.

6     Q.   And now we're talking about the March of '99

7 time frame regarding when you were negotiating a

8 contract, is that accurate?

9     A.   Yes.

10     Q.   What transpired in those two months?

11     A.   I had asked at the time, several instances

12 over the preceding year or two before I finally left

13 NETCO for a compensation written contract like I had --

14 like I had started with at NETCO and I still had at

15 Transcontinental, and I typically had done business with

16 Trans -- with Title Marketing Company with other

17 companies.  I wanted a written contract.  I had been

18 turned down.  I continued to -- to seek that with --

19 with NETCO, and that was one of the sticking points as

20 to why I left, that they would not agree to give me such

21 a contract.

22     Q.   So did you resign from your employment at

23 NETCO?  Did you quit?  Were you fired?  How would you

24 classify that?

25     A.   I resigned.

[Page 94]

1     Q.   Did you inform John Baumgart that you were

2 going to resign?

3     A.   Yes.

4     Q.   What was his response to that?

5     A.   We had several meetings over the course of a

6 few days and phone conversations.  I was still working

7 for his company and was still in their offices doing

8 work, hoping that -- that things would change and that

9 he would ultimately agree to something that -- that I

10 could agree to as to a contract that would keep me

11 working for NETCO, but at a final meeting in early April

12 I was told that -- that they were not going to move off

13 their positions.

14     Q.   So did you speak with John Baumgart?  Is he

15 the person you spoke with when you told NETCO you were

16 resigning?

17     A.   It was John Baumgart and Ed Cook.

18     Q.   And was this a face-to-face meeting?

19     A.   There were at least two face-to-face meetings

20 during that period, yes.

21     Q.   The one where you formally told them you were

22 resigning --

23     A.   It was a face-to-face meeting, yes.

24     Q.   What was John's response?

25     A.   At -- at all of those -- those conversations

[Page 95]

1 it was that -- that he would not -- he would not change

2 his position, that there was not going to be a written

3 contract and that he would not increase my compensation

4 and that I was welcome to stay under his terms of no

5 written contract and no increase in compensation but

6 that he wasn't willing to make or improve the offer.

7     Q.   Okay.  So as of March 30 of '99, you -- you

8 obviously felt that your employment at NETCO was going

9 to end although it didn't end until April, is that

10 accurate?

11     A.   Yes.

12     Q.   So Defendant's Exhibit F, your contract

13 amendment with TTC, that increased the amount of time

14 that you were going to be working with TTC, is that

15 correct?

16     A.   Yes.

17     Q.   And it states in paragraph 3 that you were

18 going to receive a salary of 45,000 per year, is that

19 correct?

20     A.   Yes.

21     Q.   Is that in addition to the 45,000 that was

22 being paid to TMC under Defendant's Exhibit G?

23     A.   No.

24     Q.   So that's the same $45,000 that's referred

25 to -- strike that.  That's a poor question.

[Page 96]

1     That's the same format of payments that TMC

2 was previously receiving, correct, as far as a set

3 amount, a lump sum amount?

4     A.   I guess it would be.  It's 45,000.  Before it

5 was 45,000.

6     Q.   That was the only lump sum payment that was

7 going to either yourself or TMC as of 3/30 of '99,

8 correct?

9     MR. HABER:  That wasn't a lump sum.

10     A.   That wasn't a lump sum.

11     Q.   (By Mr. Shoemaker)  Okay.  Let me -- let me

12 rephrase that.  That was the only annual payment or

13 salary based upon a per year that was being paid either

14 to yourself or TMC at the time, correct?

15     A.   I believe it was bi-weekly, but it was the

16 only regular payment like that, yes.

17     Q.   Based upon a year?

18     A.   Yes.

19     Q.   Okay.  And did the percentage of gross

20 receipts in excess of one million per quarter change on

21 3/30 of '99?

22     A.   Yes.

23     Q.   And how did they change?

24     A.   It went from three-quarters of a point to one

25 point.

*Deposition of Al Beamer*

```
 1      Q.    And the amount of time in paragraph 1 also
 2  changed in that you'd be working the first and third
 3  calendar weeks of each month at TTC, correct?
 4      A.    Yes.
 5      Q.    Up until that time you were working roughly
 6  how much there, about a week?  Is that what you told me?
 7      A.    Yeah.
 8      Q.    A week a month?
 9      A.    Roughly.  Roughly a week.
10      Q.    Okay.
11          (Defendant's Exhibit G was marked for
12  identification.)
13      Q.    (By Mr. Shoemaker)  I'll show you what's been
14  marked as Defendant's G.  Do you recognize this
15  document?
16      A.    Yes.
17      Q.    What is it?
18      A.    It's a contract amendment between myself, TMC,
19  and TTC.
20      Q.    And what did this amendment change?
21      A.    It changed the payments per month for three
22  months in 1999.
23      Q.    Why?
24      A.    The title insurance business for TTC was down
25  at that point, and Bill Baumgart asked me to help them
```

```
 1  out by taking a reduction for those three months.
 2      Q.    And did you agree to do that?
 3      A.    I did.
 4      Q.    And that's your signature at the bottom there?
 5      A.    Yes.
 6      Q.    So this wasn't deferred in any way.  It was
 7  just flat out reduced for that -- for those three
 8  months, correct?
 9      A.    Yes.
10      Q.    And that was through the month of August of
11  1999, correct?
12      A.    Yes.
13      Q.    All right.  While you were at TTC, and let's
14  just say in March of '99 when you started working there
15  more, what states were TTC -- was TTC located in?
16      A.    Florida, Georgia, Maryland, Virginia,
17  Tennessee, Arkansas, Alabama, Mississippi.  Did I say
18  Tennessee?
19      Q.    Yes, you did.
20      A.    I believe those were the states.
21      Q.    What about Ohio?
22      A.    TTC was never in Ohio.
23      Q.    Was Bill Baumgart ever an owner of a title
24  agency or entity dealing with title insurance in the
25  state of Ohio?
```

```
 1      A.    Yes.
 2      Q.    And who was that?
 3      A.    He bought a company named Equity -- Equity
 4  Southeast or Equity Title Southeast or something like
 5  that.
 6      Q.    When did he buy that?
 7      A.    '95, '96, somewhere around there.
 8      Q.    But it was separate from TTC?
 9      A.    Absolutely.
10      Q.    Okay.  What was his interest in -- in that
11  entity, do you know?  Did he own it, did he run it, to
12  your knowledge?
13      A.    He was owner and he -- I don't know.  He was
14  owner, but I -- I don't know much about it because I was
15  never involved in that company.
16      Q.    And Bill Baumgart and TTC expanded to all of
17  these states that you just referenced from just being in
18  Florida when the split occurred, correct?
19      A.    Yes.
20      Q.    Were you involved in the expansion of TTC or
21  its former name during that time frame regarding your
22  computer software, etc.?
23      A.    Yes.
24      Q.    Was your computer software used in all of
25  those states in which TTT -- excuse me -- TTC expanded?
```

```
 1      A.    Yes.
 2      Q.    Was your computer software used in the entity
 3  we're discussing, Southeast Equity Title, that was in
 4  Ohio?
 5      A.    No.
 6      Q.    Why not?
 7      A.    That was -- that company was never brought
 8  into TTC.  It was a separate investment that Bill
 9  Baumgart made, and I never went to that company.  I was
10  never a part of it.  It was never a part of what I was
11  paid for.  It was never a part of Transcontinental Title
12  in any way.
13      Q.    Okay.  Do you know what this entity we're
14  talking about, Southeast Equity Title, the entity that
15  Bill Baumgart owned, do you know what services they
16  performed generally?
17      A.    They were a title insurance agency.
18      Q.    Like TTC and NETCO?
19      A.    Like every title insurance agency.
20      Q.    Okay.
21      A.    I believe that they were particularly involved
22  in the -- the realtor purchase market part of the title
23  insurance and not just the -- the lender part of the
24  title insurance business that TTC and NETCO were
25  pursuing.
```

*Deposition of Al Beamer*

1    Q.    So their interests would have overlapped to a
2    certain extent, but they didn't do the exact same thing,
3    is that correct?
4    A.    They didn't do the exact -- they were more of
5    a traditional title insurance agency that sought
6    business from realtors.
7    Q.    Okay.  But certainly they would have competed
8    for some clients the same as between NETCO, is that
9    correct?
10   A.    I don't believe they competed with NETCO
11   because I -- I think they were in a suburban county.
12   They weren't in a main city.
13   Q.    What suburban county?
14   A.    I don't remember the -- the suburban counties.
15   I recall it was some little city.  They were not in
16   Cincinnati, Columbus, or Cleveland, as far as I know.
17   They were -- they were in a small county that was
18   somewhere else in Ohio.
19   Q.    Do you recall which of those cities you just
20   referenced, Columbus, Cincinnati, or Cleveland that
21   Southeast Equity Title was closest to?
22   A.    No.  I never went there.
23   Q.    So you don't know the answer to that, is that
24   correct?
25   A.    That's correct.

1    Q.    To this date you still don't know?
2    A.    I don't know.
3    Q.    So is it fair to say that --
4          MR. HABER:  Can you hold on one second?
5          MR. SHOEMAKER:  Yes.  We can go off the
6    record.
7          (There was a discussion off the record.)
8    Q.    (By Mr. Shoemaker)  Okay.  We were talking
9    about Southeast Equity Title, a company owned by Bill
10   Baumgart, and you were stating you weren't -- you didn't
11   know exactly where they were located.  My question is,
12   then, is it fair to say that you're not actually sure
13   what market they competed in?
14   A.    I was told that they competed in their little
15   county.
16   Q.    You were told that by who?
17   A.    By Bill Baumgart.
18   Q.    That they only competed in their own county?
19   A.    As far as I knew, yes.
20   Q.    Well, that's what I'm trying to make sure of,
21   Mr. Beamer, what you knew.  That's my question.  Is that
22   what he told you specifically, that they only competed
23   within their own county?
24   A.    That's my knowledge of -- of what that company
25   did as -- as I understood it from Bill Baumgart.

1    Q.    Okay.  And what I asked you is if that's what
2    he told you, or is that just your general understanding?
3    A.    That has to be what he told me because that's
4    the only way I would have had any understanding.  I
5    wasn't privy to any contracts or anything when he bought
6    that company.
7    Q.    Did you ever talk to anyone else associated
8    with Transcontinental Title regarding Southeast Equity
9    Title other than Bill Baumgart?
10   A.    Yes.
11   Q.    Who?
12   A.    Frank Skryd.
13   Q.    And when did you speak with him about it?
14   A.    I don't recall specific dates.  I just
15   remember him saying he had to go up to that -- that
16   office because they did -- they performed an audit
17   function of the escrow accounts of that office.
18   Q.    Does Bill Baumgart still own that company, do
19   you know?
20   A.    I believe he does not.
21   Q.    Do you know when his ownership interest ceased
22   in that company?
23   A.    I believe it ceased several years ago.
24   Q.    Do you have a better guess than that?
25   A.    I believe it ceased in '97 or '98.

1    Q.    And what do you base that belief on?
2    A.    Conversations with Bill Baumgart.
3    Q.    Specifically what do you recall he told you
4    regarding his ownership in the '97, '98 time frame?
5    A.    That he -- he bought it purely as an
6    investment because the previous owner was caught
7    stealing money from his escrow account and they wanted
8    to preserve the company because the underwriter thought
9    that it was a company worth preserving, that the plan
10   all along was for Bill Baumgart to only own it for a
11   very short period and then to sell it back to the
12   managers of that agency and that he -- after a short
13   period he did, in fact, sell it back to the managers of
14   that agency.
15   Q.    Okay.  So are you telling me that Bill
16   Baumgart told you he sold it in '97 or '98, or that was
17   just your general belief?
18   A.    Bill Baumgart told me he sold it.
19   Q.    Do you know who he sold it to?
20   A.    He sold it to the managers of the -- of the
21   agency.  I don't know any names.
22   Q.    Okay.  How long did your contract with TTC --
23   let me rephrase that.
24          When was your employment contract with TTC to
25   end or expire?