*Deposition of Al Beamer*

1    A.   At what point was it?

2    Q.   The last one.

3    A.   The last one meaning Exhibit G?

4    Q.   Yeah, G.

5    A.   Exhibit G didn't reference termination or

6  didn't reference the end of it.

7    Q.   Was there another employment contract after

8  this?

9    A.   No.

10    Q.   Well, somewhere in your complaint you've

11  alleged that the contract was supposed to go through the

12  end of December of 2000.  What's that based on?

13    A.   It was based on a previous amendment.

14         MR. HABER:  F, I believe.  I'm sorry.  It's

15  E.

16         THE WITNESS:  Right.

17         MR. HABER:  I apologize.

18    A.   The contract extension, Defendant's Exhibit E,

19  is where it has the -- the term, at that point.

20    Q.   (By Mr. Shoemaker)  And this is the agreement

21  between TMC and Transcontinental, correct, Defendant's

22  Exhibit E that you're referring to?

23    A.   Yes.

24    Q.   And then Exhibits F and G refer to Title

25  Marketing Company but specifically refer to yourself as

1  being employed there, is that correct?

2    A.   Yes.

3    Q.   But it was your understanding that Defendant's

4  Exhibit E continued the entire relationship through

5  December 31, 2000, is that accurate?

6    A.   At least.

7    Q.   What do you mean at least?

8    A.   I had always signed extensions every two or

9  three years.  I had every expectation that I would

10  continue to sign extensions beyond 2000.

11    Q.   Well, you had always signed extensions with

12  NETCO prior to March of '99, too, hadn't you?

13    A.   No.

14    Q.   Oh.  You hadn't?

15    A.   No.

16    Q.   How many contracts had you signed with them?

17    A.   I signed one.

18    Q.   In '99?  That's the first contract you signed?

19    A.   The compensation contract -- the only

20  compensation contract I ever had with NETCO -- I never

21  had any compensation contract with NETCO.  The only

22  compensation contract with any part of NETCO was the one

23  in '93.

24    Q.   Okay.  So you're differentiating between

25  employment agreements and compensation agreements, is

1  that correct?

2    A.   Yes, I am.

3    Q.   As far as between NETCO and TTC, right?

4    A.   You're asking if I had signed extensions

5  beyond or several extensions with -- with NETCO, and in

6  fact, I'm saying I had not.

7    Q.   And you were referencing Exhibit A as the only

8  compensation package you had signed with NETCO which at

9  that point was still Equity Title prior to the split, is

10  that accurate?

11    A.   Yes.

12    Q.   Had you discussed with TTC or specifically

13  Bill Baumgart any extension of that contract past

14  December 31 of 2000?

15    A.   Not in specific terms.

16    Q.   Well, did you talk about it in general terms?

17    A.   Yes.

18    Q.   With who?

19    A.   Bill Baumgart.

20    Q.   What was stated?

21    A.   What was stated was that he was happy with my

22  performance and hoped that the -- the relationship

23  between Transcontinental and -- and me would continue

24  for a long time.

25    Q.   When did he tell you that?

1    A.   December 1st of 1999.

2    Q.   And where did he tell you that?

3    A.   Over dinner.  I don't remember the name of the

4  restaurant.

5    Q.   What city?

6    A.   Clearwater, Florida.

7    Q.   Was anyone else present?

8    A.   No.

9    Q.   And it was at that point he told you he was

10  happy with your services and he hoped that the

11  relationship continued for a long time; is that what you

12  stated?

13    A.   Yes.

14    Q.   Did you and Bill Baumgart discuss your

15  interest -- and I'm jumping around here a little bit,

16  but while we're on the topic of dinner with Bill

17  Baumgart, did you guys discuss your interest in National

18  Real Estate at that point?

19    A.   Yes.

20    Q.   What was said in that regard?

21    A.   That -- that National Real Estate had nothing

22  to do with competing with Transcontinental and that it

23  was all a matter between myself and his brother, John,

24  and that he was tired of hearing about it and he wanted

25  to definitively say that there -- he did not want to

*Deposition of Al Beamer*

[Sheet 28, Page 109]

1    hear any more about it from anyone.
2        Q.  Did you inform him that you had an ownership
3    interest in National at that point?
4        A.  Previous to that point.  I had already
5    informed him of that, yes.
6        Q.  And that you were providing all the computer
7    software and so forth for National as well, correct?
8        A.  Yes.
9        Q.  Did Bill Baumgart ever reference his ownership
10   in Southeast Equity Title or Equity Title Southeast,
11   whichever it is, at that time to you in December of '99?
12       A.  Absolutely not.
13       Q.  Do you know a gentleman by the name of Damian
14   Sichak?
15       A.  Sichak.
16       Q.  Sichak.  How do you spell that?
17       A.  S-I-C-H-A-K.  Yes.
18       Q.  And how do you know him?
19       A.  I knew him when he was at NETCO, and then he
20   left NETCO and went to work for Transcontinental, and
21   then he left Transcontinental and went to work for
22   National Real Estate.
23       Q.  When did he leave Transcontinental and go to
24   work for National Real Estate?
25       A.  Late '99.

[Page 110]

1        Q.  Prior to your dinner with Bill on December 1st
2    of '99?
3        A.  I believe so.  I -- I'm not certain of that,
4    but I believe so, yes.
5        Q.  Well, do you recall discussing his departure
6    with Bill Baumgart during that dinner?
7        A.  No.
8        Q.  Was Bill Baumgart upset about the fact that he
9    had left TTC to go to National?
10       A.  As I recall, I don't recall discussing that.
11   I think that was between Damian and Bill.
12       Q.  So you don't recall ever discussing Damian's
13   departure with Bill, is that accurate?
14       A.  I'm sure that was mentioned in some
15   conversations between Bill and I, but the -- the -- it
16   wasn't discussed that night at dinner because I believe
17   he was already gone.
18       Q.  Did Bill ask you if National was competing
19   with Trapscontinental at that time?
20       A.  Did he ask me if they were?
21       Q.  Yes.
22       A.  Not at that point because he already knew that
23   they were not.
24       Q.  Did he ever tell you that if you were
25   competing against him that you'd be fired?

[Page 111]

1        A.  No.
2        Q.  Did he ask you if you had an ownership
3    interest in National, or did you just inform him of that
4    on your own?
5        A.  I informed him of that.
6        Q.  And when did you do that?
7        A.  Oh, a couple of weeks before the -- the
8    meeting in December or maybe -- maybe a month before.  I
9    don't know.  Whenever it was that I got the ownership
10   interest, I informed him of it.
11       Q.  What was your title with TTC as of December 1
12   of '99?
13       A.  The same as it had always been, executive
14   vice-president of information systems.
15       Q.  Okay.  And had your duties expanded as of 12/1
16   of 99 from what they were, say, in 1996?
17       A.  TTC was a much bigger company at that point,
18   so I had responsibility over more computers and more
19   users, but I -- but they were principally the -- the
20   same type of responsibilities.
21       Q.  Which came first regarding your increased
22   duties with TTC?  Did you decide you were going to leave
23   your employment at NETCO and then increase your services
24   to TCC -- TTC, I'm sorry, or was it the other way?  Did
25   you increase your services for TTC and then decide you

[Page 112]

1    were leaving NETCO?
2        A.  I don't know that it was either one.  I -- it
3    started from a conversation with Bill Baumgart in which
4    he said that TTC was paying me a lot of money, yet it
5    seemed that I was working -- that he'd like to have more
6    of my time for the amount of money that -- that they
7    were paying.  He'd like to have -- like to have me in
8    Florida more than I had been up until that point,
9    basically, and so I looked at it and I realized that I
10   was getting paid more by TTC for one week a month
11   on-site and other work outside than I was getting paid
12   by NETCO for substantially more of my time than that.
13       Q.  So as of March, we'll say, of '99 when you
14   were still working for both of them, although you were
15   putting in more hours at NETCO than TTC, correct?
16       A.  Correct.
17       Q.  But you're telling me as of March of '99 you
18   were receiving more money from TTC than NETCO, is that
19   accurate?
20       A.  Yes.
21       Q.  And it was at that point that you attempted to
22   negotiate an increase in the money you received from
23   NETCO, correct?
24       A.  That was one of several times I had attempted
25   to negotiate an increase, but yes, I did attempt to

*Deposition of Al Beamer*

[Sheet 29, Page 113]

1  increase it -- to negotiate an increase at that time.

2      Q.  When did your employment end with TTC?

3      A.  December 7th of '99 or the 6th; right around

4  the 6th or 7th of '99.

5      Q.  You don't recall which day?

6      A.  Well, I believe -- I don't recall exactly, but

7  I believe that on the 6th I got the phone call telling

8  me that -- the phone call from Bill Adams telling me to

9  call Bill Curphey --

10      MR. DIGNAM:  Bill Andrews.

11      A.  I'm sorry.  Bill Andrews telling me to call

12  Bill Curphey to -- because I had been terminated by TTC.

13      Q.  (By Mr. Shoemaker)  Okay.  We'll get into that

14  in a little more detail in a second.

15      After your employment ended with TTC, did you

16  initiate litigation against them?

17      A.  Yes.

18      Q.  The first lawsuit that you initiated against

19  TTC was based on what?

20      A.  What were the allegations of the complaint,

21  you're asking?

22      Q.  Yeah.

23      A.  Violation of the contract, principally.

24      Q.  What contract?

25      A.  The -- the contract as it -- as it stood

[Page 114]

1  amended at that time, at the time that I was terminated.

2      Q.  Is that Defendant's Exhibit G --

3      A.  It would be --

4      Q.  -- or does it date all the way back to

5  Defendant's Exhibit E?  Can you tell me by looking at

6  them?

7      MR. HABER:  Legally it dates back farther.

8  Those are all amendments.

9      A.  I was going to say.  That's amendments, and it

10  just was as to the -- the contract relationship that

11  stood at the time it was terminated.

12      Q.  (By Mr. Shoemaker)  Okay.  I'm not trying to

13  be clever here, but this contract was extended in

14  Defendant's Exhibit E, correct?

15      A.  Yes.

16      Q.  Which covered the relevant time period that

17  we're discussing, is that accurate?

18      A.  It extended through November or through

19  December of 2000.

20      Q.  Okay.  Is there language in a prior agreement

21  that's not in here that the suit was based on?

22      A.  No.

23      Q.  So the first suit was based upon the breach of

24  your employment agreement and the relationship with TMC,

25  is that correct?

[Page 115]

1      A.  Yes, it was.

2      Q.  And did that case proceed to trial?

3      A.  No.

4      Q.  When did it settle?  Did it settle, I should

5  say?

6      A.  It settled in the spring of 2001.

7      Q.  And how much did you settle for?

8      MR. HABER:  Let me stop you there for a

9  second.  Let's go off the record.  Well, we can stay on

10  the record.

11      MR. SHOEMAKER:  We can go off if you want.  I

12  don't care.

13      MR. HABER:  We can stay on and then go off

14  and decide how you want to resolve it.  I don't know

15  whether I inadvertently provided that to you

16  previously, but those settlement agreements with TTC

17  were subject to a confidentiality agreement which I

18  assume Bill Baumgart would have no objection to a

19  limited waiver of that confidentiality for purposes of

20  you exploring the mitigation issue, but without that --

21  and he may have already told you the terms, but without

22  that, I'm concerned that he might be in violation of

23  that agreement by disclosing the terms of the

24  settlement.  Now, if you'd like to go off the record

25  and discuss how to resolve that, I mean, we don't -- I

[Page 116]

1  don't have any personal objection to you knowing the

2  terms provided that we're not going to be in -- and if

3  I inadvertently provided that to you previously, that

4  was my fault.

5      MR. DIGNAM:  I think Bill may have provided

6  it to me, but I don't know.

7      MR. SHOEMAKER:  Let's go off the record.

8      (There was a discussion off the record.)

9      MR. SHOEMAKER:  We can go back on the record.

10      During our break which was somewhat initiated

11  by discussions of settlement agreements between

12  Mr. Beamer and Transcontinental Title, we were

13  discussing the first settlement agreement which does not

14  have a confidentiality provision as we'll enter here in

15  a second, but a second settlement agreement between

16  Mr. Beamer and TTC did have a confidentiality provision

17  pursuant to the recollection of Mr. Beamer and

18  Mr. Haber, so pursuant to that representation, I

19  personally spoke with Bill Baumgart and received his

20  verbal authorization for Mr. Beamer to discuss the

21  contents of that settlement agreement for the limited

22  purposes of this lawsuit that is pending.  Is that --

23      MR. HABER:  Based upon your representation

24  and that close familial relationship between Bill

25  Baumgart and the defendant John Baumgart, since they

*Deposition of Al Beamer*

[Sheet 30, Page 117]

1  are brothers, I will permit my client to answer those
2  questions in light of your representation that Bill
3  Baumgart has approved his limited disclosure of the
4  terms of the settlement agreement. However, I would
5  ask that provisionally this portion of the deposition
6  be maintained confidential or under seal pending
7  confirmation when we meet with Mr. Baumgart down in
8  Clearwater for his deposition that he, in fact, has
9  provided that limited waiver. Then at that point I
10  don't think there's any need to -- to maintain the
11  provisional confidentiality of this section of the
12  deposition.
13        MR. SHOEMAKER: That is agreed to on behalf
14  of all defendants.
15        (Defendant's Exhibits H and I were marked for
16  identification.)
17        Q. (By Mr. Shoemaker) Okay. I'm going to show
18  you what's been marked -- I'm going to give it to you as
19  a set, Defendant's Exhibits H and I, Mr. Beamer. Can
20  you tell me what those documents represent?
21        A. They are the settlement agreement and mutual
22  release of the -- the first case of myself and TMC
23  against TTC.
24        MR. HABER: And just for the record, the
25  mutual release which is Defendant's Exhibit I is also

[Page 118]

1  Exhibit A to Defendant's Exhibit H with the exception
2  that Exhibit A does not have Mr. Beamer's signature --
3        MR. SHOEMAKER: Correct.
4        MR. HABER: -- or his wife's signature as
5  president of Title Marketing.
6        Q. (By Mr. Shoemaker) And this represents the
7  settlement agreement in Case No. 002310CI19 from the
8  Circuit Court, Civil Division of Pinellas,
9  P-I-N-E-L-L-A-S, County in Florida, is that correct,
10  Mr. Beamer?
11        A. Yes.
12        Q. And that was a lawsuit styled Al Beamer and
13  Title Marketing Company, Inc., a Missouri Corporation,
14  v. Transcontinental Title Company, f/k/a Equity Title
15  Company/Southeast, a Florida Corporation, is that
16  correct?
17        A. Yes.
18        Q. This settlement agreement was dated April
19  16th, 2001, is that correct, Mr. Beamer?
20        A. Yes.
21        Q. And how much did you receive as a result of
22  this settlement agreement from TTC?
23        A. I received a bit less than $60,000.
24        MR. HABER: And by you, you mean him
25  personally or collectively him and his attorney?

[Page 119]

1        A. Yeah. I should explain. I received the full
2  80,000, or the full 80,000 that is stated on the
3  settlement agreement was paid. Then I paid my attorney
4  or my -- my attorney took his share out, and I, Title
5  Marketing and I ended up receiving something less than
6  60,000.
7        Q. (By Mr. Shoemaker) Okay. After attorneys'
8  fees?
9        A. After attorneys' fees.
10        Q. But the settlement agreement is for 80,000, is
11  that correct?
12        A. That's true.
13        Q. In addition, paragraph 4 of the settlement
14  agreement refers to TTC's authorization to use TMC's
15  Title Works software through August 31, 2001, is that
16  correct?
17        A. Yes.
18        Q. And then as a provision that if they're still
19  using it after September 1, 2001 that they have to pay
20  TMC a licensing fee that's set forth in that agreement,
21  is that accurate?
22        A. Yes.
23        Q. So your initial contract that you referred to
24  only extended through December 31 of 2000, is that
25  accurate?

[Page 120]

1        A. Yes. The written terms of that contract
2  extended through December 31 of 2000.
3        Q. But the settlement agreement actually
4  extended -- well, strike that.
5        The $80,000 that you received in this
6  settlement agreement also included TTC's right to use
7  the Title Works software through August 31, 2001, is
8  that correct?
9        A. Yes.
10        Q. You were not to receive or TMC was not to
11  receive any additional monies for the use of that
12  software unless they were still using it as of September
13  1, 2001, correct?
14        A. Correct.
15        Q. And you did have counsel for this agreement,
16  correct?
17        A. Yes.
18        Q. And this settlement agreement constituted your
19  agreement as to all facets of the case that was pending
20  in Pinellas County that I previously cited, is that
21  accurate?
22        A. Yes.
23        Q. And that case that we're referring to in
24  Pinellas County was filed based upon the cessation of
25  your employment at TTC, correct?

*Deposition of Al Beamer*

[Sheet 31, Page 121]

1    A.    It was based upon the complaint in that case.

2 It was based upon the -- violation of that -- the

3 terms of that contract by the -- by the termination

4 prior to the -- the end of the -- of the written term of

5 the contract, yes.

6    Q.    Okay. The second settlement that we've just

7 discussed on the record, when was that lawsuit filed

8 that ended in another settlement with Transcontinental

9 Title?

10    A.    It was filed in 2002. I don't -- I don't

11 remember exactly -- I don't think I could even give you

12 a month. I could research and find out when it was

13 filed, but I know it was filed in 2002.

14    Q.    Can you tell me the -- what the general nature

15 of the allegations were in that lawsuit?

16    A.    Yes. It was -- the allegation was that TTC

17 had violated section 4 of the settlement agreement in

18 the original case.

19    Q.    Which is Defendant's Exhibit H, is that

20 correct?

21    A.    Yes.

22    Q.    And was the nature of that lawsuit that TTC

23 had continued to use the Title Works software after

24 September 1 but did not pay you for that?

25    A.    Yes.

[Page 122]

1    Q.    When you filed the lawsuit, whenever it was in

2 2002, was it your understanding at the time of filing

3 that TTC was continuing to use that -- your Title Works

4 at that time?

5    A.    Yes.

6    Q.    Prior to the filing of this lawsuit, did you

7 receive monies from Transcontinental Title for the use

8 of the Title Works Suite software in September of 2001?

9    A.    Yes.

10    Q.    So is it accurate to say -- well, is that the

11 only check you received from TTC after the settlement

12 regarding the use of that software prior to the

13 settlement?

14    A.    After the first settlement and before the

15 second case, yes.

16    Q.    Okay. So was your suit based upon TTC's use

17 of Title Works from October 1, 2001 through a certain

18 time period?

19    A.    It was beginning October 1, 2001 through

20 whatever time either the case went to trial or they

21 ceased using the software.

22    Q.    Okay. When did they cease using the software,

23 do you know?

24    A.    As far as I know, they haven't.

25    Q.    They still use it?

[Page 123]

1    A.    They -- they were still using it at the time

2 of my last -- at the time of the -- the negotiations

3 when we settled the case.

4    Q.    Did the settlement agreement -- well, let me

5 get to -- the second lawsuit was ultimately settled,

6 correct?

7    A.    Yes.

8    Q.    When was it settled?

9    A.    In the spring of this year; February or March

10 of 2003.

11    Q.    Does the second settlement agreement allow TTC

12 to continue to use the Title Works software as

13 necessary?

14    A.    Yes.

15    Q.    So it satisfied all claims or potential claims

16 or future claims you had against TTC regarding the use

17 of the software?

18    A.    It did, yes.

19    Q.    And how much was that for?

20    A.    $275,000.

21    Q.    And that covers the time frame beginning in

22 October of 2001 through today or any other day, really,

23 is that correct?

24    A.    Yes.

25    Q.    All right. Let's talk about your involvement

[Page 124]

1 with National Real Estate title agency. When did you

2 first speak with Mr. Rivera, Anthony Rivera, regarding

3 the possible formation of a company?

4    A.    It's Antonio Rivera, I believe. He called me

5 one day in 1999 to tell me that he had quit NETCO, and

6 then we talked after that. I think he had quit NETCO

7 just within the past few days and that he was trying to

8 figure out what he wanted to do from then, and so he

9 ticked off a bunch of options, and forming his own title

10 company was one of those options.

11    Q.    Was that in August of 1999?

12    A.    It could well have been in August.

13    Q.    Do you not recall when it was?

14    A.    I don't recall a specific date. I know it was

15 in the summer of '99, and I know that it was started by

16 him calling after he had -- had quit NETCO. By looking

17 through the pleadings of the NETCO/Rivera case, I could

18 find out what date that was, but I don't off the top of

19 my head remember a date.

20    Q.    You're telling me right now you don't recall,

21 but it could have been June or even May of '99, is that

22 accurate?

23    A.    No. I would say August sounds right, toward

24 the end of that summer.

25    Q.    Okay. What was Rivera's position with NETCO?

*Deposition of Al Beamer*

[Sheet 32, Page 125]

1    A.    At that point I believe he was state manager
2  in Ohio.
3    Q.    Okay.  And from what you previously told me
4  regarding employment contracts at NETCO, is it safe to
5  assume you were aware Rivera had an employment contract
6  with NETCO?
7    A.    Yes.
8    Q.    Did you discuss that with him in that initial
9  conversation?
10    A.    No.
11    Q.    When -- when was the next conversation you had
12  with Rivera after that initial conversation?
13    A.    Oh, a few days or a week after that initial
14  one.
15    Q.    And what was discussed at the second
16  conversation?
17    A.    Again, just generally how was he feeling
18  knowing that he had been through a fairly significant
19  trauma about quitting NETCO and what was he going to do
20  next and things like that.
21    Q.    What was the trauma involved?
22    A.    Well, I don't know about trauma.  He left
23  after apparently a big argument with John Baumgart, and
24  so he was very upset that he had put in a lot of time
25  and effort and at one point had -- had hoped to stay

[Page 126]

1  with NETCO for a long time and that he was very
2  disappointed and angry that -- that it all had come
3  apart like it had.
4    Q.    Did you have a lot of dealings with Mr. Rivera
5  while you were employed at NETCO?
6    A.    I had dealings with him, but he was one of
7  quite a few state managers.
8    Q.    Your relationship with him, was it any
9  stronger than it was with most state managers?
10    A.    It was certainly no worse than others, but I
11  had -- I had known other state managers longer than I
12  had known Tony Rivera.  I had deeper roots with some of
13  them.
14    Q.    Well, do you have any idea why he called you
15  after his employment terminated with NETCO?
16    A.    He didn't call me immediately.  He called me a
17  few days after.  I'm sure he called quite a few people.
18  I was among them.
19    Q. .  Was he looking for employment?
20    A.    No.  I mean, he was -- he needed to do
21  something, obviously, to support himself, but he wasn't
22  looking for me to employ him.
23    Q.    Did he ask you in the initial conversation if
24  you'd be interested in investing in a new company?
25    A.    No.

[Page 127]

1    Q.    Okay.  During the second conversation which
2  you said was a few weeks after that, would that still be
3  somewhere in August or do you recall?
4    A.    I believe I said a few days to a week after
5  that, and so it was -- I would guess that that was still
6  August or early September.
7    Q.    Okay.  Where did that conversation take place?
8  Was it on the phone, or did you meet?
9    A.    On the phone.
10    Q.    And did he discuss in any more detail his
11  desire to establish a new business?
12    A.    He hadn't discussed in any detail the first
13  time his desire to establish a new business.  That was
14  just one of the options thrown out among quite a few.
15    Q.    Did you discuss it during the second
16  conversation?
17    A.    I don't believe so.  Not in the second
18  conversation, no.
19    Q.    When is the first time you discussed the
20  potential or desire for Mr. Rivera to open up his own
21  business in Ohio?
22    A.    It was quite a while after he left because at
23  first when he left, he -- his intention was to go to
24  Costa Rica and open up a title insurance agency in Costa
25  Rica, and it was only after he had some of these other

[Page 128]

1  options that he decided that he was not going to follow
2  up on that.  He then came to the idea of -- of opening
3  up a title insurance agency as -- as the best option.
4    Q.    So when you say quite a while, what do you --
5  what are you talking about, a month, two months, three
6  months?
7    A.    A couple months, probably.
8    Q.    At least two?
9    A.    This is in 1999 and we're in 2003.  As to
10  exactly when I talked to him and exactly at what point
11  the idea of opening up a title insurance agency came
12  to -- to the top of his list of alternatives, I can't
13  tell you which -- what day that was.
14    Q.    So are you telling me as we sit here today you
15  don't remember if it was more or less than two months
16  after your initial conversation with him?
17    A.    True.
18    Q.    Do you recall if it was more or less than one
19  month?
20    A.    My -- I would be guessing.  I -- I believe --
21    Q.    I'm not asking you to guess, Mr. Beamer, so
22  you can stop with your answer.  What I'm asking you is
23  if you recall as we sit here today.  I realize it was
24  four years ago.
25    A.    Yeah.

*Deposition of Al Beamer*

[Sheet 33, Page 129]

1  Q.  But this is obviously something that you've
2  discussed before and that you filed a suit on, so based
3  on that, I'm asking you sitting here do you recall if it
4  was more or less than a month when he told you that he
5  wanted to start a business in Ohio?
6  A.  No.  I don't recall.
7  Q.  Okay.  Did you meet with Mr. Rivera and James
8  Erwin at any time in person?
9  A.  Yes.
10  Q.  Do you recall when that meeting took place?
11  A.  The fall of 1999.
12  Q.  Was it after the first conversation that you
13  had with Rivera?
14  A.  Yes.
15  Q.  How long after?
16  A.  I believe it would have been in October.
17  Q.  Okay.  Is that the first face-to-face meeting
18  that you had had with Rivera since his -- the end of his
19  employment with NETCO?
20  A.  I believe so, yes.
21  Q.  At that meeting was the formation of a company
22  in Ohio discussed between yourself, Mr. Rivera, and
23  Mr. Erwin in any way?
24  A.  Yes.
25  Q.  Where -- what was the status of things at that

[Page 130]

1  point?
2  A.  It was in the very early stages.  We were
3  just -- James Erwin didn't even know entirely what a
4  title insurance agency -- he knew what they were.  He
5  had dealt with them in the past, but he didn't know how
6  they made money and how the -- what the mechanics were
7  of a title insurance agency, so we were sort of
8  educating him about what the title insurance business
9  was about to see if he might be interested.
10  Q.  So when you talk about educating Mr. Erwin
11  about it, I assume that you and Mr. Rivera had had some
12  conversations about this business in Ohio prior to this
13  day in October when you met with Mr. Erwin, correct?
14  A.  Yes.  We had had conversations where
15  Mr. Rivera talked about the possibility of opening a
16  title insurance agency by then.
17  Q.  And you must have expressed some interest at
18  that point, correct?
19  A.  _ Yes.
20  Q.  Had you told him that you would provide
21  financial assistance at that point?
22  A.  No.
23  Q.  Had he asked you about that, whether you would
24  provide financial assistance?
25  A.  Not at that point.

[Page 131]

1  Q.  Okay.  What did you express to him prior to
2  that meeting with Mr. Erwin in October that your
3  interest was?
4  A.  I said I'd listen and see what he was going to
5  do.  I liked Tony as a friend and wanted to see what he
6  was doing, and I hoped that he did well.
7  Q.  Did you review the contents of your employment
8  agreement with NETCO at that time?
9  A.  No.
10  Q.  Did you think you would be in violation of the
11  agreement if you started up a new company?
12  A.  I thought that I would not be in violation as
13  long as my involvement with anything was beyond six
14  months from my termination date at NETCO.
15  Q.  Your involvement meaning when the company
16  opened, or what do you mean by your involvement?
17  A.  My -- my involvement with what?
18  Q.  With the new company.
19  A.  I believed that as long as the new company --
20  certainly as long as the new company was not open within
21  those six months that there would not be a violation of
22  that agreement and there, in fact, was no problem about
23  that.
24  Q.  So what -- what was the next step in this
25  process after you met with Mr. Erwin in October of 2000?

[Page 132]

1  Is that the right month?  It's not.  October of 1999.  I
2  apologize.
3  A.  The next step in what process?
4  Q.  Of forming National Real Estate.
5  A.  There were other phone conversations among
6  Mr. Rivera and Mr. Erwin and then Mr. Rivera and myself,
7  all three of us.
8  Q.  When did you ultimately decide to become a
9  part of National Real Estate?
10  A.  At some point in October of '99.
11  Q.  Was Mr. Erwin receptive to the idea at your
12  meeting with him in October?
13  A.  He was interested in looking into it.  There
14  was no agreement made at that point.
15  Q.  Who ultimately contributed financially to the
16  opening of National Real Estate?
17  A.  James Erwin, Tony Rivera, and Damian Sichek
18  and I.
19  Q.  And the meeting that you had with Erwin that
20  you mentioned in October of 1999, after that meeting
21  would it be fair to say that things happened pretty
22  quickly?
23  A.  Yes.
24  Q.  Did Erwin agree to participate soon after that
25  meeting with him in early October?

*Deposition of Al Beamer*

[Sheet 34, Page 133]

1    A.    Yeah.  Erwin did agree at some point in
2  October.  I'm not sure whether it was early or mid or
3  exactly what the date was that he agreed, but he did
4  agree.
5    Q.    Do you know when the articles of incorporation
6  were filed in the state of Ohio by Antonio Rivera?
7    A.    No.
8    Q.    Prior to the meeting with Erwin in October of
9  1999, did Mr. Rivera ever inform you that he had filed
10  the articles of incorporation in the state of Ohio?
11    A.    I don't know that I knew it at that time, but
12  I did later find out that he had already or that he had
13  filed articles of incorporation.
14    Q.    Well, doesn't that seem like something he
15  would tell you if you guys were talking about starting a
16  business?
17    A.    Maybe.  I don't remember him saying that.  I
18  believe he did that on his own.
19    Q.    But you're telling me you hadn't agreed to
20  become part of National until October of 1999, correct?
21    A.    Correct.
22    Q.    Did you have a formal title at National?
23    A.    I don't believe so.
24    Q.    You mentioned Mr. -- how do you spell or
25  pronounce Sichak again?

[Page 134]

1    A.    Sichak.
2    Q.    Sichak?
3    A.    Yes.
4    Q.    You referenced that Mr. Sichak, Mr. Erwin,
5  yourself, and Mr. Rivera were the four owners, is that
6  correct?
7    A.    Yes.
8    Q.    Did you contribute equal amounts of money?
9    A.    No.
10    Q.    How much did each person contribute?
11    A.    I believe James Erwin contributed $40,000, I
12  contributed $20,000, Tony Rivera contributed $10,000,
13  and Damian Sichek contributed $5,000 or something like
14  that to begin with.
15    Q.    Were you all to have the same voting
16  authority?
17    A.    Yes.
18    Q.    So as far as a vote goes, you had a 25 percent
19  say in what happened, is that accurate?
20    A.    As far as I -- I was to own 25 percent of the
21  shares of -- of the company.
22    Q.    Voting shares?
23    A.    Voting shares.
24    Q.    Okay.
25          MR. SHOEMAKER:  Mark that, please.  I think

[Page 135]

1  we're on J.
2          (Defendant's Exhibit J was marked for
3  identification.)
4    Q.    (By Mr. Shoemaker)  Do you recognize
5  Defendant's Exhibit J, Mr. Beamer?
6    A.    Yes.
7    Q.    What is it?
8    A.    It's called a preorganization subscription
9  agreement.
10    Q.    This document is dated October 21 of 1999 but
11  does not include the signatures of the four owners that
12  we previously described, including yourself.  Was this
13  document signed either on October 21st or very near
14  that?
15          MR. HABER:  Let me object.  It also has a fax
16  ledger up at the top dated November 1st, 1999 coming
17  from a Cincinnati area code, and the document is page 2
18  and 3 of a 6 -- of a 26-page fax.
19          MR. SHOEMAKER:  Okay.  And for the record,
20  I'll just state this is a document I received from you.
21          MR. HABER:  Absolutely.  No question about
22  it.
23          MR. SHOEMAKER:  So I'm not sure where any of
24  that came from, not to mention I received it today.
25  Let me ask you this.

[Page 136]

1          MR. HABER:  You asked if this document was
2  signed in October, and since there's a fax ledger on
3  this document of November 1st and it's unsigned, I
4  wanted the record to be clear.  My client believes
5  there is a signed copy of it; he just couldn't find it.
6          MR. SHOEMAKER:  Okay.  That's actually where
7  I was headed.  That's fine.
8    Q.    (By Mr. Shoemaker)  Was there a copy -- strike
9  that.
10          Was there a version of this that was signed on
11  October 21st, 1999?
12    A.    I don't believe it was signed on October 21st
13  of 1999.  There was a version of this with some of --
14  some corrections that was signed at some point, and I --
15  I believe it was a part of the NETCO versus Rivera
16  lawsuit file.  I couldn't find it in my -- in my files.
17    Q.    Do you recall signing a document obviously
18  similar to this, identical to this, I'll say, prior to
19  November 1 of '99?
20    A.    It wasn't identical because it contained a
21  correction, but it -- it was substantially similar to
22  this, and I would have signed it sometime in -- in late
23  October of '99 or early -- early November of '99.
24    Q.    When you say it contained the correction, can
25  you tell me what you're referring to?

*Deposition of Al Beamer*

1    A.   Yes.  On the page -- the second page of the
2    two pages that you've handed me, there's a circle around
3    30 common shares and the notation 40 and a circle around
4    $30,000 and the notation 40, and I believe those --
5    those changes were made as to 40 common and $40,000.
6    Q.   Did you actually put $40,000 into this
7    company?
8    A.   No.
9    Q.   Why does it say -- why are you saying that it
10   ultimately read $40,000 as amount subscribed?
11   A.   Because I -- my contribution was $20,000 in
12   cash along with the Title Works Suite of computer
13   programs.
14   Q.   Okay.  So am I to understand that your
15   contribution was $20,000 in cash, and then your software
16   contribution was also valued at $20,000 to equal
17   $40,000?
18   A.   Yes.
19   Q.   Which was the same amount that Mr. Erwin had
20   subscribed and Mr. Rivera had subscribed, and Mr. Sichak
21   had subscribed only $10,000, is that correct?
22   A.   Yes.  I stand corrected as to my earlier
23   statement when I had said that Mr. -- as to the amount
24   of cash contributed by Damian Sichek.  I believe I had
25   said 5, and in fact, it's 10.

[Page 138]

1    Q.   So this document is correct, not your earlier
2    testimony, correct?
3    A.   I believe so.  Actually, it does state that
4    the contribution would be in the amount of 10,000.  Half
5    would be on November 1st and the balance before December
6    1st, so that's where I got the 5,000 number.
7    Q.   Okay.  So you admit that you signed this
8    agreement at some point, you just don't recall exactly
9    when, is that correct?
10   A.   Yes.
11   Q.   But you don't think it was October 21st of
12   1999?
13   A.   No, I don't.
14   Q.   Are you aware of a business plan that was
15   prepared for National Real Estate?
16   A.   I'm aware of a -- a document named business
17   plan that Tony Rivera prepared, but it was not a
18   business plan for National Real Estate.
19   Q.   What was it?
20   A.   It was a document required by a title
21   insurance underwriter to be completed in order to apply
22   for a title insurance agency with that underwriter.
23   Q.   Did you see that document?
24   A.   I have seen it.
25   Q.   Did you see it at the time it was prepared?

[Page 139]

1    A.   No.
2    Q.   Who prepared it?
3    A.   Tony Rivera.
4    Q.   Do you know when that was prepared?
5    A.   No.
6    Q.   Does October 27th sound familiar to you?
7    A.   I don't recall a date.  That would be in line,
8    roughly, with the time line of the -- getting the agency
9    agreement, but I don't know specifically when it was
10   prepared.
11   Q.   It would make sense it was prepared before
12   National opened its doors on November 1st, wouldn't it?
13   A.   Yes.
14   Q.   Did you consider NETCO to be a competitor as
15   of November 1st, 1999?
16   MR. HABER:  A competitor with whom?
17   A.   A competitor with whom?
18   Q.   (By Mr. Shoemaker)  With National, I'm sorry.
19   A.   I -- they were a potential competitor.  I
20   wanted to make sure that the -- that there was not
21   competition for NETCO's customers as of the time that
22   National Real Estate opened and was in business for the
23   first few months.
24   Q.   Well, are you aware that the business plan
25   submitted by Mr. Rivera referred to NETCO as a major

[Page 140]

1    competitor?
2    A.   I believe I saw that afterwards, and I -- I
3    would say that eventually NETCO would have become a
4    competitor, but the -- the terms of the plans for
5    operation for National Real Estate to avoid NETCO's
6    customers during the -- the first few months of -- of
7    operation would have precluded there being any actual
8    competition.
9    Q.   Why do you say the first few months?
10   A.   Because the plan was to avoid NETCO's
11   customers during the term of Tony Rivera's six month
12   employment agreement.
13   Q.   And then after the six months were up to go
14   after NETCO customers?
15   A.   After the six months were up, then the plan
16   would be to go after whatever business was there.
17   Q.   Did you provide anyone at National a list of
18   NETCO's customers?
19   A.   Absolutely not.
20   Q.   Did anyone provide -- well, did you ever see a
21   customer list of NETCO's used at National?
22   A.   No.
23   Q.   Well, how would you possibly be aware of who
24   their customers were, then?
25   A.   Tony Rivera knew who their customers were in

*Deposition of Al Beamer*

[Sheet 36, Page 141]

1  general.
2      Q.  Didn't you have other people working there
3  besides Mr. Rivera?
4      A.  There were other people working there.
5      Q.  How about Maria Sagrati?  Do you know her?
6      A.  Yes.
7      Q.  Was she employed at National?
8      A.  Yes.
9      Q.  When did she begin her employment?
10     A.  Roughly the time that they opened the doors.
11     Q.  Okay.  Was she a prior employee of NETCO?
12     A.  No.
13     Q.  Did you ever personally discuss NETCO's
14  clients with Miss Sagrati?
15     A.  No.
16     Q.  Do you know if Mr. Rivera ever discussed
17  NETCO's customers with Miss Sagrati?
18     A.  The agreement was Miss Sagrati would --
19     Q.  I'm going to ask you just to respond to the
20  question.  Do you know if, in fact, Mr. Rivera spoke
21  with Miss Sagrati regarding NETCO's customers?
22     A.  I -- I needed the --
23         MR. HABER:  Do you know whether he did or he
24  didn't is the question.  If you then want to clarify it
25  through your response, you can do that.

[Page 142]

1         MR. SHOEMAKER:  I'm all for that.
2      Q.  (By Mr. Shoemaker)  It's a yes or no question.
3  You can certainly clarify it when you're done answering
4  it, Mr. Beamer.
5      A.  Yes.  I assume that they --
6      Q.  I didn't ask you what you assumed.  I asked
7  you what you know.
8         MR. HABER:  He wants personal knowledge.
9      A.  I know they talked about NETCO's customers.
10     Q.  (By Mr. Shoemaker)  Would you like to clarify
11  it?
12     A.  Yes, please.
13     Q.  Feel free.
14     A.  The agreement as to the way that National was
15  going to do business and seek customers was that Maria
16  was going to be the only salesperson, the only contact
17  person for National Real Estate, that Mr. Rivera was not
18  going to contact any customer, whether it was NETCO's
19  or -- or anyone else, and that when Maria came up with
20  someone that she was wanting to contact to pursue
21  business that she would run that name past Mr. Rivera
22  first to make sure that they were not a NETCO customer
23  before she went out to talk to them.
24     Q.  Okay.  Were you present when this agreement
25  was made between Miss Sagrati and Mr. Rivera?

[Page 143]

1      A.  I don't know that I was present.  It might
2  have been over the phone.
3      Q.  Did you hear it?
4      A.  I was a part of making that, yes.
5      Q.  So you're telling me there was a deal, and I
6  don't mean any -- an agreement, I'll say, not a deal,
7  that you heard between Miss Sagrati, Mr. Rivera, and
8  yourself.  Was Mr. Erwin part of this conversation as
9  well?
10     A.  I don't recall.
11     Q.  Which stated that any time Miss Sagrati --
12  I'll restate that.
13         Prior to Miss Sagrati contacting any customer,
14  she would run it by Mr. Rivera to make sure it wasn't a
15  NETCO customer?
16     A.  That was my understanding.
17     Q.  Well, that's your understanding.  Is that what
18  was said?
19     A.  Yes.
20     Q.  Are you aware if that actually occurred?
21     A.  I hope it did.  I believe it did.
22     Q.  Certainly you're aware that in the Rivera case
23  that was filed that Miss Sagrati was found to have
24  contacted numerous NETCO customers.  Are you not aware
25  of that?

[Page 144]

1      A.  I believe there was a -- there's certainly a
2  difference of opinion as to what type of entity
3  constitutes a NETCO customer.  NETCO drew that as a
4  very, very broad net to cover wholesale lenders, retail
5  lenders, brokers and everybody they had ever talked to,
6  gotten an order from, written a policy for, a very wide
7  net, and that the -- what I understood to be NETCO
8  customers was -- did not include those customers.
9      Q.  All right.  My opinion or your opinion isn't
10  necessarily what I'm asking.  What I'm asking you is if
11  you are aware that the Court determined that
12  Miss Sagrati had contacted NETCO customers.  As we sit
13  here today, are you telling me you're not aware of that
14  fact?
15     A.  No.  I'm saying -- you're saying am I
16  agreeing?
17     Q.  I didn't ask if you agreed.
18         MR. HABER:  Listen to the question.  The
19  question is did the Court --
20     Q.  (By Mr. Shoemaker)  I'm not trying to confuse
21  you, Mr. Beamer.  Let me rephrase it.
22         Are you aware as you sit here today if the
23  Court determined that Miss Sagrati contacted NETCO
24  customers during that time frame of November of 1999?
25     A.  I do understand that the Court made such a

*Deposition of Al Beamer*

[Sheet 37, Page 145]

1  finding.

2      Q.  Okay.  After the Court made a finding in that

3  regard, did you have a conversation with Miss Sagrati or

4  anyone else regarding her continued contact with NETCO

5  customers?

6      A.  I'm not sure at what point the Court made that

7  finding.  It was always my understanding and direction

8  to the extent that I had any say in it that National

9  Real Estate not contact NETCO customers, but that was my

10  statement to Miss Sagrati, to Mr. Rivera, to whoever

11  would listen.

12      Q.  Did you know who NETCO's customers were --

13      A.  No.

14      Q.  -- in Ohio?

15      A.  No.

16      Q.  You didn't have any idea?

17      A.  Well, I mean, I would have assumed that

18  they -- that there were some customers that were

19  customers of NETCO in several states, but I didn't know

20  specifically who those customers were.

21      Q.  But you understood that Mr. Rivera did?

22      A.  I understood that Mr. Rivera knew or should

23  have known who the customers were.

24      Q.  But to your knowledge, there was never a list

25  drafted by Mr. Rivera that stated these are all

[Page 146]

1  potential or current NETCO customers, you shouldn't

2  contact them, Miss Sagrati?

3      A.  I never saw such a list.

4      Q.  Okay.  What were your main duties at National?

5      A.  I provided the software, and I helped to put

6  in the forms and make the software work for them.

7      Q.  Okay.  Did you talk to underwriters and so

8  forth like you did at TTC or NETCO?

9      A.  No.

10      Q.  Did you participate in the drafting or

11  formatting of these forms to comply with the

12  underwriters' requirements?

13      A.  I can't remember whether I typed in any forms

14  or not.  I -- some of the forms are standard national

15  forms, the American Land Title Association forms, and I

16  would have provided those.

17      Q.  Well, there must be some forms that are --

18      A.  There -- there were also --

19      Q.  -- created or something or they wouldn't need

20  your services, isn't that correct?

21      A.  There -- there was a need for forms.  There

22  was a need for other programming of the -- the databases

23  in order to make that all work.

24      Q.  Such as what?  What do you mean the other

25  forms, the other databases?

[Page 147]

1      A.  Well, some of the function of the software is

2  to do calculations of things like state deed tax, state

3  mortgage tax if there is one, a calculation of the

4  prepaid interest by the method that is typical in that

5  area.  There are quite a few calculations that -- that

6  need to be done as a part of -- of preparing the -- the

7  title insurance commitment and invoice and then the --

8  the settlement statement, and the software needed to

9  have all the -- the right calculations for that area of

10  the country.

11      Q.  Okay.  So there's some forms that are somewhat

12  standardized for certain geographic locations, is that

13  correct?

14      A.  Yes.

15      Q.  And in the state of Ohio, there would be one

16  set of forms that would be needed as compared to the

17  state of Missouri, is that accurate?

18      A.  There are some forms that are national forms,

19  and there are some forms that are state forms.  There

20  are even some forms that are county or local forms.

21      Q.  Okay.  And had you -- you had already

22  previously set up this software and the forms relevant

23  to the Cincinnati area for NETCO, correct?

24      A.  I had set up NETCO's software to be able to

25  handle the -- the Ohio forms, yes.  I had not set up all

[Page 148]

1  of the forms.  There were people on staff who also knew

2  how to set up forms.  I had trained them, and they set

3  up some of the forms.

4      Q.  Using your system, right?

5      A.  Using my software, TMC's software.

6      Q.  And then you did the same thing for National

7  as far as designing and setting up these forms and

8  making the software compatible with anything else you

9  needed to do for that location, is that correct?

10      A.  Well, it wasn't exactly the same thing.

11      Q.  Well, tell me what differed.

12      A.  The -- the -- National Real Estate had just

13  the Cincinnati area.  They didn't deal -- they didn't

14  have an office in the Cleveland area, for example, so

15  there was no need to set up forms or set up calculations

16  based on the way that business is done in Cleveland.

17  The organization of the office of National Real Estate

18  because it had so few people didn't require the level of

19  complexity that it had -- that the NETCO office had with

20  a substantially larger office, not only in Cincinnati

21  but substantially larger operations in Ohio and the need

22  to connect to the entire NETCO system.

23      Q.  Okay.  So from what you're telling me, and you

24  can correct me, and I'm sure you will if I'm wrong.  The

25  National software program that you created was a

*Deposition of Al Beamer*

[Sheet 38, Page 149]

1  simpler, smaller version of what the NETCO system was?

2      A.   What I created for National started from my

3  bare bones title insurance, generic title insurance

4  agency package of software that I then customized to

5  what I understood to be the needs of -- of National.

6      Q.   Okay. And I'm asking you any differences

7  between that and NETCO, and what my question was is was

8  it basically a simpler, smaller version of NETCO? Is

9  that an accurate statement?

10      A.   No. It's not an accurate statement --

11      Q.   Okay. And --

12      A.   -- because --

13      Q.   Go ahead.

14      A.   In no way was it a version of NETCO software.

15  As I have set up software in dozens of title agencies in

16  many states, I start with a -- a simple set of databases

17  and national forms and expand on it from there to get to

18  the point to provide what they need.

19      Q.   Okay. Let me ask it this way. All the forms

20  that were contained in National's package, the

21  standardized forms that you began with and the

22  information you need to, I guess, create or format these

23  forms would all be contained in NETCO's system, wouldn't

24  it? I mean, it's in the same area is what I'm getting

25  at.

[Page 150]

1      A.   It is in the same area, but they were to have

2  a different underwriter. The underwriters sometimes

3  required different forms, particularly as to closing

4  forms and affidavits and things like that. Each of them

5  have their own take on what they want on the affidavits,

6  and the -- so they -- they -- I started from scratch and

7  created those forms just as I would if I had opened --

8  if National had opened in Missouri or Montana.

9      Q.   Can you tell me what you recall was different

10  about the underwriter from National compared to the

11  underwriters for NETCO in Ohio regarding the

12  requirements or forms they needed?

13      A.   I never sat down and compared National's forms

14  to net -- to NETCO's forms. I specifically wanted to

15  avoid that.

16      Q.   Prior to your employment by NETCO, had you

17  ever had any business in the state of Ohio regarding

18  title insurance?

19      A.   Prior to my employment with NETCO?

20      MR. HABER: With NETCO and its predecessor,

21  Equity?

22      MR. SHOEMAKER: Sure. I think he said he

23  started in 1993. I'll clarify it.

24      Q.   (By Mr. Shoemaker) Prior to 1993 did you ever

25  have any --

[Page 151]

1      A.   I'm sure I talked to title insurance agents in

2  Ohio as a result of my work for Commonwealth Title

3  Insurance.

4      Q.   Did you ever implement any software there for

5  TMC in the state of Ohio prior to 1993?

6      A.   No.

7      Q.   Did you ever implement any software through

8  TMC in the state of Ohio prior to the time you

9  implemented software for NETCO?

10      A.   Is that the same question?

11      Q.   Well, I just want to clarify. I don't think

12  we established an exact date when NETCO opened -- opened

13  offices in Cincinnati. I think you said it was '97 or

14  '98. Does that sound about right?

15      A.   That's about. Yes.

16      Q.   My question is from '93 to '97 or '98, during

17  that time frame, did TMC ever or you through TMC ever

18  implement any software in the state of Ohio?

19      A.   I did work with a title insurance underwriter

20  based in Ohio.

21      Q.   Who was that?

22      A.   National Land Title.

23      Q.   Okay. Did you create a software program

24  through Title Works for their use in the state of Ohio?

25      A.   No.

[Page 152]

1      Q.   When did your involvement with National cease?

2      A.   I guess when -- when National agreed to go out

3  of business as a result of the lawsuit with NETCO. It

4  was never resurrected at that point, after that point.

5      Q.   Do you recall when that was?

6      A.   I believe it was in -- it was in the year

7  2000, late in the year 2000, early in 2001.

8      Q.   Late 2000 to early 2001?

9      A.   That's my off the top of my head guess, yes.

10      Q.   Did you get your money back at that point?

11      A.   No.

12      Q.   None of it?

13      A.   None of it.

14      Q.   Did it go bankrupt? Did it dissolve? What

15  can you tell me about the end of the days at National?

16      A.   I -- I don't know. James Erwin took care of

17  that. He was an attorney, and he took care of whatever

18  the end of National was.

19      Q.   Did you have to pay any additional amounts?

20      A.   At the point that it terminated?

21      Q.   Yes.

22      A.   No.

23      Q.   So you lost 20 grand plus the 20,000 of

24  software or whatever you put in it; would that be

25  accurate?

*Deposition of Al Beamer*

[Sheet 39, Page 153]

1    A.   Yes.

2    Q.   Did you ever receive any financial payments of

3  any sort from National?

4    A.   I believe I got reimbursed for some computers

5  that I bought once. That's it.

6    Q.   Do you recall how much that was for?

7    A.   About $3,000.

8    Q.   Okay. The 20,000 that we talked about, that

9  wasn't just for software, that was for equipment and

10  such or not?

11    A.   No.

12    Q.   It wasn't?

13    A.   Which 20,000?

14    Q.   My fault. You contributed $20,000 cash and

15  $20,000 of software, is that it? That didn't include

16  equipment or anything like that?

17    A.   No.

18    Q.   Okay. So this equipment would be additional

19  equipment that you bought that you were reimbursed for?

20    A.   Yes.

21    Q.   So you never received any profits whatsoever

22  from National?

23    A.   No.

24    Q.   Did anyone, do you know?

25    A.   Not that I know of.

[Page 154]

1    Q.   Were you set up to receive any such profits as

2  far as your agreement with National?

3    A.   Only insofar as you can see on this document

4  that I -- I owned shares.

5    Q.   Okay. So that's -- you weren't supposed to

6  receive X amount of any profits over X amount?

7    A.   No.

8    Q.   It wasn't set up that way?

9    A.   No.

10    MR. SHOEMAKER:  Let's take just a quick

11  five-minute break.

12    (A short break was taken.)

13    Q.   (By Mr. Shoemaker)  All right. Your

14  employment agreement which is Defendant's Exhibit C, do

15  you agree that this was an enforceable contract?

16    MR. HABER:  Objection; calls for a legal

17  conclusion.

18    You can answer to the extent that you know.

19    A.   I -- I don't know. It was an agreement that

20  was -- that was made, but I '-- I don't know what a court

21  would say about this agreement.

22    Q.   (By Mr. Shoemaker)  Are you aware that the

23  Ohio court found that Antonia Rivera's contract was

24  enforceable in the state of Ohio?

25    A.   I am aware that the Ohio court -- I don't know

[Page 155]

1  exactly -- I don't remember exactly what the terms of

2  the -- the judgment and everything were in that case,

3  but I -- I know that the Ohio court did find that Rivera

4  was in violation of his responsibilities to NETCO, I

5  guess.

6    Q.   Which is what you were attempting to avoid

7  when you formed National, is that correct?

8    A.   Well, that wasn't the principal interest in

9  establishing National. It wasn't to avoid NETCO, but

10  that -- that was one of the things that I sought to

11  avoid, certainly, yes.

12    Q.   Earlier you differentiated between what your

13  belief was versus what the court determined regarding

14  the violation of Rivera's non-compete, so let me ask

15  you. In your opinion, was Rivera's employment agreement

16  violated?

17    MR. HABER:  Objection to the form of the

18  question as to what he differentiated, but you may

19  answer if you're able.

20    A.   I -- could you restate the question?

21    Q.   (By Mr. Shoemaker)  Yeah. I'll actually

22  restate it.

23    MR. HABER:  Do you want her to read it back?

24    MR. SHOEMAKER:  No. That's fine. I'll

25  restate it in its entirety. That's fine.

[Page 156]

1    Q.   (By Mr. Shoemaker)  Do you think Mr. Rivera

2  violated his employment agreement with NETCO?

3    A.   No, I don't.

4    Q.   And why not?

5    A.   Because I don't believe that National sought

6  business or did business with substantial NETCO

7  customers.

8    Q.   You don't think Miss Sagrati contacted any of

9  NETCO's substantial customers?

10    A.   No, I don't.

11    Q.   Okay. What do you mean by substantial,

12  Mr. Beamer?

13    A.   I mean customers more than somebody that had

14  done one deal or two deals in a year with NETCO.

15    Q.   Let me clarify that. You don't think National

16  or any member of National contacted any of NETCO's

17  clients that NETCO did business with more than once or

18  twice a year? Is that what you just stated?

19    A.   I -- I did state that I don't believe National

20  contacted and then obtained business from any customers

21  that were substantial network -- NETCO customers that

22  did a substantial -- that did half of their business or

23  more or did any substantial amount of their business

24  with NETCO on a regular basis.

25    Q.   And when you say substantial, did you just say

*Deposition of Al Beamer*

1  not make sense why it is so broad in an employment
2  agreement so there's no risk of that whatsoever for a
3  six-month period?
4      MR. HABER:  Objection to the form.
5      A.  I don't agree.
6      Q.  (By Mr. Shoemaker)  Do you think paragraph 6
7  of this employment agreement is overly broad in its
8  language?
9      A.  I --
10     MR. HABER:  Objection, but you may answer.
11     A.  I believe it's subject to interpretation as to
12 the real world.
13     Q.  (By Mr. Shoemaker)  When you met with Sagrati
14 and Rivera concerning NETCO customers, did you tell them
15 not to worry about the small customers, only the
16 substantial customers?
17     A.  First of all, I don't believe we established
18 that I met with them.  I said I talked with them.  It
19 may have been over the phone.
20     Q.  That's fine.  During that conference, then,
21 same question.
22     A.  The issue of substantial customers did not
23 come up until in the course of the lawsuit NETCO refused
24 to -- first claimed that Rivera was in violation by
25 dealing with NETCO customers and then refused to provide

1  a list of who those customers were that they were
2  supposed to avoid doing business with.
3      Q.  So initially Miss Sagrati was supposed to tell
4  Mr. Rivera about any customer she was to contact
5  regardless, correct, so Mr. Rivera could determine
6  whether or not it was in violation of the agreement, is
7  that accurate?
8      A.  That's my understanding, yes.
9      Q.  How long had Mr. Rivera run the Ohio operation
10 for NETCO?
11     A.  Around two years.
12     Q.  In paragraph 6 of Defendant's Exhibit C of
13 your employment agreement, it states subsection D,
14 employee shall not hire, solicit, induce, or attempt to
15 induce any employee or independent contractor of NETCO
16 to leave its employer engagement, engage in any
17 competing business, or to otherwise aid or assist any
18 person or company that is or intends to be in
19 competition with NETCO.  Do you understand that
20 provision, Mr. Beamer?
21     A.  Yes.
22     Q.  Did you aid or assist Mr. Rivera in the
23 formation of National during the six months after your
24 termination --
25     A.  No.

1      Q.  -- with NETCO?
2      MR. HABER:  Okay.  I'm sorry.  Can you repeat
3  or read back the question so I can --
4      MR. SHOEMAKER:  I think the question was if
5  he aided or assisted Mr. Rivera in the formation of
6  National within six months after his employment with
7  NETCO.
8      MR. HABER:  Within six months of Rivera's --
9  of Beamer's --
10     MR. SHOEMAKER:  Beamer's.
11     MR. HABER:  Thank you.  I'm sorry.  I had a
12 brain lock.
13     MR. SHOEMAKER:  That's all right.
14     A.  I said no.
15     Q.  (By Mr. Shoemaker)  And your employment with
16 NETCO ended early in April, is that correct?
17     A.  Yes.
18     Q.  So through the early part of October you
19 didn't aid or assist Mr. Rivera in any way, shape, or
20 form in the formation of National?
21     A.  I don't believe so, no.
22     Q.  Did you obtain confidential information as set
23 forth in paragraph 3 of NETCO during your employment
24 with NETCO?
25     A.  I'm sorry.  Could you --

1      Q.  Did you obtain any of this confidential
2  information as referenced in paragraph 3 during your
3  employment with NETCO?
4      A.  I did have access to information that would --
5  that would fit within some of these categories.
6      Q.  Well, not just access to.  Didn't you discuss
7  in meetings with Mr. Baumgart such things as actual
8  customers -- well, I'll just start with that, actual or
9  potential customers.  Wasn't that discussed at some
10 meetings that you attended?
11     A.  Not -- at most of the meetings there was no
12 mention of customers.
13     Q.  I didn't ask you about most of the meetings.
14 I'm asking you if you discussed -- if at some meetings
15 were actual or potential customers of NETCO's discussed?
16     A.  There were mentions of some customers at some
17 meetings.
18     Q.  Were there products or services of NETCO's
19 discussed at meetings?
20     A.  Products or services were discussed, but I
21 would not consider those to be non-public information or
22 not generally known to the public or trade.  Title
23 insurance is a very generic industry.
24     Q.  So the way NETCO does business is the same as
25 the way National was going to do business?

*Deposition of Al Beamer*

[Sheet 42, Page 165]

1    MR. HABER: Objection. You asked him about
2  products.
3        MR. SHOEMAKER: It's a different question.
4        MR. HABER: All right.
5    A.  The way NETCO does business is the way every
6  title insurance agent does business.
7    Q.  (By Mr. Shoemaker) So there's no secrets at
8  all is what you're saying?
9    A.  I'm saying there certainly were none held by
10  NETCO.
11    Q.  What about the client relationships? Are they
12  an extremely important part of any title insurance
13  agency?
14    A.  It's important to have clients, certainly,
15  yes.
16    Q.  Is that -- do you not consider that an
17  extremely important part of that business? Isn't that
18  what it's based on?
19    A.  It's not non-public. It's -- it's dealing
20  with the public and dealing with the customers that are
21  out there. You try to -- to obtain their business,
22  certainly, but it's not anything secret that you do in
23  negotiating or obtaining business from a particular
24  customer.
25    Q.  How about money spent on developing clientele,

[Page 166]

1  those types of things? Is that public information?
2    A.  There was very little money spent on
3  developing clientele as far as I know at NETCO.
4    Q.  Okay. Would you consider that public
5  information, though?
6    A.  I don't know how much NETCO spent on -- on
7  sales or developing clients.
8        MR. HABER: The question was would you
9  consider the money spent to be public information.
10    A.  The -- the private financial matters of -- of
11  NETCO as to what it spent money on would be NETCO's
12  private financial information. I would agree with that.
13    Q.  (By Mr. Shoemaker) How about how NETCO wanted
14  to market NETCO in the Ohio area or in any other state,
15  for that matter? Would that be something that would be
16  considered a trade secret, in your mind?
17    A.  Absolutely not.
18    Q.  Okay. Why not?
19    A.  Because they did it the same way that
20  everybody else in the title insurance industry does.
21  You hire a salesman and you send the salesman out there,
22  and you tell them that we'll provide good pricing, we'll
23  provide good service, and then you hope that they try
24  you and that they -- they like your people and that they
25  like your pricing and that everybody goes on happily

[Page 167]

1  ever after.
2    Q.  So if everybody does it the same, why are some
3  companies more successful than others?
4    A.  Better salespeople provide product -- that
5  provide the services faster, they provide them -- their
6  relationships that get formed as to connections within
7  the industry with realtors and others. There are any
8  number of reasons why any business is more successful
9  than another in the same industry without it being a
10  trade secret.
11    Q.  Okay. Well, certainly would you agree that
12  NETCO is a successful company?
13    A.  They've made a lot of money.
14    Q.  Okay.
15    A.  I wouldn't consider them a successful company.
16    Q.  Why not?
17    A.  I don't like the way that John Baumgart does
18  business.
19    Q.  If you based success purely on how much money
20  a business makes, would you consider NETCO a successful
21  company?
22    A.  Yes.
23    Q.  And is that based, I can only guess, on what
24  you just described, on things that make title insurance
25  agents or agencies successful? Are some of those things

[Page 168]

1  utilized by NETCO to make them successful?
2    A.  It's such a vague question. NETCO hires
3  salespeople. They go out and meet customers. They try
4  to solicit business from those customers, and they have
5  been successful in getting those customers to send them
6  orders, and they have been able to keep their costs low
7  enough so that there have been profits. That's --
8  that's the way that any grocery store or any -- any
9  business or -- that's the way that many businesses make
10  money. It's not a trade secret.
11    Q.  Okay. Did you use any of the knowledge you
12  obtained while you were at NETCO when you were creating
13  the software package for National?
14    A.  I did my best to avoid using any NETCO
15  experience, and I certainly avoided using their forms
16  and all of the databases that I -- that had been in
17  place at NETCO.
18    Q.  You said you did your best, but my question
19  was did you use any of your knowledge that you obtained
20  at NETCO in creating your software for National?
21    A.  Creating the software, no.
22    Q.  Okay. How about did you use any of the
23  knowledge that you obtained at NETCO when implementing
24  any of the forms that you used at National?
25    A.  No.

*Deposition of Al Beamer*

[Sheet 44, Page 173]

1   happened one day to the next.
2       Q.   Didn't your meeting --
3       A.   Tony Rivera wasn't employed at the time, so
4   his main focus was figuring out what he was going to do
5   next and making it happen.
6       Q.   Well, are you sure that meeting with Erwin
7   took place in October?
8       A.   I don't know. I don't have anything on paper
9   telling me when that meeting took place.
10      Q.   So it could have taken place in September, as
11  far as you know?
12      A.   I don't believe it took place in September,
13  but to -- I -- I don't have written confirmation of
14  exactly when it took place.
15      Q.   So you don't believe it occurred in September,
16  you think it occurred in October, and on top of that,
17  after the general discussions with Erwin in early
18  October, everything got done by the 21st of October.
19  That's your understanding or that's your recollection?
20      A.   I don't know that everything got done.
21      Q.   Well, everything contained in the agreement.
22      A.   There was a -- there was an agreement proposed
23  dated October 21st.
24      Q.   And the doors opened November 1st, right?
25      A.   Yes.

[Page 174]

1       Q.   Okay. Are you aware of the interrogatory
2   responses that your attorney, Mr. Haber, or at least
3   someone from his office submitted to me? Did you review
4   them, I should say?
5       MR. HABER:   The ones e-mailed today or the
6   prior ones?
7       MR. SHOEMAKER:   Anything prior to today.
8       A.   I believe so.
9       Q.   (By Mr. Shoemaker)   Did you sign a
10  verification that they were true and accurate?
11      A.   I don't remember.
12      MR. HABER:   Did he?
13      MR. SHOEMAKER:   He should have if he didn't.
14      MR. HABER:   Yeah. If he didn't -- they came
15  from John, so --
16      A.   I have no reason to expect that -- that I am
17  not aware of the answers to the interrogatories.
18      Q.   (By Mr. Shoemaker)   Well, I want to clarify
19  today that the information contained in the
20  interrogatories is true and accurate, to the best of
21  your knowledge. You're required to sign them. I want
22  to know if you did -- if you looked through and verified
23  them.
24      MR. HABER:   I don't know if I have a verified
25  copy of them. Do you?

[Page 175]

1       MR. SHOEMAKER:   I may upstairs.
2       MR. HABER:   Since John did it, I mean, I
3   don't know.
4       MR. SHOEMAKER:   Well, regardless of who did
5   it, Mr. Beamer is required to verify that they're
6   accurate, so if he hasn't --
7       MR. SHOEMAKER:   Then he should.
8       MR. SHOEMAKER:   -- then I'd like him to do it
9   right now on the record.
10      MR. HABER:   There was some supplemental stuff
11  which I e-mailed which he has not formally reviewed,
12  although I worked with him last night.
13      MR. SHOEMAKER:   If that's the case, if you
14  want tonight as well, that's fine, but I would like for
15  those to be verified as well.
16      MR. HABER:   Can you just print those for me
17  because I don't have a printer.
18      MR. SHOEMAKER:   Yeah. I can, actually.
19      MR. HABER:   I did them on the computer and
20  e-mailed them, so if you will print them for me, I'll
21  have him verify them. Do you want us to just do it
22  tonight so we don't waste deposition time?
23      MR. SHOEMAKER:   No. Actually, as far as
24  those go, I want him to do it right now if he hasn't
25  previously because frankly, he should have if he

[Page 176]

1   hasn't.
2       MR. HABER:   I agree.
3       MR. SHOEMAKER:   So I would assume that's
4   something that he has reviewed, and if he hasn't, then
5   yeah. Frankly, I would like to know that on the record
6   if he hasn't reviewed them and you submitted them. As
7   far as what you sent me last night, that's fine to do
8   tonight.
9       MR. HABER:   There was a supplemental response
10  after that.
11      A.   I do remember reviewing these. They are my
12  responses.
13      Q.   (By Mr. Shoemaker)   Okay. And --
14      MR. HABER:   I will formally, if you don't
15  have a verified copy, get a verification form so that
16  you can -- signed by him so it can be attached.
17      MR. SHOEMAKER:   Frankly, I wasn't trying to
18  be clever. I will see if I do. I don't know if I did.
19  If I didn't, I want to make sure that you verify at
20  least on the record that they're true and accurate, and
21  that's what you're telling me, correct?
22      MR. HABER:   No one is going to accuse you of
23  being clever.
24      MR. SHOEMAKER:   Thanks.
25      Q.   (By Mr. Shoemaker)   Is that correct,

*Deposition of Al Beamer*

[Sheet 45, Page 177]

1  Mr. Beamer, these responses are true and accurate?

2  A.  Yes.

3  Q.  To the best of your knowledge, correct?

4  A.  Correct.

5  MR. HABER:  Just so we're -- since there was

6  a supplementation that was done in April of '03, why

7  don't you take a look at those to make sure to the

8  extent they've been supplemented.  I know it looks -- I

9  think John supplemented them by letter form as well to

10  you.  Do you have a copy of that?  Do you want me to

11  have -- I want to make sure you have them all verified.

12  MR. SHOEMAKER:  If you have a letter, you may

13  supplement that tomorrow.  What we're talking about on

14  the record is your first responses, I believe, that

15  Mr. Beamer just reviewed, correct?

16  MR. HABER:  Correct.  He reviewed the first

17  responses.  There was a supplemental sent in April of

18  '03.

19  MR. SHOEMAKER:  And he reviewed that as well

20  as we sat here, correct?

21  MR. HABER:  He's just reviewed that now, but

22  then separate and apart there was an April 9th, 2003

23  letter sent via e-mail to you from John supplementing

24  the damage calculations.  It appears that Mr. Beamer

25  would have gotten a copy of this letter.  If you wish,

[Page 179]

1  correct?

2  A.  Yes.

3  Q.  What is that based on?

4  A.  It's based on several things.

5  Q.  Can you tell me?

6  A.  It started with a -- with several

7  conversations with Bill Baumgart in Florida in which he

8  told me that his brother had been pressuring him to

9  terminate me as a result of my involvement with

10  National.  It continued with Bill Andrews taking me

11  aside into a separate room in the -- during my

12  deposition in Cincinnati and telling me that if National

13  was not disbanded immediately that John would arrange

14  through his brother to see that I was -- that my

15  involvement with TTC was terminated.  It continued with

16  Bill Andrews then calling me a few days later on

17  December 6th, '99 to tell me that, in fact, the deal had

18  been struck and that I was, in fact, terminated from

19  Transcontinental at that point and instructed me to

20  contact Attorney Curphey to confirm that, and it then

21  continued with me calling Attorney Curphey and having

22  him tell me yes, I was terminated from Transcontinental,

23  yes, he had been in touch with Mr. Andrews and that

24  the -- I had asked to talk to Mr. Baumgart, and he said

25  that I could not, and Mr. Curphey then sent proposed

[Page 178]

1  I will put these in formal interrogatory form,

2  MR. SHOEMAKER:  I don't have a problem with

3  that, with the way they're formatted.

4  MR. HABER:  It's done in a letter.  If you

5  want it in the format of an interrogatory, I'll do so

6  for you.

7  MR. SHOEMAKER:  I do not need that because

8  we're going to discuss that today anyway, so I think

9  it's fine the way it is.

10  MR. HABER:  Okay.

11  MR. SHOEMAKER:  If he has a problem with

12  what's in there, he can let me know today.  That's

13  something I plan on covering.

14  MR. HABER:  Okay.

15  Q.  (By Mr. Shoemaker)  Okay.  So you've reviewed

16  the responses to the interrogatories that are dated I

17  believe in March of 2003 and then plaintiff's

18  supplemental responses that are dated April 18th, and

19  you swear to the best of your knowledge that the

20  responses to that are true and accurate, is that

21  correct?

22  A.  Yes.

23  Q.  Okay.  You've alleged in your complaint that

24  John Baumgart pressured his brother to terminate you in

25  retaliation for your investment in National, is that

[Page 180]

1  agreements by which I would agree to the termination of

2  my employment and the termination of my contracts as

3  Title Marketing Company with TTC.

4  Q.  Anything else?

5  A.  What was the question at the beginning of all

6  that?

7  Q.  What was your allegation that John pressured

8  his brother to terminate you from TTC for your

9  investment in National?  What was it based on?

10  A.  It was also based on conversations that I had

11  with Transcontinental Title employees who told me that

12  there was a deal in place that John Baumgart would

13  reimburse Bill Baumgart for any costs that he may incur

14  as a part of terminating my employment.

15  Q.  And who specifically told you that?

16  A.  Frank Skryd.

17  Q.  When did Frank tell you that information?

18  A.  In early 2000.

19  Q.  Where were you when he told you this?

20  A.  I believe it was a phone conversation.

21  Q.  Who initiated the phone call?

22  A.  I did.

23  Q.  For what purpose?

24  A.  To -- because Frank and I were friends, to see

25  how he was doing, and to -- and to see what he was

*Deposition of Al Beamer*

[Sheet 46, Page 181]

1  doing, if he was still with Transcontinental and to --
2  and to see if they were still using my software, and
3  that issue came up.
4      Q.  Did you bring it up, or did Frank bring it up?
5      A.  I don't recall.
6      Q.  Do you recall specifically what Frank told you
7  in regards to that fact?
8      A.  Yes, I do.
9      Q.  And what was the statement?
10     A.  He said that Ian Gorman was in the same room
11  with Bill when Bill was on the phone with John Baumgart
12  and made that deal.  Ian had told him.
13     Q.  So let me be clear here.  Frank told you that
14  Ian Gorman told him that he was present during a phone
15  conversation between Bill Baumgart and John Baumgart
16  where this deal was made?
17     A.  Yes.
18     Q.  Frank was not in the room during the
19  conversation between Bill and John, correct?
20     A.  He didn't say that he was.
21     Q.  All right.  Did he state whether Mr. Gorman
22  was involved in a -- in like a speaker phone
23  conversation?  Did he actually hear John say this, or
24  was he just present when Bill and John were talking?
25     A.  I don't remember.

[Page 182]

1      Q.  Well, what was your understanding?
2      A.  He -- Ian -- Frank said that Ian was well
3  aware that the -- the conversation had taken place and
4  what the conversation was about and that the offer was
5  made and eventually accepted for the -- the agreement to
6  terminate me and for there to be an agreement to
7  reimburse Bill by John.
8      Q.  Do you have any knowledge of whether John ever
9  reimbursed Bill for any amounts regarding that matter?
10     A.  My understanding is that he didn't.
11     Q.  He did not?
12     A.  That's my understanding.
13     Q.  And where did you obtain that information?
14     A.  From either Frank Skryd or Ian Gorman.
15     Q.  So you have spoken with Mr. Skryd or
16  Mr. Gorman since your initial settlement with TTC for
17  80,000?
18     A.  Yes.
19     Q.  And that's when that conversation would have
20  taken place?
21     A.  I've talked with them several times, so during
22  one of those conversations it took place.
23     Q.  And they told you that to their knowledge,
24  John had never paid Bill anything?
25     A.  Yes.

[Page 183]

1      Q.  Okay.  Let's go back.  You mentioned you had
2  several conversations with Bill Baumgart that John
3  Baumgart was pressuring him to terminate you, is that
4  right?
5      A.  Yes.
6      Q.  When did the first one of these conversations
7  take place?
8      A.  I would estimate about six weeks prior to the
9  time I was terminated.
10     Q.  Well, your employment ended with TTC in early
11  December, right?
12     A.  Maybe four weeks.  About the time, I guess, we
13  first started talking about it as to John wanting me
14  terminated, about the time that National opened up.
15     Q.  Which was November 1st of '99?
16     A.  So roughly November 1st.
17     Q.  Okay.  What do you specifically recall Bill
18  Baumgart telling you at that time?
19     A.  I recall him saying that -- that John had
20  called him and was upset that this company was going to
21  be competing against him and that he wanted Bill to
22  terminate me to hurt the chances of National Real
23  Estate.
24     Q.  Where did this conversation take place?
25     A.  Either in the Transcontinental office or at

[Page 184]

1  dinner.
2      Q.  When is the next conversation you had with
3  Bill where the topic came up?  When did that occur?
4      A.  A week or so later.  The next time I was down
5  in Florida.
6      Q.  And what was said at that meeting?
7      A.  That John had again contacted Bill asking him
8  to -- to fire me.
9      Q.  How about the next meeting regarding the
10  topic?  Was there any further meetings between you and
11  Bill where it was discussed?
12     A.  Yes.
13     Q.  And when was that?
14     A.  I don't know if there was one or two more, but
15  it was roughly the same -- the gist was the same for
16  each until the -- last one which was I believe the
17  day before my deposition in Cincinnati.
18     Q.  Okay.  Well, before -- your deposition in
19  Cincinnati was what, December 2nd of '99?  Does that
20  sound right?
21     A.  Right.  I believe so.
22     Q.  So you think December 1st of '99 you had a
23  meeting with Bill, right?
24     A.  Within a day or two before that, yes, sir.
25     Q.  Okay.  And between the last time we just

*Deposition of Al Beamer*

[Sheet 47, Page 185]

1  discussed and your meeting in early December, you think
2  there were one or two other meetings?
3      A.  Yes.  Generally whenever Bill and I talked
4  during that period, it included a statement by him that
5  John had called or John had come down or John had done
6  something and -- and tried to get him to agree to fire
7  me as a part of it.  We talked about other things,
8  certainly, but that was one of the things that he
9  continued to mention, and it was very aggravating to
10 him.
11     Q.  It was aggravating to him that John was asking
12 him that?
13     A.  Yes.
14     Q.  Overall, how would you describe the
15 relationship between John and Bill?
16     A.  Brothers.
17     Q.  Are they friends, do you think?
18     A.  They -- sure.
19     Q.  Do they get along well?
20     A.  At times as I'm sure with any set of brothers
21 that they get along better than other times.
22     Q.  Would you describe their relationship as being
23 fairly normal as far as relationships between brothers?
24     A.  They're quite competitive with each other, but
25 they often act like normal brothers.

[Page 186]

1      Q.  But the competition between them obviously is
2  different than most brothers, correct?
3      A.  Well, it wasn't so much at that time.  They
4  had divided up the country, and they kept out of each
5  other's markets, so they -- they were not competing head
6  to head.  They were just both wanting to -- to have the
7  biggest, most financially successful company, so that --
8  that would be like two brothers wanting to run the
9  fastest race or have the biggest car or something like
10 that.
11     Q.  Okay.
12     A.  They were not competitive directly with each
13 other at that point.
14     Q.  Did you consider yourself to be a part of the
15 success at TTC in December of '99?
16     A.  Yes.
17     Q.  And you think Bill considered you to be a part
18 of the success of TTC in December of '99?
19     A.  _ I know he did.  He said that.
20     Q.  Yet you think he threw all that away and the
21 help to his company that you provided him because John
22 asked him to?
23     A.  Yes.  I know that happened.
24     Q.  So on 12/1 when you spoke with Bill, what
25 specifically did he say about it?

[Page 187]

1      A.  He said that his brother and Ed Cook had come
2  down to Florida and one of their main purposes was to
3  convince him to terminate my employment and that he had
4  told his brother and now he was telling me -- he was
5  quite angry and upset -- that I was an employee of
6  Transcontinental Title, I was going to continue to be an
7  employee of Transcontinental Title, I had been an
8  important part of the success of Transcontinental Title,
9  and that he did not want to hear any more about National
10 Real Estate or anything to do with the state of Ohio
11 from me or his brother forever and ever.  He wanted to
12 put this to bed forever and say look, Al Beamer works
13 for me and he's going to continue to work for me, and I
14 don't want to hear about it.
15     Q.  That's what he told you he told his brother?
16     A.  That's what he told me, and that's what he
17 told me that he told his brother.
18     Q.  Any of these conversations that we've just
19 discussed between you and John Baumgart, were there any
20 witnesses to any of those conversations?
21     A.  I believe you misspoke.  You said the
22 conversation was with --
23     Q.  Thank you.  Any of the conversations that
24 we've just discussed regarding your conversations with
25 Bill Baumgart, were there any witnesses to any of those?

[Page 188]

1      A.  The ones at the bar or at the -- at dinner
2  were -- there were not witnesses.  The ones in the
3  office, there may have been one or two witnesses.
4      Q.  I'm not asking may have.  I'm asking you if
5  you remember if there were any witnesses to any
6  conversation between you and Bill regarding this topic?
7      A.  I -- I don't recall specifically that there
8  were witnesses to any particular conversations.
9      Q.  So what changed, Mr. Beamer?  What changed
10 between 12/1 and 12/6?
11     A.  I was terminated.
12     Q.  Even though Bill had just told you on 12/1
13 that he didn't want to hear any more about it and so
14 forth, correct?
15     A.  Yes.
16     Q.  Was there any change of anything, to your
17 knowledge, between the 1st of December and the 6th or
18 7th of December?
19     A.  A change in what?
20     Q.  In your involvement with National or anything
21 that you had done with TTC; anything, to your knowledge.
22     A.  What happened between those times was the --
23 the time that I was threatened with termination by Bill
24 Andrews.
25     Q.  Okay.

*Deposition of Al Beamer*

[Sheet 48, Page 189]

1    A.   And he said that he had -- he was talking to
2    me on behalf of John Baumgart and NETCO, that John had
3    asked him to tell me that unless I saw to it that
4    National was immediately torn apart and disbanded and --
5    and sought no further business that he was working out a
6    deal to where I would be terminated from
7    Transcontinental.
8    Q.   Okay.  Did he specifically state to you that
9    NETCO would, quote, exploit the family relationship
10   between NETCO and TTC?
11   A.   I don't know that he used those words.
12   Q.   What did he state that was similar to that?
13   What do you recall?  What words did he use?
14   A.   His words were generally just as I've said,
15   that unless I saw to it that National was disbanded and
16   sought no further business that he was directed by John
17   Baumgart to tell me that I could count on being
18   terminated by Transcontinental.
19   Q.   Where did that take place?
20   A.   In David Skidmore's offices in Cincinnati.
21   Q.   Were there any witnesses to your conversation
22   with Mr. Andrews?
23   A.   No.  He specifically asked that -- that we be
24   left alone and that I not bring in Mr. Fitch who was
25   with me that day.

[Page 190]

1    Q.   Did you tell Mr. Fitch about the conversation
2    directly afterwards --
3    A.   Absolutely.
4    Q.   -- before the deposition started back up?
5    A.   Yes.
6    Q.   What did Mr. Fitch say at that point?
7    A.   I told him what I had heard from Bill Andrews,
8    and I also told him that I didn't believe it could be
9    true because I had just heard from Bill Baumgart within
10   the past 24 or 48 hours that, in fact, that was not
11   going to happen.
12   Q.   So is this -- the fact that he would exploit
13   your family -- I should say the family relationship and
14   arrange for your termination if you did not disband your
15   participation in National, did all that occur in the
16   same -- at the same time?
17   A.   It was a part of the same threat, yes.
18   Q.   The same conversation?
19   A.   _ Yes.
20   Q.   Correct?
21   A.   Yes.
22   Q.   Was there anything else said at that time by
23   Mr. Andrews, or was that it?
24   A.   I think that was enough.  That was about it.
25   Q.   I mean, that's two sentences, correct?

[Page 191]

1    A.   No.  It was more than two sentences.
2    Q.   Well, then --
3    A.   Because I didn't -- I didn't think that it was
4    possible, and I certainly didn't think that it was
5    right, and I -- I had known Bill Andrews for a couple
6    years at that point, and I had tried to say that he
7    needed to talk to John Baumgart to convince him that
8    this was not the way to go, that it was certainly
9    illegal and unethical and wrong, and that he should not
10   be trying to get me fired from a job and a contract that
11   he had no participation in, and so I had -- I tried to
12   convince Mr. Andrews of that, that NETCO shouldn't do
13   it, John Baumgart shouldn't do it, and Bill Andrews
14   shouldn't be the mouth piece for it.
15   Q.   And he specifically told you he was acting on
16   behalf of John?
17   A.   He specifically told me that, yes.
18   Q.   And so you responded with all of this stuff
19   that you just stated all prior to informing your counsel
20   of any of that stuff, correct?
21   A.   Yes.
22   Q.   Anything else that was said by Mr. Andrews in
23   response to your response, I guess, that he shouldn't do
24   it?
25   A.   You know, it's just John.  It's just John

[Page 192]

1    being John.  You just have to stand out of the way, you
2    know, he's going to do this kind of stuff, and you have
3    to expect him to do this kind of stuff.
4    Q.   And that was it?
5    A.   I argued further, but I -- I apparently made
6    no headway.
7    Q.   When was the next time you talked to Bill
8    Andrews in any way, shape, or form?
9    A.   We went from that room out to the deposition.
10   Q.   Okay.  After the deposition did you speak with
11   Mr. Andrews?
12   A.   Not one on one.  If I spoke to him, it would
13   have just been a matter of scheduling what was happening
14   next or things like that.
15   Q.   When was the next time you talked to
16   Mr. Andrews that had anything to do with your -- the end
17   of your employment with TTC?
18   A.   On December 6th.
19   Q.   And he called you?
20   A.   Mr. Andrews called me at my home.
21   Q.   And specifically told you what?
22   A.   That I had been terminated by Transcontinental
23   and as he had threatened, that I was going to be and
24   that if I wanted to confirm that, I could call Attorney
25   Bill Curphey.

*Deposition of Al Beamer*

```
 1      Q.   Was that all he said?
 2      A.   Again, I tried to convince him that doing this
 3  was unethical and illegal and wrong, immoral, everything
 4  else, and -- and he said again this is John being John,
 5  and I -- I told you it was going to happen, and it
 6  happened just like I told you it would.
 7      Q.   Was that the end of the conversation?
 8      A.   I don't know if we talked about anything else
 9  or not.  I believe I was pretty much in shock at that
10  point.
11      Q.   And then -- I'm sorry.
12      A.   I was in -- pretty much in shock at that point
13  that I had been terminated from my -- my main means of
14  livelihood.
15      Q.   And then you contacted Mr. Curphey, correct?
16      A.   Yes.
17      Q.   What time of the day was it when Mr. Andrews
18  called you, do you remember?
19      A.   I believe it was in the morning, but I don't
20  recall specifically.
21      Q.   Did you call Mr. Curphey immediately after you
22  hung up with Mr. Andrews?
23      A.   I believe so.
24      Q.   Did you have his number handy or had you --
25      A.   I believe Mr. Andrews gave it to me.
```

[Page 194]

```
 1      Q.   Did you contact Bill Baumgart?
 2      A.   I tried to.
 3      Q.   When?
 4      A.   That same day.  When I spoke to Bill Curphey,
 5  I asked if he would pass on a message to Bill Baumgart
 6  that I would like to speak to him, and he said that he
 7  would convey that to Bill Baumgart, and then a day or
 8  two later when I talked to Bill Curphey again, he told
 9  me that Bill Baumgart had refused to talk to me.
10      Q.   Didn't you have a cell phone number for Bill
11  Baumgart?
12      A.   No.
13      Q.   You didn't?
14      A.   No.
15      Q.   Did he have a cell phone at that time, do you
16  know?
17      A.   Probably.  I -- I had a home phone number for
18  him, but I didn't have his cell phone number.
19      Q.   Did you leave a message at his home?
20      A.   Yes.
21      Q.   What did the message say?
22      A.   I can't believe this is -- this is happening,
23  please call me, I'd like to discuss this.
24      Q.   When was the next time -- after your meeting
25  or dinner or whatever it was at the beginning of
```

[Page 195]

```
 1  December of '99, when is the next time you met with Bill
 2  Baumgart or spoke with him in any way?
 3      A.   At his scheduled deposition in the first
 4  lawsuit.
 5      Q.   And he never told you at any time prior to
 6  December 1st or during that meeting on December 1st of
 7  1999 that if you were competing with him in Ohio, he
 8  would terminate you?
 9      A.   No, because I wasn't.
10      Q.   And you're telling me that he didn't have any
11  business up in Cincinnati, any title insurance business
12  at that time in November of '99, correct?
13      A.   Not that I know of.
14      Q.   Well, you told me he specifically told you he
15  didn't, right?
16      A.   I'll telling you that Transcontinental Title
17  did not.
18      Q.   All right.  What about Southeast Equity Title?
19      A.   I'm saying that he had told me that he had
20  sold that company prior to that time, and I didn't know
21  if it does business in the Cincinnati market.  I didn't
22  know that it did, and -- and that that had nothing to do
23  with any of my contracts or relationships with
24  Transcontinental ever.
25      Q.   Okay.  Did you receive a settlement agreement,
```

[Page 196]

```
 1  a proposed settlement agreement from Bill Curphey on
 2  December 7th of 1999?
 3      A.   Yes.
 4      Q.   Did you ever sign that agreement?
 5      A.   No.
 6      Q.   Was that agreement solely between yourself,
 7  TMC, and TTC?
 8      A.   That was the terms of that agreement, yes.
 9      Q.   Okay.  Did you ever receive any other proposed
10  settlement agreements from anyone regarding your
11  employment with TTC?
12      A.   Yes.
13      Q.   And when was that?
14      A.   As a part of the NETCO case, NETCO proposed a
15  settlement that included a clause that required me to
16  waive any claim against TTC.
17      Q.   Do you have a copy of that document?
18      A.   A copy of NETCO's proposed settlement
19  agreement?
20      Q.   Uh-huh.
21      A.   I suppose.
22          MR. HABER:  Yes.
23          MR. SHOEMAKER:  Is this something that you --
24          MR. HABER:  I didn't know that it wasn't
25  produced with the other stuff that I produced.
```

*Deposition of Al Beamer*

1       MR. SHOEMAKER:  Is this something you think
2   you produced I guess is what I'm asking.
3       MR. HABER:  Yeah.  If I haven't, I apologize,
4   but you may make a copy of it.  It was with the stuff
5   when I produced the contracts and some of the stuff
6   from Florida, so I thought it had been produced.
7       THE WITNESS:  I think it was.
8       MR. HABER:  I thought it was.
9       MR. SHOEMAKER:  Off the record.
10      (There was a discussion off the record.)
11      Q.   (By Mr. Shoemaker)  You've referenced that
12  there was a proposed settlement agreement.  I'm not
13  going to mark it, but we -- we've reviewed it.  You had
14  to release your rights to sue TTC as part of the
15  settlement in Rivera, is that accurate?  It's probably
16  not stated real clearly, but is that the general idea?
17  It's in paragraph 24 of that document.
18      A.   Yes.
19      Q.   Who --
20      A.   It's a condition on my covenant not to sue
21  TTC.
22      Q.   Who provided you a copy of that document?
23      A.   My attorney.
24      Q.   Who is that?
25      A.   Mark Fitch.

1       A.   I believe the next day or at most, two days
2   later.  I guess it was the next day because he faxed me
3   those agreements.
4       Q.   How about after that?  Did you have any
5   further conversations with him?  I'll continue my
6   question with prior to you filing a lawsuit against TTC.
7       A.   I don't remember if I -- I don't remember
8   talking to him after that.  I was trying to -- I was
9   trying to get to Bill Baumgart, to talk to Bill
10  Baumgart.  I don't remember if I tried to call Bill
11  Curphey again to get through to Bill Baumgart or not,
12  but I -- but that would have been the only other
13  conversation.
14      Q.   You don't recall any other statements
15  Mr. Curphey made to you regarding the end of your
16  employment with TTC, is that accurate?
17      A.   Any other statements?  You're saying did I
18  ever talk to him after?
19      Q.   Right.  And you're saying you don't really
20  remember, you may have, so my question is being more
21  specific.  Do you recall sitting here today saying anything
22  else that Mr. Curphey stated to you regarding the end of
23  your employment with TTC?
24      A.   There are things that he stated to me during
25  the December 6th and December 7th phone calls, yes.

1       Q.   Do you claim that you were not part of the
2   Rivera NETCO case?
3       MR. HABER:  Objection.  Define part.
4       MR. SHOEMAKER:  Okay.  I'll define it.
5       MR. HABER:  Are you defining it as party?
6       Q.   (By Mr. Shoemaker)  You're not a party, is
7   that correct?
8       A.   No.  I cannot claim that I was not a party.  I
9   was a party.
10      Q.   Well, I think in your complaint it says
11  Curphey further stated that termination would be
12  finalized as part of a settlement in NETCO v. Rivera
13  despite the fact that neither TTC nor Beamer were
14  parties to the lawsuit.  Are you stating you were or you
15  were not a party to this lawsuit?
16      A.   I was a party to the lawsuit.
17      Q.   So to the extent that the complaint states
18  that you were not a party to the lawsuit, the
19  complaint's incorrect, is that accurate?
20      A.   I was a party to the NETCO/Rivera lawsuit.
21      Q.   Did you have any further conversations with
22  Bill Curphey after you contacted him on December 6th
23  regarding the end of your employment with TTC?
24      A.   Yes.
25      Q.   When were -- when did that occur?

1   What I'm saying is I don't recall when I talked to him
2   after December 7th.
3       Q.   Okay.  On December 6th you asked him if it was
4   true that you were terminated, is that right?
5       A.   Yes.
6       Q.   And he said yes, it is, you're gone?
7       A.   Yes.
8       Q.   Did he state why you were being terminated?
9       A.   He said you know why, and I said that I had
10  just talked to Bill Andrews, and Bill Andrews had told
11  me to call him and that I -- I couldn't believe that
12  Bill Baumgart had given in to pressure from John to fire
13  me, and he said that was outside of his knowledge as to
14  why that had happened, but he was certain that I had
15  been terminated and that the -- I guess I did talk to
16  him after he sent me those agreements because he needed
17  to have some information to fill in pieces of the
18  agreement.  I don't believe that he knew the name of
19  Title Marketing Company and a few other pieces of the
20  agreement, so he -- he wanted me to fill in just little
21  informational pieces of that, of those agreements.  So I
22  did talk to him at least one more time after the 7th
23  when I gave him that information, and -- and in all of
24  those times I tried to convince him as I had Bill
25  Andrews that this whole thing was a mistake to terminate

*Deposition of Al Beamer*

[Sheet 51, Page 201]

1  me because of -- of John Baumgart's claims and John

2  Baumgart's influence.

3      Q.  Okay.  Did he make any other statements to you

4  about it that next time you talked to him after December

5  6th or 7th that you just referenced?

6      A.  He said that this -- the whole thing needed to

7  be resolved in relation to the Cincinnati case.  I had

8  asked about timing and things like that, and I said

9  that he wasn't sure about that, that I should contact

10  Bill Andrews about how the sequence of events needed to

11  be done as to getting that done and any kind of

12  settlement with -- with NETCO and piecing it all

13  together.

14      Q.  So did you contact Andrews, then?

15      A.  Yes.

16      Q.  When did you contact him?

17      A.  I believe I called -- tried to reach him soon

18  after my conversation with -- with Curphey on the 6th,

19  and again had the same conversation that they shouldn't

20  do this but that they were doing it.

21      Q.  Let me interrupt you just to be clear on

22  something.  You state that Andrews called you on the 6th

23  and told you you were terminated.  Then you called

24  Curphey, and we're talking about a later conversation

25  with Curphey.  You said that was a couple of days after

[Page 202]

1  the 6th, is that correct?

2      A.  I -- in the conversation with Curphey on the

3  6th and then on the 7th, I had again tried to convince

4  him to try and convince Bill Baumgart that this was not

5  the way to go.

6      Q.  Okay.  And then you talked to Bill Andrews

7  after that second conversation with Curphey, is that

8  correct?

9      A.  No.  It was after -- it was on the same day of

10  the first conversation with -- with Curphey.

11      Q.  So you talked to Bill Andrews twice on

12  December 6th?

13      A.  I believe so.

14      Q.  I'm asking you what you remember today,

15  Mr. Beamer.  That's all -- that's all I want you to

16  answer.

17      A.  That's all I can remember.  To the best of my

18  recollection, I called him back and again tried to plead

19  my case.

20      Q.  On the 6th?

21      A.  Yes.

22      Q.  Did you talk with Mr. Andrews any more after

23  December 6th regarding this matter?

24      A.  I don't believe so.

25      Q.  But you did talk to Mr. Curphey again after

[Page 203]

1  the 6th, is that correct?

2      A.  Yes.

3      Q.  And that was a couple of days after where he

4  told you to contact Mr. Andrews about --

5      A.  On the 6th he told me to contact

6  Mr. Andrews --

7      Q.  Okay.

8      A.  -- and that he had been in touch with

9  Mr. Andrews.

10      Q.  All right.  So on the 8th do you recall any

11  additional statements Mr. Curphey made, and I say the

12  8th; a couple of days after the 6th?

13      A.  I spoke to him on the 6th and then on the 7th

14  and then a couple days after the 7th, so --

15      Q.  Okay.  A couple of days after the 7th when you

16  talked to him, did he make any other statements to you

17  regarding the end of your employment with TTC as to why

18  or what his knowledge was?

19      A.  No.  He just said it was up to Bill Baumgart;

20  he was following orders.

21      Q.  Curphey was following orders from Bill

22  Baumgart; that's what you're referring to, correct?

23      A.  Yes.

24      Q.  So Curphey never told you that you were being

25  terminated because John Baumgart pressured Bill

[Page 204]

1  Baumgart, correct?

2      A.  He never specifically said those words, no.

3  He told me that he had been contacted by Bill Andrews.

4      Q.  So?  What did that mean to you?

5      A.  That told me that they were all in on the same

6  deal which involved my termination.

7      Q.  Did he tell you that Bill had told him this or

8  that -- I'm sorry -- Bill Baumgart or Bill Andrews that

9  you were being terminated?

10      A.  Bill Baumgart told him that I was being --

11  that I was being terminated.

12      Q.  Okay.  So when he was contacted by Bill

13  Andrews, what relevance does that have?  What did he

14  tell you that that was for?

15      A.  He knew that it was -- that it was all related

16  to the Cincinnati case.

17      Q.  Did he specifically tell that -- say that to

18  you?

19      A.  Yes.

20      Q.  Did you state specifics of what it was related

21  to in Cincinnati?

22      A.  No.

23      Q.  Did he state to you that they were all in on

24  the same deal?  Was that a statement he made?

25      A.  No.

*Deposition of Al Beamer*

[Sheet 52, Page 205]

1     Q.   Okay.  That's just your summary of what he was

2  saying?

3     A.   My inference.

4     Q.   Of what he said?

5     A.   Yes.

6     Q.   Any other statements by Bill Curphey that made

7  you think that?

8     A.   No.

9     Q.   And the only basis for your claim that NETCO

10  agreed to indemnify TTC was based on what Frank Skryd

11  told you that Ian Gorman told him, correct?

12     A.   That was the first I had heard of that.  I

13  later talked to Ian Gorman, and he said that -- he

14  confirmed that to me.

15     Q.   Oh.  He did?

16     A.   Yes.

17     Q.   Okay.  When was that?

18     A.   At a lunch meeting some months later.

19     Q.   Early 2000?

20     A.   I don't believe it was early 2000.  I believe

21  it was later in 2000.

22     Q.   Okay.  Where was the lunch meeting?

23     A.   In Clearwater.

24     Q.   For what?

25     A.   Just a meeting of Frank and Ian and I for

[Page 206]

1  lunch.

2     Q.   Just a friendly meeting?

3     A.   It was.

4     Q.   Did you fly to Clearwater?

5     A.   Not for the purpose of that meeting, no.

6     Q.   What were you down there for?

7     A.   Probably one of my depositions or some part of

8  the -- the lawsuit against TTC.

9     Q.   So when you were suing TTC, you think you went

10  to lunch with Gorman and Skryd while you were down there

11  for that lawsuit?

12     A.   If not for that lawsuit, there were other

13  reasons that I was in Tampa in 2000, 2001, and 2002.

14     Q.   Well, we're talking about 2000.  Why else were

15  you down in Tampa or the Clearwater area?

16     A.   If it was in 2000, that would have been

17  related to the lawsuit.

18     Q.   I'm not guessing when it is, Mr. Beamer.  You

19  just told me it was in 2000.  That's my question.  Was

20  it in 2000 like you previously told me?

21     A.   I'm saying it was after I had first been told

22  this by Frank Skryd and then I got it confirmed later

23  with Ian Gorman directly, and that was at a luncheon

24  after -- some months after I had been told this by Frank

25  Skryd, and so that could have been into 2001.

[Page 207]

1     Q.   So now it's 2000 or 2001 when you talked to

2  Gorman?

3     A.   Yes.

4     Q.   But specifically Gorman told you this at a

5  lunch with Frank Skryd and yourself?

6     A.   Yes.

7     Q.   And was Frank Skryd present when Gorman told

8  you this at lunch?

9     A.   I believe so, yes.

10     Q.   And what specifically did Gorman tell you in

11  this regard?

12     A.   I said I can't believe that, you know, Bill

13  made this deal, and he said yeah, I can't believe it,

14  either.  I was there.

15     Q.   Anything else that he stated?

16     A.   No.

17     Q.   You've also alleged that after defendants

18  arranged for your termination from TTC that NETCO's

19  attorneys threatened to press baseless criminal charges

20  against you in retaliation for your involvement with

21  National.  What baseless criminal charges are you

22  talking about?

23     A.   They claimed that they were going to go to the

24  local prosecutor and seek criminal charges on the basis

25  of trade secret infringement and whatever else they

[Page 208]

1  could find.

2     Q.   Who told you this?

3     A.   My attorney.

4     Q.   Mark Fitch?

5     A.   Mark Fitch, yes.

6     Q.   Is that specifically what you remember him

7  saying?

8     A.   Yes.

9     Q.   Did they ever do that, to your knowledge?

10     A.   I don't -- I don't know whether they went to

11  the prosecutor.  I know I was never charged with

12  anything.

13     Q.   Did he specifically state which of NETCO's

14  attorneys made this remark?

15     A.   I believe it would have been David Skidmore,

16  but I -- I don't know for a fact which of NETCO's

17  attorneys made that remark.

18     Q.   He just told you that NETCO's attorneys

19  threatened to do this, is that right?

20     A.   My recollection is that it was David Skidmore

21  that he said had -- had made the threat.

22     Q.   Any other baseless criminal charges that

23  NETCO's attorney threatened you with besides that?

24     A.   It was just that one time that they made the

25  claim that they were going to go to the prosecutor.  I

*Deposition of Al Beamer*

[Sheet 53, Page 209]

1  remember trade secrets.  I don't remember if there were
2  any other claims that they were going to come up with.
3       Q.   Who told you that John Baumgart would spend
4  any amount of money necessary to get you regardless of
5  the legal merits?
6       A.   Bill Andrews.
7       Q.   When did that conversation occur?
8       A.   During that deposition meeting on December
9  2nd.
10      Q.   The meeting where he asked you to go into
11 another room and he made the other statements?
12      A.   Yes.
13      Q.   So that was all part of the same conversation?
14      A.   Yes.
15      Q.   You just didn't mention it before?
16      A.   It was all part of the same.
17      Q.   So there were -- there were no witnesses to
18 that remark, either, correct?
19      A.   Just Bill Andrews and I.
20      Q.   You also have that NETCO filed motions for
21 civil and criminal contempt against Beamer, a non-party,
22 in National v. Rivera.  Again, you've admitted that you
23 were a party, correct?
24      A.   That's correct.
25      Q.   So that's an inaccurate statement?

[Page 210]

1       A.   The part about being a party is inaccurate.
2  The part about them filing the lawsuit is not.
3       MR. HABER:  I'll object because I'm not sure
4  that it's inaccurate on the docket.  I don't think he
5  was named as an individual defendant at that time.
6  There was an attempt to amend.
7       MR. SHOEMAKER:  Well, he was certainly part
8  of National, as being an owner of National.
9       MR. HABER:  As a shareholder of National, but
10 he was not individually named as a defendant at the
11 time that the lawsuit was filed, nor was he an
12 individual defendant at the time the settlement
13 agreement that you've referenced was submitted to him.
14 I know there was an attempt to amend, according to the
15 document.
16      MR. SHOEMAKER:  Well, Mr. Beamer obviously
17 thinks he was a party.
18      MR. HABER:  Well, you get -- he had to defend
19 himself in a contempt proceeding, but what
20 Mr. Beamer --
21      MR. SHOEMAKER:  This is prior to --
22      MR. HABER:  What Mr. Beamer thinks and what
23 the docket and the public record reflect are two
24 different things.
25      MR. SHOEMAKER:  Okay.  Let me state it a

[Page 211]

1  different way, then.
2       Q.   (By Mr. Shoemaker)  Why do you think you were
3  a party to this?
4       A.   I -- I know I was named as a witness, and I
5  know I was a shareholder of -- of National.  I was
6  certainly interested in the outcome of the case.
7  Whether I was a named defendant or not I guess was part
8  of the minutiae that I didn't remember four years ago.
9       Q.   Okay.  So motions for civil and criminal
10 contempt were -- were filed against you in this matter,
11 correct?
12      A.   Yes.
13      Q.   As well as other individuals, correct?
14      A.   Yes.
15      Q.   Were there any merit -- was there any merit to
16 any of the contempt motions filed by NETCO against any
17 individual?
18      MR. HABER:  Objection.  It calls for a legal
19 conclusion.
20      You can answer if you know.
21      Q.   (By Mr. Shoemaker)  It doesn't call for a
22 legal conclusion at all if you've seen it.
23      MR. HABER:  Is there merit to a contempt
24 motion; is that the question?
25      Q.   (By Mr. Shoemaker)  I'll ask you differently.

[Page 212]

1  Did the court grant any of NETCO's motions for contempt
2  against any individual in the Rivera matter?
3       MR. HABER:  Objection.  It's a matter of
4  public record.
5       You can answer if you know.
6       A.   I'm not sure.  I know that they didn't file --
7  that I was dismissed from the case.
8       Q.   (By Mr. Shoemaker)  You're telling me you're
9  not aware that Rivera was found to be in contempt of
10 that order?
11      A.   I know there were -- there were orders and
12 judgements and things like that, and I -- I was
13 certainly more interested and involved in those that
14 affected me personally.  I don't remember specifically
15 as to that order or as to that contempt motion whether
16 that or something else was found against Tony Rivera or
17 National.
18      Q.   Do you not think if something was found
19 against National that they were in contempt that that
20 affected you?
21      A.   I -- as I say, I was the -- the contempt case
22 against me was -- was dismissed.  It was found --
23 judgment was in my favor.
24      Q.   Okay.
25      A.   Civil and criminal.

*Deposition of Al Beamer*

[Sheet 54, Page 213]

1    Q.   And you're telling me as we sit here today
2  you're not aware if anybody else, National or Rivera,
3  was found to be in contempt, correct?
4    A.   I don't remember what was the outcome of that
5  civil contempt or criminal contempt matter exactly
6  except that I wasn't found guilty.
7    Q.   Okay.  Did you ask for sanctions at that time
8  against NETCO or its attorneys for filing those motions?
9    A.   I don't believe so, no.
10   Q.   Well, this I don't believe so stuff -- I need
11  a little better answer.  Do you recall filing any
12  motions as we sit here?
13   A.   No.
14   MR. SHOEMAKER:  Can we have this marked,
15  please?
16       (Defendant's Exhibit K was marked for
17  identification.)
18   Q.   (By Mr. Shoemaker)  Do you recognize
19  Defendant's Exhibit K, Mr. Beamer?
20   A.   Yes.
21   Q.   And what does that represent?
22   A.   It represents billing that was sent to me by
23  my attorney in the contempt matter.
24   Q.   Less payments made for attorneys' fees to
25  date, it says 4,000, it looks like the total bill as

[Page 214]

1  described on this would have been $7,225, is that
2  correct?
3    A.   Yes, it is.
4    Q.   And was that all of the fees that you paid to
5  your attorney regarding the contempt motions?
6    A.   I believe it was, yes.
7    Q.   And I do not have a copy of the second portion
8  of this, but are you representing that the $4,000 that
9  has already been paid was paid for the civil and
10  criminal contempt motions?
11   A.   Yes.
12   Q.   And who was the attorney that handled that?
13   A.   Attorney David Parker.
14   Q.   And you paid him on an hourly basis?
15   A.   I paid him according to this bill.
16   Q.   Well, did you give him a flat fee, or did you
17  pay him on an hourly basis?
18   A.   I paid him on an hourly basis.
19   Q.   Okay.  You've also stated that NETCO's
20  settlement negotiations in the Rivera matter were
21  unsuccessful due to the insistence that you had to
22  release your rights.  Where did you hear that
23  information?
24   A.   From my attorney.
25   Q.   Mark Fitch?

[Page 215]

1    A.   Yes.
2    Q.   Did he state that that was a direct comment
3  from someone or that things weren't going well?  What
4  did he tell you?
5    A.   He said that -- that NETCO's attorneys had
6  told him that -- that my willingness to waive any
7  potential claim against TTC was a deal-breaker, and he
8  kept using the word deal-breaker as to the settlement of
9  the NETCO/Rivera case.
10   Q.   So the word deal-breaker, that quote, that's
11  from your counsel, correct?
12   A.   He -- he quoted that to me as coming from
13  NETCO's counsel.
14   MR. HABER:  Just so the record reflects, I've
15  let you ask some questions regarding communications
16  with Mark Fitch because they are basically relating
17  those things that were told, but I don't want it to be
18  construed as a blanket waiver of the attorney-client
19  privilege to the extent that one exists.
20   MR. SHOEMAKER:  I understand.
21   MR. HABER:  All right.
22   Q.   (By Mr. Shoemaker)  It also states you
23  continued to be harassed and threatened by NETCO and its
24  employees in subsequent months in retaliation for your
25  involvement with National and for use as leverage in the

[Page 216]

1  NETCO v. Rivera case.  What was the continued harassment
2  and threats by NETCO and its employees?
3    A.   There was, as I understood, further talk about
4  this filing of the contempt motion, and we're going
5  to -- to make this criminal and you're going to go to
6  prison as a result of the -- of the contempt motion, or
7  as a result of those, we're going to -- we're going to
8  make this bigger, we're going to get you, and --
9    Q.   Did they make these threats to you?
10   A.   No.
11   Q.   Who did they make them to?
12   A.   Through Mark Fitch.
13   Q.   And the stuff about the criminal contempt
14  we've covered; the stuff about the filing something with
15  the prosecutor we've covered, right?
16   A.   Yes.
17   Q.   The only thing in addition to that that you've
18  told me is something about that you're going to go to
19  prison on the criminal contempt charge, is that
20  accurate?
21   A.   Yes.
22   Q.   Mark Fitch told you that's what they said?
23   A.   Yes.
24   Q.   Did you know what the range of punishment was
25  for criminal contempt in Ohio at that time?