# CERTIFIED COPY



[Sheet 1, Page 228]

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

AL BEAMER, ET AL.,            )
                              )
            PLAINTIFFS,       )
                              )
v.                            )  NO. C-1-02-013
                              )
NETCO, INC., ET AL.,          )
                              )
            DEFENDANTS.       )


DEPOSITION OF AL BEAMER
TAKEN BY GREGORY A. SHOEMAKER, ESQ.
ON BEHALF OF THE DEFENDANTS
OCTOBER 28, 2003


VOLUME II


REPORTED BY TRACI BUTZ
CERTIFIED SHORTHAND REPORTER
CERTIFIED REALTIME REPORTER


RANKIN REPORTING & LEGAL VIDEO, INC.
1015 LOCUST STREET, SUITE 911
ST. LOUIS, MISSOURI 63101-1329
(314) 231-2202
(800) 285-2115

---

[Page 229]

1   IN THE UNITED STATES DISTRICT COURT
2         SOUTHERN DISTRICT OF OHIO
              WESTERN DIVISION
3
4   AL BEAMER, ET AL.,            )
                                  )
5               PLAINTIFFS,       )
                                  )
6   v.                            )  NO. C-1-02-013
                                  )
7   NETCO, INC., ET AL.,          )
                                  )
8               DEFENDANTS.       )
9
10
11
12
13         DEPOSITION OF AL BEAMER, VOLUME II, produced,
14   sworn and examined on the 28th day of October, 2003 at
15   the offices of McMahon, Berger, Hanna, Linihan, Cody &
16   McCarthy, 2730 North Ballas Road, in the City of St.
17   Louis, State of Missouri, before Traci Butz, Certified
18   Shorthand Reporter, Certified Realtime Reporter, in and
19   for the State of Missouri, in a certain cause now
20   pending in the United States District Court, Southern
21   District of Ohio, Western Division, between AL BEAMER,
22   ET AL., PLAINTIFFS, and NETCO, INC., ET AL.
23
24
25

---

[Page 230]

1                     A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFFS:
4         REMINGER & REMINGER
          Richard C. Haber, Esq.
5         1400 Midland Building
          101 Prospect Avenue, West
6         Cleveland, Ohio  44115-1093
7
8   ON BEHALF OF THE DEFENDANTS:
9         McMAHON, BERGER, HANNA, LINIHAN,
              CODY & McCARTHY
10        Gregory A. Shoemaker, Esq.
          2730 North Ballas Road
11        St. Louis, Missouri  63131
12
13  ALSO PRESENT:
14        Patrick Dignam, Esq.
          General Counsel, NETCO
15
16
17
18                     I N D E X
19
20  Further Examination by Mr. Shoemaker        Page 232
21
22
23
24
25

---

[Page 231]

1                 S T I P U L A T I O N
2         IT IS HEREBY STIPULATED AND AGREED by and
3   between counsel for the parties that this deposition may
4   be taken in shorthand by Traci Butz, Certified Shorthand
5   Reporter, Certified Realtime Reporter, and afterwards
6   transcribed into printing, and signature by the witness
7   is not waived.
8                     AL BEAMER,
9   of lawful age, being first duly sworn to tell the truth,
10  the whole truth and nothing but the truth, deposes and
11  says as follows:
12        MR. HABER:  You can put on the record that
13  he's still under oath from his prior deposition.
14        MR. SHOEMAKER:  The only other thing I'll put
15  on the record is I'm going to ask a few questions here.
16  We have agreed that testimony regarding damages as well
17  as anything I guess I would say remotely related to the
18  additional documents I received in discovery is
19  something that we are going to resume at a different
20  date for Mr. Beamer either on November 20th or on a
21  mutually acceptable date, so it will continue from
22  there, and we'll go through a few things right now.  Is
23  that correct, Mr. Haber?
24        MR. HABER:  It is correct.  As I've indicated
25  to you, you've indicated you have about 10 or 15

---

*Deposition of Al Beamer*

[Sheet 2, Page 232]

1  minutes of questioning you'd like to do today. Whether
2  it's damages or otherwise, I'm not going to stand on
3  ceremony. We're going to continue the deposition if
4  you wish to ask him some questions at a later date.
5        MR. SHOEMAKER: Okay.
6  FURTHER EXAMINATION BY MR. SHOEMAKER:
7        Q.  Mr. Beamer, regarding your conviction that we
8  previously discussed, was it your testimony that you
9  were convicted in 1985?
10       A.  '84 or '85. I thought it was '85.
11       Q.  I think you testified to '85, but I'm just
12 asking you again.
13       A.  Well, now that you're bringing it up, I --
14 I -- I was --
15       MR. HABER: I'll object as to what his
16 testimony was. Do you know when his conviction was?
17 Are you -- I know the question was was your testimony
18 in 1985.
19       Q.  (By Mr. Shoemaker) I want to know when the
20 date of your conviction was.
21       A.  I would have to refer to some papers that I
22 don't have with me today.
23       Q.  Okay. And I don't have the interrogatories in
24 front of me, but I thought it was included in there.
25       MR. HABER: I think we indicated 1985.

[Page 233]

1        Q.  (By Mr. Shoemaker) Okay. My question in that
2  regard -- and if you're not sure of the date, I believe
3  the interrogatories state that and your verification's
4  on there so I can obtain it. What I'm really getting at
5  is I believe you indicated you also served just a little
6  over two years of a three-year sentence, is that
7  accurate?
8        A.  I said I served time in the Duluth federal
9  prison camp from -- I believe it was July of '85 through
10 early March, late February of '87 and then was in a
11 halfway house in St. Louis for four to six months after
12 that.
13       Q.  Okay.
14       A.  So approximately two years.
15       Q.  So that roughly puts your release date
16 somewhere towards the end of 1987, is that correct?
17       A.  Release from probation or release from the
18 halfway house?
19       Q.  Yeah, from the halfway house. Is that
20 accurate?
21       A.  Yes.
22       Q.  Okay. That is actually what I was trying to
23 get at to lay the foundation. Were you on probation and
24 parole after you were released from the halfway house?
25       A.  I -- I was on probation for I believe the

[Page 234]

1  remainder of -- of five years from the date that I
2  entered the Duluth prison, so that would be roughly
3  another three years. I believe that that was a
4  five-year probation, but I thought the probation
5  started -- I -- I again should say I should refer to the
6  documents before I swear under oath.
7        MR. HABER: I can get those for you.
8        Q.  (By Mr. Shoemaker) My next question was --
9        A.  I would be glad to provide you those dates.
10       Q.  Okay. So you do still have documents that
11 would refer to those dates, correct?
12       A.  I can -- I can find out those dates,
13 certainly.
14       Q.  And then you'll provide them to your counsel,
15 and he will provide them to me as far as when your
16 probation or parole actually was terminated or done --
17       A.  Yes.
18       Q.  -- or ceased or whatever? Okay. Regarding --
19 we talked about the end of -- and this was yesterday is
20 what I'm referring to. We talked about the end of
21 National in general, when it ceased doing business, when
22 you were done being a part of National, and I believe
23 you told me that was at the end of 2000. Sound
24 accurate?
25       A.  Yes.

[Page 235]

1        Q.  Okay. My question to you is was National, to
2  your knowledge, transformed, bought, in any way merged
3  into another company?
4        A.  I don't believe so.
5        Q.  Are you familiar with Counselors Title?
6        A.  Yes.
7        Q.  To your knowledge, does Counselors Title have
8  any relation to the old National as we referred to
9  National?
10       A.  Counselors Title was started by James Erwin
11 who was one of the people involved with National Real
12 Estate, so to that extent it has a relationship, and
13 Counselors Title also at least has had some of the same
14 employees who had been employees of National, yes.
15       Q.  But to your knowledge, it wasn't -- strike
16 that.
17       To your knowledge, did Counselors Title -- was
18 Counselors Title formed after National ceased doing
19 business as National?
20       A.  I believe so, yes.
21       Q.  And to your knowledge, was there any direct
22 relationship, whether it was a purchase of assets or
23 anything along those lines, from National into
24 Counselors Title?
25       A.  I don't know of any such transfer. I wasn't

*Deposition of Al Beamer*

[Sheet 3, Page 236]

1  involved in any such transfer.

2  Q. Okay. So are you telling me you don't know

3  either way, or are you unfamiliar with that?

4  A. I'm unfamiliar with that as to say Counselors

5  was formed by James Erwin, not by me, and how that was

6  formed, I'm unfamiliar.

7  Q. You didn't have any ownership interest with

8  Counselors Title, is that correct?

9  A. No.

10  Q. Okay. Tell me, if you would, what ELM East,

11  Inc. is.

12  A. My understanding of ELM East is that they are

13  a company that provides HR services, human relations

14  services for other companies and that ELM was, I assume,

15  hired by Counselors Title for those services.

16  Q. Okay. So there are two separate and distinct

17  companies, Counselors Title and ELM East, Inc., correct?

18  A. Yes.

19  Q. Did you receive income from ELM East, Inc.?

20  A. Yes.

21  Q. What was that for?

22  A. That was for work done for Counselors Title.

23  Q. But you were paid by ELM East, Inc.?

24  A. Yes.

25  Q. What was that work performed for Counselors

[Page 237]

1  Title?

2  A. Computer work.

3  Q. And that was paid to you personally, not TMC,

4  is that correct?

5  A. Yes.

6  Q. Why was it set up that way?

7  A. What way?

8  Q. To you personally as an employee verse through

9  some contract with TMC.

10  A. I did the work.

11  Q. Well, you do lots of work for TMC, don't you?

12  A. Yes.

13  Q. So what -- you were actually employed by ELM

14  East, Inc.?

15  A. That was -- the way that it was set up was

16  that as far as I know, all their employees or at least

17  the employees that I know of were hired through ELM so

18  that the -- the services of -- of ELM as to providing

19  health insurance and other HR matters could be handled

20  by them rather than by Counselors.

21  Q. But Erwin owned both companies, right?

22  A. No.

23  Q. Okay. Which one did he not own?

24  A. He didn't own ELM. They're a separate company

25  that does this as their prime business.

[Page 238]

1  Q. I apologize. I thought Erwin owned that. So

2  to your knowledge, Erwin didn't have any ownership in

3  ELM?

4  A. To my knowledge, he had none.

5  Q. Okay. You had access to the software that

6  NETCO used in their business at the time of your

7  resignation, correct?

8  A. Up until the time of my resignation, yes.

9  Q. Including at your home in Chesterfield,

10  Missouri, correct?

11  A. I had access to it by modem from my home in

12  Chesterfield, but I would -- my computer had a modem

13  connected to a telephone line, and I could dial in to

14  NETCO's operations and could gain access that way.

15  Q. Was there a specific code or password that you

16  used?

17  A. Yes.

18  Q. Okay. Once you left your employment at NETCO,

19  was that password disconnected, or do you just not use

20  it? How does that happen?

21  A. I didn't use it. I never dialed in after I

22  resigned from NETCO. As to what they did on their side,

23  I have no idea.

24  Q. Did you have the ability to download the

25  information from the databases onto a different database

[Page 239]

1  at your home? I'm not asking you if you did it. I'm

2  asking you if you had the ability to do that.

3  A. At what point?

4  Q. Prior to your resignation.

5  A. Yes.

6  Q. Okay. Did you ever do that?

7  A. In limited form when I was needing to work on

8  something, I would download it temporarily to work on

9  it. It was faster to work on it on my computer rather

10  than working on it across the phone line, and then I

11  would send it back in.

12  Q. What -- strike that.

13  Your employment at Residential Title Service,

14  RTS that we've referred to -- you're currently employed

15  by them, correct?

16  A. Yes.

17  Q. Is that a title insurance agency?

18  A. Yes.

19  Q. Similar to TTC or NETCO?

20  A. It's a title insurance agency. As to similar

21  to NETCO or TTC, you'd have to say it's similar in what

22  way?

23  Q. They're all title insurance agencies?

24  A. They're all title insurance agencies.

25  Q. That's all I'm looking for. At Residential do

*Deposition of Al Beamer*

[Sheet 4, Page 240]

1  you -- does Residential write title policies?

2      A.   Yes.

3      Q.   And are you involved in the writing of title

4  policies there?

5      A.   No.

6      Q.   Okay.  Are you involved in the formatting of

7  any forms and so forth that are used there regarding

8  title policies?

9      A.   Some of them.

10      Q.   You are an employee of Residential, though,

11  correct?

12      A.   Yes.

13      Q.   What is -- strike that.

14           Under your employment with TMC or your

15  ownership interest in TMC, do you perform services for

16  underwriters?

17      A.   Yes.

18      Q.   And is an underwriter really ultimately who

19  re-insures the risk of the title?

20      A.   They don't re-insure.  They're the primary

21  insurer.

22      Q.   So they insure the risk of titles, correct?

23      A.   Yes.

24      Q.   And does your computer software assist them in

25  their operations of insuring the risk of the titles?

[Page 241]

1      A.   I guess I don't understand what --

2      Q.   I'll make it easier.

3      A.   I don't understand the question.

4      Q.   Okay.  That's fine.  That's acceptable.  It's

5  probably a poor question.

6           Does your computer software assist these

7  underwriters in their operations?

8      A.   Some of their operations, yes.

9      Q.   And you were an employee of TTC as of March

10  30th, 1999, correct?

11      A.   I believe that's the date on that.

12      Q.   Do you want to check it?

13      A.   That sounds right, yes.

14           MR. SHOEMAKER:  Are you in agreement with

15  that, Mr. Haber?  I mean, there's a document.  Let's

16  just be clear.

17           MR. HABER:  I don't think that date's in

18  dispute.

19      Q.   (By Mr. Shoemaker)  I'm going to show you

20  what's been marked as Defendant's Exhibit F, Mr. Beamer.

21  Is that the document that changed the relationship you

22  had at TTC from an independent contractor relationship

23  to an employee/employer relationship?

24      A.   Yes, it is.

25      Q.   Is that dated March 30th of 1999?

[Page 242]

1      A.   Yes, it is.

2      Q.   And were you under this same relationship at

3  TTC from March 30th of 1999 until your employment ceased

4  in December of '99?

5      A.   Yes.

6      Q.   Okay.

7      A.   Excuse me.

8      Q.   Sure.

9      A.   Subject to the one further amendment, I

10  believe, that was in July of '99.

11      Q.   But that amendment -- let me ask you this, and

12  if you want to look at it, you can, but that didn't

13  alter paragraph 1, the relationship --

14      A.   No.

15      Q.   -- is that correct?

16      A.   That's correct.

17      Q.   Did you perform services for TTC from your

18  home in Chesterfield, Missouri?

19      A.   Yes.

20      Q.   And do you do that for Residential as well?

21      A.   Yes.

22      Q.   And Residential is in multiple states, is that

23  correct?

24      A.   Yes, they are.

25           MR. SHOEMAKER:  Can I have one minute,

[Page 243]

1  please?

2           (There was a discussion off the record.)

3      Q.   (By Mr. Shoemaker)  Did TMC have a contract

4  with Counselors Title to perform services?

5      A.   No.

6      Q.   Do you have the written consent of any

7  insurance regulatory official authorized to regulate

8  insurance to perform services regardless of your felony

9  conviction?

10      A.   I don't understand.

11      Q.   Have you ever --

12      A.   Give me that again.

13      Q.   Okay.  Are you aware there's a federal statute

14  involving somebody who has a prior felony conviction and

15  their ability to perform services in the insurance

16  industry?

17      A.   No.

18      Q.   So my question then is, and I have to assume

19  it's no if you're not aware of the statute, that you

20  don't have any special permission to engage in conduct

21  in the business -- strike that.

22           You don't have any special permission from any

23  regulatory official to engage in the insurance industry

24  pursuant to a federal statute?

25      A.   No, I don't.

# CERTIFIED COPY

[Sheet 1, Page 249]

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

AL BEAMER, ET AL.,                 )
                                   )
            PLAINTIFFS             )
                                   )
v.                                 ) NO. C-1-02-013
                                   )
NETCO, INC., ET AL.,               )
                                   )
            DEFENDANTS             )

DEPOSITION OF AL BEAMER
TAKEN BY GREGORY A. SHOEMAKER, ESQ.
ON BEHALF OF THE DEFENDANTS
NOVEMBER 25, 2003

VOLUME III

REPORTED BY REBECCA A. COPELAND, CSR
REGISTERED PROFESSIONAL REPORTER

RANKIN REPORTING & LEGAL VIDEO, INC.
1015 LOCUST STREET, SUITE 911
ST. LOUIS, MISSOURI 63101-1329
(314) 231-2202
(800) 285-2115

---

[Page 251]

1                    A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFF (BY TELEPHONE):

4            Reminger & Reminger
             Richard C. Haber, Esq.
5·           1400 Midland Building
             101 Prospect Avenue, West
6            Cleveland, OH  44115-1093

7

8    ON BEHALF OF THE DEFENDANT:

9            McMahon, Berger, Hanna,
             Linihan, Cody & McCarthy
10           Gregory A. Shoemaker, Esq.
             2730 North Ballas Road, Suite 200
11           St. Louis, MO  63131

12

13

14

15                    I N D E X

16

17   Examination by Mr. Shoemaker              255

18

19

20

21

22

23

24

25

---

[Page 250]

1            IN THE UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF MISSOURI
2                    WESTERN DIVISION

3

4    AL BEAMER, ET AL.,            )
                                   )
5            PLAINTIFFS            )
                                   )
6    v.                            ) NO. C-1-02-013
                                   )
7    NETCO, INC., ET AL.,          )
                                   )
8            DEFENDANTS            )

9

10

11

12           DEPOSITION OF AL BEAMER, produced, sworn and

13   examined on the 25th of November, 2003, at the offices

14   of McMahon, Berger, Hanna, Linihan, Cody & McCarthy,

15   2730 North Ballas Road, St. Louis, Missouri, before

16   Rebecca A. Copeland, Certified Shorthand Reporter within

17   and for the State of Missouri, in a certain cause now

18   pending in the United States District Court, Southern

19   District of Ohio, Western Division, between AL BEAMER,

20   ET AL., PLAINTIFFS, and NETCO, INC., ET AL., DEFENDANTS.

21

22

23

24

25

---

[Page 252]

1                    E X H I B I T S

2

3    Defendant's Exhibit AA                    271
         (1996 Individual Income Tax Return)
4
     Defendant's Exhibit BB                    276
5        (1996 S Corporation Tax Return for
         Title Marketing Company)
6
     Defendant's Exhibit CC                    280
7        (1997 Individual Income Tax Return)

8    Defendant's Exhibit DD                    283
         (1997 S Corporation Tax Return for
9        Title Marketing Company)

10   Defendant's Exhibit EE                    286
         (1998 Individual Income Tax Return)
11
     Defendant's Exhibit FF                    288
12       (1998 S Corporation Tax Return for
         Title Marketing Company)
13
     Defendant's Exhibit GG                    292
14       (1999 Individual Income Tax Return)

15   Defendant's Exhibit HH                    295
         (1999 S Corporation Tax Return for
16       Title Marketing Company)

17   Defendant's Exhibit II                    299
         (2000 Individual Income Tax Return)
18
     Defendant's Exhibit JJ                    301
19       (2000 S Corporation Tax Return for
         Title Marketing Company)
20
     Defendant's Exhibit KK                    303
21       (2001 Individual Income Tax Return)

22   Defendant's Exhibit LL                    307
         (2001 S Corporation Tax Return for
23       Title Marketing Company)

24

25

*Deposition of Al Beamer*

[Sheet 2, Page 253]

```
 1              E X H I B I T S
 2
 3    Defendant's Exhibit MM              314
           (2002 Individual Income Tax Return)
 4
 5    Defendant's Exhibit NN              314
           (2002 S Corporation Tax Return for
 6          Title Marketing Company)
 7    Defendant's Exhibit OO              314
           (Employment Contract and Software
 8          License Agreement)
 9    Defendant's Exhibit PP              323
           (November 28, 2001 Letter to David
10          M. Snyder from William H. Baumgart)
11    Defendant's Exhibit QQ              327
           (April 9, 2003 Letter to Gregory
12          Shoemaker from Jonathan T. Hyman)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

[Page 254]

```
 1              S T I P U L A T I O N
 2         IT IS HEREBY STIPULATED AND AGREED by and between
 3    counsel for the parties that this deposition may be
 4    taken in shorthand by Rebecca A. Copeland, Certified
 5    Shorthand Reporter, and afterwards transcribed into
 6    printing, and signature by the witness is not waived.
 7                   AL BEAMER,
 8    of lawful age, being first duly sworn to tell the truth,
 9    the whole truth and nothing but the truth, deposes and
10    says as follows:
11         MR. SHOEMAKER: I assume that you will agree
12    that Mr. Beamer is still under oath, Rich; correct?
13         MR. HABER: I do.
14         MR. SHOEMAKER: And, Mr. Beamer, you agree to
15    that as well?
16         MR. BEAMER: Yes.
17         MR. SHOEMAKER: Briefly, for the record, this
18    is a continuation of the deposition of Plaintiff Al
19    Beamer and present are myself, Mr. Beamer and his
20    attorney, Richard Haber, who is obviously already on the
21    record, is participating via telephone today.
22         That being said, Rich, obviously, if there is
23    some sort of objection that calls for a side-bar or what
24    have you, which I don't anticipate, just let me know.
25         MR. HABER: I will.
```

[Page 255]

```
 1         MR. SHOEMAKER: Other than that, if you're
 2    objecting, you and I will continue to be courteous to
 3    each other as far as trying to keep our mouth shut until
 4    the other one is done so Rebecca can get everything on
 5    the record and she has the express authority to
 6    interrupt at any time if she doesn't hear anything.
 7    Agreed?
 8         MR. HABER: That's fine. Can you hear me on
 9    speaker okay?
10         MR. SHOEMAKER: I can hear you. If Rebecca
11    has a problem, she'll let us know I assume. So yeah,
12    that's fine with me.
13                   EXAMINATION
14    BY MR. SHOEMAKER:
15         Q.  Okay. Mr. Beamer, picking up from somewhat
16    where we left off, one question I want to ask you, do
17    you recall giving a deposition on December 2nd, 1999 in
18    the National v. Rivera matter?
19         A.  I don't remember the specific date, but
20    roughly that date, yes.
21         Q.  Early December you gave a deposition; is that
22    correct?
23         A.  Yes. Yes.
24         Q.  And at that deposition you were sworn in; is
25    that correct?
```

[Page 256]

```
 1         A.  Yes.
 2         Q.  And as we sit here today, is everything you
 3    testified to in that deposition still truthful and
 4    accurate to the best of your knowledge?
 5         A.  I don't know of any reason why it wouldn't.
 6         Q.  Okay. Specifically referring to some
 7    witnesses listed in your 26(a)(1) disclosures that were
 8    submitted to me by your counsel, I want to talk about a
 9    few people whose names have not been brought up yet in
10    any fashion in this matter.
11         Beginning with Tina Gaitens. Who is Ms.
12    Gaitens? Do you know her?
13         A.  Yes. She's a former employee of
14    TransContinental Title.
15         Q.  What was her position there?
16         A.  She was in the accounting and bookkeeping
17    department.
18         Q.  And was she employed there the entire time you
19    were involved with TTC?
20         A.  No.
21         Q.  Okay. When did she become employed there?
22         A.  I would have to estimate based on my knowledge
23    that she might have worked there from '92 to '97 or
24    somewhere around those years.
25         Q.  Did she work there at all between '97 and '99?
```

*Deposition of Al Beamer*

[Sheet 4, Page 261]

1      A.   Yes.

2      Q.   In what manner?

3      A.   Saying that there -- that they have -- that

4  Netco has claimed that I somehow violated their trade

5  secret and that I thought it was laughable that they

6  considered themselves to even have a trade secret.

7      Q.   So you don't think Netco has any trade secrets

8  of any nature whatsoever?

9      A.   I don't believe that there are -- are trade

10  secrets in the title insurance industry as to how you

11  perform title insurance work.

12      Q.   Okay.  My question to you is do you believe

13  Netco possesses any trade secrets in any manner?

14      A.   No, I don't believe they have trade secrets.

15      Q.   What was Mr. Erwin's involvement with

16  National?

17      A.   He was one of the investors.

18      Q.   When did you first discuss the concept of

19  forming National with Mr. Erwin?

20      A.   Sometime in October of '99, I believe.

21      Q.   And did you discuss your employment contract

22  that you previously had -- I understand at that point

23  you were not working for Netco anymore, but did you

24  discuss your previous employment contract with Netco

25  with Mr. Erwin at that time?

[Page 262]

1      A.   No.

2      Q.   Was Mr. Rivera present during this

3  conversation?

4      A.   Yes.

5      Q.   Where did this conversation take place?

6      A.   We had breakfast somewhere.  I don't remember

7  the name of the restaurant.

8      Q.   What city?

9      A.   Chicago.

10      Q.   Was the meeting -- who set up the meeting?

11      A.   Tony Rivera.

12      Q.   Did you know the nature of the content that

13  was going to be discussed at that meeting?

14      A.   Did I know the nature of the content.

15      Q.   Do you want me to restate that?

16      A.   Please.

17      Q.   Had you previously spoken with Mr. Rivera

18  prior to that meeting?

19      A.   Yes.

20      Q.   Had you and Mr. Rivera previously discussed

21  possibly forming a new corporation?

22      A.   Mr. Rivera had talked about forming a

23  corporation.  The idea that I would be a part of it

24  wasn't -- had not been discussed at that point.

25      Q.   So you had never discussed with Rivera your

[Page 263]

1  involvement with National prior to the meeting with

2  James Erwin; is that correct?

3      A.   Never discussed that I would be any kind of

4  shareholder or owner of any kind of National prior to

5  that meeting, no.

6      Q.   Okay.  And my question was had you ever

7  discussed your involvement in the formation of it.  And

8  due to your answer, are you telling me that you had

9  discussed your participation in the company prior to

10  that, just not your participation as an owner?

11      A.   I don't recall exactly what had been discussed

12  at that point.  I know Tony was considering lots of

13  different opportunities and possibilities at that point

14  and even at the point of that meeting was still

15  considering Costa Rica and several other possibilities.

16      Q.   Did you discuss with Mr. Erwin and Mr. Rivera

17  at that meeting in October of '99 your potential to be

18  an investor of a new corporation?

19      A.   I don't believe so.

20      Q.   Were you aware that Tony Rivera had already

21  filed an articles of incorporation at that point?

22      A.   I'm not sure that I knew that at that meeting.

23  I did learn that later.

24      Q.   When did you learn that?

25      A.   Sometime after that meeting.

[Page 264]

1      Q.   When did National open its doors?

2      A.   Late '99.

3      Q.   You don't recall the month?

4      A.   November of '99.

5      Q.   Does November 1, 1999 sound accurate to you?

6      A.   Could be.

7      Q.   Did -- do you recall if it was at the

8  beginning of November or not?

9      A.   I believe it was at the beginning of November.

10      Q.   Was your meeting with Mr. Erwin and Mr. Rivera

11  at the beginning, middle or late October?

12      A.   It wasn't late October, but I'm not sure

13  exactly when -- what date it was in October.

14      Q.   Okay.  Did you meet with Mr. Erwin in any

15  capacity again after that initial meeting prior to

16  November 1 of 1999?

17      A.   I don't believe we had any face-to-face

18  meetings that...

19      Q.   Did you have phone conversations with him?

20      A.   Yes.

21      Q.   When did you make a decision that you were

22  going to be an owner or principal or investor in

23  National?

24      A.   At some point just prior to National becoming

25  a -- or just prior to National opening.

*Deposition of Al Beamer*

[Sheet 5, Page 265]

1  Q.  So in the month of October; correct?

2  A.  Yes.

3  Q.  Of 1999?

4  A.  Yes.

5  Q.  How would you describe your involvement in

6  National at that point?

7  A.  At what point?

8  Q.  In November 1, 1999.

9  A.  I had -- I was -- I was the person who brought

10  in the software and installed it and configured it.

11  Q.  Well, did you have --

12  A.  And I was --

13  Q.  I'm sorry.  Go ahead.

14  A.  And I was a part owner, stockholder.

15  Q.  How large was your percentage of ownership?

16  A.  On November 1st?

17        MR. HABER:  Greg, I'm going to object.  I'm

18  going to let you go a little longer, but it was my

19  understanding that we were reconvening this deposition

20  so you could ask questions regarding damages.

21        You've asked him questions regarding the

22  subscription agreement previously and you've asked him

23  questions regarding ownership and you've asked him

24  questions regarding the company and the establishment of

25  the company.  I think you're going back over areas that

[Page 266]

1  we already addressed which I did not understand would be

2  the purpose of the deposition.

3        I'll let you go a little farther, but I'd like

4  to get into the damage issue if we could.

5        MR. SHOEMAKER:  Okay.  And I guess for the

6  record I'll state I certainly do not feel I'm limited to

7  asking him about damages nor did I represent that was

8  the only thing I would be asking him about.

9        However, any objection of something that's

10  already been asked and answered or an area that I

11  already covered is certainly something you can object

12  to.  I certainly do not plan on going through all of the

13  details on National again, however, regarding a few

14  specific witnesses that he's listed or you have listed

15  as potential witnesses --

16        MR. HABER:  I'm not objecting to those

17  questions regarding those witnesses.  I just think the

18  issue of ownership, when the business started, who he

19  talked to, when he talked to, I think these are all

20  areas that we've gone over.

21        I'm not limiting you right now, but you did

22  represent that it was damages that we were going to be

23  returning for.  You know, if we can move towards that --

24        MR. SHOEMAKER:  I'm going to finish through

25  these witnesses then that's where I plan on heading so

[Page 267]

1  you can proceed as you wish.

2  Q.  (by Mr. Shoemaker)  What percentage was your

3  ownership?

4  A.  I was to become a one-quarter owner.

5  Q.  Okay.  And when you say I was, what do you

6  mean by that?

7  A.  Well, I contributed my software and $20,000

8  and got a certain number of shares.  I don't remember

9  how many shares.  James Erwin contributed cash and got,

10  I believe, the same number of shares.  And Tony Rivera

11  and Damian Sichak contributed something less than cash

12  but they were going to continue to contribute until they

13  had reached the same level of contribution and the same

14  level of stock that -- as James Erwin and I.

15  Q.  Were your voting shares going to be the same

16  between the four of you?

17  A.  Yes.

18  Q.  Okay.  How about Damian -- is it Sichak?

19  A.  Yes.

20  Q.  What additional knowledge besides from an

21  ownership standpoint or something that we just covered

22  today, not talking about prior in the depo, would

23  Mr. Sichak have regarding the allegations in this

24  lawsuit?

25  A.  Additional thing I can think of that he knew

[Page 268]

1  of my relationship with Bill Baumgart and

2  TransContinental Title and so he could provide

3  information also supporting the fact that I, in December

4  of '99, would have had an expectation of continuing for

5  many years with the relationship with TransContinental.

6  Q.  When did Mr. Sichak end his employment with

7  TTC?

8  A.  October or November of '99.  I don't remember

9  if he quit before November whenever the National started

10  or just after that.

11  Q.  To your knowledge, did Mr. Sichak's employment

12  at TTC end due to his new involvement with National?

13  A.  He quit TTC and joined National, yes.

14  Q.  Okay.  What was Mr. Sichak's position at TTC?

15  A.  He was a vice president, I believe, at the

16  time that he resigned.

17  Q.  When did your involvement -- and roughly.

18  This is already on the record.  I'm not trying to trick

19  you into a month here.  When did your involvement with

20  National cease?

21  A.  I guess the answer to that would be whenever

22  National ceased.  I don't really know.

23  Q.  Okay.

24  A.  National was only in business for a few months

25  and then the -- my participation was just involvement in

*Deposition of Al Beamer*

[Sheet 6, Page 269]

1  the lawsuit that Netco filed against National. At some

2  point National stopped doing business.

3     Q.  Okay. Since the end, I'll say, of 2000, have

4  you spoken with Mr. Sichak?

5     A.  Yes.

6     Q.  On what occasion and what was the purpose of

7  it?

8     A.  Since the end of 2000.

9     Q.  Let me ask you another question, Mr. Beamer,

10  unless you want to answer that for some reason, but

11  that's a poor question.

12     Since the end of 2000, have you had a

13  continuing relationship with Mr. Sichak either on a

14  business or personal level?

15     A.  Yes.

16     Q.  What is that relationship?

17     A.  It's a personal one right now.

18     Q.  Okay. Have you had any sort of business

19  relationship with Mr. Sichak since the end of 2000?

20     A.  Yes.

21     Q.  What is that?

22     A.  That was Counselors Title Company that was

23  formed, I believe, in 2001 and we both did some work for

24  Counselors Title. I believe he's still there.

25     Q.  We've previously discussed Counselors Title, I

[Page 270]

1  believe, and Mr. Erwin is involved in that as well; is

2  that correct?

3     A.  Yes, he is.

4     Q.  Okay. Have you spoken with Mr. Sichak in

5  regards to this lawsuit?

6     A.  No.

7     Q.  How about Maria Sagrati? What is your

8  understanding of her knowledge regarding the allegations

9  in this lawsuit?

10     A.  Maria Sagrati was a salesperson for National

11  Real Estate Title and her information would be also in

12  defense of the counterclaims in this lawsuit.

13     Q.  Okay. Are you referring to the fact that the

14  counterclaims -- are you getting back into the

15  Erwin-type of analysis that she would know that no trade

16  secrets were violated and so forth?

17     A.  Not as to trade secrets particularly, but as

18  to other allegations in the counterclaim related to

19  customers and customer lists and things like that.

20     Q.  Any other area that Ms. Sagrati would have any

21  knowledge regarding the allegations in this lawsuit?

22     A.  Not that I know of.

23     Q.  When's the last time you spoke with

24  Ms. Sagrati?

25     A.  I believe sometime in the year 2001.

[Page 271]

1     (Defendant's Exhibit AA was marked for

2     identification.)

3     Q.  Okay. I am going to show you what's been

4  marked as AA, Defendant's Exhibit AA. Do you recognize

5  that, Mr. Beamer?

6     A.  Yes.

7     Q.  And what is it?

8     A.  It's an individual tax return for 1996 for

9  myself and my wife.

10     Q.  Okay. Is this filed jointly or how is this

11  form filed?

12     A.  Jointly.

13     Q.  And on Line 7, what were the wages acquired

14  that year?

15     A.  133,997.

16     Q.  On Line 17 I see a number, 4,809. What does

17  that represent?

18     A.  I assume that that's Title Marketing Company

19  income.

20     Q.  And if you're filing a return for Title

21  Marketing Company, which we'll look at here in a second,

22  why does -- why does anything from Title Marketing

23  appear on this form?

24     A.  Title Marketing is an S corporation.

25     Q.  So you reported on your individual tax return

[Page 272]

1  as well as the S corporation form?

2     A.  Yes.

3     Q.  Okay. But only $4,809 from Title Marketing

4  Company goes towards your individual income tax return;

5  is that correct?

6     A.  In 1996.

7     Q.  That's correct on this form?

8     A.  Yes.

9     Q.  The 133,997 wages that we spoke about, was

10  that earned by yourself or your wife?

11     A.  From looking at this, I can't tell. I'd have

12  to look at other forms to know for sure.

13     Q.  Well, from your knowledge, did your wife

14  acquire any income that year that was filed on this

15  form?

16     A.  I don't remember exactly which years my wife

17  worked outside the home and which she didn't. It could

18  well be that she did work. I believe she did work to

19  some extent in '96.

20     Q.  Okay. Where -- for any time during this time

21  frame -- we may as well just get this out of the way --

22  from '96 through the end of 2002, where did your wife

23  work outside of the home?

24     A.  She worked for the Rockwood School District at

25  the Marquette High School in Chesterfield.

*Deposition of Al Beamer*

[Sheet 10, Page 285]

1    50 percent of the sales in '96 you attributed to TTC and
2    you're telling me you would again estimate that that
3    percentage increased in '97. Would that be accurate?
4        A.    I -- I said it was in the range of 50.
5        Q.    I agree with that.
6        A.    And yes, it went -- went up in '97.
7        Q.    Would you guess that it was more than
8    75 percent of sales in '97?
9        A.    I would guess it was in the 60 to 80 --
10    80 percent range.
11        Q.    Out of 109,000, you're guessing it was
12    somewhere then from 60 some to 80 some thousand that was
13    generated as well; is that accurate?
14        A.    Yes.
15        Q.    And, again, in '97, you did not generate any
16    income for TMC from Netco; correct?
17        A.    Correct.
18        Q.    Just so I can keep it straight as we go
19    through this, when was Residential Title Service or RTS
20    as we've referred to it as formed?
21        A.    Best of my understanding either '97 or '98.
22        Q.    Not as an employee but I'm talking about any
23    contact, when was your first relationship with RTS
24    formed?
25        A.    March of 2000.

[Page 286]

1        Q.    And I'll wait till 2000 to get into that in
2    detail, but just so I understand, you became an employee
3    of theirs in August of 2002; correct?
4        A.    I believe so.
5        Q.    We'll show you the contract. I'm not trying
6    to trick you, but does that sound about the same time
7    line?
8        A.    I remember that there are some contracts and
9    that -- that's roughly what I would expect, yes.
10        Q.    So from March of 2000 through August of 2002,
11    your relationship with RTS would have solely been
12    through TMC; correct?
13        A.    Correct.
14        Q.    And you would have not generated any
15    individual income from RTS until that contract that
16    we'll discuss in August of 2002?
17        A.    Correct.
18              (Defendant's Exhibit EE was marked for
19              . identification.)
20        Q.    Okay. All right. Let me show you what's been
21    marked as EE. Can you identify that document for me?
22        A.    It's the individual income tax return for 1998
23    for myself and my wife.
24        Q.    And wages that year were $123,417; is that
25    correct?

[Page 287]

1        A.    Yes.
2        Q.    And do you recall if your wife generated any
3    income in 1998?
4        A.    I don't recall specifically, but if she did,
5    it was $20,000 or less.
6        Q.    And that would have still been as a teaching
7    assistant; is that correct?
8        A.    I guess that was her title.
9        Q.    It was in the same position that we previously
10    discussed at Marquette High School?
11        A.    That's true.
12        Q.    And the remainder of that, was that once again
13    solely generated from your work at Netco?
14        A.    Yes.
15              MR. SHOEMAKER: Rich, for the record, I'm
16    going to request -- when it says W2's, I'm pretty sure I
17    referenced those. I don't even necessarily need all of
18    those, but what I will ask is if Mr. Beamer would follow
19    up at least on these years that -- I got a feeling we're
20    going to get into a couple of years where you know that
21    your wife, Kathleen, did not work, but in any year where
22    she did work, I would ask for a breakdown of what she
23    received.
24              Is that acceptable or do you got any questions
25    in that regard?

[Page 288]

1              MR. HABER: I'll have him look for his records
2    for these years that would reflect the schedules as well
3    as the W2's for that.
4              MR. SHOEMAKER: I'm not trying to get overly
5    document heavy here.
6              MR. HABER: I'm not sure going back to '96 or
7    '97 is going to have a lot of bearing on this case, but
8    I'll have him search.
9              MR. SHOEMAKER: Okay.
10              (Defendant's Exhibit FF was marked for
11              identification.)
12        Q.    (by Mr. Shoemaker) Let's go to FF. Can you
13    identify that document?
14        A.    That's the tax return for an S corporation for
15    Title Marketing Company for 1998.
16        Q.    And sales are $190,554; is that correct?
17        A.    Yes.
18        Q.    I assume you would admit that's a substantial
19    increase from 1997 in sales and income?
20        A.    Yes.
21        Q.    What attributed to this large increase in
22    sales in 1998?
23        A.    1998 was a year that included a refinance boom
24    in the title industry and so title insurance companies
25    in general made a lot more money in 1998.

# EMPLOYMENT CONTRACT

AL BEAMER (hereinafter "AL") is hereby employed by EQUITY TITLE COMPANY - U.S.A. (hereinafter "EQUITY"), upon the following terms:

1. Term.  The term of this contract is three (3) years, unless extended by the parties.  It begins on June 1, 1993.

2. Job Description.  AL's primary responsibility will be to further integrate all EQUITY computer systems, to improve their capabilities and efficiency, and to support the computer users.  Other responsibilities, involving corporate planning, development of new markets and development of underwriter relationships will be added as needed by EQUITY and as time permits.

3. Job Title.  AL's initial title will be Executive Vice President - Information Systems.

4. Outside business/employment.  It is understood and agreed that AL will continue to operate TITLE MARKETING COMPANY, INC.  AL may also have one or more consulting or employment contracts with title insurance underwriters.  These other business\employment involvements will require AL's time, but EQUITY will have first priority in AL's work.  It is understood that some of the work to be done, particularly computer programming and software development work, will be done at AL's home. AL will not divulge confidential information of EQUITY to any other entity without EQUITY's approval.

EQUITY will not owe anything for programs or support to TITLE MARKETING COMPANY, INC. during the term of this contract, as extended, except the bonus stated in item #7, below.  At the end of this contract, as extended, EQUITY will own a perpetual license to use any of the programs previously provided by TITLE MARKETING COMPANY, INC. or created under this contract in any of EQUITY's offices existing at the end of this contract.

5. Holidays\vacations\sick days.  These will be taken as AL deems necessary, with the intention of fulfilling his responsibilities kept in mind.

6. Medical and dental insurance.  AL and his family will be covered without charge by the medical and dental insurance plan in place for full time EQUITY - U.S.A. employees.  AL's employment will be considered to constitute full time status for the purpose of qualifying for such insurance coverage.

7. Software development costs.  It is the intention of AL and EQUITY to gain for EQUITY the advantages of the latest in computer hardware and software technology.  To that end, EQUITY will pay for computer hardware and software to be used or tested for use by EQUITY.  It will pay for a laptop computer to be chosen by AL at a cost of up to $4,000. It will also pay for computer-related books and magazines and for attendance by AL at up to two days of the COMDEX Spring computer convention.  This year's COMDEX will be held the week of May 24th in Atlanta.

Defendants'
Exhibit

A

8. Salary.  AL's salary for each of the three (3) years of this contract will be $80,000.

9. Bonus.  A bonus will be paid to TITLE MARKETING COMPANY, INC. equal to 0.75 % of that portion of EQUITY's total gross revenue from all of its offices which exceeds $2 million in each calendar quarter.  This bonus will be calculated at the end of each calendar quarter and paid within 30 days after the end of each quarter.  Because this contract begins one month from the end of the April-June quarter, the first such calculated "quarter" will cover the months of June, July, August and September, 1993.  0.75 % of the portion of EQUITY's total gross revenue which exceeds $2 million for that 4-month period will be paid on or before October 30, 1993.

10. Car Expenses.  EQUITY will pay to AL a $400 per month car allowance and will pay for gas ~~and maintenace~~ on AL's car. *J.M.B., AB*

11. Home\office and portable phone.  EQUITY will pay the regular monthly charge for a car phone.  AL will pay the regular monthly charges of a business line at his home\office and will provide a fax machine and answering machine at his home\office.  EQUITY will reimburse AL for any long distance charges for calls to, or on behalf of, any EQUITY office.

12. Travel and entertainment expenses.  EQUITY will pay the costs of AL's travel (hotel, airfare, car rental or taxi, meals, etc.) on EQUITY business and for any entertaining AL does on behalf of EQUITY.  AL will use reasonable efforts to keep costs down, but it is agreed that AL will stay at hotels comparable to a Marriott and will usually fly on TWA.

13. Buyout.  If, at any time during the term of this contract, EQUITY chooses to terminate the contract, EQUITY will pay to AL one-half of the remaining salary obligation.

14. Non-compete.  Within one (1) year after the end of this contract, AL will not contact EQUITY's customers for the purpose of attempting to persuade the customers to do business with a competitor of EQUITY.


Dated this _31_ day of May, 1993.

EQUITY TITLE COMPANY - U.S.A.


By: _____
    John Baumgart

    _____
    Al Beamer

# EQUITY TITLE COMPANY OF AMERICA, INC.

## EMPLOYEE AGREEMENT

**THIS AGREEMENT,** made and entered into on _June    14_ , 19 _94_ , by and between Equity Title Company of America, Inc., an Illinois corporation, on behalf of itself, its divisions, and affiliates (hereinafter collectively "Equity Title"), and _Al    Beamer_ ("Employee");

Defendants'
Exhibit

**B**

## RECITALS

**WHEREAS** the Employee is or desires to be employed by Equity Title, and Equity Title desires to employ or continue to employ Employee on the following terms and conditions; and

**WHEREAS** by virtue of employment with Equity Title, Employee has and/or shall become acquainted with certain confidential aspects of its products, customers, methods of doing business, marketing and other business information that Equity Title wishes to protect, including, but not limited to the issuance, sales, and servicing of title commitments, title insurance, and property/letter reports.

**NOW THEREFORE,** in consideration of the mutual convenants contained herein and of employment or continued employment by Equity Title, which is specifically conditioned on execution of this Agreement, and of the compensation to be paid by Equity Title for services, the parties hereto do hereby agree as follows:

1.   **SCOPE OF EMPLOYMENT:**  During employment with Equity Title, Employee shall devote his/her whole working time and best efforts to those duties assigned to him/her by Equity Title from time to time, and Employee shall not, either on his/her own account or for others, directly or indirectly solicit, accept, or participate in any business competitive with that of Equity Title. Employee's employment shall be subject to Equity Title's Employee Handbook ("Employee Handbook") for all matters not covered herein.

2.   **REMUNERATION:**  In consideration of the performance by Employee of the duties required by Equity Title, and in further consideration of the undertaking by Employee of the obligations herein provided, Equity Title shall pay to such employee such remuneration in such a manner as is specified by Equity Title from time to time hereafter.

3.   **CONFIDENTIAL INFORMATION:**  Employee acknowledges that during employment with Equity Title, Employee will have access to, obtain, and may conceive, originate and/or develop or prepare confidential information of and for Equity Title. For purposes of this Agreement, "Confidential Information" shall mean information not generally known or available to the relevant trade or industry without restriction that arises from or relates to any of Equity Title 's actual and potential customers, products, issuances, sales, services, finances, marketing, merchandising, accounting, personnel, data

processing (including but not limited to software, programming design and development materials, documentation, and hardware and data base information), research and/or development activities, general information and information of any third party that is provided to Equity Title in confidence. Absent prior authorization by Equity Title, Employee shall neither use or permit the use of, disclose or permit the disclosure to any third party of any such Confidential Information, either during his/her employment with Equity Title or thereafter.

   4.   **INVENTIONS:**  All discoveries, designs, improvements, techniques, ideas, and issuances, whether patentable or not, relating to (or suggested by or resulting from) products, services, issuances, or other technology of Equity Title or relating to (or suggested by or resulting from) methods or processes used or usable in connection with the business of Equity Title that may be conceived, developed or made by Employee during the term of employment by Equity Title (hereinafter "Inventions"), either solely or jointly with others shall automatically become the sole property of Equity Title.  Employee shall disclose to Equity Title all such Inventions and shall execute all assignments and other documents deemed necessary by Equity Title to perfect Equity Title's title thereto, or to the patents issued therein, or to otherwise secure and protect Equity Title's property rights therein.   These obligations shall continue beyond the termination of Employee's employment with respect to Inventions conceived, developed or made by Employee during employment with Equity Title.  Equity Title acknowledges and agrees that the provisions of this paragraph shall not apply to any Invention for which no equipment, supplies, facility or trade secret information of Equity Title is used by Employee and which is developed entirely on Employee's own time, unless (a) such Invention relates (i) to the business of Equity Title or (ii) to Equity Title's actual or demonstrably anticipated research or development or (b) such Invention results form any work performed by Employee for Equity Title.

   5.   **MARKS OR NAMES:**  All designs, emblems, marks, mottoes, devices, symbols, words, and names, whether or not they are trademarked or trade named, relating to (or suggested by or resulting from) products, services, or issuances, used or usable in connection with the business of Equity Title that may be conceived, developed or made by Employee during the term of employment by Equity Title (hereinafter "Marks or Names"), either solely or jointly with others shall automatically become the sole property of Equity Title.  Employee shall disclose to Equity Title all such Marks or Names and shall execute all assignments and other documents deemed necessary by Equity Title to perfect Equity Title's title thereto, or to the trademarks or trade names issued therein, or to otherwise secure and protect Equity Title's property rights therein.  These obligations shall continue beyond the termination of Employee's employment with respect to Marks or Names conceived, developed or made by Employee during employment with Equity Title.  Equity Title acknowledges and agrees that the provisions of this paragraph shall not apply to any Marks or Names for which no equipment, supplies, facility or trade secret information of Equity Title is used by Employee and which is developed entirely on Employee's own time, unless (a) such Marks or Names relates (i) to the business of Equity Title or (ii) to Equity Title's actual or demonstrably anticipated research or development or (b) such Marks or Names results form any work performed by Employee for Equity Title.

6.  **COMPETITION:**  For a period of six months after the termination of Employee's employment with Equity Title for any reason (a) Employee shall not sell to, contact, solicit, or deal with any Equity Title customers, including, but not limited to those customers that are lenders, bankers, brokers or finance companies with respect to any products or services that are competitive with one or more products or services of Equity Title; (b) Employee will not render services for a new or existing competitor of Equity Title with respect to products or services that are competitive with those of Equity Title, within the geographical area in which Equity Title does business, except that Employee may accept employment with an Equity Title competitor if Employee is rendering the kind of services that are not competitive with those of Equity Title; (c) Employee will not establish its own business as a competitor of Equity Title with respect to products or services that are competitive with those of Equity Title within the geographical area in which Equity Title does business; and (d) Employee shall not hire, solicit, induce or attempt to induce any employee of Equity Title to leave its employ, engage in any competing business, or to otherwise aid or assist any person or company that is or intends to be in competition with Equity Title.  For purposes of Paragraph 5, "Equity Title" shall mean all companies affiliated with Equity Title Company of America, Inc., in which Employee has been employed and/or for which employee has performed services.

7.  **EMPLOYEE HANDBOOK:**  Employee acknowledges that certain items in the Employee Handbook shall be altered in regard to its application to Employee. Designated below are the applicable policies, rules, and/or benefits that have been modified for purposes of its application to Employee.

   (a) **Health Care Benefits:**  Health care benefits provided by Equity Title begin on Employee's date of hire.

   (b) **Holidays:** The designated half staff days do not apply to Employee.

   (c) **Compensation Days:**  Compensation days do not apply to Employee. Employee is entitled to arrange his/her own "time-off" for vacation, personal, and sick time as long as such "time-off" does not interfere with Employee's job performance.

   (d) **Leaves of Absence:**  Employee is not entitled to a Leave of Absence unless it is under the Family and Medical Leave Act, a Military Leave or a Maternity Leave (as stated in the Employee Handbook).

   (e) **Payroll:**  Employee is an exempt employee under the Fair Labor Standards Act.  Therefore, employee is not entitled to overtime pay. Any Employee designated as a "salesperson" should receive a letter from their applicable State Vice-President confirming their compensation structure in regards to salary, commissions and expenses.

   (f) **Hours of Work:**  Employee is expected to work the hours necessary to perform his/her job.

   (g) **Performance Reviews:**  Employee will receive a performance review once every twelve (12) months.

8.  **REMEDIES:**  Employee acknowledges that his/her compliance with the terms of this Agreement is necessary to protect Equity Title's Confidential Information and good will and that any breach by him/her of this Agreement will cause continuing and irreparable injury to Equity Title.  Employee acknowledges that Equity Title shall, in

3

addition to any other rights or remedies it may have, be entitled to injunctive relief for any breach by Employee of any part of this Agreement. This agreement shall not in any way limit the remedies in law or equity otherwise available to Equity Title.

**9. TERMINATION OF EMPLOYMENT:** Employee's employment under this Agreement may be terminated by either party for any reason whatsoever at any time. Upon termination of employment, Employee shall (1) deliver to Equity Title all writings, records, data, memoranda, contracts, orders, brochures, sales literature, card rates, production materials, and other documents, whether or not obtained from Equity Title and including but not limited to Confidential Information, which pertain to or were used by Employee in connection with employment by Equity Title; and (2) not remove, retain, copy, or utilize any Confidential Information, privileged or proprietary data, or property of Equity Title or its customers. Termination of employment shall not affect the obligations of Employee which, pursuant to the express provisions hereof, continue in effect. Modification or change of Employee's duties by Equity Title shall not affect Employee's continuing obligation to fully observe the provisions of this Agreement.

**10. EMPLOYEE WARRANTY:** The Employee represents and warrants that neither the execution, delivery, nor performance of this Agreement by Employee will in any way violate or conflict with any other agreement by which Employee may be bound.

**11. GENERAL PROVISIONS:** All provisions of this Agreement are intended to be interpreted and construed in a manner to make such provisions valid, legal and enforceable. To the extent that any paragraph of this Agreement or any word, phrase, clause, or sentence hereof shall be deemed by any court to be illegal or unenforceable, such word, clause, phrase, sentence or paragraph shall be deemed modified, restricted or omitted to the extent necessary to make this Agreement enforceable. The covenants set forth herein shall inure to the benefit of, may be assigned by, and shall be binding upon the successors and assigns of Equity Title. This Agreement may not be assigned by the Employee, but shall be binding upon Employee's executors, administrators, heirs and legal representatives. The representations and warranties contained in this Agreement shall survive the execution of, and the consummation of the transactions contemplated by, this Agreement. Nothing herein expressed or implied is intended or shall be construed to confer upon or give any person other than the parties hereto and their successors or assigns, any rights or remedies under or by reason of this Agreement. This Agreement is deemed to have been prepared jointly by the parties hereto, and any uncertainty or ambiguity existing herein shall not be interpreted against any party, but shall be interpreted according to the application of the rules for arm's length agreements. No waiver by Equity Title of any breach by the Employee of any of the latter's obligations, covenants, or representations under this Agreement shall constitute a waiver by Equity Title of any prior or subsequent parties with respect to its subject matter and may not be changed or amended orally but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought. Any other understandings and agreements, oral or written, respecting the subject matter hereof are hereby superseded and canceled. Any notice required under this contract shall be deemed given upon deposit in the U.S. mail, postage prepaid, certified return receipt requested, addressed to the General Counsel of Equity Title, at its place of business and to the Employee at his/her home address as reflected in records of Equity Title.

12.    **GOVERNING LAW:**   The parties agree that this Agreement shall be construed and governed by the laws of the State of Illinois, excepting its conflict of laws principles.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

_____          By _____
            Employee                                    John R. Baumgart
                                                          President

Defendants'
Exhibit

C

EQUITY TITLE COMPANY OF AMERICA, INC.

EMPLOYEE AGREEMENT

THIS AGREEMENT,   made and entered into January__, 1999, by and between Equity Title Company of America, Inc., an Illinois corporation, and Robert Allen Beamer ("Employee").

RECITALS

WHEREAS  Employee desires to be employed by NETCO, and NETCO desires to employ Employee on the following terms and conditions  (for purposes of this Agreement, "NETCO" shall mean Equity Title Company of America, Inc. and all companies affiliated with, or under common ownership with, Equity Title Company of America, Inc., by which Employee is employed or for which Employee performs services during the term of this Agreement); and

WHEREAS by virtue of employment with NETCO, Employee shall become acquainted with certain confidential information relating to its products, customers, methods of doing business, marketing and business processes that NETCO wishes to protect, including, but not limited to those related to the issuance, sales, and servicing of title commitments, title insurance, and property / letter reports.

NOW THEREFORE,  in consideration of the mutual covenants contained herein and of Employee's employment by NETCO, which is specifically conditioned on execution of this Agreement, a bonus structure applicable to Employee, and of the compensation to be paid by NETCO for services during the term hereof, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1.  **EMPLOYMENT:** NETCO agrees to employ Employee subject to the terms and conditions contained in this Agreement.  During Employee's employment with NETCO, Employee agrees to devote Employee's best efforts to those duties assigned to Employee by NETCO from time to time.  NETCO acknowledges and agrees that Employee may provide services to TransContinental Title Company, a Florida corporation ("TransContinental") and the other title agencies and underwriters listed on Schedule 1, attached hereto (TransContinental and the entities listed on Schedule 1 are collectively referred to as "Permissible Companies"), provided that the provision of such services does not violate the provisions of Section 6 hereof. Employee may add entities to Schedule 1 with written notice to NETCO from time to time and such entities will be considered "Permissible Companies" for purposes of this Agreement.  Employee's employment shall be subject to NETCO's Employee Handbook ("Employee Handbook") for all matters not covered herein.

2.  **COMPENSATION:** In consideration of the performance by Employee of the duties required by NETCO, and in further consideration of the undertaking by Employee of the obligations and covenants herein provided, NETCO shall pay to Employee such compensation in such manner as is specified by NETCO from time to time hereafter.

3.  **CONFIDENTIAL INFORMATION:** Employee acknowledges that during Employee's employment with NETCO, Employee will have access to, obtain, and may conceive, originate and/or develop or prepare "Confidential Information", as defined below, of and for NETCO.  For purposes of this Agreement, "Confidential Information" shall mean information not generally known or available to the relevant trade or industry without restriction that arises from or relates to any of NETCO's actual and potential customers, products, issuances, sales, services, finances, marketing, merchandising, accounting, personnel, data processing (including, but not limited to software, programming design and research and/or development activities, general information and information of a third party that is provided to NETCO in confidence).  Absent prior written authorization by NETCO, Employee covenants not to use or permit the use of, disclose or permit the disclosure to any third party of any such Confidential Information, either during Employee's employment with NETCO or for a period of three (3) years thereafter, or for so long as such Confidential Information remains a "Trade Secret", as defined in the Illinois Trade Secrets Act, whichever period is longer, except in the performance of

Employee's duties hereunder. Notwithstanding the above, Employee may disclose Confidential Information comprising only software created by Employee to Permissible Companies.

4.  INVENTIONS: Except as provided in Section All discoveries, designs, software, improvements, processes, techniques, ideas, and issuances, whether or not patentable or copyrightable, relating to (or suggested by or resulting from) products, services, issuances, or other technology of NETCO or relating to (or suggested by or resulting from) methods or processes used or usable in connection with the business of NETCO that may be conceived, developed or made by Employee during the term of employment by NETCO (hereinafter "Inventions"), either solely or jointly with others shall automatically become the sole property of NETCO. Employee shall disclose to NETCO all such Inventions and shall execute all assignments and other documents deemed necessary by NETCO to perfect NETCO's title thereto, or to the patents or copyrights issued therein, or to otherwise secure and protect NETCO's property rights therein. These obligations shall continue beyond the termination of Employee's employment with respect to the Inventions conceived, developed or made by Employee during employment with NETCO. NETCO acknowledges and agrees that the provisions of this paragraph shall not apply to any Invention for which no equipment, supplies, facility or Confidential Information of NETCO is used by Employee and which is developed entirely on Employee's own time, unless (a) such Invention relates (i) to the business of NETCO, or (ii) to NETCO's actual or demonstrably anticipated research or development; or (b) such Invention results from any work performed by Employee for NETCO. Notwithstanding anything to the contrary contained in this Agreement, Employee shall retain ownership interest in all computer programs and modifications and parts thereof created during his employment with NETCO and Employee hereby grants NETCO a worldwide, non-exclusive, royalty free, irrevocable license to use, modify, sell or sublicense any and all computer programs and modifications and parts thereof created by Employee during Employee's employment with NETCO. Employee agrees not to license, sell or otherwise disclose any computer programs and modifications and parts thereof created during Employee's employment with NETCO to any persons or entities other than Permissible Companies.

5.  MARKS OR NAMES: All design, emblems, marks, mottoes, devices, symbols, words, trademarks, service marks and trade names, whether or not they are registered, relating to (or suggested by or resulting from) NETCO's products, services, or issuances, used or usable in connection with the business of NETCO that may be conceived, developed or made by Employee during the term of employment by NETCO (hereinafter "Marks or Names"), either solely or jointly with others shall automatically become the sole property of NETCO. Employee shall disclose to NETCO all such Marks or Names and shall execute all assignments and other documents deemed necessary by NETCO to perfect NETCO's title thereto, or to register any such Marks or Names, or to otherwise secure and protect NETCO's property rights therein. These obligations shall continue beyond the termination of Employee's employment with respect to Marks or Names conceived, developed or made by Employee during employment with NETCO. NETCO acknowledges and agrees that the provisions of this paragraph shall not apply to any Marks or Names for which no equipment, supplies, facility or Confidential Information of NETCO is used by Employee and which is developed entirely on Employee's own time, unless (a) such Marks or Names relates (i) to the business of NETCO or (ii) to NETCO's actual or demonstrably anticipated research or development or (b) such Marks or Names results from any work performed by Employee for NETCO.

6.  COMPETITION: For a period of six (6) months after the termination of Employee's employment with NETCO for any reason (a) Employee shall not sell to, contact, solicit, or deal with any NETCO customers, including, but not limited to those customers that are lenders, bankers, brokers or finance companies (collectively, "Netco Customers") with respect to any products or services that are competitive with one or more products or services of NETCO; (b) Employee will not render services for a new or existing competitor of NETCO with respect to products or services that are competitive with those of NETCO, within the geographical area in which NETCO does business, if such services involve sales, solicitations or dealings with any NETCO Customers; (c) Employee will not establish its own business as a competitor of NETCO with respect to products or services that are competitive with those of NETCO within the geographical area in which NETCO does business if such business involves sales, solicitations or dealings with any NETCO Customers; and (d) Employee shall not hire, solicit, induce or attempt to induce any employee or independent contractor of

NETCO to leave its employ or engagement, engage in any competing business, or to otherwise aid or assist any person or company that is or intends to be in competition with NETCO.

7.  **EMPLOYEE HANDBOOK:**  Employee acknowledges that certain provisions in the Employee Handbook shall be deemed altered with respect to their application to Employee.  Designated below are the applicable provisions that have been modified for purposes of its application to Employee.
    (a) **Health Care Benefits:**  Health care benefits provided by NETCO begin on Employee's date of hire.
    (b) **Holidays:**  The designated half staff days do not apply to Employee.
    (c) **Compensation Days:**  Compensation Days do not apply to Employee.  Employee is entitled to arrange his/her own "time-off" for vacation, personal, and sick time as long as such "time-off" does not interfere with Employee's job performance.
    (d) **Leaves of Absence:**  Employee is not entitled to a Leave of Absence unless it is under the Family and Medical Leave Act, a Military Leave or a Maternity Leave (as defined in the Employee Handbook).
    (e) **Payroll:**  Employee acknowledges and agrees that he/she is an exempt employee under the Fair Labor Standards Act.  Therefore, Employee is not entitled to overtime pay.  Any employee designated as a "salesperson" should receive a letter from his/her applicable State Vice President confirming his/her compensation structure in regards to salary, commissions and expenses.
    (f) **Hours of Work:**  Employee is expected to work the hours necessary to perform his/her job.
    (g) **Performance Reviews:**  Employee will receive a performance review once every twelve (12) months.

8.  **REMEDIES:**  Employee acknowledges that his/her compliance with the terms of this Agreement is necessary to protect NETCO's Confidential Information, good will and other proprietary rights and interests and that any breach by Employee of this Agreement will cause continuing and irreparable injury to NETCO.  Employee acknowledges that NETCO shall, in addition to any other rights or remedies it may have, by entitled to injunctive relief for any breach by Employee of any part of this Agreement.  This agreement shall no in any way limit the remedies in law or equity otherwise available to NETCO.

9.  **TERMINATION OF EMPLOYMENT:**  Employee's employment with NETCO is "AT-WILL".  Employee's employment under this Agreement may be terminated by either party for any reason whatsoever at any time.  Upon termination of employment, Employee shall (1) deliver to NETCO all writings, records, data, memoranda, contracts, orders, brochures, sales literature, card rates, production materials, and other documents, whether or not obtained from NETCO and including but not limited to Confidential Information, which pertain to or were used by Employee in connection with employment by NETCO; and (2) not remove, retain, copy, or utilize any Confidential Information , privileged or proprietary data, or other property of NETCO or its customers.  Termination of employment shall not affect the obligations of Employee which, pursuant to the express provisions hereof, continue in effect. NETCO's payment of compensation accrued to Employee as of the date of termination of employment shall be the sole and exclusive obligation and liability of NETCO under this Agreement. Modification or change of Employee's duties or compensation by NETCO shall not affect Employee's continuing obligation to fully observe the provisions of this Agreement.

10. **EMPLOYEE WARRANTY:**  Employee represents and warrants that neither the execution, delivery, nor performance of this Agreement by Employee will in any way violate or conflict with any other agreement by which Employee may be bound.

11. **GENERAL PROVISIONS:**  All provisions of this Agreement are intended to be interpreted and construed in a manner to make such provisions valid, legal and enforceable.  Notwithstanding anything herein to the contrary, to the extent that any paragraph of this Agreement, or any word, phrase, clause, or sentence hereof shall be deemed by any court to be illegal or unenforceable, such word, clause, phrase, sentence or paragraph shall be deemed modified, restricted or omitted to the extent necessary to make this Agreement enforceable to the fullest extent permitted by law.  The covenants set forth herein shall inure to the benefit of, may be assigned by, and shall be binding upon the successors and assigns of NETCO. This Agreement may be assigned by NETCO, without the consent of Employee, to any other entity with which NETCO or any assignee has merged or consolidated, or to which it has sold all or substantially all of its assets, and which has assumed NETCO's liabilities under this Agreement, or which, directly or indirectly, controls, is controlled by, or is under common

control with NETCO. This Agreement may not be assigned by the Employee, but shall be binding upon Employee's executors, administrators, heirs and legal representatives. The representations and warranties contained in this Agreement shall survive the execution of this Agreement. Nothing herein expressed or implied is intended or shall be construed to confer upon or give any person other than the parties hereto and their permitted successors or assigns, any rights or remedies under or by reason of this Agreement. This Agreement is deemed to have been prepared jointly by the parties hereto, and any uncertainty or ambiguity existing herein shall not be interpreted against any party, buy shall be interpreted according to the application of the rules for arm's length agreements. No waiver by NETCO of any breach by Employee of any of Employee's obligations, covenants, or representations under this Agreement shall constitute a waiver by NETCO of any prior or subsequent breach by Employee. All undertakings and agreements between the parties hereto are hereby merged into this Agreement, which fully and completely expresses the agreements between the parties, and supersedes any prior agreement or understanding of the parties with respect to the subject matter hereof. No provision of this Agreement may be waived, extended, changed or amended orally, without an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification, extension or discharge is sought. Any notice required under this contract shall be deemed given upon deposit in the U.S. mail, postage prepaid, certified return receipt requested, addressed to the General Counsel of NETCO, at 415 N. LaSalle, Suite 402, Chicago IL 60610, and to the Employee at his/her home address as reflected in the records of NETCO.

12. **GOVERNING LAW:** The parties agree that this Agreement shall be construed and governed by the laws of the State of Illinois, as such laws are applied to agreements executed, delivered and performed wholly within the State of Illinois.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

Equity Title Company of America, Inc.

By: _____
John R. Baumgart
President

_____
Robert Allen Beamer

## Exhibit 1

Arkansas Title Insurance Co.
Sheridan, Arkansas (owned by Stewart Title)

Fidelity National Title Insurance Company
Dallas, Texas

Title 100
Milwaukee, Wisconsin

Lenders Title
Benton, Arkansas

Guaranty Title
Hot Springs, Arkansas

Pine Bluff Title
Pine Bluff, Arkansas

CONTRACT EXTENSION AND AMENDMENT

The employment contract existing between AL BEAMER, as employee, and EQUITY TITLE / SOUTHEAST, INC. (hereinafter "EQUITY/SE"), as employer, is hereby extended and amended as follows:

1. Relationship.  The employer-employee relationship is hereby replaced by an independent contractor relationship between EQUITY/SE and TITLE MARKETING COMPANY, INC. (hereinafter "TMC"), AL BEAMER's corporation.  TMC, through AL BEAMER, will continue to provide the same level of services and amount of time to EQUITY/SE as has been provided under the previous relationship.

2. Term.  The term of this amendment commences on June 1, 1996 and is in effect through May 31, 1999, unless extended by the parties.

3. Insurance and taxes.  EQUITY/SE will no longer pay for medical insurance, dental insurance, FICA tax, unemployment tax, or other employee-related tax or charge related to AL BEAMER.

4. Payments.  For services and a perpetual software use license, EQUITY/SE will pay to TMC as follows:
    a. For the first year of this amendment, $43,000 per year, paid in equal monthly installments.
    b. For the second year of this amendment, $45,000 per year, paid in equal monthly installments.
    c. For the third year of this amendment, $58,000 per year, paid in equal monthly installments.
    d. The bonus section of the previous amendment, calculated at 3/4 of 1 % of gross proceeds exceeding $1 million per quarter, is hereby extended without change for the term of this amendment.

5. Expenses.  EQUITY/SE will continue to reimburse AL BEAMER for travel expenses, telephone expenses, and will pay a $400 per month car allowance to AL BEAMER.  EQUITY/SE will no longer pay for gas for AL's car, except when AL is travelling on EQUITY/SE business.

6. Will pay twice per month. Effective 8/1/96. AB

Dated this 12 day of July, 1996.

EQUITY TITLE / SOUTHEAST, INC.

By: William H. Baumgart, President

John Rosso, President / Owner

TITLE MARKETING CO., INC.

By: Al Beamer

Defendants' Exhibit D

CONTRACT EXTENSION AND AMENDMENT

The existing service contract between TITLE MARKETING CO., INC. and TRANSCONTINENTAL TITLE COMPANY, INC. (formerly known as EQUITY TITLE / SOUTHEAST, INC.) is hereby extended, with only the following amendments:

1. Term.  The term of this amendment commences on August 1, 1998 and is in effect through December 31, 2000, unless extended by the parties.

2. Payments. The current payments of $45,000 per year, paid semi-monthly and a bonus of 3/4 of 1% of the gross receipts exceeding $1 million per calendar quarter are hereby extended without change for the term of this amendment.

3. Expenses.  TRANSCONTINENTAL will continue to reimburse AL BEAMER for travel expenses, gas expenses and telephone expenses.  The car allowance is changed to $800 per month for the term of this amendment.

Dated this 1st day of August, 1998.


TRANSCONTINENTAL TITLE COMPANY, INC.

By: _____
     William H. Baumgart, President


TITLE MARKETING CO., INC.

By: _____
     Al Beamer

Defendants'
Exhibit

**E**

CONTRACT AMENDMENT

The contract existing between TITLE MARKETING CO., INC., (hereinafter "TMC") and TRANSCONTINENTAL TITLE COMPANY, INC. (hereinafter "TRANSCONTINENTAL"), concerning work done by Al Beamer and software license payments made to TMC, is hereby amended as follows:

1. Relationship.  The independent contractor relationship is hereby changed to partly an employee/employer relationship between AL BEAMER and TRANSCONTINENTAL and an independent contractor relationship between TMC and TRANSCONTINENTAL.  AL BEAMER will increase the amount of time spent on work for TRANSCONTINENTAL, and will now work generally the first and third calendar weeks of each month.

2. Insurance.  TRANSCONTINENTAL will add AL BEAMER to its list of full-time employees and pay for its standard medical and dental insurance for AL BEAMER and his wife and children.

3. Salary to AL BEAMER.  TRANSCONTINENTAL will pay AL BEAMER a salary of $45,000 per year, paid at the same time as its other management-level employees.

4. Payments to TMC.  For a perpetual software use license, TRANSCONTINENTAL will pay to TMC 1.00% of its gross receipts exceeding $1 million per quarter.  Such payments will continue to be made before the end of the month following the end of each calendar quarter.

5. Car Allowance.  The monthly car allowance is increased to $1,000 per month.

6. Existing Contract.  Any items from the existing contract not specifically changed by this amendment remain in effect.

Dated this _____ 3-30-99 ~~day of January, 1999~~.

TRANSCONTINENTAL TITLE CO., INC.                    TITLE MARKETING CO., INC.

By: _____                      By: _____
    William H. Baumgart, President                      Al Beamer

Defendants'
Exhibit

F

Contract Amendment

The contract made and previously amended between TITLE MARKETING CO., INC. (herein "TMC"), AL BEAMER, and TRANSCONTINENTAL TITLE COMPANY, INC. (herein "TRANSCONTINENTAL") is hereby further amended as follows:

1. Payments to TMC.  The payments from TRANSCONTINENTAL to TMC are temporarily reduced to $7,000 per month for the months of June, July, and August, 1999.  The June payment, originally due on July 31, 1999, will now be paid on or before August 15, 1999.  The July payment will be paid on or before August 31, 1999.  The August payment will be paid on or before September 30, 1999.

Beginning with the month of September, 1999, the payment of which is due on or before October 31, 1999, payments will return to the formula in the contract amendment dated March 30, 1999, and will be calculated and paid monthly.

2. Car allowance.  The car allowance is suspended for the months of July, August and September, 1999.  It will begin again in October, 1999.

Dated this __11__ day of August, 1999.


TRANSCONTINENTAL TITLE CO., INC.

By: _____
    William H. Baumgart, President


TITLE MARKETING CO., INC.

By: _____
    Al Beamer

Defendants'
Exhibit

G

PREORGANIZATION SUBSCRIPTION AGREEMENT

WHEREAS, it is proposed to organize in the State of Ohio under the Ohio Revised Code,

Sections 1701.01 et seq., as amended, a corporation to be known as NATIONAL REAL ESTATE

TITLE AGENCY, INC. (the "Corporation"); and

WHEREAS, the aggregate number of shares which the Corporation shall be authorized to

issue is 2,000. The designation of classes, the number of shares, and a statement of par value are as

follows:

| Class | Series (If any) | Number of Shares | Par Value per Share or statement that shares are without par value |
|---|---|---|---|
| Common, voting | A | 200 | $1,000.00 |
| Common, non-voting | B | 450 | $1,000.00 |
| Common, non-voting | C | 200 | $ 100.00 |

*(handwritten in left margin: Minority Class)*

WHEREAS, it is proposed that the Corporation shall be organized for such purposes as the

incorporator may determine;

NOW THEREFORE, we, the undersigned individuals, subscribe for the number of shares

the proposed Corporation set opposite our signatures, and agree to pay therefor the amount

designated thereafter.

All subscriptions hereto shall be payable at such times as the Board of Directors may

determine and shall be paid in cash or services, as the Board of Directors may determine. Initially, it

is agreed that:

Antonio R. Rivera, Jr. will contribute cash in the amount of $10,000.00 along with his

services as a promoter and incorporator of this corporation, and will receive thirty (30) shares;



Defendants'
Exhibit

Al Beamer will contribute cash in the amount of $20,000.00 along with the Titleworx suite of computer programs, and his services as a promoter and incorporator of this corporation, and will receive forty (40) shares;

James A. Erwin will contribute cash in the amount of $40,000 and will receive forty (40) shares;

Damian Sichak will contribute cash in the amount of $10,000.00, half on or before November 1, 1999 and the balance on or before December 1, 1999, and will receive ten (10) shares.

Dated as of the 21st day of October, 1999

| Signature, Name and Address | Number of Shares Subscribed for and Designation | Amount Subscribed |
|---|---|---|
| ANTONIO R. RIVERA, JR. 1353 Edwards Road Cincinnati, Ohio 45208 | 30 Common – Class A | $30,000.00 |
| AL BEAMER 15760 Carriage Hill Court Chesterfield, Missouri 63017 | 30 Common – Class A | $30,000.00 |
| DAMIAN SICHAK 532 Centerwood Drive Tarpon Springs, Florida 34689 | 10 Common – Class A | $10,000.00 |
| JAMES A. ERWIN 4048 N. Hermitage Avenue Chicago, Illinois 60613 | 40 Common – Class A | $40,000.00 |