# DEFENDANTS'
# ATTACHMENT 2

CERTIFIED COPY

[Sheet 1, Page 1]

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

AL BEAMER, ET AL.,            )
                             )
            PLAINTIFFS,       )
                             )
v.                           )  NO. C-1-02-013
                             )
NETCO, INC., ET AL.,          )
                             )
            DEFENDANTS.       )

DEPOSITION OF JOHN R. BAUMGART
TAKEN BY RICHARD C. HABER, ESQ.
ON BEHALF OF THE PLAINTIFFS
OCTOBER 28, 2003

REPORTED BY TRACI BUTZ
CERTIFIED SHORTHAND REPORTER
CERTIFIED REALTIME REPORTER

RANKIN REPORTING & LEGAL VIDEO, INC.
1015 LOCUST STREET, SUITE 911
ST. LOUIS, MISSOURI 63101-1329
(314) 231-2202
(800) 285-2115

---

[Page 2]

1    IN THE UNITED STATES DISTRICT COURT
2          SOUTHERN DISTRICT OF OHIO
             WESTERN DIVISION
3
4    AL BEAMER, ET AL.,            )
5            PLAINTIFFS,           )
6    v.                           )  NO. C-1-02-013
7    NETCO, INC., ET AL.,          )
8            DEFENDANTS.           )
9
10
11
12
13        DEPOSITION OF JOHN R. BAUMGART, produced, sworn
14   and examined on the 28th day of October, 2003 at the
15   offices of McMahon, Berger, Hanna, Linihan, Cody &
16   McCarthy, 2730 North Ballas Road, in the City of St.
17   Louis, State of Missouri, before Traci Butz, Certified
18   Shorthand Reporter, Certified Realtime Reporter, in and
19   for the State of Missouri, in a certain cause now
20   pending in the United States District Court, Southern
21   District of Ohio, Western Division, between AL BEAMER,
22   ET AL., PLAINTIFFS, and NETCO, INC., ET AL.
23
24
25

---

[Page 3]

1                    A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFFS:
4        REMINGER & REMINGER
5        Richard C. Haber, Esq.
         1400 Midland Building
         101 Prospect Avenue, West
6        Cleveland, Ohio  44115-1093
7
8    ON BEHALF OF THE DEFENDANTS:
9        McMAHON, BERGER, HANNA, LINIHAN,
           CODY & McCARTHY
10       Gregory A. Shoemaker, Esq.
         2730 North Ballas Road
11       St. Louis, Missouri  63131
12
13   ALSO PRESENT:
14       Patrick Dignam, Esq.
         General Counsel, NETCO
15
16
17                    I N D E X
18
19   Examination by Mr. Haber                Page   5
20
21
22
23
24
25

---

[Page 4]

1                    E X H I B I T S
2
3    Plaintiff's Exhibit 1                    Page 53
        (Settlement Agreement)
4
     Plaintiff's Exhibit 2                    Page 57
5       (Counterclaim)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

Defendants'
Attachment
2

22
23
24
25

### Deposition of John R. Baumgart

[Sheet 2, Page 5]

                S T I P U L A T I O N

1            IT IS HEREBY STIPULATED AND AGREED by and

2  between counsel for the parties that this deposition may

3  be taken in shorthand by Traci Butz, Certified Shorthand

4  Reporter, Certified Realtime Reporter, and afterwards

5  transcribed into printing, and signature by the witness

6  is not waived.

7             JOHN R. BAUMGART,

8  of lawful age, being first duly sworn to tell the truth,

9  the whole truth and nothing but the truth, deposes and

10  says as follows:

11          MR. HABER:  Let the record reflect this is

12  the deposition of John Baumgart being taken by

13  agreement of the parties as to the time and place.

14  EXAMINATION BY MR. HABER:

15     Q.  Mr. Baumgart, before I get started, my name is

16  Rich Haber.  I'm an attorney representing Al Beamer in a

17  lawsuit that's been filed against NETCO, yourself, and

18  Mr. Andrews.  Have you been deposed before?

19     A.  Yes.

20     Q.  Okay.  How many times?

21     A.  About five to ten.

22     Q.  All right.  Well, I'm sure that you're

23  familiar with the routine, and I won't belabor the

24  ground rules, but I need to get verbal responses to my

[Page 6]

1  questions.  If at any time I ask you a question that you

2  don't know the answer to, I'd ask that you stop me and

3  ask me or tell me that you don't know the answer to my

4  question.  If you don't understand my question, stop me

5  and ask me to restate the question so you do understand

6  it.  Is that fair?

7     A.  Yes.

8     Q.  I don't want you to guess or speculate unless

9  my question specifically asks you to guess or speculate,

10  and then I'd like you to qualify your answer so that we

11  know that you're just guessing at that point rather than

12  relying upon a specific recollection, okay?

13     A.  Yes.

14     Q.  Would you please state your full name and

15  spell your last name for the record?

16     A.  John Robert Baumgart, B-A-U-M-G-A-R-T.

17     Q.  Mr. Baumgart, where do you currently reside?

18     A.  26539 North Middleton Parkway in Mundelein,

19  M-U-N-D-E-L-E-I-N, Illinois.

20     Q.  You have been through this before.

21     A.  Yeah.  60060.

22     Q.  How long have you lived at that address?

23     A.  Six years.

24     Q.  Are you married?

25     A.  Yes.

[Page 7]

1     Q.  Kids?

2     A.  Three.

3     Q.  They all live with you?

4     A.  Yes.

5     Q.  What's your wife's name?

6     A.  Sharon.

7     Q.  What's your date of birth?

8     A.  2/5/63.

9     Q.  So you're 40 years old?

10     A.  Yep -- or yes.  Sorry.

11     A.  Yep is also recognizable.

12         You're currently employed by NETCO?

13     A.  I'm actually employed by Equity Title Company

14  of America.

15     Q.  Is Equity Title Company of America doing

16  business as NETCO?

17     A.  No, it's not, but it has a contract to provide

18  back room support for NETCO.

19     Q.  By back room support, what do you mean?

20     A.  Legal, accounting, sales, management

21  expertise.

22     Q.  Equity Title Company is a corporation in what

23  state?

24     A.  Illinois.

25     Q.  What is your capacity with Equity Title

[Page 8]

1  Company?

2     A.  I'm chief executive officer.

3     Q.  And you're also an owner?

4     A.  I own 100 percent of the stock.

5     Q.  Is NETCO a corporation as well?

6     A.  Yes.

7     Q.  Where is NETCO incorporated?

8     A.  There's -- there's four NETCOs.  There's one

9  incorporated in Illinois, one incorporated in Ohio, one

10  incorporated in Texas, and one incorporated in Utah.

11     Q.  Do you own NETCO as well?

12     A.  I own all four of those, yes, all 100 percent.

13     Q.  Are you an officer of any of those four

14  corporations?

15     A.  Yes.

16     Q.  What is your title with respect to the NETCO

17  incorporated in the state of Illinois?

18     A.  I think it's fair to say I'm the chief

19  executive officer of all of them.  I have a -- I'm on

20  the board of all of them, and I'm also -- I'm not sure.

21  I can't think of what I am as far as, you know, there's

22  president, secretary for the board, and treasurer.  For

23  all intents and purposes, I control all of the entities.

24     Q.  When you receive compensation, you receive

25  your compensation from Equity Title Company?

### Deposition of John R. Baumgart

[Sheet 3, Page 9]

1      A.    My paycheck is received from Equity Title
2  Company of America.
3      Q.    I understand that there was a period of time
4  when Equity Title Company was operated by you and your
5  brother, Bill Baumgart.
6      A.    There was an Equity Title Company -- there was
7  a few of them that were operated by both me and my
8  brother.
9      Q.    Was that a separate corporation?
10     A.    Yes.
11     Q.    And what was the name of that corporation
12  before the split-up?
13     A.    Well, there was one called Equity Title
14  Company of Illinois, Equity Title Company of Wisconsin,
15  Equity Title Company of Missouri, and Equity Title
16  Company Southeast.  I think that was all.
17     Q.    All right.  Why don't we start first with
18  where did you go to -- where did you grow up?
19     A.    I grew up in Riverdale, Illinois.
20     Q.    Where did you go to college?
21     A.    Northern Illinois University.
22     Q.    I'm sorry about the loss last week.
23     A.    That was our first nationally televised
24  football game, and we lost big.
25     Q.    What year did you graduate from Northern

[Page 10]

1  Illinois?
2      A.    1986.
3      Q.    And with what degree?
4      A.    I have a Bachelor of Science in finance.
5      Q.    After you graduated from college in 1986, what
6  did you do?
7      A.    I worked at a couple different jobs,
8  accounting jobs, a management job.
9      Q.    In what field?  In what industry?
10     A.    One was retail.  The management job would be
11  in retail.  The accounting job was working for an
12  accounting firm.
13     Q.    And which firm was that?
14     A.    Delta Services.  Delta Financial Services.
15  They're in Elmhurst, Illinois, or they were then.
16     Q.    How long were you employed there?
17     A.    Less than a year.
18     Q.    And the management job, who was that with?
19     A.    T.M.K. Industries, something like that.  They
20  had kiosks in shopping malls.
21     Q.    And how long were you there?
22     A.    Less than a year.
23     Q.    Then what did you do?
24     A.    Then I started working for Equity Title
25  Company of Illinois.

[Page 11]

1      Q.    Who founded that company?
2      A.    My brother, Bill Baumgart, Joe Pasulo, Richard
3  Toth, and Bob Beverly.
4      Q.    What year did you start working for them?
5      A.    1987.
6      Q.    And in what capacity did you commence your
7  employment?
8      A.    I was just the first employee.  I did pretty
9  much anything that needed to be done.
10     Q.    Any prior experience in the title industry
11  before that, the title insurance industry?
12     A.    Yes.
13     Q.    When?
14     A.    I worked for Intercounty Title my late years
15  in high school and college.
16     Q.    Doing what?
17     A.    Searching, a little examining.  I also worked
18  for Record Data as a searcher.
19     Q.    In 1987 when you originally went to work for
20  them, did you have any shares of stock?
21     A.    No.
22     Q.    And the company that you went to work for in
23  1987 was Equitable -- Equity Title Company of America?
24     A.    Of Illinois.
25     Q.    Of Illinois.  When did you first obtain any

[Page 12]

1  ownership in any title company?
2      A.    In 1988 I acquired ownership in Equity Title
3  Company of Illinois.
4      Q.    How much of the -- what percentage ownership
5  did you have of Equity Title Company of Illinois?
6      A.    25 percent.
7      Q.    At that time who were the other share holders?
8      A.    Bill Baumgart, Bob Beverly, Larry Michel,
9  M-I-C-H-E-L, maybe, and myself.
10     Q.    And did you -- what was your position once you
11  obtained 25 percent of the shares of that company?
12     A.    Vice-president or something like that.
13     Q.    Who had operational control over that business
14  at that time?
15     A.    My brother was the head of the company.
16     Q.    In 1988 when you obtained a 25 percent share
17  of Equity Title of America, where -- what states did
18  Equity Title of America -- I'm sorry -- Equity Title of
19  Illinois do business?
20     A.    Illinois.
21     Q.    Did you have ownership interest or did the
22  company have ownership interest in any other title
23  insurance agencies in other states?
24     A.    No.
25     Q.    So at that point in 1988 the company was

*Deposition of John R. Baumgart*

[Sheet 4, Page 13]

1  solely an Illinois corporation?

2  A.   Yes.

3  Q.   When did the company expand outside the state

4  of Illinois?

5  A.   Another company was started called Equity

6  Title Company of Missouri in 1989.

7  Q.   And where was that company headquartered?

8  A.   In Missouri; St. Louis.

9  Q.   That was in 1989?

10  A.   Yes.

11  Q.   What role did you have in the formation of

12  that company?

13  A.   I was sent to St. Louis to set it up and get

14  it going.

15  Q.   Did you have ownership in that company?

16  A.   Yes.

17  Q.   What percentage?

18  A.   25 percent.

19  Q.   Is that when you first met Al Beamer?

20  A.   Yes.

21  Q.   How do you recall first meeting Mr. Beamer?

22  A.   Our underwriter was Commonwealth Land Title.

23  Q.   I'm sorry.  Commonwealth?

24  A.   Commonwealth Land Title.

25  Q.   Thank you.

[Page 14]

1  A.   Al Beamer was the agency rep in St. Louis for

2  Commonwealth Land Title.

3  Q.   Did Mr. Beamer have any role in assisting you

4  in getting started in St. Louis?

5  A.   Not a role.  He just did whatever an agency

6  rep would do; provide us with forms and get us contact

7  with some legal counsels to get us up to date on local

8  customs and rules.

9  Q.   When was the first time that you contracted

10  with Al Beamer and a company in which he was associated

11  for software?

12  A.   I don't recall the -- the date, but somewhere

13  around that time is when I was made aware of Al's

14  computer system that he designed, and I know that we

15  signed a contract at some point for that computer

16  system.

17  Q.   Describe for me what the computer system is or

18  what it --

19  A.- We would call it Q and A.  It's a DOS-based

20  title production system.

21  Q.   How is it used in your business?

22  A.   It was used as our title production software.

23  Q.   What does that mean, title production?

24  A.   It's the program that the employees would

25  interface with for data entry.

[Page 15]

1  Q.   So sometime around 1989 you became aware of

2  his software system and you purchased that software

3  system from Mr. Beamer or his company?

4  A.   We signed a contract with Title Marketing for

5  use of the system.

6  Q.   And was that system initially just used in St.

7  Louis, or was it used in your Illinois operation as

8  well?

9  A.   I think it was used in Illinois also.

10  Q.   What's the next state that your company or you

11  and your brother went into?

12  A.   The next state a company was started in was

13  Florida; Equity Title Company Southeast.

14  Q.   And do you remember approximately when that

15  was?

16  A.   It was about October of 1989.

17  Q.   Was Mr. Beamer's software used in that

18  location as well?

19  A.   I believe it was.

20  Q.   When you would implement Mr. Beamer's software

21  in Missouri, Illinois, and then ultimately down in

22  Florida, would Mr. Beamer go to those locations and

23  install that for you?

24  A.   I don't remember.

25  Q.   What was your understanding of Mr. Beamer's

[Page 16]

1  background in title insurance prior to purchasing his

2  software?

3  A.   I knew that he worked for Commonwealth, that

4  he was an agency rep for Commonwealth, and that he had

5  designed a DOS system that they were using that he was

6  always trying to sell to other title agents.  I don't

7  know if he had any more of a background in the title

8  business.

9  Q.   At the time that you purchased his software

10  system for your Missouri operation and your Illinois

11  operation, were you aware that he had sold the system to

12  other title insurance agencies?

13  A.   Yes.

14  Q.   How much time did you spend with Mr. Beamer

15  back in 1989 at the time you were opening up the

16  operations in Missouri?

17  A.   I -- I don't know if it would be significant

18  at all.

19  Q.   After Florida, what was the next state that

20  you entered into?

21  A.   Wisconsin.

22  Q.   And what year was that?  It's a memory test.

23  A.   Yeah.

24  Q.   We'll see how good you are.

25  A.   It might have been '91 or '90 or even '92.

*Deposition of John R. Baumgart*

[Sheet 5, Page 17]

1  I'm not sure.

2  Q.  And was Mr. Beamer's software used in the

3  Wisconsin operation as well?

4  A.  I think so.

5  Q.  When did your relationship -- and by yours, I

6  mean Equity Title of Illinois or Wisconsin or Southeast

7  or Missouri.  When did the relationship with Al Beamer

8  or TMC expand beyond just the purchase of software?

9  A.  It would have to be after Al came to work.  If

10  I remember right, in 1994 Al took a job with Equity

11  Title Company of America.  It might have been sooner.  I

12  don't know the exact time frame.

13  Q.  Now, what was the -- you have Equity Title of

14  America.  We mentioned Equity Title of Illinois, Equity

15  Title of Missouri, Equity Title of Wisconsin, Equity

16  Title Southeast.  When did Equity Title Company of

17  America take effect?

18  A.  It was somewhere in the early '90s; '91, '92.

19  Q.  And was that company incorporated to be kind

20  of the umbrella corporation for these other Equity Title

21  companies?

22  A.  It was basically set up to provide a -- a

23  different place for the top officers to work in and to

24  be a way to generate profits out of the other entities,

25  funnelling them for a more efficient tax use.

[Page 18]

1  Q.  So the -- the -- as an officer of Equity Title

2  Company of America, you provided services to these other

3  corporations and billed for those services, and then

4  ultimately you guys were -- you were a shareholder of

5  these other corporations, but they paid service fees, if

6  you will, or contract fees to Equity Title Company of

7  America?

8  A.  Yeah.  We call them royalties.

9  Q.  So Mr. Beamer would have come to work for

10  Equity Title Company of America?

11  A.  Yes.

12  Q.  Okay.  Did Mr. Beamer ever work for Equity

13  Title Company of Illinois, Missouri, Wisconsin, or

14  Southeast?

15  A.  Not that I'm aware of.

16  Q.  When did you and your brother, Bill Baumgart,

17  split the operations?

18  A.  In 1990 Bill came to the conclusion that he

19  wanted to live in Florida, so he asked me to run the

20  Midwest operations for him, and he would oversee the

21  Florida operations.

22  Q.  That was in 1990?

23  A.  In 1990 he moved to Florida, and he basically

24  controlled the Florida operation and asked me to be in

25  control of the Midwest for him.

[Page 19]

1  Q.  And when that happened, the company still

2  remained as -- you still had Equity Title Company of

3  Illinois, Equity Title Company of Missouri, Equity Title

4  Company Southeast, and Equity Title Company of

5  Wisconsin?  Yes?

6  A.  Yes.

7  Q.  When did you and your brother divest yourself

8  of each other from a corporate standpoint?  In other

9  words, when did you separate out ownership of the

10  companies?

11  A.  I purchased my brother's interest in Equity

12  Title of Missouri, Equity Title of America, Equity Title

13  of Illinois, and Equity Title of Wisconsin on January

14  1st, 1994.

15  Q.  I'm sorry.  Did you also say Equity Title of

16  Illinois you purchased?

17  A.  Yes.

18  Q.  Okay.  So you purchased four entities, and he

19  retained ownership of Southeast?

20  A.  He retained ownership of Equity Title

21  Southeast.  Part of the transaction was I gave him my

22  ownership in Equity Title Southeast, and I might have

23  acquired Equity Title of Missouri outright from him

24  prior to that, but in about a 12-month period it was all

25  done.

[Page 20]

1  Q.  So at the conclusion of those transactions,

2  you had ownership of four corporations operating in

3  Missouri, Wisconsin, Illinois, and Equity Title of

4  America, and then he had ownership of Southeast which

5  was operating in Florida?

6  A.  Yes.

7  Q.  Were there any other states that Southeast was

8  operating in at that time?

9  A.  No.

10  Q.  So at the time that you split, he operated a

11  business in Florida, and you operated a business in

12  three different states?

13  A.  Yes.

14  Q.  And that was all finalized by January 1st of

15  1994?

16  A.  That was the closing date, correct.

17  Q.  All right.  As of the time that you closed on

18  that, was Mr. Beamer -- just prior to closing on that,

19  was Mr. Beamer an employee of Equity Title of America?

20  A.  I think he was.

21  Q.  All right.  As a result of the closing of that

22  transaction, did Mr. Beamer's employment status change?

23  A.  I think he stayed an employee of Equity Title

24  of America.

25  Q.  Did he then also become an employee of Equity

*Deposition of John R. Baumgart*

[Sheet 6, Page 21]

1  Title Southeast?

2     A.  I don't think so.

3     Q.  Do you know whether he ever went to work for

4  your brother, Bill Baumgart, in Florida?

5     A.  I think at some point he became an employee.

6  When, I don't know.

7     Q.  I'm showing you what was previously marked as

8  Defendant's Exhibit A which is a contract between

9  Mr. Beamer and Equity Title Company USA.  Is Equity

10  Title Company USA what you referred to as Equity Title

11  of America?

12     A.  I never have.

13     Q.  But that's what the -- as you understand this

14  contract, that was intended to be a contract with Equity

15  Title of America?

16     A.  I don't know.

17     Q.  All right.  You'll note on the second page

18  that your signature appears on that?

19     A.  Yes.

20     Q.  This employment agreement appears to be a

21  contract for three years starting June 1st, 1993.  Would

22  this be the first contact, to your recollection, with Al

23  Beamer?

24     A.  It might have been.  I don't remember.

25     Q.  Do you know who negotiated this contract with

[Page 22]

1  Mr. Beamer?

2     A.  No.

3     Q.  Did you?

4     A.  I might have.  Al probably just wrote it.

5     Q.  Okay.  You believe that Al Beamer wrote this?

6     A.  Yes.

7     Q.  On June 14th, 1994 -- I'm showing you

8  Defendant's Exhibit B.  There was a new contract

9  executed with Al Beamer and apparently signed by you as

10  well with Equity Title Company of America.  This would

11  have been after you and your brother had separated out

12  the businesses?

13     A.  Yes.

14     Q.  All right.  Do you know who prepared this

15  agreement, one of the attorneys for Equity Title of

16  America?

17     A.  Yeah.  I can't remember if it would be -- I

18  can't think of their names.  Either Bob Reynolds or -- I

19  can't remember which legal counsel we had at the time.

20     Q.  When did Mr. Andrews start working for Equity

21  Title of America?

22     A.  I -- I don't remember that.

23     Q.  Mr. Andrews was an employee of Equity Title of

24  America, correct?

25     A.  Yes.

[Page 23]

1     Q.  And he was employed as general counsel?

2     A.  Yes.

3     Q.  This agreement contains a paragraph 6 relating

4  to competition.  Is this a form of agreement that you

5  had all of your management level employees sign at that

6  time?

7     A.  I would have my officers and my sales staff.

8     Q.  And what was your purpose in having them sign

9  an agreement that contained paragraph 6 relating to

10  competition?

11     A.  Well, being in the position they were, they

12  would have access to an awful lot of information about

13  the company, what made it successful, and we wished to

14  protect the company from them using that for their own

15  benefit.

16     Q.  Okay.  That paragraph prohibits competition

17  for a period of six months relating to sales or offering

18  services to customers of NETCO.  How does -- I'm

19  sorry -- customers of Equity Title of America.  How did

20  Equity Title of America define customers at that time?

21     A.  Customers were people who did business with

22  Equity Title.

23     Q.  Okay.  And who would they be, I mean, from an

24  institution standpoint?

25     A.  They would be local originators.  They would

[Page 24]

1  be banks, they would be savings and loans, they would be

2  finance companies, they would be lenders.  They

3  conceivably could be other title companies.

4     Q.  The next agreement that we have was marked as

5  Defendant's Exhibit C yesterday which was an agreement

6  dated January of 1999 with Equity Title Company of

7  America.  Do you recall why you had a new agreement

8  signed in January of 1999 with Mr. Beamer?

9     A.  Yes.  We would have people periodically trying

10  to violate their agreement, and we would learn from

11  court decisions what would be more correct in the

12  agreement and what needed to be changed.

13     Q.  So you would re-draft the agreement and

14  re-submit it to your officers and sales people?

15     A.  Yes.

16     Q.  In January of 1999 would this have been an

17  agreement that you re-submitted to all of your officers

18  and sales staff?

19     A.  It could have been.  I wouldn't know why this

20  one was done.

21     MR. SHOEMAKER:  I want to note for the

22  record, Rich, that we haven't represented that that was

23  the next contract after the June 14, '94 contract.

24     MR. HABER:  I know you haven't represented

25  that.

*Deposition of John R. Baumgart*

1    MR. SHOEMAKER:  Okay.  We just don't have any
2    in between in my possession.
3         MR. HABER:  And I haven't seen any in
4    between, either.  It doesn't mean there wasn't any.
5         MR. SHOEMAKER:  Okay.
6         MR. HABER:  I'm not saying there was or there
7    wasn't, but when I said the next one we have, I meant
8    present.
9         MR. SHOEMAKER:  I understand.  That's fine.
10   I just want to make sure that's noted.
11        MR. HABER:  All right.
12   Q.   (By Mr. Haber)  When did Mr. Beamer leave the
13   employ of Equity Title Company of America?
14   A.   I think it was April of 1999.
15   Q.   And how was the decision -- how was the
16   relationship terminated?  Did he resign?  Was he fired?
17   A.   I believe Al resigned.
18   Q.   How was that communicated to you?
19   A.   He had a meeting with me and Bill Andrews to
20   discuss working for the company.  We couldn't come to
21   mutually agreeable terms, and I believe he told us that
22   by not meeting those terms, he could not work for us no
23   longer.
24   Q.   Was he already working for your brother down
25   in Florida at that time?

1    A.   He always was working for my brother through
2    contractual relationships.  Was he an employee of my
3    brother?  I don't recall.
4    Q.   You always understood he had some form of
5    contractual relationship with your brother?
6    A.   Yes.
7    Q.   Whether he was an employee or an independent
8    contractor, you didn't know?
9    A.   Yeah.  I didn't know.
10   Q.   When you say he had a meeting with you and
11   Bill Andrews and you couldn't come to terms regarding
12   his continued employment, what were the specific
13   subjects of your discussion with Mr. Beamer?
14   A.   I think it was started by Mr. Beamer, and he
15   just -- he felt he deserved a substantial raise in pay.
16   Q.   Did he say why he felt he deserved a
17   substantial raise?
18   A.   What I recall is he felt because the company's
19   sales had increased that he should get the same
20   percentage increase in salary as the sales were.
21   Q.   Between January of 1994 and these discussions
22   with Mr. Beamer, how many additional states had you
23   entered into from the title insurance agency standpoint?
24   A.   We went to four or five more.
25   Q.   Which states were those?

1    A.   I know Indiana, Kentucky, Ohio.
2    Q.   Texas?
3    A.   Texas?  Yes.  Texas.  Thank you.
4    Q.   Any others?
5    A.   Maybe Michigan.  I don't remember.
6    Q.   In 1998 was there a change in the law in Texas
7    that resulted in substantial revenue growth for your
8    company?
9    A.   They changed the Constitution in Texas in
10   1997.  It went in effect January 1st, 1998.
11   Q.   And that change was to legalize home equity
12   loans?
13   A.   No.  It made it -- you were now allowed to
14   pull equity out of your house through a loan.  Home
15   equity loans were still prohibited.
16   Q.   I'm sorry.  You were allowed to pull equity
17   out of your home through what?
18   A.   Through a loan.  You could take cash out of
19   your house.
20   Q.   Okay.
21   A.   You weren't allowed to get a second mortgage
22   on your house which is what a home equity loan is.
23   Q.   Did that result in significant business for
24   your Texas operations in 1998?
25   A.   We -- we started generating more revenue in

1    Texas because of that, yes.  More loans were made in
2    Texas.
3    Q.   Was the revenue growth in Texas part of your
4    discussions with Al Beamer in early 1999 regarding
5    increased compensation?
6    A.   I don't recall.
7    Q.   Do you recall what he was specifically asking
8    for in early 1999 when he asked for more compensation?
9    A.   No.  The only thing I remember is he felt that
10   his salary should increase in the same percentage as the
11   sales had increased for NETCO as a whole.
12   Q.   And you disagreed?
13   A.   Yes.
14   Q.   And so he resigned his employment?
15   A.   Yes.
16   Q.   And did you have any further discussions other
17   than that one meeting with you and Mr. Andrews where he
18   resigned his employment?
19   A.   With Al Beamer?
20   Q.   Yeah.  I understood it to be he sat down with
21   you and Mr. Andrews, and you tried to hash out an
22   agreement regarding compensation, that you couldn't
23   reach an agreement, and as a result of that, Mr. Beamer
24   said I'm going to have to resign my employment.
25        MR. SHOEMAKER:  Okay.  I'm going to object.

*Deposition of John R. Baumgart*

[Sheet 8, Page 29]

```
 1   Are you talking about did they have any prior meetings
 2   or any meetings subsequent to that?
 3           MR. HABER:  That's fair.  Let me try and
 4   clear it up.
 5       Q.   (By Mr. Haber)  How many meetings did you have
 6   with Mr. Beamer trying to hash out this difference of
 7   opinion as to how he should be compensated?
 8       A.   I think there were always conversations
 9   leading up to that meeting in April of '99, and then at
10   that meeting kind of like it was all coming to a head,
11   like we've got to get this behind us.  We've got to come
12   to some kind of meeting of the minds, so that meeting
13   was, you know, for all intents and purposes the meeting
14   to decide whether an agreement could be made or not, and
15   it became very obvious at the end of the meeting that an
16   agreement was not going to be made.
17       Q.   And so it was in that meeting in April of 1999
18   that he resigned his employment?
19       A.   Yes.
20       Q.   Okay.  Were you upset that he resigned?
21       A.   Upset, no.  Disappointed.
22       Q.   Did you understand that he would continue to
23   work in some capacity with your brother?
24       A.   Yes.
25       Q.   Did you understand that he would also continue
```

[Page 30]

```
 1   to sell his software to other title insurance agencies?
 2       A.   Yes.
 3       Q.   And even during his employment with Equity
 4   Title of America, you understood that he would continue
 5   to sell through TMC his software to other title
 6   insurance agencies, correct?
 7       A.   Yes.  I think our agreement was that he would
 8   provide us notice when he wanted to sell to a new
 9   company and let us know who he was servicing.
10       Q.   He put it on a schedule, or he would update
11   the schedule?
12       A.   I think we just expected him to tell us.
13   There wasn't -- I mean, he had the same clients from the
14   day we met him, I think.  I don't think he ever added
15   any new title agencies to his software.
16       Q.   Were you ever approached -- let me back up.
17   Were you aware of whether your brother, Bill Baumgart,
18   ever obtained an ownership interest in a title company
19   in Ohio?
20       A.   Was I aware of it?
21       Q.   Yes.
22       A.   Yes.
23       Q.   When did you become aware that your brother
24   had obtained ownership in a title company in Ohio?
25       A.   I don't know the dates at all, but I -- I know
```

[Page 31]

```
 1   that it was offered to me, and I was thinking about it,
 2   and two days later I was told by John Rosso that my
 3   brother had stepped in and helped -- there was a
 4   situation in Ohio that our underwriter had, and my
 5   brother stepped in to help him out in the situation.
 6       Q.   Who was the underwriter?
 7       A.   Old Republic Title, I believe.
 8       Q.   And what was the situation in Ohio?
 9       A.   An owner of a title insurance agency had taken
10   a lot of money out of the escrow accounts for personal
11   use, and his son-in-law and I think his brother wanted
12   to continue as a successful agency.  They had no
13   knowledge of what was going on and wanted to continue
14   the operation based on that company, and Old Republic
15   wanted to continue it realizing that those two
16   individuals had nothing to do with the theft, but they
17   were concerned, you know, that if they signed them up as
18   agents, would they not themselves take from the escrow
19   account, something along those lines.
20       Q.   Okay.  So then how was it brought to your
21   attention?
22       A.   John Rosso called me and told me that he got a
23   call from his underwriter telling him about this and
24   that they were trying to find a way to keep these guys
25   in business and keep their upper level managers happy to
```

[Page 32]

```
 1   know that the escrow account would be protected and that
 2   if one of us stepped in, they would trust us that we
 3   would make sure the escrow accounts would be kept whole.
 4       Q.   How was it proposed to you?  Was it that you
 5   were going to own the business, or was it a short-term
 6   situation?
 7       A.   I don't know if there was a proposal at that
 8   point as much as the overall gist of it that Old
 9   Republic was trying to solve a problem, was wondering
10   if -- I think they talked to John Rosso first to see if
11   he had any interest.  He then called me to see if I had
12   any interest, and I told him give me a couple days, let
13   me think about it.
14       Q.   Did you already have operations in Ohio?
15       A.   Yes.
16       Q.   And did it bother you that ultimately your
17   brother obtained an ownership interest in that title
18   company in Ohio, that title insurance company?
19       A.   I don't know that I was excited about it.  I
20   don't know that it mattered that much.
21       Q.   Was part of your agreement when you and your
22   brother separated out the businesses that you were not
23   going to go into the same states?
24       A.   My brother had an agreement that he couldn't
25   go into the states that I purchased from him.
```

*Deposition of John R. Baumgart*

[Sheet 9, Page 33]

1    Q.   But beyond that, every other state was fair

2  game?

3    A.   I -- I believe that would be true.

4    Q.   What was your understanding from your

5  conversation with John Rosso as to the arrangement that

6  Bill Baumgart made to assist Old Republic in getting

7  these guys into business?

8    A.   I don't know if John Rosso told me what the

9  arrangement was.  I think I actually called him back a

10  couple days later to tell him -- to just find out more

11  about it.  Maybe I was thinking about it, but I needed

12  to know more information.  He told me he had talked to

13  Bill and Bill was interested in it, and they got on a

14  plane and flew to Ohio that day and signed the agreement

15  and set it up.  Bill stepped in and actually took

16  control of the company.  What actually was involved, I

17  don't know.

18    Q.   Did you ever speak to your brother about that

19  business opportunity?

20    A.   Not at that time.

21    Q.   How about at any time?

22    A.   At some time in the future we were talking

23  about it.  I mean, he explained to me kind of the

24  history of it all and how it worked out really well for

25  him.

[Page 34]

1    Q.   Tell me what he explained to you.  What was

2  his role with that business?  What was the history of

3  it?  How did it work out for him?

4    A.   Well, it was a company -- he owned a company

5  in Ohio.  These guys had generated a lot of business.

6  They were doing a good job.  They were professional.

7  They -- they made good money, Bill made good money, and

8  it ended up being a good deal for him.

9    Q.   Do you know when he sold that business?

10    A.   No.  I don't know the exact time.

11    Q.   You do know that he sold it?

12    A.   Yes.

13    Q.   And he sold it at a profit, presumably?

14    A.   Yes.

15    Q.   And who did he sell the business to, do you

16  know?

17    A.   To those two individuals.

18    Q.   Okay.  Do you remember the names of those

19  individuals?

20    A.   I think it's Hayes.  I don't remember the

21  first names; the Hayes brothers.

22    Q.   So basically he came in, purchased the

23  business, provided some oversight to allow these

24  gentlemen to get up and running, generate a profit, and

25  then when they had established a -- level of trust

[Page 35]

1  with Old Republic and in the industry, then he sold the

2  business to them, made a little bit of money on it, and

3  let them continue on with the business after that?

4    A.   I don't know if I know exactly what happened.

5  I just know my brother owned -- he -- he started a

6  business in Ohio, and they ran it for him.

7    Q.   What's your best estimate of when he sold that

8  business with the understanding that you don't know the

9  exact time?

10    A.   I -- I can't remember.  It's not something I

11  really cared about.

12    Q.   Was it prior to Mr. Beamer resigning his

13  employment with NETCO -- I'm sorry -- with Equity Title

14  of America?

15    A.   If I get this right, what you're asking is did

16  Al Beamer stop working for me and did my brother still

17  own the company in Ohio at that time?

18    Q.   At the time that Al Beamer resigned.

19    A.   I think that's true.

20    Q.   That he did own it?

21    A.   That he did own the company in Ohio at that

22  time, yes.

23    Q.   Since selling that company, has your brother

24  competed in any way in the state of Ohio with you?

25    A.   I believe my brother competes in the state of

[Page 36]

1  Ohio with me right now.

2    Q.   And in what way does he compete?

3    A.   He's licensed to do business in the state of

4  Ohio and actively pursues business in the state of Ohio.

5    Q.   Through which company?

6    A.   Through his title insurance company,

7  Transcontinental Title.

8    Q.   When did he become licensed in the state of

9  Ohio?

10    A.   I have no idea.

11    Q.   Do you know when he started competing with you

12  in Ohio?

13    A.   Well, he started competing with me in Ohio

14  when he bought -- when he started that one company.

15    Q.   I'm sorry.  You're correct.  Do you know, was

16  there a period of time after he sold that business

17  before Transcontinental became licensed in Ohio?

18    A.   I have no idea.

19    Q.   Have you ever talked with your brother about

20  terminating his contractual relationship with Al Beamer?

21    A.   I don't know if I understand the question.

22    Q.   Have you ever spoken with your brother

23  about -- prior to his termination of Al Beamer about the

24  concept or desire that he terminate Al Beamer?

25        MR. SHOEMAKER:  I'm going to object as to the

*Deposition of John R. Baumgart*

[Sheet 10, Page 37]

1  form of the question regarding termination. Are you
2  asking whether he spoke with him regarding Bill's
3  desire or John's desire?
4      MR. HABER: I'll be happy to rephrase it.
5      Q.  (By Mr. Haber) Prior to December of -- prior
6  to December 6th or 7th of 1999, did you speak to your
7  brother regarding his desire to terminate Al Beamer?
8      A.  I still don't know if I understand exactly
9  what you're saying. Did I speak to my brother and he
10  had at that time a desire to fire Al Beamer?
11      Q.  Did you ever talk -- prior to him terminating
12  Al Beamer, did you and he ever talk about the subject in
13  any way, whether it was his desire or your desire?
14      A.  Me and my brother have had conversations about
15  Al Beamer.
16      Q.  Okay. And that was prior to him being
17  terminated?
18      A.  Sure.
19      Q.  Tell me what conversations you had regarding
20  Al Beamer that involved his contractual relationship
21  with your brother.
22      A.  I don't know that we had any conversations
23  about his contractual relationship with my brother.
24      Q.  Well, what did you talk about Al Beamer with
25  your brother? What did you discuss?

[Page 38]

1      A.  I'm sure we talked about his computer system.
2  I'm sure we talked about working out times that Al could
3  work for me, but Bill needed him. Sometimes Bill had
4  special projects so he needed Al to spend more time with
5  Bill's company which took time from working for me.
6  Most of the conversations we had would be in regards to
7  those kind of things, dealing with the computer system
8  and Al's time.
9      Q.  Prior to Mr. Beamer's resignation in April of
10  1999, did you consider Mr. Beamer to have provided a
11  value to your business?
12      A.  I don't consider him providing a value to my
13  business, no.
14      Q.  Why were you paying him, then, to work for
15  your business if you didn't consider him to have added
16  value?
17      A.  He didn't add value. I paid him because he
18  was an employee of my company who worked adequately to
19  earn his pay like any other employee.
20      Q.  And you don't consider that to be value added
21  to your business?
22      A.  I don't consider it to be value added. I
23  consider a fair day's pay for a fair day's work.
24      Q.  Were you satisfied prior to his resignation
25  with his performance in his job with your company?

[Page 39]

1      A.  I thought it was adequate for the amount of
2  money we were paying.
3      Q.  Between April of 1999 and December of 1999 did
4  you ever ask your brother to terminate his contractual
5  relationship with Al Beamer?
6      A.  No.
7      Q.  How often between that period of time did you
8  go to Florida?
9      A.  I have no idea.
10      Q.  Were you in Florida in December of 1999 at a
11  time that you were originally scheduled to be deposed in
12  the litigation in Cincinnati?
13      A.  I don't recall.
14      Q.  Did you instruct anybody on your behalf to
15  speak with your brother about terminating Al Beamer?
16      A.  No.
17      Q.  Did you instruct anybody on your behalf to
18  advise Al Beamer that if he did not disband National
19  that he would be terminated from Transcontinental?
20      A.  No.
21      Q.  Mr. Andrews worked for Equity Title of
22  America?
23      A.  Yes. His paycheck was received from there.
24      Q.  He reported to you?
25      A.  Yes.

[Page 40]

1      Q.  Is there anybody else that would be considered
2  his superior in the company besides yourself?
3      A.  Maybe Ed Cook.
4      Q.  Did Mr. Andrews on your behalf supervise the
5  litigation in Hamilton County Court of Common Pleas
6  regarding Antonio Rivera?
7      A.  He was our chief counsel. He was involved in
8  that court case.
9      Q.  His responsibilities on behalf of your company
10  were to supervise that litigation, in part?
11      A.  Fair. Fair statement, I suppose.
12      Q.  And did that also include advising you as to
13  the status of that litigation?
14      A.  He would tell me what was going on, yes.
15      Q.  When did you learn that your brother was
16  terminating his contractual relationship with Al Beamer?
17      A.  I don't know if I remember.
18      Q.  Was it before or after it had been
19  communicated to Mr. Beamer?
20      A.  I have no idea.
21      Q.  Who told you?
22      A.  I don't remember who told me.
23      Q.  Did you speak with your brother regarding that
24  subject?
25      A.  About him terminating? I don't remember.

*Deposition of John R. Baumgart*

1    Q.    As we sit here today, you have no recollection
2  of discussing with your brother, Bill Baumgart, the
3  decision to terminate Al Beamer?
4    A.    I have no recollection of my brother telling
5  me that he terminated Al Beamer.  He might have, but I
6  don't recall that.
7    Q.    Did you call -- did you discuss at any point
8  from December 1st, 1999 to the present the decision to
9  terminate Al Beamer with your brother?
10   A.    I -- I don't understand the question.
11   Q.    From December 1st, 1999 have you ever asked
12  your brother why he terminated Al Beamer?.
13   A.    No.  I've never asked my brother why he
14  terminated Al Beamer.
15   Q.    Have you ever discussed with your brother the
16  litigation that Mr. Beamer filed in Florida against him
17  for breach of his contractual relationship?
18   A.    Have I called my brother and talked to him
19  about it?
20   Q.    I don't care who called who.  Have you talked
21  to him?
22   A.    I have talked to my brother, yes.
23   Q.    About the litigation with Al Beamer for breach
24  of contract?
25   A.    My brother has told me some things about it.

1    Q.    What did he tell you?
2    A.    He thought it was bullshit, it's Al looking
3  for money again, you know how Al is, he's always suing
4  everybody.  He talked to me more just to blow off steam
5  and complain.
6    Q.    In your relationship with Al Beamer, did you
7  know Al Beamer to be a guy that sued everybody?
8    A.    I believe Al Beamer is somebody who sues
9  everybody, yes.
10   Q.    Who are you aware of that he's sued besides
11  you and your brother?
12   A.    I don't know that I'm aware of that.  I don't
13  know if he's -- I think I'm aware he sued a title agent
14  at one point over his contract.
15   Q.    Well, what makes you think that he's a person
16  that sues over -- sues everybody over anything if you're
17  not aware of any other litigation besides that involving
18  you and your brother?
19   A. - Well, we might be a little skewed because he
20  sued my brother twice and he sued me now once, and you
21  might get a little more acute to the point that this
22  person just seems to keep wanting to sue us.  Maybe we
23  make the overgeneralization that he wants to do that to
24  everybody that has money.
25   Q.    That's what I'm asking, whether it's an

1  overgeneralization or it's based on some personal
2  knowledge of other lawsuits he filed.
3    A.    No.  I'm pretty sure it's me spouting steam
4  and overgeneralizing.
5    Q.    Has your brother ever advised you what he paid
6  Mr. Beamer in settlement of those lawsuits?
7    A.    My brother has told me what he's paid Al, yes.
8    Q.    And in these conversations with your brother
9  where he told you that he thought the lawsuit that Al
10  filed against him was bullshit and that it was just Al
11  seeking money, you never once discussed with him why he
12  terminated Al's contractual relationship in December of
13  1999?
14   A.    I've never asked him why he did, no.
15   Q.    Okay.  So your testimony is that unequivocally
16  you and your brother have never spoken since December of
17  1999 regarding the reason for the termination of Al
18  Beamer?
19   A.    I don't believe that would be a correct
20  statement.
21        MR. SHOEMAKER:  Yeah.  I'm going to object to
22  the mischaracterization of his testimony.  You can
23  certainly rephrase it.
24        MR. HABER:  Okay.  Read back my question, and
25  then I'll be happy to rephrase it.

1        (The preceding question was read back as
2  requested.)
3    Q.    (By Mr. Haber)  And you said that that's not
4  correct.
5    A.    Yes.
6    Q.    What is it about that statement that was not
7  correct?
8        MR. SHOEMAKER:  Well, I'm going to object
9  because your question is was that his testimony.  The
10  answer to that is it's -- is it's not his testimony.
11   Q.    (By Mr. Haber)  Have you spoken, then, to your
12  brother since December of 1999 regarding the reasons for
13  Al Beamer's termination?
14   A.    I have talked to my brother about why he says
15  he fired Al.
16   Q.    Okay.  Well, then, what did he tell you?
17   A.    He told me that he fired Al because Al lied to
18  him and was competing against him.
19   Q.    What did Al -- what did he say Al lied about?
20   A.    Al told him that he didn't have any interest
21  in that company in Ohio.  I guess it would be called
22  National.
23   Q.    And when did Al tell him he had no interest in
24  National?
25   A.    I don't know.

*Deposition of John R. Baumgart.*

1    Q.    And did your brother tell you how he knew
2    about National?
3        A.    Yeah.  He knew about National because of me.
4    Q.    How did he find out about National?
5        A.    I told him about it.
6    Q.    When did you tell him about it?
7        A.    When it started happening, when Tony Rivera
8    quit, and periodically I'd have conversations letting
9    him know what was going on.
10    Q.    How often do you speak with your brother?
11    A.    It varies.  It averages about once a month,
12    but sometimes it could be multiple times in a week.
13    Q.    When did you become aware that Tony Rivera was
14    starting National Real Estate?
15    A.    Probably around September of 1999.
16    Q.    How did you become aware of it?
17    A.    I think I was told by -- I don't know exactly
18    how.  Either an employee in Ohio made me aware of it or
19    we found a filing, somebody at the company found a
20    filing and made me aware that a title insurance company
21    was incorporating in Ohio by Tony Rivera.
22    Q.    A filing with the Secretary of State?
23    A.    Yes.
24    Q.    And when you found out, what did you do?
25    A.    I think -- what I remember is I instructed

[Page 46]

1    Bill Andrews to find out what's going on and what's
2    Tony's intentions about starting this company.
3    Q.    And when you first found this out, did you
4    call your brother and tell him that Tony Rivera was
5    starting his own title company in Ohio?
6        A.    I'm sure I called my brother and told him that
7    Tony Rivera started his own title company.
8    Q.    Why are you sure you would have called him
9    then?
10    A.    Because it would be information that I would
11    talk to him about.
12    Q.    And so close in proximity to you learning that
13    Mr. Rivera had incorporated a business in Ohio that
14    appeared to be a title insurance agency, you would have
15    let your brother know that and advised him of the name
16    of the business?
17    A.    I wouldn't be talking to him to advise him or
18    let him know.  I'd be talking to him from a personal
19    standpoint.
20    Q.    Just telling him what's going on?
21    A.    Just giving him a call.  I've always used my
22    brother as my mentor, so when things like that happen, I
23    usually just call him, start talking to him, blow off
24    steam and say I can't believe what's going on here, you
25    know, talk to him, try to get some support, somebody who

[Page 47]

1    cares.
2    Q.    So do you know whether your brother -- did
3    your brother ever advise you that he asked Al Beamer
4    whether he knew about the business?
5        A.    My brother told me that he had talked to Al
6    and asked him if he owned any interest in the company
7    and that Al had told him no.
8    Q.    Why would your brother ask Al Beamer if he
9    owned any interest in the company?
10    MR. SHOEMAKER:    I'm going to object.  It
11    calls for speculation, but you can answer if you know.
12    A.    I just think he probably wondered if one of
13    his employees or contractors, whatever Al was, was
14    trying to compete against him.
15    Q.    (By Mr. Haber)  And so it is your
16    understanding from your conversation with your brother
17    that -- that he believed this business, National, to be
18    in competition with him in Ohio?
19    A.    I would think my brother would consider a
20    title agency in Ohio would be competitive against his
21    title agency in Ohio.
22    Q.    And the title agency in Ohio that you're
23    referring to is the one that he purchased after -- at
24    the request of Old Republic?
25    A.    That's the one that he owned in Ohio at that

[Page 48]

1    time.
2    Q.    And did he tell you prior to Mr. Beamer being
3    terminated from his company that he had asked Al Beamer
4    whether he was involved in National?
5        A.    Did he tell me that -- if he asked Al Beamer?
6    Q.    In other words, during this window -- let me
7    be clear.  During the window of September 1999 to
8    December 1999 before Mr. Beamer was terminated from TTC,
9    did you have a discussion with your brother where he
10    advised you I asked Al if he's involved in the business,
11    and he says no?
12    A.    My brother told me that he talked to Al and
13    asked Al if he owned any interest in that company in
14    Ohio, and Al told him no, he owned no interest in that
15    company.
16    Q.    And at the time that your brother communicated
17    that to you, did you know anything differently?
18    A.    I had a belief that that statement from Al was
19    not true.  I told him that.  I told him I thought Al was
20    lying to him.
21    Q.    And when you told your brother that you
22    thought Al was lying to him, did you suggest to him that
23    he should terminate Al as a result of that?
24    A.    No.
25    Q.    Why did you believe that Al Beamer had an

*Deposition of John R. Baumgart*

[Sheet 13, Page 49]

1  ownership interest in National?
2      MR. SHOEMAKER:  I'm just going to ask you to
3  reference a time frame.
4      MR. HABER:  The time frame is between
5  September 1999 when he --
6      Q.  (By Mr. Haber)  I understand that that's your
7  best guess as to when you found that out.  You know, the
8  record will reflect whenever the corporate filings are,
9  etc., but your best estimate was it was September of
10  1999, so my question is for that period of time between
11  September 1999 and when Al Beamer was terminated by TTC
12  which was a two-month -- a one-month, two-month window,
13  why did you believe that Al Beamer owned an interest in
14  National?
15      A.  In regards to Tony Rivera, we spent a lot of
16  time talking to people, individuals to try to figure out
17  what was going on, and in our opinion -- in my opinion,
18  it became fairly clear fairly quickly that Al Beamer was
19  the person that actually came up with the idea and
20  started National.
21      Q.  Who did you speak to that gave you that idea?
22      A.  I -- we -- we talked to probably almost every
23  employee in our Ohio operations.  You just start talking
24  to people.  You just start asking hey, what's going on,
25  what's Tony doing, is Al involved.  You just start

[Page 50]

1  asking questions like that, and you get -- you find out
2  fairly quickly about all kinds of things that were going
3  on that nobody told you about prior.
4      Q.  So the people that you would have spoken to
5  were your employees in Ohio?
6      A.  Employees.  It might have been some business
7  contacts.  It might not have been.  It's hard to
8  remember everybody you talked to.  You just try to --
9  you do a little bit of an ad hoc investigation.  You
10  start talking to people and saying hey, what the heck's
11  going on.  When you've got people of this stature who
12  have left your company who are going to start their own
13  company, you start making assumptions.
14      Q.  Did you tell your brother about your
15  investigation by seeking your business contacts in Ohio
16  and telling him Al Beamer was involved?
17      A.  I told him I thought Al was lying to him, that
18  he did own an interest in the company.
19      Q.  When did you tell your brother that you had
20  confirmed that Al Beamer was lying to him and that he
21  did own an interest?
22      A.  The day of Al's deposition in the Rivera
23  lawsuit.
24      Q.  You were not present at Al Beamer's
25  deposition?

[Page 51]

1      A.  No, I was not.
2      Q.  Who told you what was testified to during that
3  deposition?
4      A.  One of the attorneys in the deposition.
5      Q.  And then you would have picked up the phone
6  and called your brother?
7      A.  At some point I would have told him.  I don't
8  know if I did it right away.
9      Q.  Well, for purposes of my question, assuming
10  that the deposition was December 2nd and the decision to
11  terminate him was communicated on December 6th, your
12  conversation with your brother would have been sometime
13  between that period of time?
14      A.  Yes.
15      Q.  Tell me what you recall about your
16  conversation with your brother.
17      A.  Well, I remember telling him that Al in his
18  deposition said that he had an ownership interest in
19  National.
20      Q.  And what did your brother say?
21      A.  I think he told me that pissed him off.
22      Q.  Did he tell you why?
23      A.  Because it meant Al lied to him.
24      Q.  What else did he tell you?
25      A.  I don't know.  I don't remember anything else.

[Page 52]

1      Q.  Did you ask him what he was going to do?
2      A.  No.
3      Q.  Sometime after that conversation with your
4  brother, were you -- you were then advised that
5  Mr. Beamer had been terminated from his employment with
6  TTC?
7      A.  Somebody told me.
8      Q.  Do you have any knowledge as to why Bill
9  Andrews would have been in communication with Bill
10  Curphey regarding Mr. Beamer's termination?
11      A.  I don't know why.
12      Q.  Do you know why as part of an attempted
13  resolution of the litigation in Summit -- in Hamilton
14  County in the Rivera matter a request or demand was made
15  that Mr. Beamer covenant not to sue TTC?
16      A.  I think what happened at that time was there
17  was -- Al was in negotiations settling with my brother,
18  and we were in negotiations settling with Al and
19  everybody else in regards to it, and I think that the
20  discussion was why don't we just do it all in one swoop
21  and just be done with it.
22      Q.  And who were those discussions with where the
23  decision was made to try to do it all in one fell swoop?
24      A.  I don't know.  I -- I just know somebody
25  brought it to my attention that they were just going to

*Deposition of John R. Baumgart*

1   put it all together, and I said whatever.

2       Q.   And you don't know who brought it to your

3   attention?

4       A.   I would assume it was Bill Andrews, but I

5   don't know exactly.

6       Q.   Did you ever speak with Bill Curphey regarding

7   this issue?

8       A.   Not that I remember.

9       MR. HABER:   We'll mark this as Plaintiff's 1.

10      (Plaintiff's Exhibit 1 was marked for

11  identification.)

12      Q.   (By Mr. Haber)  I'm showing you what's been

13  marked as Plaintiff's 1 which purports to be a

14  settlement agreement that apparently was drafted in

15  December of 1999 or around December of 1999 as indicated

16  in the first sentence.  Did you ever see this proposed

17  settlement agreement that was circulated in the Rivera

18  matter?

19      A.   I'm sure I did.

20      Q.   In paragraph 24 --

21      A.   Of section?

22      MR. SHOEMAKER:  It's page 13.

23      Q.   (By Mr. Haber)  Page 13, paragraph 24, the

24  last sentence indicates that this entire agreement is

25  also conditioned upon Beamer's covenant not to sue

1   Transcontinental Title, Inc.  Did you have any specific

2   discussions with that -- with regard to that provision

3   with your brother?

4       A.   Not that I remember.

5       Q.   Did you offer to try and get a release for

6   your brother in the Cincinnati litigation against

7   Rivera?

8       A.   Not that I remember.

9       Q.   At the time that this was circulated, do you

10  know whether Al Beamer had personally or individually

11  been sued in the Cincinnati litigation?

12      A.   At the time this was done did I know if Al

13  Beamer had personally been sued?

14      Q.   Correct, which is December of 1999, very early

15  in the litigation.

16      A.   I don't know the relationship of that.

17      Q.   Do you know whether Al Beamer was ever

18  individually or personally sued in that litigation?

19      A.   I don't have that information.

20      Q.   Do you know -- did you authorize the filing of

21  a motion to show cause why Al Beamer should not be held

22  in civil or criminal contempt?

23      MR. SHOEMAKER:  I'm going to object as to if,

24  in fact, a motion was specifically filed against

25  Mr. Beamer or if it was Mr. Beamer along with other

1   people.  If you have knowledge that it was just against

2   Mr. Beamer, that's fine, but actually, I think the

3   motion was filed --

4       MR. HABER:  There was probably one motion for

5   everybody.

6       MR. SHOEMAKER:  I would agree.

7       MR. HABER:  Mr. Beamer was named individually

8   as opposed to in his official capacity.

9       MR. SHOEMAKER:  Then I would just ask that

10  you clarify that it's the entire motion.

11      MR. HABER:  That's fine.  I mean, I don't --

12  I'm not trying to confuse you.

13      MR. SHOEMAKER:  Yeah.

14      A.   Unfortunately, you are.

15      Q.   (By Mr. Haber)  Did you authorize in any way

16  the inclusion of Al Beamer individually in a motion to

17  show cause why he should not be held in civil or

18  criminal contempt?

19      A.   I -- I don't believe that I was that much

20  overseeing the exact nuts and bolts of what was done or

21  what was decided to do.  I worked on the overall what we

22  were trying to accomplish which was to get Rivera's

23  company to stop directly competing with us.  Now, what

24  the attorneys filed against who and for what reason was

25  their decisions to make, and I usually leave it to them

1   to decide what is the best course of action.

2       Q.   Did you understand that your -- did you

3   understand your non-competition agreement to prohibit

4   Rivera from calling on companies that were not customers

5   of NETCO?

6       A.   I don't know that that's what it says.

7       Q.   I'm not trying -- I'm trying to understand --

8   forget what it says for a minute.  The court will

9   interpret --

10      A.   The agreement prohibits Tony Rivera for six

11  months from soliciting NETCO customers.

12      Q.   And so if Tony Rivera created a title

13  insurance agency and solicited people who were not

14  customers of NETCO, at least as to your understanding of

15  that agreement, that would not be a violation of that

16  agreement?

17      MR. SHOEMAKER:  Are you talking about within

18  six months after he left?

19      MR. HABER:  Uh-huh.

20      MR. SHOEMAKER:  Okay.

21      A.   If Tony Rivera solicited a company in regards

22  to an apartment building, yeah, that -- somebody who did

23  a loan on an apartment building, no.  That had never

24  done business with NETCO?

25      Q.   (By Mr. Haber)  If they had never done any

*Deposition of John R. Baumgart*

[Sheet 15, Page 57]

1  business with NETCO, that would not violate the
2  agreement?
3      A.   It would not violate that part of the
4  agreement.
5      Q.   Would it violate any other part of the
6  agreement?
7      A.   I don't know.
8      Q.   As you understood the purpose of that
9  non-compete, it was to protect your customer base?
10     A.   It was -- that particular section was to stop
11 employees from taking my customers within six months
12 after leaving my company.
13     Q.   And by -- by that provision of the agreement,
14 and I mean paragraph 6 of Beamer's, and I assume it's
15 paragraph 6 in Rivera's, but I don't have Rivera's.
16 Basically the non-competition paragraph was designed to
17 protect your customer base from solicitation by former
18 employees for six months?
19     A.   It was designed so that they wouldn't talk to
20 my customers for six months.
21     Q.   Okay.  You understand --
22          MR. HABER:  Let's mark this as Plaintiff's 2.
23          (Plaintiff's Exhibit 2 was marked for
24 identification.)
25     Q.   (By Mr. Haber)  You understand through counsel

[Page 59]

1  within Mr. Beamer's agreement which previously, I'll
2  represent to you, had been marked as Exhibit C,
3  Defendant's Exhibit C to Mr. Beamer's deposition.
4  Paragraph 11 says that Beamer agreed not to sell,
5  contact, solicit, or deal with any NETCO customers
6  including but not limited to those customers that are
7  lenders, bankers, brokers, or finance companies with
8  respect to any products or services that were
9  competitive with one or more products or services of
10 NETCO.
11          My first question is do you know of a single
12 customer as that term is defined either in paragraph 11
13 or in -- in the agreement itself that Mr. Beamer
14 contacted?
15     A.   I'm not aware of it, no.
16     Q.   Paragraph 12 indicates that Beamer agreed not
17 to render services for a new or existing competitor of
18 NETCO with respect to products or services that were
19 competitive with those of NETCO within the geographical
20 area in which NETCO did business if such services
21 involved sales, solicitation, or dealings with any NETCO
22 customers.
23          During the six months following Mr. Beamer's
24 termination, are you aware of any services that he
25 provided to a competitor of NETCO?

[Page 58]

1  that you've filed a counterclaim against Al Beamer?
2      A.   Yes.
3      Q.   All right.  At least NETCO has filed a
4  counterclaim against Al Beamer?
5      A.   Yes.
6      Q.   All right.  NETCO is the business that was
7  formerly known as Equity Title of Illinois?  I guess
8  there's four NETCOs now.
9      A.   Yeah.  I mean --
10     Q.   Basically the individual states, Equity Title
11 of Illinois, Wisconsin, and Missouri are now NETCO?
12     A.   NETCO and Equity Title you could construe over
13 the longevity of the last 25 years as the same company.
14     Q.   I'd like to refer you to certain allegations
15 in the counterclaim filed against my client, okay.  If
16 you would turn to --
17          MR. SHOEMAKER:  If I may, at some point when
18 you get a second at your convenience, can we take a
19 five-minute break?
20          MR. HABER:  We can do it now.
21          (A short break was taken.)
22     Q.   (By Mr. Haber)  Why don't you turn to page 3,
23 paragraph 11.  This is your counterclaim or NETCO's
24 counterclaim against Al Beamer, and starting in
25 paragraph 11 is some recitations of some provisions

[Page 60]

1      A.   Yes.
2      Q.   Which competitor?
3      A.   National Real Estate.
4      Q.   And when did National Real Estate start doing
5  business, to your knowledge?
6      A.   I think they were incorporated in August of
7  1999.
8      Q.   When did they start doing business, however?
9      A.   I believe it was fairly soon right after that.
10     Q.   Okay.  So it is your belief that -- that
11 National was contacting NETCO customers in either
12 August, September, or October of 1999?
13     A.   I believe the court ruled that, yes.
14     Q.   So I should just go look at what the court's
15 ruling is?
16          MR. SHOEMAKER:  I'm going to object as to
17 what you should do.  If you want to ask him a question,
18 that's --
19          MR. HABER:  I kind of did, but I'll be happy
20 to rephrase the question --
21          MR. SHOEMAKER:  That would be great.
22          MR. HABER:  -- if you don't like the form of
23 the question.
24          MR. SHOEMAKER:  I'll object to the form,
25 then.

*Deposition of John R. Baumgart*

1  A.  I did not physically see on my own Al draft
2  any documents in regards to National.
3  Q.  Did anybody tell you that Al Beamer drafted
4  any documents on behalf of National?
5  A.  No.
6  Q.  Has anybody told you that Al Beamer instructed
7  anybody at National to call on NETCO employees?
8  A.  No.
9  Q.  Has anybody told you that Al Beamer instructed
10  anybody at National to call on NETCO customers?
11  A.  No.
12  Q.  Paragraph 18 of the counterclaim indicates
13  that NETCO serves a unique niche of the residential
14  title and insurance market.  How would you describe the
15  unique niche of the residential title insurance market
16  that NETCO serves?
17  A.  NETCO specializes in what is known as the
18  refinance market, the lending market.  We deal with
19  lenders or entities that provide loan products to buyers
20  wishing to get residential mortgages on their homes.
21  Q.  Paragraph 19 indicates that NETCO customers
22  are typically mortgage brokers, bankers, finance
23  companies, and lenders.  How does NETCO find those
24  customers?
25  A.  We -- we network with individuals.  We go to

[Page 70]

1  conferences.  We drive down the street and look for
2  things, but for the most part, through networking you
3  discover them.
4  Q.  The identity of a mortgage broker is -- is not
5  that complicated to find.  I mean, you can open up the
6  phone book, for example, and find mortgage brokers,
7  bankers, finance companies, and lenders?
8  A.  Right.
9  Q.  At least the companies, right?
10  A.  They're listed in the phone book.
11  Q.  You can make phone calls to those companies
12  and find out who the individuals are that are
13  responsible for the refinance market, right?
14  A.  I -- I don't think it's that easy, no.
15  Q.  You don't?
16  A.  I know it isn't.
17  Q.  You indicate in paragraph 20 that prior to
18  being hired by NETCO, Beamer had no contact with --
19  A... I'm sorry.  Paragraph 20?
20  Q.  Yeah.  Paragraph 20.  Prior to being hired by
21  NETCO, Beamer had no contact with NETCO's clients.  Was
22  Commonwealth a client of NETCO?
23  A.  No.
24  Q.  Underwriters -- insurance underwriters are
25  clients of NETCO, is that -- or are customers of NETCO.

[Page 71]

1  is that --
2  A.  No.
3  Q.  You wouldn't categorize those as customers?
4  A.  No.  We would be the customer for the
5  underwriter.
6  Q.  Okay.  So generally speaking, you would
7  consider your customers to be the lending institutions
8  or the people who are responsible for the refinancing?
9  A.  As we stated, mortgage brokers, bankers,
10  finance companies, and lenders.
11  Q.  What is the basis of your conclusion here in
12  paragraph 20 that Beamer had no contact with these
13  clients prior to his employment with NETCO?
14  A.  He -- he had no clients.  He worked for an
15  underwriter that specialized in home equity lending, so
16  the only direct business that -- most underwriters are
17  not in the direct business other than commercial,
18  especially at that time, so the only business that
19  Commonwealth did directly in St. Louis was dealing with
20  home equity lenders.
21  Q.  When you use the term prior to his employment
22  with NETCO, you mean prior to 1993 when he started
23  working for Equity Title Company of America?
24  A.  I took it to mean prior that he worked at
25  Commonwealth.  I believe Al Beamer worked at

[Page 72]

1  Commonwealth, and then he worked for NETCO or Equity
2  Title or --
3  Q.  So it's the initial relationship, employment
4  relationship around 1993 is what you're referring to as
5  prior to NETCO?
6  A.  My belief is if there was a gap between Al
7  Beamer working at Commonwealth and Al Beamer working for
8  Equity Title or NETCO, it would have been served by his
9  software company which was in the process -- which was
10  in the business of selling software applications to
11  title insurance agencies.
12  Q.  Paragraph 21 indicates that Beamer derived
13  substantial knowledge, experience, training, and client
14  contacts in the title insurance business from his
15  employment with NETCO and NETCO's affiliated companies.
16  What client contact did Beamer have while employed by
17  NETCO?
18  A.  I -- I think sometimes he had direct over the
19  phone contact with clients.  He might have even went on
20  a couple sales calls with clients.  He went to
21  conferences.  In a lot of the meetings and client
22  conferences, information would be discussed and Al would
23  be -- his opinion would be asked or he would give it
24  about certain things we could do.  Al was always
25  interested in our meetings and in other ways we would

*Deposition of John R. Baumgart*

[Sheet 19, Page 73]

1 present our company and products to generate other
2 business.
3     Q.    What was Al Beamer's title or job
4 responsibilities with NETCO during his employment and/or
5 independent contractor relationship?
6     A.    His employment which would be different than
7 the contractor -- he was a vice-president in charge of
8 information technology.  As a vice-president, he would
9 also have responsibilities of dealing with the overall
10 scope of the direction of the company.  My statement to
11 all my vice-presidents at the time was we have a table,
12 and you're sitting at the table, and everybody's opinion
13 matters, and everybody has to put in their knowledge so
14 that we can become better at what we do.
15     Q.    What document would reflect that Al Beamer was
16 the vice-president of information technologies?
17     A.    I -- I don't know.
18     Q.    Do you have a corporate flow chart or
19 structure that would reflect Al Beamer in 1999, 1998 as
20 the vice-president of information technologies?
21     A.    I don't think at the time that we would make
22 written flow charts.
23     Q.    Okay.  So if you don't have -- if you don't
24 have an organizational chart that would reflect his
25 position as vice-president of informational

[Page 74]

1 technologies, do you have any other document that would
2 reflect that?
3     A.    I don't know if we would or --
4     Q.    Did his business card say vice-president of
5 information technologies for Equity Title Company of
6 America?
7     A.    It said something like that.  I know Al said
8 he needed a certain title, so when he went to
9 conferences in regards to that, it would show what his
10 duties were.
11     Q.    Did he ever make sales calls for you?
12     A.    Al might have gone on some sales calls with
13 the sales people.  I wouldn't know exactly.
14     Q.    As we sit here today, do you know if he did?
15     A.    I -- I personally don't know.  It doesn't mean
16 he didn't.
17     Q.    Okay.  It's fair to say that his job
18 responsibilities did not require day-to-day interaction
19 with your clients, correct?
20     A.    Not day-to-day, but his job duties did -- he
21 did have interaction with clients.
22     Q.    Tell me about what in his job responsibilities
23 would require interaction with clients or customers.
24     A.    It would just deal with computers connected in
25 some way, working with modems, technology.

[Page 75]

1     Q.    Interfacing their systems?
2     A.    Interfacing is probably a better word.
3 Clients might be having difficulty doing a certain
4 thing, and we'd offer our computer technology as maybe a
5 solution.
6     Q.    In paragraph 22 you indicate that Beamer had
7 access to confidential information including business
8 strategies and methodologies for servicing clients.  Are
9 those business strategies in writing?
10     A.    I don't think that they were in writing.
11     MR. HABER:  Off the record.
12     (There was a discussion off the record.)
13     Q.    (By Mr. Haber)  Do you know whether -- do you
14 have personal knowledge or any evidence that any
15 business strategies or methodologies for servicing
16 NETCO's unique niche in the marketplace was used by Al
17 Beamer after his employment ended with NETCO?
18     A.    I believe that National's business plan was
19 based on the exact same methodology as NETCO is based
20 on, how to do business and what was needed to be
21 successful in that business with the clientele.
22     Q.    What business plan are you referring to at
23 National?
24     A.    The National business plan.
25     Q.    A written document?

[Page 76]

1     A.    There was a written business plan National had
2 made.
3     Q.    Okay.  But that business plan, you don't know
4 who drafted it?
5     A.    I'm not aware of who drafted it.
6     Q.    And you also know that Tony Rivera used to
7 work at your company as well, correct?
8     A.    Tony Rivera did work at my company.
9     Q.    And do you have a business plan in writing
10 similar to what you claim National had in writing?
11     A.    No.
12     Q.    Computer software.  What computer software of
13 NETCO did Mr. Beamer take when he left his employment
14 with NETCO?
15     A.    I -- I don't know exactly what software.  I
16 don't have knowledge of what exact software he took.
17     Q.    Lists of actual and potential customers.  Were
18 those written lists?
19     A.    They would be data in the computer.
20     Q.    Do you know whether Mr. Beamer took any lists
21 of actual or potential customers or downloaded data of
22 your actual or potential customers?
23     A.    It is my belief that he had databases of NETCO
24 on a computer that he controlled somewhere.
25     Q.    And the basis of that belief is what?

*Deposition of John R. Baumgart*

1    A.    He would need to function with those databases
2  to do his job, so I believe that he had those databases.
3    Q.    How computer literate are you, by the way?
4    A.    Not very.
5          MR. DIGNAM:  Get that on the record.
6    Q.    (By Mr. Haber)  So you don't know as we sit
7  here today where NETCO's database of customers is
8  stored, do you?
9    A.    I -- I know where it's stored today, yes.
10   Q.    Okay.  At that time did you know where it was
11  stored?  Do you understand it's stored on a server?
12   A.    It's on a server, yeah.
13   Q.    And you have a belief but no evidence that
14  Mr. Beamer had a copy of that database on some computer
15  that he owned?
16   A.    There was -- at that time there was many
17  databases, and I believe that Al Beamer had some of
18  those databases.  I think just to do his job to try to
19  implement some software changes, he would need some
20  databases to see how they interact with his new changes
21  to the software.
22   Q.    To the extent that you have limited knowledge
23  of the computer systems, that's your belief, right?
24   A.    Yes.
25   Q.    Okay.  Do you have any personal knowledge or

1  evidence that Al Beamer maintained any of NETCO's
2  databases after he resigned his employment in April of
3  1999?
4    A.    I -- I don't have that knowledge, no.
5    Q.    How would Al Beamer know the identity of key
6  industry insurance underwriters?
7    A.    How would he know that?
8    Q.    Yeah, and let me ask a more specific question.
9    A.    Okay.
10   Q.    You've indicated that confidential information
11  that you -- that NETCO had that Beamer was privy to
12  included the identity of key industry insurance
13  underwriters.  How did Mr. Beamer learn who those key
14  industry insurance underwriters were?
15   A.    When he worked for NETCO.
16   Q.    Is that the type of information -- first of
17  all, are these underwriters -- typically do they just do
18  business in one state, or do they business nationally?
19   A.    It depends.
20   Q.    Who are these key insurance underwriters?
21   A.    The largest underwriters would be national,
22  maybe international.  The smaller ones would be
23  regional.
24   Q.    What do you mean or what does NETCO mean when
25  they refer to key industry insurance underwriters?

1    A.    The people who can make the decisions in
2  regards to agent and underwriter decisions.
3    Q.    Okay.  And the underwriters are the people
4  that provide the insurance?
5    A.    The product.
6    Q.    The product that you ultimately --
7    A.    Sell.
8    Q.    -- sell.  What proprietary information
9  regarding products, sales -- let me start -- let me do
10  it one at a time.
11         What proprietary information regarding
12  products was Al Beamer privy to?
13   A.    He was privy to all the different products we
14  offered.  He was privy to the services.  Our business
15  products and services are pretty interchangeable.  The
16  product is a title policy, and the service is how you
17  deliver it, time frames you deliver it, the vehicle you
18  deliver it.  All that is all kind of intertwined as the
19  same, and he would be involved in all of that because he
20  would be involved in all the strategic meetings of
21  NETCO.
22   Q.    Well, let's -- the product that you offered to
23  consumers is not confidential.  I mean, you offer it,
24  right, these products?
25   A.    We offer products.

1    Q.    And if you're going to sell a product, you've
2  got to make it known to the public that you're going --
3  that you've got a product to sell, right?
4    A.    Yes.
5    Q.    So the actual product itself is not
6  confidential in any way, is it?
7    A.    It's the way the product can be delivered, the
8  price of the product, the style of the product that is
9  confidential.
10   Q.    Pricing is a component of both the price
11  offered by the underwriter and your markup, right?
12   A.    In regards to a title insurance product, yes.
13   Q.    Okay.  Your pricing for a particular product,
14  at least that which is offered to the consumer, is also
15  not confidential because it's out there in the public
16  domain?
17   A.    We don't offer our products to the consumer.
18  We offer our products to lenders.
19   Q.    Well, perhaps it was a poor choice of words,
20  but the pricing that you offer to the lenders is then
21  communicated to that third party, correct?
22   A.    It's communicated to them what price we're
23  expecting them to pay, yes.
24   Q.    How you get to that price is something that
25  you don't necessarily disclose to your customer?

*Deposition of John R. Baumgart*

[Sheet 21, Page 81]

1    A.    Correct.

2    Q.    All right.  Whatever that product may be, that

3    price is a function of both the cost of the product to

4    you and your overhead and profit margin that you add on

5    top of that product?

6    A.    Yeah.  The price is determined in negotiations

7    with the client.

8    Q.    Do you in your industry try and negotiate more

9    favorable terms with a particular -- for example, using

10   insurance, with an underwriter because of volume

11   business?

12   A.    We -- we negotiate a term that we feel is fair

13   to both parties.

14   Q.    Okay.  So there is an aspect of individualism

15   with your relationship with an underwriter.  In other

16   words, you may get a better deal based upon your

17   negotiation acumen and volume than another insurance --

18   another title agency might get?

19   A.    I -- I don't know if the deal is based on

20   volume as much as the profit of the client.  Volume I

21   don't think determines the price.

22   Q.    But is it fair to say that the price you get

23   from an insurance underwriter might be different than

24   the price another company gets?

25   A.    In some markets, yes.

[Page 82]

1    Q.    In some markets the -- the state dictates --

2    A.    Yes.

3    Q.    -- the price?  How much of your company's

4    finances did you share with Al Beamer?

5    A.    I -- I don't understand the question.  You

6    mean share like you mean whole dollars, gave him money,

7    or --

8    Q.    No, no, no.  The information, the financial

9    information.  I'm still referring to paragraph 22.  You

10   indicated that there was proprietary information

11   regarding finances that Al Beamer was aware of.  What

12   was that information that Al Beamer was aware of?

13   A.    He -- he would have access to all information

14   about the finances of the company.  He would have

15   information to the revenue that every market

16   individually would be generating.  He would have

17   information on what profit every market would be making

18   or whether it was not making a profit.  He would know

19   how many orders they were generating.  He would know

20   what the cancellation rate of those orders were.  He

21   would have information to know how much clients were

22   generating.  He would know what closings were generated

23   and what markets they were generating closings in.  At

24   the level he was as an employee of NETCO, he had full

25   and complete knowledge of all that information, whatever

[Page 83]

1    information he determined he needed.

2    Q.    How did he get access to that information?

3    A.    He would get it through reports.  We -- we

4    would send out monthly and quarterly reports also, and

5    if he asked for it, he could gain access to it.  He also

6    had full access to all databases so he could on his own

7    peruse whatever he wanted to peruse.

8    Q.    And how has he used, to your knowledge, that

9    information to the detriment of NETCO since he left in

10   April of 1999?

11   A.    He -- he knows who the clients are.  He knows

12   who the good clients are.  He knows what the prices of

13   those clients are.  He knows what those clients are

14   expecting, what they need us to do to be successful and

15   maintain a relationship.  I mean, you know, it's -- we

16   always call that the keys to the kingdom.

17   Q.    I understand you say he knows that.  How has

18   he used, to your knowledge, that information to the

19   detriment of NETCO since he left in April of 1999?

20   A.    He started a competing company with other

21   employees of mine and directly competed with my company

22   in the states of Ohio and Kentucky.

23   Q.    Well, your agreement wouldn't prohibit that,

24   even -- even calling on your customers after six months.

25   How has he used that information that you deem to be

[Page 84]

1    proprietary to your detriment other than the fact that

2    he started a competing business?

3    A.    He started a competing business.  He started

4    soliciting our customers.

5    Q.    Which customer did Al Beamer solicit?

6    A.    The -- his company solicited -- I think there

7    was two distinct ones, and there was -- I know U.S. Bank

8    was one client that they also solicited which was a very

9    major account.

10   Q.    Who were the two distinct ones?  You can't

11   remember?

12   A.    They were local originators, Money something.

13   Q.    Local in Cincinnati?

14   A.    They were local in the Cincinnati market.

15   Q.    And what did -- is it your belief that Al

16   Beamer would have had some particular confidential

17   information regarding the identity of U.S. Bank and

18   these other two originators in Cincinnati that he used

19   on behalf of National?

20   A.    Al Beamer would definitely know all about U.S.

21   Bank.

22   Q.    Well, so would most people, right?

23   A.    In regards to what services and what products

24   they bought from NETCO and at what prices and how much

25   volume and what markets they did business with us, no.

*Deposition of John R. Baumgart*

[Sheet 22, Page 85]

1    Q.   Has anybody at U.S. Bank advised you of the
2    discussions that they had with Al Beamer regarding that
3    information?
4    A.   No.
5    Q.   Has anybody at U.S. Bank indicated who they
6    spoke to at National?
7    A.   No.
8    Q.   So other than the fact that National called
9    on -- and there may be more, I'm not going to hold you
10   to the number, but to unique lenders or financial
11   institutions in Cincinnati and U.S. Bank, other than the
12   fact that National called on those three entities, what
13   information do you have that Al Beamer utilized any of
14   the proprietary information you've identified or NETCO's
15   identified in paragraph 22 to the detriment of your
16   company?
17   A.   He started a competing company in the state of
18   Ohio that directly competed against NETCO and was the
19   controlling force behind it, was the person who led that
20   company, and was the person who was in charge of getting
21   that company to do whatever it needed to do to be
22   successful.
23   Q.   That's your belief?
24   A.   And that company -- that company directly
25   competed with NETCO, and I -- my belief is that the

[Page 86]

1    person who's in charge, who organizes the company, who
2    starts the company is who determines the direction of
3    that company, and my belief is that Al Beamer was in
4    total and complete control of that company, and he was
5    the one who decided that that company should directly
6    compete with NETCO, and he believes that the best way to
7    do that was to hire NETCO employees who had the same
8    knowledge he had and expertise on how to directly
9    compete by taking clients from NETCO.
10   Q.   And I think we went through this, but you
11   don't have any personal knowledge or evidence to support
12   anything that you've just said in that last answer,
13   correct?
14   A.   I have Al's deposition that says that he owned
15   interest in that company. I have Tony Rivera's
16   testimony and his involvement in that company. I have
17   Maria's testimony. I have Damian's testimony.
18   Q.   What did they say his involvement in the
19   company was?
20   A.   That he was an active solicitor in that
21   company, that he was one of the people who could --
22   Q.   Solicitor of what?
23   A.   Well, he was the person -- he was one of the
24   main persons who owned the company who was the person
25   that was deciding what that company should do.

[Page 87]

1    Q.   What specifically can you recall -- and I can
2    look at those depositions, but as you sit here today,
3    what do you recall any of those individuals indicating
4    with respect to Al Beamer's direction and control of
5    that company?
6    A.   I -- I can't say here today specific
7    testimonial, but Al was in control of that company. Al
8    was the one who set up that company. It's my belief
9    that the person who decides to start a company is the
10   person who will decide what direction that company goes
11   in. I know that's how I run my company. I don't let
12   others control my investment. I don't believe Al would
13   let anybody control his investment.
14   Q.   When did NETCO start doing business in Ohio?
15   A.   I believe 1996.
16   Q.   What knowledge do you have of attempts by Al
17   Beamer to induce Jeff Wind to leave NETCO?
18   A.   I -- I've been told by individuals that Al
19   talked to Jeff about coming to work for him.
20   Q.   Has Jeff Wind told you that?
21   A.   No.
22   Q.   Have you spoken to Jeff Wind.
23   A.   No.
24   Q.   Do you know whether Jeff Wind ever came to
25   work for Al?

[Page 88]

1    A.   I don't know.
2    Q.   Who were the individuals that told you that
3    Jeff Wind was spoken to by Al Beamer?
4    A.   It -- it would just be individuals in the
5    office. There's -- in St. Louis there seems to be a lot
6    of people who just seem to be connected either through
7    marriage or cousins, and we -- we effectively call it
8    the St. Charles Mafia here. We don't know who is
9    related to who, but they all seem to know what's going
10   on.
11   Q.   So tell me who would have told you that they
12   heard that Jeff Wind was contacted?
13   A.   I don't remember the exact person. It's
14   just -- there's plenty of people who have talked to Jeff
15   Wind and still talk to Jeff Wind, communicate --
16   Q.   Okay.
17   A.   -- things like that. It's just you talking to
18   people and then saying well, I know that Al Beamer
19   talked to Jeff Wind about going to work for him. Oh,
20   yeah. Jeff Wind told me that.
21        MR. HABER: Let me go off the record for a
22   second.
23        (There was a discussion off the record.)
24   Q.   (By Mr. Haber) What is your understanding
25   of -- first of all, have we exhausted what you've heard

*Deposition of John R. Baumgart*

1    A.    Every title company that he decides to be a
2  part of and decides to control and direct is a title
3  company that -- whose whole idea and objective is to
4  directly compete against NETCO.
5    Q.    And those title companies would be?
6    A.    National Real Estate and RTS.
7    Q.    Okay.  And RTS' goal is to compete with NETCO?
8    A.    I believe their goal is to put NETCO out of
9  business.
10    Q.    And what is the basis of that belief?
11    A.    I don't think his co-owners like me, either.
12  I think they're jealous of me, and I don't think they
13  think I'm a nice person, either.
14    Q.    Why would anyone not think you're a nice
15  person?
16    A.    I don't know.  I really am a nice person.
17  Only my wife has the ability to tell me I'm not a nice
18  person, and she does every day.
19    Q.    Do you know how Al Beamer has been unjustly
20  enriched by his relationship with National or his
21  alleged breaches of the employment agreement?
22    A.    Well, he's taken confidential information of
23  NETCO and tried to use it for his own personal gain.
24    Q.    And how has that enriched him?
25    A.    I don't know if it's enriched him as much as

1  he has attempted to try to enrich himself based on
2  information that we have provided to him.  He's tried to
3  use that information to try to get personal gain for
4  himself.
5    Q.    After you spoke with your brother in December
6  of 1999 after Mr. Beamer's deposition, do you recall the
7  next time you would have discussed the subject of Al
8  Beamer's relationship with TTC?
9    A.    With who?
10    Q.    Your brother.  The next line of questions are
11  all going to relate to conversations with your brother.
12    A.    All right.  So if you could repeat it.  I'm
13  sorry.
14    Q.    Sure.  You've indicated to me that sometime
15  shortly after Al Beamer was deposed in Cincinnati, you
16  contacted your brother and said he's a shareholder of
17  National, he lied to you, I told you so, essentially.
18  Is that correct?
19    A.    I -- I just told him that Al said that he owns
20  an interest in National Real Estate.
21    Q.    Okay.  And your brother said that pisses me
22  off?
23    A.    Yes.
24    Q.    And you don't recall, as I understand it, much
25  more about the conversation at that time?

1    A.    No.  I just know my brother was mad and that
2  Al had lied to him.
3    Q.    Your brother did not say during that
4  conversation that he was going to terminate Al?
5    A.    I don't think so, no.
6    Q.    Did you ever know how much compensation Al
7  Beamer received from TTC?
8    A.    From his employment contract, no.
9    Q.    Do you know the terms under which he was
10  employed by TTC?
11    A.    No.
12    Q.    You and your brother never discussed those
13  specifics?
14    A.    No.
15    Q.    Did you in your negotiations with Al Beamer
16  prior to his resignation in April of 1999 learn that he
17  was receiving more compensation from TTC than he
18  received from you?
19    A.    Al might have said that to me as a leverage to
20  get more money from me.
21    Q.    Did he indicate that your brother had
22  requested that he spend more time in Florida?
23    A.    He might have.
24    Q.    Were you aware that your brother wanted Al
25  Beamer to spend more time in Florida assisting him in

1  his business?
2    A.    Yeah.  I -- I think so because I think at the
3  time Al was spending two days a month working for my
4  brother.
5    Q.    So in December of 1999 after you spoke with
6  your brother regarding Al Beamer's testimony in the
7  civil litigation in Cincinnati, when was the next time
8  you and your brother spoke regarding the issue of Al
9  Beamer's employment at TTC?
10    A.    I -- I don't know if we spoke about Al
11  Beamer's employment at TTC.
12    Q.    After you learned that he had terminated Al
13  Beamer, did you then speak with him as to the reasons
14  why?
15    A.    I -- I don't -- I don't think I ever called my
16  brother to ask him why he terminated Al.
17    Q.    I think that your testimony previously, and I
18  won't hold you -- I mean, it is what it is and the
19  transcript will reflect it, but I understood your
20  testimony to be that at some point in time after Al
21  Beamer was terminated, you did speak with your brother,
22  and he told you the reason why he terminated Al Beamer.
23    A.    Yes.
24    Q.    Okay.  Do you recall when that was?
25    A.    No.

*Deposition of John R. Baumgart*

[Sheet 27, Page 105]

1    MR. SHOEMAKER:  That's not only acceptable, I
2  think that's even what we previously agreed to anyway.
3  I think that's consistent with our previous agreement.
4    MR. HABER:  I don't recall our discussions,
5  but I certainly don't have an issue with it.
6    MR. SHOEMAKER:  We will disclose that
7  information to you if and when applicable.
8    MR. HABER:  So that I don't run into a
9  problem, I'd like -- what I'm telling you, I'd like
10  that information disclosed for my eyes only now in the
11  context of our discovery, but I would represent to you
12  that I will not provide that information to my client
13  nor offer it into any public document or evidence until
14  such time as the court makes a determination that
15  punitives as to any defendant is going to the jury.
16    MR. SHOEMAKER:  I would have to discuss that
17  with my client before agreeing to that.
18    MR. HABER:  Talk to your client. I'll
19  agree -- for purposes of today subject to not waiving
20  my right to recall this witness and ask those questions
21  if we can't reach an agreement, I will -- I will agree
22  not to continue into that line of questions.
23    MR. SHOEMAKER:  That's fine. I agree to
24  that, certainly.
25    Q.  (By Mr. Haber)  Did you or any agent on your

[Page 106]

1  behalf negotiate a deal with your brother that resulted
2  in the termination of Al Beamer?
3    A.  No.
4    Q.  Did you personally have any conversations with
5  William --
6    A.  Can I ask in regards to his termination with
7  Transcontinental Title?
8    Q.  Yeah. Yeah.  Thank you.
9    A.  Sorry.
10    Q.  That is what I meant.  Did you at any time
11  have any personal conversations with Bill Curphey
12  regarding the termination of Al Beamer from TTC?
13    A.  Not that I recall.
14    Q.  Did you agree at any time to indemnify TTC for
15  losses resulting from the termination of Al Beamer from
16  their employment?
17    A.  No.
18    Q.  Did you ever tell any agent on your behalf
19  that you would spend any amount of money to, quote, get
20  Beamer regardless of the legal merits of your position?
21    A.  I -- I don't know if I've ever said something
22  that wordy.
23    Q.  Have you ever said something less wordy
24  regarding getting Al Beamer?
25    A.  I don't know if it's getting Al Beamer as much

[Page 107]

1  as I will spend whatever money I need to do to protect
2  my family's business.
3    Q.  Did you tell any agent on your behalf that the
4  provision in the settlement agreement which was
5  Plaintiff's 1 releasing TTC -- do you remember we talked
6  about that?
7    A.  Okay.  Yes.
8    Q.  From a foundational standpoint, let me refresh
9  your recollection that there was a provision in a
10  proposed settlement agreement that required as a
11  condition of the settlement agreement Al Beamer to agree
12  or covenant not to sue TTC.  Do you recall that?
13    A.  Yes.
14    Q.  It's paragraph 24.  Did you ever tell any
15  agent or authorized agent on your behalf that that
16  provision, that sentence, was a deal-breaker in any
17  resolution of the NETCO v. Rivera case?
18    A.  No.
19    Q.  Would you have settled that case if -- if
20  there was not a release for TTC in it?
21    A.  If all the rest of the terms that we proposed
22  were agreed to exactly, yes.
23    MR. HABER:  Why don't you give me a second
24  with Al?
25    (A short break was taken.)

[Page 108]

1    Q.  (By Mr. Haber)  What was Ed Cook's title with
2  the company, with NETCO?
3    Ed?
4    Q.  Ed Cook.
5    A.  Yeah, but at what point?
6    MR. SHOEMAKER:  Can you give a time?
7    Q.  (By Mr. Haber)  Sure.  Does he still work for
8  you --
9    A.  Yes.
10    Q.  -- in some capacity?  What is his current
11  title?
12    A.  He's senior vice-president, special projects.
13    Q.  And that would be at Equity Title Company of
14  America?
15    A.  That's the company he works for, yes.
16    Q.  Okay.  And while Al Beamer was employed by the
17  company, what position did Ed Cook hold?
18    A.  I believe it was senior vice-president of
19  operations.
20    Q.  Okay.  You've indicated in some
21  supplemental -- not you but your lawyers have indicated
22  in a supplemental response to initial disclosures that
23  Ed Cook has knowledge of defendant's involvement in
24  National Equity Title Agency, Inc. v. Rivera and
25  defendant's business relationship with Transcontinental

## SETTLEMENT AGREEMENT

EXHIBIT

1

This Settlement Agreement ("Agreement") is dated and effective this ____ day of December, 1999 between National Equity Title Agency, Inc., its current and former affiliated corporate entities, shareholder, agents, assigns, successors, attorneys, officers, owner, employees, insurers (hereinafter collectively referred to as "Netco"), National Real Estate Title Agency, Inc., its current and former affiliated corporate entities, shareholders, agents, assigns, successors, attorneys, officers, owners, employees, insurers (hereinafter collectively referred to as "National Real Estate"), Antonio Rivera, his heirs, agents, and assigns (hereinafter collectively referred to as "Rivera"), Robert Allen Beamer, his heirs, agents, and assigns (hereinafter collectively referred to as "Beamer"), James Erwin, his heirs, agents and assigns (hereinafter collectively referred to as "Erwin"), Damian Sichak, his heirs, agents, and assigns (hereinafter collectively referred to as "Sichak"), and Maria Sagrati, her heirs, agents, and assigns (hereinafter collectively referred to as "Sagrati").

## SECTION ONE

### Statement of Dispute

1.     On November 9, 1999, Netco commenced an action against National Real Estate and Rivera in the Court of Common Pleas, Hamilton County, Ohio, Case No. A99006815 (the "Pending Action") in which it asserted various claims.

2.     On November 10, 1999, the Court issued a Temporary Restraining Order in the Pending Action.

3.     On November 24, 1999, Netco filed a Motion to Show Cause Why National Real Estate and Rivera Should Not Be Held in Contempt of Court in the Pending Action.

4.     On or about December 6, 1999, Netco planned to file a Supplemental Motion to Show Cause Why National Real Estate, Rivera, Beamer, Erwin, Sagrati, and Sichak Should Not

Be Held in Contempt of Court in the Pending Action.  In this Supplemental Motion, Netco would have sought, among other relief, attorneys' fees and sanctions against National Real Estate, Rivera, Beamer, Erwin, Sagrati, and Sichak.

5.     Rivera has contemplated filing a counterclaim against Netco in the Pending Action.

6.     Beamer, Erwin, Sagrati, and Sichak each acknowledge and agree that they are shareholders of National Real Estate or are entitled to shares of National Real Estate, and accordingly, each will personally benefit from the release of claims by Netco against National Real Estate contained in this Agreement.

7.     It is understood that by entering into this Agreement, all parties deny any and all liability and enter into this Agreement solely in the interest of resolving finally all claims and issues relating to Netco's interaction and dealings with National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak, and any other matters raised in the Pending Action.

## SECTION TWO

### Terms of Settlement

In consideration of the full and complete settlement of the above-described dispute, and in further consideration of the mutual covenants and other good and valuable consideration set forth in this Agreement, the receipt of which is hereby acknowledged, the parties agree as follows:

1.     Upon execution of this Agreement by Netco, National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak agree to submit an Agreed Order to the Court in the form attached to this Agreement as Exhibit A.  This entire Agreement is conditioned upon the Court entering the Agreed Order attached to this Agreement as Exhibit A.

- 2 -

2.    Netco and National Real Estate do hereby release and forever discharge each other of, from, and against all manner of claims, actions, causes of action, rights, judgments, debts, contracts, promises, allegations, demands, obligations, duties, suits, expenses, assessments, penalties, charges, injuries, losses, costs, damages and liabilities (hereinafter all referred to collectively as "Claims") of every kind and manner whatsoever, in law or in equity, civil or criminal, administrative or judicial, which each has had or now has against the other, whether now known or unknown, claimed, asserted, suspected or discoverable by each, including, but expressly not limited to, all Claims set forth in the Pending Action; provided, however, that this release shall not apply to, and nothing contained in this Agreement shall be construed to release, compromise, settle, waive or satisfy any Claims by either party that the other party has breached the terms of this Agreement.

3.    Netco and Rivera do hereby release and forever discharge each other of, from, and against any and all Claims of every kind and manner whatsoever, in law or in equity, civil or criminal, administrative or judicial, which each has had or now has against the other, whether now known or unknown, claimed, asserted, suspected or discoverable by each, including, but expressly not limited to, all Claims set forth in the Pending Action; provided, however, that this release shall not apply to, and nothing contained in this Agreement shall be construed to release, compromise, settle, waive or satisfy any Claims by either party that the other party has breached the terms of this Agreement. Rivera's release of Claims against Netco hereby includes, but is not limited to, Claims involving race, national origin, ancestry, handicap, disability, religion, sex and age discrimination or retaliation under the Ohio Civil Rights Act, Chapter 4112 of the Ohio Revised Code ("O.R.C."), Section 4101.17 of the O.R.C., the Ohio "Whistleblower" statute, §§ 4113.52 et seq., Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000 et seq.,

- 3 -

the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq., the

Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq., the Reconstruction Era Civil Rights Acts,

as amended, 42 U.S.C. §§ 1981 et seq., the Americans with Disabilities Act, 42 U.S.C. §§ 12101

et seq., the Family and Medical Leave Act, 29 U.S.C. §§ 2601 et seq., the Age Discrimination in

Employment Act (ADEA), 29 U.S.C. §§ 621 et seq., any related statute of any state, breach of

contract, promissory estoppel, harassment, wrongful termination, public policy claims,

defamation, other tort claims, or any other Claims, which have been, could be or could have been

asserted as of the date of this Agreement by Rivera or on his behalf in any forum. Thus, Rivera

has surrendered all of his rights and Claims against Netco.

    4.    Netco and Beamer do hereby release and forever discharge each other of, from,

and against any and all Claims of every kind and manner whatsoever, in law or in equity, civil or

criminal, administrative or judicial, which each has had or now has against the other, whether

now known or unknown, claimed, asserted, suspected or discoverable by each, including, but

expressly not limited to, all Claims set forth in the Pending Action; provided, however, that this

release shall not apply to, and nothing contained in this Agreement shall be construed to release,

compromise, settle, waive or satisfy any Claims by either party that the other party has breached

the terms of this Agreement. Beamer's release of Claims against Netco hereby includes, but is

not limited to, Claims involving race, national origin, ancestry, handicap, disability, religion, sex

and age discrimination or retaliation under the Ohio Civil Rights Act, Chapter 4112 of the Ohio

Revised Code ("O.R.C."), Section 4101.17 of the O.R.C., the Ohio "Whistleblower" statute, §§

4113.52 et seq., Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000 et seq.,

the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq., the

Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq., the Reconstruction Era Civil Rights Acts,

- 4 -

as amended, 42 U.S.C. §§ 1981 <u>et</u> <u>seq.</u>, the Americans with Disabilities Act, 42 U.S.C. §§ 12101 <u>et</u> <u>seq.</u>, the Family and Medical Leave Act, 29 U.S.C. §§ 2601 <u>et</u> <u>seq.</u>, the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 <u>et</u> <u>seq.</u>, any related statute of any state, breach of contract, promissory estoppel, harassment, wrongful termination, public policy claims, defamation, other tort claims, or any other Claims, which have been, could be or could have been asserted as of the date of this Agreement by Beamer or on his behalf in any forum. Thus, Beamer has surrendered all of his rights and Claims against Netco. Notwithstanding the above, Beamer's obligations pursuant to Sections 3 and 4 of the Employee Agreement by and between Beamer and Netco's affiliate Equity Title Company of America, Inc., shall not be affected hereby.

5.      Netco and Erwin do hereby release and forever discharge each other of, from, and against any and all Claims of any kind and manner whatsoever, in law or in equity, civil or criminal, administrative or judicial, which each has had or now has against the other, whether now known or unknown, claimed, asserted, suspected or discoverable by each, including, but expressly not limited to, all Claims set forth in the Pending Action; provided, however, that this release shall not apply to, and nothing contained in this Agreement shall be construed to release, compromise, settle, waive or satisfy any Claims by either party that the other party has breached the terms of this Agreement.

6.      Netco and Sichak do hereby release and forever discharge each other of, from, and against any and all Claims of every kind and manner whatsoever, in law or in equity, civil or criminal, administrative or judicial, which each has had or now has against the other, whether now known or unknown, claimed, asserted, suspected or discoverable by each, including, but expressly not limited to, all Claims set forth in the Pending Action; provided, however, that this

release shall not apply to, and nothing contained in this Agreement shall be construed to release, compromise, settle, waive or satisfy any Claims by either party that the other party has breached the terms of this Agreement. Sichak's release of Claims against Netco hereby includes, but is not limited to, Claims involving race, national origin, ancestry, handicap, disability, religion, sex and age discrimination or retaliation under the Ohio Civil Rights Act, Chapter 4112 of the Ohio Revised Code ("O.R.C."), Section 4101.17 of the O.R.C., the Ohio "Whistleblower" statute, §§ 4113.52 et seq., Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000 et seq., the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq., the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq., the Reconstruction Era Civil Rights Acts, as amended, 42 U.S.C. §§ 1981 et seq., the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., the Family and Medical Leave Act, 29 U.S.C. §§ 2601 et seq., the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 et seq., any related statute of any state, breach of contract, promissory estoppel, harassment, wrongful termination, public policy claims, defamation, other tort claims, or any other Claims, which have been, could be or could have been asserted as of the date of this Agreement by Sichak or on his behalf in any forum.

　　　7.　　Netco and Sagrati do hereby release and forever discharge each other of, from, and against any and all Claims of every kind and manner whatsoever, in law or in equity, civil or criminal, administrative or judicial, which each has had or now has against the other, whether now known or unknown, claimed, asserted, suspected or discoverable by each, including, but expressly not limited to, all Claims set forth in the Pending Action; provided, however, that this release shall not apply to, and nothing contained in this Agreement shall be construed to release, compromise, settle, waive or satisfy any Claims by either party that the other party has breached the terms of this Agreement.

- 6 -

8.    Each of the parties understands and acknowledges to the other the significance and consequence of releasing all of its/his/her Claims (including presently existing, but unknown, unasserted, unsuspected or undiscovered Claims) and hereby assumes full risk and responsibility for any and all injuries, losses, damages, assessments, penalties, charges, expenses, costs and/or liabilities that it/he/she may hereafter incur or discover which in any way arise out of or relate to such Claims.  To the extent that any statute, law, ordinance, rule, regulation, case or other such legal provision or authority may purport to preserve either parties' right hereafter to assert presently existing but unknown, unasserted, unsuspected or undiscovered Claims which would otherwise be barred by the terms of this Agreement, each party hereby specifically and expressly waives its/his/her rights under such statute, law, ordinance, rule, regulation, case, common law, or other such legal provision or authority.

9.    National Real Estate, through its agents, and Rivera, Beamer, Erwin, Sagrati and Sichak, individually, each agree not to sell to, contact, solicit, do business with, speak with, or deal in any way with Netco Customers for the nine-month period following the Court entering the Agreed Order in the form attached to this Agreement as Exhibit A.  The term "Netco Customers" is defined under this Agreement to be any entity or person who has placed an order with Netco between the dates of January 26, 1999 and August 26, 1999.  Upon the execution of this Agreement, Netco shall provide a list of Netco Customers to Patrick W. Walsh.  National Real Estate, Rivera, Beamer, Erwin, Sagrati, and Sichak may contact Patrick W. Walsh, or his designee, at (312) 467-5300 to determine whether any particular entity or person is a Netco Customer.  In the event that there is a dispute as to whether a particular entity or person is a Netco Customer, the parties will in good faith attempt to confirm whether that entity or person is, in fact, a Netco Customer.  Neither Patrick W. Walsh nor his agents shall reveal to anyone at

Netco the name or names of any person or entity that National Real Estate, Rivera, Beamer, Erwin, Sagrati or Sichak reveal to Patrick W. Walsh or his agents under this Agreement unless first obtaining a Court Order allowing them to do so. Counsel for National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak hereby agree that their clients may speak directly with Patrick W. Walsh pursuant to this paragraph. In the event that National Real Estate, Rivera, Beamer, Erwin, Sagrati or Sichak assert that Patrick W. Walsh has incorrectly identified a person or entity as a Netco Customer, National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak agree to first provide written notice via overnight mail (and to keep the receipt for the overnight mail package) to Patrick W. Walsh, 415 N. LaSalle, Suite 201, Chicago, IL 60610, and to David A. Skidmore, Jr., Esq., Frost & Jacobs LLP, 2500 PNC Center, 201 E. Fifth Street, Cincinnati, OH 45202 and to allow Netco seven business days to cure any defect. National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak each agree that if a Netco Customer initiates any type of conversation with them that the only response shall be "I cannot speak with you until [Date] by Court Order." If National Real Estate, Rivera, Beamer, Erwin, Sagrati or Sichak receive an order or a request from a Netco Customer the only response will be "we are unable to process your order [or request] until [Date] by Court Order." Because damages may not be readily ascertainable, National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak each agree, jointly and severally, to liquidated damages of $25,000 per violation of this Agreement, and specifically acknowledge and agree that if there is a violation Netco may also obtain other relief as ordered by the Court, and that the award of liquidated damages does not limit Netco's right to other additional relief.

10.    National Real Estate or any company or entity established either directly or indirectly by, or under the direction of, Rivera, Beamer, Erwin, Sagrati, and/or Sichak which

- 8 -

provides title insurance services shall be periodically audited. The first audit shall commence 22 days after the Court enters the Agreed Order in the form attached as Exhibit A. Additional audits will occur every 45 days thereafter during the nine-month period identified and discussed in paragraph 9 of this Agreement. Such audit shall be performed by outside legal counsel chosen by Netco. If Netco elects not to perform an audit, such an election shall not constitute a waiver to perform further audits pursuant to this Agreement or a waiver of any of its other rights under this Agreement.

11.    Beamer shall pay Netco $20,000 via certified check upon execution of this Agreement. Netco agrees that National Real Estate and Beamer may continue to use the Titleworx Suite of computer programs.

12.    National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak, jointly and severally, shall pay Netco $30,000 via certified check upon execution of this Agreement.

13.    National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak will not, individually or collectively, establish or own or control, directly or indirectly, any corporation, partnership, sole proprietorship, or any other entity providing title insurance services in Ohio, New York, Pennsylvania, Kentucky, Indiana, Michigan, Illinois, Wisconsin, Minnesota, Missouri, Kansas, or Texas, except that they may continue to run National Real Estate pursuant to the terms of this Agreement and the Agreed Order in the form attached as Exhibit A. In addition, Rivera, Beamer, Erwin, Sagrati, and Sichak may each own less than 5% of a publicly traded company providing title insurance services. This paragraph will apply for the nine-month period identified and discussed in paragraph 9 of this Agreement.

14.     National Real Estate shall not do business in New York, Indiana, Michigan, Illinois, Wisconsin, Minnesota, Missouri, Kansas, Kentucky, Pennsylvania or Texas for the nine-month period identified and discussed in paragraph 9 of this Agreement.

15.     Rivera, Beamer, Erwin, Sagrati and Sichak agree not to apply at any time for employment or re-employment with Netco. Further, National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak agree not to hire, solicit, induce or attempt to induce any employee or independent contractor of Netco to leave its employ or engagement or engage in any competing business for the nine-month period identified and discussed in paragraph 9 of this Agreement.

16.     National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak submit to personal jurisdiction in the Ohio courts to enforce both this Agreement and the Agreed Order in the form attached as Exhibit A, and agree that Ohio law governs this Agreement. The Ohio Court of Common Pleas shall exercise continuing jurisdiction to enforce this Agreement and the Agreed Order in the form attached as Exhibit A. National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak understand and acknowledge that any violation of the Agreed Order in the form attached as Exhibit A may result in civil or criminal contempt, as well as other relief ordered by the Court.

17.     Rivera, Sichak and Beamer hereby agree to request withdrawal of any charge(s) either has filed with the EEOC, the OCRC or any other governmental agency or quasi-governmental agency. Upon request by William P. Andrews, Jr., Rivera further agrees to send the Kentucky Bar Association a certified letter withdrawing his complaint and stating that his complaint was unfounded and a tactic to help Rivera in anticipated litigation with Netco. National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak hereby agree, jointly and severally, to indemnify Netco and William P. Andrews, Jr., for any damages or costs, including

- 10 -

attorneys' fees, incurred as a result of Rivera's complaint to the Kentucky Bar Association about Andrews and Netco.

18.    National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak agree not to discuss with anyone not a party to this Agreement Netco's business practices or conduct unless required by law.

19.    National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak each further covenant, warrant, represent and acknowledge to Netco that, except by:  (a) compulsion of a valid and enforceable subpoena; (b) compulsion of a valid order of a court of competent jurisdiction; or (c) prior written approval of Netco, it/he/she will not provide (or encourage or authorize, if such authority is required, any of its/her agents, employees, shareholders, officers, directors, attorneys or legal representatives to provide) any testimony, documents or other information for use by any third party in any action of any kind, civil or criminal, legal or equitable, judicial or administrative, against Netco based upon or in any way related to any of the facts that have arisen in the Pending Action.

20.    National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak each further covenant, warrant, represent and acknowledge to Netco that, prior to providing any testimony, documents or other information pursuant to authority of subdivisions (a) or (b) of Paragraph 19 above, it/he/she will make diligent efforts to give Netco sufficient and reasonable notice of such subpoena or court order to enable Netco to object to the same and to move to quash or to take such other action as is allowed by law to prevent such testimony, documents or other information from being provided.

21.    In the event that National Real Estate, Rivera, Beamer, Erwin, Sagrati and/or Sichak violates this Agreement, and Netco proves a breach of this Agreement, then National

- 11 -

Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak shall hereby be liable, jointly and severally, for Netco's attorneys fees. National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak agree that the obligations under this Agreement are not dischargeable in a case under either Chapter 7, 11, or 13 of the U.S. Bankruptcy Code. In addition, National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak will not attempt to discharge the debts created in this paragraph and will not oppose any action under Chapter 7, 11, or 13 of the Bankruptcy Code in which Netco seeks to bar the discharge or the dischargeability of the specific obligations under this Agreement.

22.    National Real Estate, Rivera, Beamer, Erwin, Sagrati and Sichak hereby further warrant, represent and acknowledge to Netco that:

(a)    it/he/she has the right and authority to execute this Agreement and to receive the consideration given for this Agreement;

(b)    it/he/she has not sold, assigned, transferred, conveyed or otherwise disposed of any of the Claims covered by this Agreement;

(c)    the consideration received by it/him/her for this Agreement is fair, reasonable, sufficient, just and adequate and constitutes lawful consideration supporting the execution of this Agreement;

(d)    through its duly authorized representative, it/he/she has read all provisions of this Agreement in full, understands them, has had the opportunity to consult with counsel, and voluntarily agrees to be bound by this Agreement.

(e)    it/he/she is entering into this Agreement based upon its/his/her own analysis of the facts and/or information of which it/he/she is independently aware and not based

upon or in reliance upon any statements and/or representations of the other party (except to the extent such statements and/or representations are fully and expressly set forth herein).

23.    It is further understood and agreed by the parties to this Agreement that the facts pursuant to which this Agreement is made may hereafter prove to be other than or different from the facts now understood and/or believed by the parties to be true. Each party expressly agrees that it is its/his/her express and specific intent to assume and accept the risk of the facts proving to be different, and each of the parties agrees that all the terms of the Agreement shall be in all respects effective and not subject to reformation, termination or rescission on account of any such difference in facts.

24.    Rivera and Beamer each hereby acknowledge that they have been given at least twenty-one days to consider this Agreement and that Rivera or Beamer may revoke the portion of this Agreement relating to claims under the ADEA within 7 days after signing it by providing Netco with written notice of revocation. Written notice should be sent by certified mail to William P. Andrews, Jr., Esq. General Counsel, National Equity Title Agency, Inc., d/b/a Netco, Inc., 415 North LaSalle Street, Suite 402, Chicago, IL 60610, and to David A. Skidmore, Jr., Frost & Jacobs, 2500 PNC Center, 201 E. 5th Street, Cincinnati, Ohio 45202. This entire Agreement is conditioned upon Beamer and Rivera not revoking the waiver of their claims under the ADEA set forth in this paragraph. This entire Agreement is also conditioned upon Beamer's covenant not to sue TransContinental Title, Inc.

- 13 -

## SECTION THREE

### Effect of Agreement

1.    It is understood and agreed to by the parties to this Agreement:

(a)    If any portion(s) or provision(s) of this Agreement is found to be unenforceable the remaining parts of this Agreement shall be in full force and effect.

(b)    This Agreement contains the entire agreement between the parties with respect to the subject matter of this Agreement and any agreement hereafter made shall be ineffective to change, modify or discharge this Agreement unless such subsequent agreement is in writing and signed by the party to be charged;

(c)    Facsimile signatures of the parties to this Agreement will be enforceable. The parties to this Agreement, however, shall provide two originals of this Agreement via overnight mail to counsel. Counsel shall then provide one of each original to opposing counsel. Copies of this Agreement shall be enforceable; and

(d)    All parties to this Agreement shall bear their own attorneys' fees and costs, except that Court costs, if any, will be split equally between Plaintiff and Defendants in the Pending Action.


IN WITNESS WHEREOF, the parties have executed this Agreement in duplicate on the dates set forth opposite their respective signatures.


Date:_____

National Equity Title Agency, Inc.

By:_____

Title:_____

- 14 -

National Real Estate Title Agency, Inc.

Date:_____    By:_____

Its:_____

Antonio Rivera

Date:_____    _____

Robert Allen Beamer

Date:_____    _____

James Erwin

Date:_____    _____

Damian Sichak

Date:_____    _____

Maria Sagrati

Date:_____    _____

716900.01

- 15 -