# DEFENDANTS' ATTACHMENT 3

```
 1
           UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OHIO
               WESTERN DIVISION
 3
              CASE NO. C-I-02-013
 4
 5   AL BEAMER, et al,
 6         Plaintiffs,
 7      vs.
 8   NETCO, INC., et al,
 9         Defendants.
     ----------------------------------/
10
11
12
13
          DEPOSITION OF WILLIAM BAUMGART
14
              November 20, 2003
15              9:12 a.m. to 10:20 a.m.
16         Transcontinental Title Company
         2605 Enterprise Road, Suite 150
17             Clearwater, Florida  33759
18
     ---------------------------------------------
19
20
21
22
REPORTED BY:
23    AUDREY LANDRY
Notary Public
24    State of Florida at Large
Esquire Deposition Services - Tampa, Florida
25    813-221-2535 (800-838-2814)
Job No.: N586079A
```

Defendants' Attachment 3

Page 2

```
 1
APPEARANCES:
 2
 3
   RICHARD C. HABER, ESQUIRE
 4    Reminger & Reminger
   1400 Midland Building
 5    101 Prospect Avenue West
   Cleveland, Ohio 44115-1093
 6    (216) 687-1311
 7       Attorney for Plaintiff, Al Beamer
 8
 9  GREGORY A. SHOEMAKER, ESQUIRE
   McMahon, Berger, Hanna, Linihan,
10    Cody & McCarthy
   2730 North Ballas Road, Suite 200
11    St. Louis, Missouri 63131
   (314) 567-7350
12
       Attorney for Defendant, NETCO
13
14
   PATRICK DIGNAM, ESQUIRE
15    NETCO
   401 Fountain Lakes Boulevard
16    St. Charles, Missouri 63301
   (636) 925-8640
17
18       Attorney for Defendant, NETCO
19
   WILLIAM E. CURPHEY, ESQUIRE
20    William E. Curphey & Associates, P.C.
   2605 Enterprise Road East, Suite 155
21    Clearwater, Florida 33759
   (727) 726-8624
22
       Attorney for Transcontinental
23
24
25
```

Page 3

```
 1
                INDEX
 2                              PAGE
 3
   Direct Examination by Mr. Haber............. 4
 4
   Certificate of Oath.......................... 45
 5
   Certificate of Reporter...................... 46
 6
 7
 8
 9
10            EXHIBITS
11  NO.   DESCRIPTION              PAGE
12  FLORIDA DEPOSITION EXHIBIT:
13  1 Stock Purchase Agreement TTC-70..... 12
14  2 Equity Title Agency of Ohio, Inc.
    Minute Book  TTC-38  K101-1.......... 14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

 1       The deposition of WILLIAM BAUMGART was
 2  taken pursuant to Notice by counsel for the
 3  Plaintiff on November 20, 2003, commencing at
 4  9:12 a.m. at Transcontinental Title Company,
 5  2605 Enterprise Road, Suite 150, Clearwater,
 6  Florida. Said deposition was reported by
 7  Audrey Landry, Notary Public, State of Florida at
 8  Large.
 9         - - - - - - - - - -
10  WHEREUPON:
11       WILLIAM BAUMGART,
12  a witness, having been duly sworn to tell the
13  truth, the whole truth and nothing but the truth,
14  was examined and testified as follows:
15       DIRECT EXAMINATION
16  BY MR. HABER:
17   Q  Mr. Baumgart, my name is Richard Haber. I'm
18  an attorney representing Al Beamer in a lawsuit, which
19  he's filed against your brother's company, NETCO, your
20  brother, and formerly Bill Andrews, although
21  Mr. Andrews has just been voluntarily dismissed from
22  the litigation. I'm assuming you're aware of the
23  litigation, in general?
24   A  Yes.
25   Q  And I know that you've been deposed before,

Page 5

 1  so I won't belabor the ground rules. But you need to
 2  give me verbal responses to my questions, and if I ask
 3  you a question you don't know the answer to, please
 4  stop me or please tell me you don't know the answer to
 5  my question. Is that understood?
 6   A  Sure.
 7   Q  And if you don't remember something, tell me.
 8  And if I ask you a question you don't understand, stop
 9  me and ask me to restate the question so you do
10  understand it.
11   A  Okay.
12   Q  What is your current home address?
13   A  3010 Oakmont Drive, Clearwater, Florida,
14  33761.
15   Q  You're currently employed by
16  Transcontinental?
17   A  Correct.
18   Q  And you are the owner of Transcontinental?
19   A  Yes.
20   Q  Do you own all of the shares?
21   A  Yes.
22   Q  Is Transcontinental Title Company a
23  corporation?
24   A  It's an S Corp.
25   Q  Was it formally known by any other names?

Page 6

1   A   We used to be called -- what was the other
2   name? Equity Title Southeast.
3   Q   Is it a Florida corporation?
4   A   Correct.
5   Q   What states do you currently do business in
6   as Transcontinental Title Company?
7   A   We do business in 35 states.
8   Q   What is the nature of your business?
9   A   Title insurance.
10  Q   Do you insure risks?
11  A   Yes.
12  Q   How long have you been insuring risks?
13  A   We've been in business since '92.
14  Q   And have you been insuring for risks since
15  1992?
16  A   Yes.
17  Q   What type of risks do you insure for?
18  A   Essentially, just real estate.
19  Q   Do you work with underwriters?
20  A   Correct.
21  Q   And those underwriters are with actual title
22  insurance companies?
23  A   Correct.
24  Q   As a title insurance agency, you act as an
25  agent for those title insurance companies?

Page 7

1   A   Correct.
2   Q   And acting as an agent for those title
3   insurance companies, people in your employ solicit
4   business -- strike that. People who work for you sell
5   title insurance issued by title insurance companies?
6   A   Correct.
7   Q   Give me an example of a couple of title
8   insurance companies that you work with?
9   A   The title insurers?
10  Q   Yes.
11  A   Old Republic.
12  Q   Is that the only one you work with?
13  A   Yes.
14  Q   Is it Old Republic's paper that you use or
15  Old Republic whose policy that you issue?
16  A   Correct.
17  Q   When did you first meet Al Beamer?
18  A   Boy, it had to be in the late 80s.
19  Q   How did you meet him?
20  A   I don't recall.
21  Q   Do you remember where you met him?
22  A   No.
23  Q   When do you first recall having any type of
24  business relationship with Al Beamer?
25  A   That was when I was in Chicago in the late

Page 8

1   80s.
2   Q   What was the nature of that relationship?
3   A   Al had put together a computer system that he
4   was selling to us.
5   Q   "To us" meaning who?
6   A   That's when I used to own Equity Title in
7   Chicago.
8   Q   Who is the founder of Equity Title in
9   Chicago?
10  A   That was me.
11  Q   When did you found that company?
12  A   In '87.
13  Q   John Baumgart is your younger brother?
14  A   Correct.
15  Q   How much younger is he?
16  A   Four years.
17  Q   When did you bring him into the business?
18  A   I think it was like the first day or so.
19  Q   When did you first give him ownership of any
20  type in Equity Title in Chicago? Equity Title of
21  Illinois, isn't it?
22  A   Yeah, I think that was the main company.
23  That was back in '91 he bought it.
24  Q   When did you cease having ownership in
25  Equity Title of Illinois?

Page 9

1   A   When he bought it in '91.
2   Q   Is that when you founded
3   Equity Title Southeast?
4   A   No, that was in '92. I took some time off.
5   Q   So you were out of the business for about a
6   year?
7   A   About eight months.
8   Q   And then you founded Equity Title Southeast
9   down here in Clearwater?
10  A   Correct.
11  Q   When you originally founded Equity Title
12  Southeast, were you just doing business in Florida?
13  A   Yes.
14  Q   When did you first do business as
15  Equity Title Southeast in the State of Ohio? Let me
16  back up and rephrase the question. I'm assuming that
17  Equity Title Southeast's name essentially changed to
18  Transcontinental Title Company?
19  A   Correct.
20  Q   So then for purposes of my question I'll use
21  them jointly. When did you first start doing business
22  in the State of Ohio as a corporate entity,
23  Equity Title Southeast or Transcontinental Title?
24  A   Let's see, what year was that? Either 1997
25  or 1998.

Page 10

1  Q  Where were your offices located?
2  A  Boy, what in the heck is that little town.
3  Q  Greenville?
4  A  Greenville, there you go.
5  Q  Do you know where Greenville is located?
6  A  I think it's on the west side of the state.
7  Q  Did you ever go there?
8  A  Yes, a couple of times.
9  Q  What was the geographic scope of that
10 business that you had in Ohio in 1997, 1998?
11 A  I think we were doing business in the
12 southern half of the state. I don't think we're as
13 far north as Cleveland, per se.
14 Q  How did you become involved in that business
15 in Greenville, Ohio?
16 A  I purchased that business from
17 Fidelity National.
18 Q  Was there a formalized purchase document?
19 A  No.
20 Q  What was the purchase price?
21 A  Zero.
22 Q  What precipitated you purchasing this
23 business from Fidelity National?
24 A  Well, from what I understand is the owner
25 stole six million dollars of the escrow account. So

Page 11

1  Fidelity, it was an ongoing business and they didn't
2  want to lose it, so they asked me if I would step in
3  and put some working capital into it and they would
4  indemnify me from all the losses.
5  Q  Who first contacted you about this
6  opportunity?
7  A  I don't remember his name. He was an auditor
8  there.
9  Q  At Fidelity National?
10 A  Yes.
11 Q  When you were first contacted, was there an
12 understanding that you would eventually sell your
13 share or your ownership in that business?
14 A  No.
15 Q  When did you sell your ownership in that
16 business?
17 A  I think in July of 2000.
18 Q  Who did you sell it to?
19 A  Chris Hayes.
20 Q  Who is Chris Hayes?
21 A  He was the guy who was running it.
22 Q  Did you have any purchase agreements prior to
23 July of 2000?
24 A  Yes.
25 Q  Were they finalized in July of 2000?

Page 12

1  A  Correct.
2  Q  Who is a woman by the name of
3  Virginia Bertram?
4  A  I think that's his mother-in-law.
5  Q  You didn't warn him not to go into business
6  with his mother-in-law?
7  A  I think Chris had some problems with getting
8  a license, so he put everything in his mother-in-law's
9  name.
10      MR. HABER: Let's mark this Florida's
11   Deposition 1.
12      (Florida's Deposition Exhibit Number 1 marked
13   for identification.)
14 Q  (By Mr. Haber) I'm showing you a Stock
15 Purchase Agreement that had been produced by you in
16 previous litigation with Mr. Beamer. Have you ever
17 seen this document before?
18 A  Yeah.
19 Q  Does it bear your signature on page -- the
20 third page, TTC-72?
21      MR. CURPHEY: Just to clear for the record,
22   you said what document he executed with
23   Mr. Beamer. I don't think that's what this
24   reflects.
25      MR. HABER: I think I said it was produced

Page 13

1  previously in litigation with Mr. Beamer.
2       MR. CURPHEY: I beg your pardon.
3  Q  (By Mr. Haber) Is this the Stock Purchase
4  Agreement with Virginia Bertram that resulted in the
5  sale of your shares?
6  A  Yes, I think this was the first one.
7  Q  Is there a subsequent agreement?
8  A  We kept changing it because, you know, he
9  kept telling me I was ripping him off.
10 Q  You changed it even after there were signed
11 agreements?
12 A  Yeah.
13 Q  So you believe that there is more than one
14 executed agreement, Stock Purchase Agreement, with
15 Virginia Bertram?
16 A  I think there is at least one other that was
17 done after this, that changed the dollar amount. It
18 just changed the dollar amount, it didn't change the
19 purchase.
20 Q  The purpose of selling or having this
21 agreement with Virginia Bertram was because Mr. Hayes
22 needed to put everything in his mother-in-law's name
23 in order to get a license?
24 A  A title license, yeah.
25 Q  There's a reference in the agreement to a

Page 18

1  recall, we probably -- I probably picked this thing up
2  about a year, year and a half before that now.
3  Because there's about -- I picked it up, and about a
4  year, year and a half later he wanted to buy it. And
5  then this whole thing started.
6     Q  So the Stock Purchase Agreement, that we have
7  marked as Florida Exhibit 1, would have been the
8  beginning of the process of divesting yourself of that
9  business?
10    A  Yes; correct.
11    Q  At some point after Exhibit 1 was executed,
12 there was another document that you believe was
13 executed that became the final document reflecting the
14 sale of the business?
15    A  Yeah. And all that did was change the amount
16 of money.
17    Q  Who is the custodian of that document? In
18 other words, who had -- do you have a copy of it?
19    A  Well, I didn't keep any of the documents.
20 But Chris Hayes probably has them all. It means more
21 to him than me.
22    Q  Your best recollection then of the terms of
23 the purchase, whenever that subsequent document was
24 executed changing the amount, is that there was
25 payment -- periodic payments?

Page 19

1     A  Monthly.
2     Q  Monthly payments until the sum of whatever
3  the purchase price was, 1.2 million, whatever it was,
4  until that was paid?
5     A  Correct.
6     Q  Were you entitled to any other compensation
7  during that payment period other than the payment of
8  the contract terms?
9     A  He was paying me some amount of money per
10 month to do accounting work, you know.
11    Q  Audit the books?
12    A  Exactly.
13    Q  I think it's reflected in the Stock Purchase
14 Agreement that there would be a payment of $1500 per
15 quarter, under Section 11 of the agreement, Page 2?
16    A  Yeah.
17    Q  For you to come in and do the auditing. How
18 long did you audit for him? How long did you perform
19 those services?
20    A  During until he paid me off.
21    Q  When did the ownership of the business or
22 stock actually transfer?
23    A  I think that was in the middle of the year
24 2000, like July/August, something like that, that I
25 actually signed the stock over.

Page 20

1     Q  Who did your auditing for that business? I
2  assume you didn't go up there and do it.
3     A  John Rosso did.
4     Q  Why was Al Beamer terminated from his
5  employment with Transcontinental?
6     A  That was a disagreement him and I had, where
7  I had found out -- I had an employee quit on me,
8  Damion Sichak, to go to work for a title company that
9  started up in Ohio. And I was concerned because I
10 heard Al was doing some work for them. And so I
11 talked to Al about that and he said that he was just
12 doing computer work for them.
13    And I said that's fine, I'm not going to get
14 involved in anything, I'm not going to stop you from
15 earning a living, because you have other clients
16 outside of Transcontinental, but I had heard rumors
17 that you were a part owner of the company. And I told
18 him that that wouldn't fly; if you were a part owner,
19 we would have a serious problem. So I find out he was
20 part owner and I fired him.
21    Q  How did you find out he was part owner?
22    A  I don't really recall. I think my brother
23 told me; either something came out in another court
24 case about something.
25    Q  Do you know what that other court case was?

Page 21

1     A  No, but I believe it was in Ohio.
2     Q  You didn't know that your brother had sued a
3  company owned by Tony Rivera?
4     A  I believe he probably was. He was suing a
5  couple of companies at the time. I don't keep track
6  of who he's suing.
7     Q  Do me a favor, spell Sichak?
8     A  I can't. I don't know how you spell it,
9  Sichak. S-I-C-H-A-K, maybe. It's a weird name.
10    Q  Who is Tony Rivera?
11    A  All I know about Tony Rivera is he's a guy
12 from Texas that my brother hired.
13    Q  Did you ever meet him?
14    A  No.
15    Q  Did you ever talk with Al Beamer about hiring
16 him after he left your brother's employ?
17    A  No.
18    Q  Al Beamer was terminated in December of 1999.
19 When did you learn that he was a part owner of a
20 business in Ohio?
21    A  Well, I don't actually remember when we
22 terminated him.
23    Q  That's why I gave you the date.
24    A  The best that I could tell you is that it was
25 probably a week before then. It happened real quick.

Page 22

1  I found out, and he was gone.
2  Q  Did your brother ask you to terminate him?
3  A  No.
4  Q  Would it bother you that he was a part owner
5  of a business in Ohio?
6  A  That's a huge conflict of interest, in my
7  book.
8  Q  Why?
9  A  Because I don't want to do business with
10 somebody who's got proprietary information on my
11 company, competing against my company.
12 Q  Which company would he be competing with in
13 Ohio?
14 A  My company with Chris Hayes.
15 Q  The one you were selling?
16 A  Right.
17 Q  You knew that you were going to be out of
18 that market in the middle of 2000; right?
19 A  Yes.
20 Q  Six months after you terminated Mr. Beamer?
21 A  Well, I didn't know for sure I was going to
22 be out. I mean, the guys miss a payment, I keep the
23 stock. Plus, these guys still have to keep making
24 money to pay me money, you know.
25 Q  What do you know about the business in Ohio

Page 23

1  that Mr. Beamer was involved in?
2  A  Not much. All I know is that Damion Sichak
3  was an owner there, I guess.
4  Q  How did you find that out?
5  A  Well, he quit and told us.
6  Q  When did he quit?
7  A  I don't remember.
8  Q  Before you terminated Al Beamer?
9  A  Yeah.
10 Q  So he quit and told you I'm going to work for
11 this company in Ohio?
12 A  Yes.
13 Q  Did you know who he was going to be working
14 with in Ohio?
15 A  No. I didn't know all of the players at that
16 point.
17 Q  When did you become licensed to do business
18 in the State of Ohio as Transcontinental?
19 A  We were never licensed as Transcontinental.
20 It was always Southeast Equity Title, I believe the
21 name we took.
22 Q  When did you become licensed as
23 Southeast Equity Tittle in Ohio?
24 A  Right after we took the company over we
25 probably changed the name. I don't recall.

Page 24

1  Q  Well, now that you've sold that business, are
2  you licensed to do business in the State of Ohio?
3  A  Yes.
4  Q  Under what name?
5  A  Transcontinental Title.
6  Q  When did you become licensed under
7  Transcontinental Title?
8  A  2000. Somewhere in 2000.
9  Q  That's the same time that you divested
10 yourself of the stock?
11 A  Correct.
12 Q  In Exhibit 2 there's a number of pages that
13 have signatures on it. If you would look on the tenth
14 page, which at the bottom has a K101-5 down in the
15 bottom right corner. I'll save you some time, you can
16 look at mine. Is this your signature?
17 A  Yes.
18 Q  Okay. On the page number K101-5?
19 A  Yes.
20 Q  Is this also your signature on the page
21 number K101-4?
22 A  Yes.
23 Q  Who is the secretary of the meetings that
24 were being held? Do you recognize that signature?
25 A  No.

Page 25

1  Q  See if we can figure it out. Frank Skryd?
2  Does that look like Frank's?
3  A  Your guess is as good as mine.
4  Q  Is this your signature here?
5  A  Yes.
6  Q  That would be on page K101-7?
7  A  Yes.
8  Q  There was ultimately a document in here
9  approving the sale of the business. I'll give you an
10 example: PTC-66. There was a meeting on February 1st,
11 1997, by conference call, in which you participated
12 with John Rosso and Frank Skryd, approving the sale of
13 the business for 1.4 million dollars to Chris Hayes
14 and Mark Hanna.
15 A  Oh, okay. 1.4 on that one, too.
16 Q  Well, for purposes -- I wasn't really
17 concerned about the purchase price. Was there ever a
18 separate resolution approving the sale to
19 Virginia Bertram or was this the resolution that
20 ultimately resulted in the Stock Purchase Agreement
21 marked as Florida 1?
22 A  I have no idea.
23 Q  What is the retail division of
24 Transcontinental?
25 A  That's our unit where we do all national

Page 26

1  clients.
2  Q  National clients being national banks,
3  mortgage companies?
4  A  Multi-state lenders.
5  Q  Is your focus predominantly on the refinance
6  business?
7  A  Yes.
8  Q  Why was an attempt to resolve Al Beamer's
9  dispute with you made part of the litigation in
10 Cincinnati? Do you know?
11 A  I had no idea it was.
12 Q  Did your brother ever tell you that he was
13 going to try and get a covenant not to sue by
14 Al Beamer, as a resolution of the Cincinnati
15 litigation?
16 A  No.
17 Q  When did you and your brother -- assuming for
18 purposes of my question Al Beamer was terminated in
19 December of 1999, and you learned that he was involved
20 in a business in Ohio approximately a week before he
21 was terminated. Do you recall whether you had any
22 prior conversations with your brother regarding that
23 business in Ohio and Al Beamer's involvement?
24 A  I don't recall any specific conversations.
25 Q  Do you recall how it was that your brother

Page 27

1  communicated to you that Al Beamer was involved in
2  this business?
3  A  I don't really recall, but I'm sure it was
4  through the phone.
5  Q  Did you participate in a conference call?
6  A  I couldn't tell you.
7  Q  Was it around the time that Al Beamer was
8  deposed in that litigation?
9  A  I couldn't tell you.
10 Q  How many times did you and Al Beamer speak
11 regarding the business in Ohio, prior to his
12 termination?
13 A  Just once.
14 Q  When was that conversation?
15 A  Well, I don't really recall. Like I said, it
16 was just we went out for a couple of beers and I
17 talked to him about it. It was a week or so before he
18 was let go.
19 Q  You talked to Al Beamer a week or so before
20 he was let go? I thought you indicated you learned a
21 week or so before he was let go, that he was involved
22 in the business?
23 A  It was just prior to that. It's all mixed up
24 because I don't remember any of it. All I know is the
25 events, you know. We went out for a beer --

Page 28

1  Q  You and Al?
2  A  Al and myself went out for a couple of beers.
3  I had told him that I'm hearing these nasty rumors
4  about his involvement in that company. He assured me
5  that he was not an owner, that he was just doing the
6  computer work for them. And then everything else just
7  kind of fell into place. Exact dates, I don't
8  remember. And then I found out that he was an owner
9  and then like a week after that, I think we fired him.
10 I don't really recall how we did it, actually.
11 Q  What was the reason that when you renewed
12 Al Beamer's contract prior to terminating him, that
13 you increased his compensation? Let me back up. Was
14 there a time that you asked Al Beamer to spend more
15 time here in Florida with your business?
16 A  I'm sure there was many times we asked him,
17 you know, because he spent almost no time down here,
18 so.
19 Q  Were you satisfied with the work that he was
20 performing?
21 A  Not really. But, you know, it was okay. I'm
22 not usually satisfied with anybody's work, though.
23 Q  Why would you continue to renew his contract
24 if you weren't satisfied with the work?
25 A  No better mousetraps.

Page 29

1  Q  Meaning no better software to use?
2  A  There probably was better software at the
3  time, but we were so tied into his. I mean, you know,
4  that's a major undertaking to change a whole software
5  around. So it's like stick with what you got,
6  otherwise you're going to spend hundreds of thousands
7  of dollars.
8  Q  Did you ultimately spend hundreds of
9  thousands of dollars replacing his software?
10 A  Yes, I did.
11 Q  And that was with the Gator system that you
12 replaced the Title Works?
13 A  Yes.
14 Q  Why did you change, if you weren't satisfied
15 with his work, change his status from independent
16 contractor to employee?
17 A  I don't know. When was that?
18 Q  I think it was March of '99.
19    MR. SHOEMAKER: I'll stipulate that's
20 correct.
21 A  That would have made sense, because since
22 we're an interest rate driven company, in March of '99
23 our company was going down the toilet. So it would
24 have made more sense to cut back on his bonus part and
25 pay more of a salary.

Page 34

1  do you recall whether in any contractual agreement
2  that you had with Al Beamer, separate and apart from
3  resolutions of litigation, in any contractual
4  agreement, was there ever an agreement to pay
5  Transcontinental more than one percent of gross
6  receipts?
7     A   I have no idea.
8     Q   In a previous document, Defendant's
9  Exhibit G, August 11th, there was a contract amendment
10 that permitted the reduction in the compensation to
11 Al Beamer. Do you see that?
12    A   Yeah.
13    Q   What was going on in the business at that
14 time?
15    A   That's interesting that we did that. All I
16 can assume is in August of '99, I know that we weren't
17 doing too well, so Al must have voluntarily taken some
18 cuts just like everybody else.
19    Q   I note that I'm guessing that in light of the
20 refinance boom following '99, that business has gotten
21 a little better?
22    A   Yes.
23    Q   And your web site, I think indicates that in
24 2002 you guys exceeded 30 million dollars in gross
25 revenue?

Page 35

1     A   Yes.
2     Q   Do you remember what the gross revenue of the
3  business was in 2001?
4     A   No. 2001? I should know this stuff.
5     Q   You would think.
6     A   I could get it for you. I don't have it.
7     Q   Can you get it for me today?
8     A   Yes.
9     Q   If you would give me 2000 and 2001, all I
10 need is the gross revenue numbers.
11    A   2000 and 2001?
12    Q   Right.
13    A   No problem.
14    Q   And we can either do it as a supplementation
15 to your deposition or you can just provide me with
16 them.
17    A   I just don't know off the top of my head.
18 It's a long time ago.
19    Q   Maybe what we can do is when we're done with
20 your deposition, which I'm almost there, you can get
21 me those two numbers and we can do it as a
22 supplementation to the end of your deposition.
23    A   Fine.
24    Q   Did you have any conversation with
25 Bill Andrews regarding the termination of Al Beamer?

Page 36

1     A   No.
2     Q   Did you ever tell Bill Andrews to communicate
3  the decision to Al Beamer that he had been terminated?
4     A   Who's Bill Andrews?
5     Q   Former general counsel for NETCO.
6     A   Oh, John's attorney?
7     Q   Yeah.
8     A   I don't recall any conversations with him.
9     Q   Who communicated the decision to terminate
10 Al Beamer, to Al Beamer?
11    A   It was kind of a funny thing how it happened.
12 Because I was very upset, so I know for a fact I
13 didn't. I just ignored him; stopped paying him and
14 ignored him. Somebody else communicated it to him. I
15 don't know who. It could have been Frank. It could
16 have been Bill. I don't recall, but I know I never
17 told him he was fired.
18    Q   How many paychecks did you not pay before he
19 learned that he was terminated?
20    A   It happened right away.
21    Q   So when you say you stopped paying him, you
22 hadn't actually formally missed a pay period with
23 Al Beamer before he learned that he was terminated?
24    A   Right.
25    Q   So who did you tell that he was terminated,

Page 37

1  if you didn't tell Al Beamer?
2     A   I think I told Frank. I would have told
3  Frank, because Frank is our computer guy.
4     Q   Frank Skryd?
5     A   Yeah. I probably told him at that point that
6  you better go find yourself a new computer system,
7  because you don't have this one anymore. So I think I
8  would have told Frank. You know, when you talk to
9  Frank, he'll probably know more.
10    Q   Is it your belief -- obviously, I will ask
11 Frank. Is it your belief that Mr. Skryd then
12 communicated the termination to Al Beamer?
13    A   That would be logical.
14    Q   But you don't know?
15    A   But I don't know.
16    Q   Did you get any phone calls from Al Beamer
17 after somebody communicated?
18    A   Lots.
19    Q   Did he leave you messages?
20    A   Yeah, I'm sure he did.
21    Q   You didn't speak to him?
22    A   No.
23    Q   Did you communicate a message to him in any
24 way so he could talk to somebody about the resolution
25 of his employment?

Esquire Deposition Services                          813-221 2535

Page 38

1  A   No, I pretty much ignored all his messages.
2  Q   In December of 1999, did Transcontinental
3  Title Company have any offices in Ohio, other than
4  this Southeast Equity Title in Greenville?
5  A   No.
6  Q   Were you and your brother discussing the sale
7  of your respective businesses to a California company
8  around the same time that Al Beamer was terminated?
9  A   Well, the only time that I recall I was
10 involved with my brother about a possible sale of both
11 our businesses, I don't recall the timing of it, but
12 we talked to a company in California, American Title,
13 I believe, and in New York, when we went to New York.
14 Q   Can you give me an estimate as to when that
15 occurred?
16 A   It was back during the late 90s, I know that.
17 Q   Was it before or after or around the time of
18 Al Beamer's termination?
19 A   I couldn't --
20 Q   It couldn't have been after if it was in the
21 late 90s, because Beamer was terminated in December of
22 '99. There wasn't a lot of after in '99.
23 A   It probably was before.
24 Q   What happened with those sales discussions?
25 A   Actually, it was just the one discussion and

Page 39

1  nothing came of it.
2  Q   What did you review in preparation for the
3  deposition today, if anything?
4      MR. CURPHEY: Anything you and I discussed,
5      or any notes I went over with you are
6      attorney/client privilege.
7  A   I just talked to Bill about the depositions a
8  little bit.
9  Q   (By Mr. Haber) I don't want to get into what
10 you discussed with Bill Curphey. Although, if you
11 were a party to this litigation, I might make a
12 stronger stand on if you reviewed notes, that that is
13 no longer privileged. But I'm not going to bother
14 trying to pierce through that issue with Bill.
15     Without discussing the topics, were there actual
16 written documents, handwritten notes or anything that
17 you reviewed?
18 A   Yeah.
19 Q   And these handwritten notes, without getting
20 into what was in them, were they in your handwriting
21 or Mr. Curphey's handwriting or somebody else's
22 handwriting?
23 A   They were in Bill's.
24 Q   Did these notes refresh your recollection
25 regarding events or timing in any way?

Page 40

1  A   Yeah. Essentially, it was to refresh my
2  memory as far as events with our settlement and things
3  like that, so I can talk a little coherently.
4  Q   And by settlement, you mean settlement of the
5  litigation that you were involved in with Mr. Beamer?
6  A   Correct.
7  Q   Bill, you decide whether you want to object
8  to this. Were there any notes with respect to the
9  timing or events that led up to Mr. Beamer's
10 termination?
11 A   No, there's nothing in there about that.
12 Q   So it all related to the litigation in some
13 manner?
14 A   Right.
15 Q   Do you know whether your brother, John, was
16 contacted about this opportunity with Equity Title of
17 Ohio?
18 A   No.
19 Q   You don't know or he wasn't?
20 A   I don't know. I don't know if he was or not.
21 Q   Is your brother now competing with you in
22 Florida?
23 A   Yes.
24 Q   How does that affect the family relationship?
25 A   It really doesn't.

Page 41

1      MR. HABER: Give me a second with my client.
2  I may be done.
3      (Recess Break.)
4  Q   (By Mr. Haber) A couple of follow-up
5  questions and then I'll be done. The business in the
6  Equity Title Agency of Ohio, when you owned it, you
7  personally owned it, right, you owned a hundred
8  percent of the shares?
9  A   Correct.
10 Q   Transcontinental Title Company was not the
11 owner of the shares?
12 A   No, I don't think so.
13 Q   Did Al Beamer perform any work for Equity
14 Title Agency of Ohio at any time?
15 A   I couldn't tell you offhand.
16 Q   Did you have Al Beamer's software installed
17 in Equity Title Agency of Ohio?
18 A   I don't think so.
19 Q   Was the profit or gross receipts of Equity
20 Title Agency of Ohio, in any way part of the
21 compensation to Al Beamer or his business?
22 A   I can't remember that.
23 Q   Do you know who Ed Cook is?
24 A   Who?
25 Q   Ed Cook?