# DEFENDANTS'
# ATTACHMENT 4

CERTIFIED COPY

[Sheet 1, Page 1]

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


AL BEAMER, ET AL.,          )
                            )
          PLAINTIFFS,       )
                            )
v.                          ) NO. C-1-02-013
                            )
NETCO, INC., ET AL.,        )
                            )
          DEFENDANTS.       )


DEPOSITION OF WILLIAM ANDREWS
TAKEN BY RICHARD C. HABER, ESQ.
ON BEHALF OF THE PLAINTIFFS
OCTOBER 28, 2003


REPORTED BY TRACI BUTZ
CERTIFIED SHORTHAND REPORTER
CERTIFIED REALTIME REPORTER


RANKIN REPORTING & LEGAL VIDEO, INC.
1015 LOCUST STREET, SUITE 911
ST. LOUIS, MISSOURI 63101-1329
(314) 231-2202
(800) 285-2115

---

[Page 3]

```
 1                    A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFFS:
 4            REMINGER & REMINGER
             Richard C. Haber, Esq.
 5            1400 Midland Building
             101 Prospect Avenue, West
 6            Cleveland, Ohio  44115-1093
 7
 8   ON BEHALF OF THE DEFENDANTS:
 9            McMAHON, BERGER, HANNA, LINIHAN,
               CODY & McCARTHY
10            Gregory A. Shoemaker, Esq.
             2730 North Ballas Road
11            St. Louis, Missouri  63131
12
13   ALSO PRESENT:
14            Patrick Dignam, Esq.
             General Counsel, NETCO
15
16
17
18                    I N D E X
19
20   Examination by Mr. Haber          Page   4
21
22
23
24
25
```

Defendants'
Attachment
4

---

[Page 2]

```
 1       IN THE UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF OHIO
 2               WESTERN DIVISION
 3
 4   AL BEAMER, ET AL.,          )
                                 )
 5            PLAINTIFFS,        )
                                 )
 6   v.                          ) NO. C-1-02-013
                                 )
 7   NETCO, INC., ET AL.,        )
                                 )
 8            DEFENDANTS.        )
 9
10
11
12
13       DEPOSITION OF WILLIAM ANDREWS, produced, sworn
14   and examined on the 28th day of October, 2003 at the
15   offices of McMahon, Berger, Hanna, Linihan, Cody &
16   McCarthy, 2730 North Ballas Road, in the City of St.
17   Louis, State of Missouri, before Traci Butz, Certified
18   Shorthand Reporter, Certified Realtime Reporter, in and
19   for the State of Missouri, in a certain cause now
20   pending in the United States District Court, Southern
21   District of Ohio, Western Division, between AL BEAMER,
22   ET AL., PLAINTIFFS, and NETCO, INC., ET AL.
23
24
25
```

---

[Page 4]

```
 1              S T I P U L A T I O N
 2       IT IS HEREBY STIPULATED AND AGREED by and
 3   between counsel for the parties that this deposition may
 4   be taken in shorthand by Traci Butz, Certified Shorthand
 5   Reporter, Certified Realtime Reporter, and afterwards
 6   transcribed into printing, and signature by the witness
 7   is not waived.
 8                    WILLIAM ANDREWS,
 9   of lawful age, being first duly sworn to tell the truth,
10   the whole truth and nothing but the truth, deposes and
11   says as follows:
12   EXAMINATION BY MR. HABER:
13       Q.  Mr. Andrews, my name is Rich Haber.  I'm an
14   attorney in a lawsuit Al Beamer has filed against NETCO.
15   Mr. Baumgart, and yourself pending in the Southern
16   District of Ohio.  I know you're an attorney.  I'm sure
17   that you've participated in depositions.  Have you ever
18   been deposed before?
19       A.  Yes.
20       Q.  Okay.  On how many occasions?
21       A.  I think two.  Maybe just one.
22       Q.  What did that matter pertain to?
23       A.  It was the Rivera case.
24       Q.  You actually were deposed, then, in the Rivera
25   case or just testified at a hearing?
```

*Deposition of William Andrews*

1    A.    I believe I was deposed.  I may be wrong on
2    that, but I think I was deposed.
3    Q.    All right.  I'm not going to belabor all of
4    the ground rules.  As you know, you've got to give
5    verbal responses to my questions.  If at any time I ask
6    you a question that you don't understand, stop me and
7    ask me to restate the question so you do understand it.
8    Is that fair?
9    A.    That's fair.
10    Q.    Okay.  If at any time you don't know the
11    answer to my question or you don't remember something,
12    just tell me that and we'll either try and refresh your
13    recollection or move on to another subject, okay?
14    A.    Okay.
15    Q.    Where do you currently reside?
16    A.    In Winnetka, Illinois.
17    Q.    What's the address there?
18    A.    848 Foxdale, F-O-X-D-A-L-E.
19    Q.    One word?
20    A.    Yes.
21    Q.    And with whom do you reside?
22    A.    My wife and three children.
23    Q.    What's your wife's name?
24    A.    Jill.
25    Q.    Where are you currently employed?

1    A.    Regent Title.
2    Q.    That's a title insurance agency?
3    A.    Yes.
4    Q.    And where are they located?
5    A.    33 North Dearborn, Suite 803.
6    Q.    In Chicago, Illinois?
7    A.    Yes.
8    Q.    And in what capacity are you employed by them?
9    A.    President.
10    Q.    Do you have ownership?
11    A.    Yes.
12    Q.    What percentage?
13    A.    50.
14    Q.    Who are the other shareholders of that
15    company?
16    A.    Caty Thomas.
17    Q.    C-A-T-Y?
18    A.    Yeah, and we are interest holders, not
19    shareholders.
20    Q.    Is this a corporation, Residential Title
21    (sic)?
22    A.    No.
23    Q.    Is it a partnership?
24    A.    No.
25    Q.    Just doing business as?

1    A.    No.
2    Q.    What is the technical entity corporate
3    structure or otherwise?
4    A.    It's an LLC.
5    Q.    And to what market do you at Regent Title
6    market your services?
7    A.    The Chicago commercial and residential
8    markets.
9    Q.    Would this be the same unique market that
10    NETCO marketed their services to?
11    A.    No.
12    Q.    How is the market different?
13    A.    Commercial business is something that NETCO
14    does not do.  We're pursuing the purchase and sale
15    market in Chicago which is a market that is not, to my
16    knowledge -- it may be now but it was not when I was
17    there at least pursued at all by NETCO, and on the
18    residential refinance business, the vast majority of our
19    clients are A credit mortgage brokers.
20    Q.    What does that mean, A credit mortgage
21    brokers?
22    A.    It means that they're not sub-prime.  They
23    don't do sub-prime loans for their -- their focus.  They
24    focus on conforming loans.  We also don't focus on
25    national lending, the lenders.  We don't have any

1    relationships with any of the national lenders.
2    Q.    Did NETCO market their services to sub -- what
3    did you use the term?
4    A.    Sub-prime.
5    Q.    Sub-prime markets?
6    A.    Yeah.  At least when I was there, that was the
7    focus.
8    Q.    When did you leave NETCO?
9    A.    I believe --
10    Q.    Before you answer that question, we've kind of
11    used these terms interchangeably.  We've been referring
12    to NETCO as the entity that was Equity Title Company of
13    America, and as I understood it, you were employed by
14    Equity Title Company of America and then NETCO?
15    A.    Yeah.  I believe the -- the accurate way to
16    put it would be was I was employed by Equity Title
17    Company of America, but I served as an officer with all
18    of the NETCO-related companies.
19    Q.    Okay.  When did you leave your employ with
20    Equity Title Company of America?
21    A.    I believe it was August of 2001.
22    Q.    What was your reason for leaving?
23    A.    New job.
24    Q.    And that new job was with?
25    A.    Commercial Land Title.

*Deposition of William Andrews*

[Sheet 3, Page 9]

1    Q.    And what did you do for Commercial Land Title?

2    A.    I was hired to start and run Commercial Land

3    Title as a commercial division affiliated with an

4    ongoing existing residential title operation.

5    Q.    Was your -- did you resign your employment?

6    A.    Yes.

7    Q.    Were you told to look for other work, or was

8    this purely your decision to leave?

9    A.    It was my decision.

10    Q.    What was the precipitating factor in choosing

11    to go to a new company?  What was the reason?

12    A.    I was offered a proposed bonus structure which

13    would result in equity ownership of the entity and would

14    allow me to venture back into the commercial environment

15    and no travel.

16    Q.    How long were you at Commercial Land Title?

17    A.    Roughly two years.

18    Q.    What was your reason for leaving?

19    A.    I started my own company.

20    Q.    Can you briefly summarize your educational

21    background?

22    A.    I have a political science degree from Purdue

23    University and a Juris Doctor from Indiana University.

24    Purdue was -- the Purdue degree was obtained in December

25    of '87, and the JD was obtained in May of '91.

[Page 10]

1    Q.    After graduating from law school at Indiana,

2    what did you do?

3    A.    Worked for a law firm in Chicago doing mostly

4    corporate transactional work.

5    Q.    What was the name of that law firm?

6    A.    Masuda, M-A-S-U-D-A, Funai, F-U-N-A-I, Eifert,

7    E-I-F-E-R-T, and Mitchell.

8    Q.    How long were you working there?

9    A.    Three years.

10    Q.    Then what did you do?

11    A.    I worked for another law firm, Fagel,

12    F-A-G-E-L, and Haber, H-A-B-E-R.

13    Q.    They pronounce it wrong, just so you know.

14    Fagel & Haber?

15    A.    Yes.

16    Q.    What did you do there?

17    A.    Again, mostly corporate transactional work,

18    some real estate, focus on some securities transactions.

19    Q.    How long were you there?

20    A.    Two years.

21    Q.    Then what did you do?

22    A.    Then I left to do work with two friends,

23    Michael Roberts and Kathryn McGivney at Roberts &

24    McGivney in an of counsel capacity doing commercial real

25    estate.

[Page 11]

1    Q.    How long did you do that?

2    A.    One year.

3    Q.    Then what did you do?

4    A.    I worked for NETCO.

5    Q.    When did you start with NETCO?

6    A.    November of --

7    MR. SHOEMAKER:  What's the question?

8    Q.    (By Mr. Haber)  When did you start at NETCO?

9    A.    November of 2001.  No, no, no.  November of

10    '97, I believe.  Is that right?  I think November of

11    '97.

12    Q.    In what capacity were you employed at NETCO?

13    A.    General counsel.

14    Q.    What were your job responsibilities?

15    A.    Responding to underwriting questions, managing

16    claims, dealing with contracts, leasing, legal

17    employment questions, licensing, all things legal.

18    Q.    Who did you report to?

19    A.    John Baumgart.

20    Q.    How did you meet John Baumgart?

21    A.    At an interview.

22    Q.    For the position?

23    A.    Yes.

24    Q.    When did you first meet Al Beamer?

25    A.    Within the first month that I worked for --

[Page 12]

1    no.  The first day I worked for NETCO.

2    Q.    What was, as you understand it, Al Beamer's

3    position at the company?

4    A.    Responsible for the computer system.

5    Q.    Do you know if he had a job title?

6    A.    I'm sure he did, and I don't recall what it

7    was.

8    Q.    Were you familiar in any way with Mr. Beamer's

9    relationship with Transcontinental Title Company?

10    A.    Vaguely.

11    Q.    Were you familiar with the prior

12    relationship -- were you familiar with Transcontinental

13    Title Company?

14    A.    When?  When I -- when I started or --

15    Q.    Well, I guess I assumed you didn't know

16    anything about them before you started.

17    A.    That's right.

18    Q.    After you started, did you then learn that

19    John Baumgart had a brother, Bill Baumgart, who owned

20    Transcontinental down in Florida?

21    A.    I did learn that.

22    Q.    And do you -- did you learn during your four

23    years of employment at NETCO that Al Beamer also worked

24    for TTC?

25    A.    Yes.

*Deposition of William Andrews*

[Sheet 4, Page 13]

```
 1      Q.   How did you learn that?
 2      A.   Al was -- would split his time between NETCO
 3  and various other companies, one of which I knew to be
 4  Transcontinental, as I understood it.
 5      Q.   During the four years that you were -- let me
 6  back up.  From November of 1997 to the time that Al
 7  Beamer resigned his employment with NETCO, were you
 8  aware of any particular problems between Al Beamer and
 9  John Baumgart?
10      A.   I would say no particular problems, no.
11      Q.   Did they get along?
12      A.   They seemed to.
13      Q.   Did you get along with Al?
14      A.   Yeah.
15      Q.   Did John Baumgart ever complain about Al
16  Beamer's performance?
17      A.   He complained about the computer system.
18      Q.   What did he complain about specifically as it
19  relates to the computer system?
20      A.   Reliability was not what he desired.  Towards
21  the end of Al's employment, there were several quarterly
22  meetings where the subject of switching from a DOS-based
23  to a Windows-based system came up, and I think -- well,
24  I know John complained that the timing on that was --
25  was slower than Al had suggested it was going to be.
```

[Page 14]

```
 1      Q.   Was John Baumgart an easy guy to work for?
 2           MR. SHOEMAKER:  I'm going to object as to the
 3  relevance.
 4           You can answer it if you have an opinion.
 5      A.   I -- I don't know what you mean by easy.
 6      Q.   (By Mr. Haber)  Was he a difficult guy to get
 7  along with?
 8      A.   To get along with, no.
 9      Q.   Was he a difficult guy to work for?
10      A.   I don't know.  If you understand where John is
11  coming from and what he expects and you're -- you accept
12  that that is the person you're working for, there should
13  be no surprises in working with John.  He's extremely
14  consistent.  He's demanding but very consistent.
15      Q.   Did you participate in any discussions with Al
16  Beamer before his resignation wherein he was attempting
17  to negotiate higher compensation?
18      A.   Yes.
19      Q.   Tell me what you recall of those
20  conversations.
21      A.   Al, I believe, gave us a proposal wherein he
22  would be compensated with a bonus structure, and most of
23  the conversations I -- or I think all of the
24  conversations I had with Al about the proposal related
25  to the legal matters and the employment agreement, not
```

[Page 15]

```
 1  the amount or the type of bonus.
 2      Q.   What types of legal matters did you discuss
 3  with him?
 4      A.   The -- I remember one in particular.  He
 5  wanted the non-compete not to apply if he was fired.
 6      Q.   Okay.
 7      A.   I believe there were some discussions relating
 8  to the licensing or the ownership or the continued use
 9  of the software.
10      Q.   His software?
11      A.   Well, the software.  I don't know that it was
12  his.
13      Q.   You don't know that?
14      A.   I don't know that.
15      Q.   When you refer to the software, you mean the
16  software that the company was using for title -- for the
17  title production software?
18      A.   The title production software.
19      Q.   Okay.  What other legal issues?
20      A.   I don't recall anything else other than he
21  wanted to discuss the scope of the section of the
22  non-compete.
23      Q.   What did he want to discuss about that?
24      A.   How it operated.  He just had questions about
25  what it meant.
```

[Page 16]

```
 1      Q.   Did you explain to him what you thought it
 2  meant?
 3      A.   Yes.
 4      Q.   And what did you explain to him it meant?
 5      A.   Well, the -- the various provisions mean
 6  different things.  There are -- do you want me to go
 7  through paragraph by paragraph?  I can do that, I
 8  suppose.
 9      Q.   Well, this is a document that's been marked as
10  Defendant's Exhibit C which was the most -- the last
11  agreement that we understand was in effect before he
12  resigned his employment, and paragraph 6 was the
13  non-competition provision.
14      A.   Okay.
15      Q.   What I'm really looking for -- and I
16  understand that there's a written document.  What I'm
17  really looking for is to the best of your recollection,
18  what is it you explained to Al Beamer it meant?
19      A.   I don't remember explaining anything other
20  than walking through the provisions with him.
21      Q.   Okay.  So you --
22      A.   I can walk through the provisions now --
23      Q.   Sure.
24      A.   -- as to what they mean, but in this -- I'm
25  not sure as to whether or not this is the draft we were
```

*Rankin Reporting & Legal Video, Inc.   (314) 231-2202  (800) 285-2115*

*Deposition of William Andrews*

1  working on.

2      Q.  Do you think there was some prior agreement?

3      A.  No.  I don't know -- I mean, we were talking

4  about a new contract for Al.  I don't know what that

5  was.

6      MR. SHOEMAKER:  If I may, are you referring

7  still to the meetings that led up to Al's

8  resignation --

9      MR. HABER:  Yeah.

10      MR. SHOEMAKER:  -- or are you talking about

11  meetings he had regarding this employment agreement?

12      MR. HABER:  I'm talking about meetings that

13  they had where he negotiated with Al leading up to his

14  resignation.

15      Q.  (By Mr. Haber)  Did you understand that that's

16  what I was talking about as well?

17      A.  Yes, and I'm not sure that we were using

18  his --

19      Q.  Let me just clarify so we're talking on the

20  same page.  It was my -- you indicated to me that you

21  spoke to Al regarding certain legal issues, one of which

22  was the non-compete, and I assumed that you spoke to him

23  regarding the non-compete that was in effect at that

24  time.  Is it your testimony that you were speaking to

25  him regarding a new non-compete?

1      A.  You gave me --

2      Q.  The January 1999 agreement.

3      A.  -- the January 1999 agreement?

4      Q.  Uh-huh.

5      A.  And I don't know whether or not this was the

6  actual -- I'm sure it wasn't the physical agreement we

7  were talking about, or it may -- well, because it ended

8  up not being signed, and this one is signed.

9      Q.  So there was a different agreement with a

10  different non-compete that was being discussed with Al

11  Beamer that didn't get signed?

12      A.  No.  There was a different agreement.  I would

13  expect it would have the exact same non-compete in it --

14      Q.  Okay.

15      A.  -- but I don't have that agreement in front of

16  me.

17      Q.  I think I understand what you're telling me.

18  When you started talking with Al, there were some

19  written drafts that went back and forth that included as

20  part of it a non-compete identical to the one that's

21  contained in this signed agreement, but it also had

22  other terms and conditions that the parties never agreed

23  on?

24      A.  I would expect that the agreement had the

25  exact same non-compete in it, but I don't have that

1  agreement in front of me.  This isn't the -- the exhibit

2  you put in front of me is not what we were talking

3  about.

4      Q.  What I'm trying to understand is that during

5  your discussions -- I'm assuming, and maybe I shouldn't.

6  Is it fair to say that your discussions with Al Beamer

7  were in relative close proximity to the time he resigned

8  his employment?

9      A.  As far as I recall, yeah.

10      Q.  Within a month or two, right?

11      A.  As far as I remember.  This is four years ago

12  plus.

13      Q.  Sure.  I understand.  I understand.  Those

14  discussions included some exchange of written proposal

15  and/or draft agreements?

16      A.  Like I said, it's my -- it's my recollection

17  that Al gave us a draft proposal.  Whether that was in

18  the form of an agreement or a bullet point, I can't

19  remember, but it was his proposal as to how he wanted to

20  be compensated, and I don't remember whether it had

21  other terms and provisions in it.

22      Q.  Would you have generated a new draft agreement

23  for Al to review based upon the discussions that you

24  were having at that period of time?

25      A.  I may have.

1      Q.  Okay.  And you're not -- but you're just not

2  sure?

3      A.  Right.

4      Q.  But it's your belief that there was some

5  written document that ultimately wasn't signed because

6  the parties couldn't agree on the other terms such as

7  compensation?

8      A.  I don't recall if there was one.  There's a

9  possibility we were -- there's a chance I was looking at

10  my standard employment agreement that's sitting in my

11  office talking with Al about the non-competition

12  provision.  I think what is fair to say is that -- maybe

13  we can move this along this way.  The non-competition

14  provision we would have been talking about would be

15  identical to the one in this exhibit.  I just wanted to

16  be clear that this exhibit you put in front of me is not

17  the one we were talking about.

18      Q.  That's fine.

19      A.  Okay.

20      Q.  And I'm going to come back to the

21  non-competition.  I just want to know if there were some

22  draft proposals that went back and forth, and you're not

23  sure is what you're saying?

24      A.  Right.

25      Q.  With respect to the provisions of the

*Deposition of William Andrews*

[Sheet 6, Page 21]

1   non-competition agreement, what would you have told Al
2   as you went through the terms of the non-competition?
3       MR. SHOEMAKER:  Again, can you reference a
4   time?  Are you talking about prior?
5       Q.   (By Mr. Haber)  I'm assuming that we're still
6   talking about that period of time just prior to Al's
7   resignation.
8       A.   Right.  Well, when it says for a period of six
9   months after the termination of employee's employment
10  with NETCO for any reason, Al wanted that to be marked
11  up to say unless he was fired, and I said that -- I
12  remember specifically that conversation where we --
13  where we said that can't be.
14      Q.   I'm not changing it?
15      A.   We can't change that because you can always
16  get yourself fired, put yourself -- create some crazy
17  dynamics.  The first provision is very simple.  The
18  employee cannot sell to, contact, or solicit with NETCO
19  customers.
20      Q.   For a period of six months?
21      A.   For a period -- all of this is -- each
22  provision is prefaced by six months.
23      Q.   So each lettered subsection is you shouldn't
24  do this for six months?
25      A.   Right.

[Page 22]

1       Q.   You can't do this for six months?
2       A.   Right.
3       Q.   Okay.
4       A.   You can't provide services to a new or
5   existing company -- I'm sorry -- a competitor of NETCO,
6   and I'm paraphrasing, if those services involve the
7   sale, solicitation, or dealings with NETCO customers.
8       Q.   For a period of six months?
9       A.   For a period of six months.  You can't
10  establish a business as a competitor with NETCO if the
11  business involves the sale, solicitation, or dealings
12  with NETCO customers.
13      Q.   For a period of six months?
14      A.   For a period of six months.  You can't hire
15  employees.
16      Q.   Of NETCO?
17      A.   Of NETCO.
18      Q.   For a period of six months?
19      A.   To engage in any competing business for a
20  period of six months from the termination date.
21      Q.   Okay.  In sum and substance realizing that
22  that was four years ago, that's what you would have told
23  Al Beamer?
24      A.   Yeah.  I remember we walked through that point
25  by point.

[Page 23]

1       Q.   Where was the breakdown in the negotiations as
2   you recall it?
3       A.   Money.
4       Q.   What was Al asking for, if you recall?
5       A.   I don't recall it was any specific amount of
6   money.  I just recall that the bonus structure was not
7   acceptable to John.
8       Q.   Okay.  At the time of those negotiations, what
9   was your understanding of Mr. Beamer's employment at
10  TTC?  Let me be more specific.  Were you aware as to how
11  he was being compensated at TTC?
12      A.   No.
13      Q.   Were you aware of the terms of his employment
14  at TTC?
15      A.   No.
16      Q.   Had you spoken to Bill Baumgart at the time of
17  those negotiations regarding anything relating to Al
18  Beamer's employment at TTC?
19      A.   No.
20      Q.   Had you at that time ever spoken to a
21  gentleman by the name of Bill Curphey who represents
22  TTC?
23      A.   Yes.
24      Q.   Okay.  And did any of those discussions
25  involve Al Beamer?

[Page 24]

1       A.   No.
2       Q.   How many times do you think prior to the
3   negotiations with Al Beamer did you speak with
4   Mr. Curphey?
5       A.   Once or twice.
6       Q.   And what was the subject matter of those
7   discussions?
8       A.   John and Bill were considering doing some
9   business together which would have required some legal
10  documentation, and Bill and I discussed exchanging some
11  information and preparing the proposed documents if it
12  went down that road.
13      Q.   And did it ever go down that road?
14      A.   No.
15      Q.   Was that -- was that -- did those discussions
16  involve a proposed purchase of the two companies by a
17  California title agency?
18      A.   No.
19      Q.   Do you recall a situation where a California
20  title company was considering making an offer or made an
21  offer or discussed purchasing NETCO and TTC?
22      A.   No.
23      Q.   When Mr. Beamer resigned his employment, what
24  was Mr. Baumgart's reaction?
25      MR. SHOEMAKER:  I think it's fairly obvious.

*Deposition of William Andrews*

[Sheet 7, Page 25]

1  but you're obviously speaking about John Baumgart,
2  correct?
3          MR. HABER:  Yes.  It is fairly obvious.
4          MR. DIGNAM:  I was confused.
5          Q.  (By Mr. Haber)  I did mean John Baumgart so
6  that we're absolutely clear.  What was his reaction?
7          A.  He was very sad and very concerned about the
8  computer department.
9          Q.  What was he concerned about with respect to
10 the computer department?
11         A.  He was concerned about the computers
12 continuing to work, and if they didn't, how we were
13 going to get them to work.
14         Q.  When did you first learn that Antonio Rivera
15 had formed a company to provide -- to provide title
16 insurance in the Cincinnati area?
17         A.  I don't recall.
18         Q.  How did you learn about that?
19         A.  We got a copy of the articles of organization
20 or the articles of incorporation, I believe, of National
21 Real Estate.
22         Q.  Who gave those to you?
23         A.  I don't recall.
24         Q.  After you got the articles of incorporation
25 from National Real Estate, what did you do?

[Page 26]

1          A.  Lots of things.
2          Q.  Start from the beginning.
3          A.  Well, I don't recall the whole process,
4  whether or not I got them from John, whether an employee
5  gave them to me, where I got them.  I can't remember how
6  that actually came to be, but I'm sure the first thing I
7  did was talk to John about what this meant.
8          Q.  Okay.  After speaking with John regarding what
9  this meant, was there a course of action that you then
10 undertook?
11         A.  Yes.  I believe we wrote a letter to
12 Mr. Rivera reiterating his obligations under his
13 employment contract.
14         Q.  How long after receiving the articles of
15 incorporation for National Real Estate did you learn
16 that Al Beamer was a shareholder?
17         A.  I don't know the dates, but it was during
18 Antonio Rivera's deposition.
19         Q.  Prior to Antonio Rivera's deposition, did you
20 suspect that Al Beamer was a shareholder?
21         A.  I knew it was possible.
22         Q.  How did you know it was possible?
23         A.  Because Tony would need a computer system, and
24 Al would be one of the first people Tony would talk to
25 if that was the way it was going to go.  I knew that Al

[Page 27]

1  had a relationship with Tony and --
2          Q.  You mean they were friends?
3          A.  Yeah.  They appeared to be friends, and
4  employees at NETCO had told us that -- employees at
5  NETCO's office in Cincinnati had told us that Al was
6  calling Tony throughout the spring and summer.
7          Q.  Which employees?
8          A.  I'm trying to remember names.  I don't know
9  their names.
10         Q.  Would they have told you personally?
11         A.  Yes.
12         Q.  Okay.  As part of your investigation into
13 these issues?
14         A.  Right.
15         Q.  Do you know why Tony Rivera left NETCO?
16         A.  No.
17         Q.  Do you know when he left?
18         A.  Sometime in August of '99.  Is that right?
19         Q.  Were you at Antonio Rivera's deposition?
20         A.  Yes.
21         Q.  What did you do with the information that Al
22 Beamer was a shareholder of National?
23         A.  That information along with all other
24 important information obtained from the deposition I
25 called John and reported to him.

[Page 28]

1          Q.  What was his reaction?
2          MR. SHOEMAKER:  I'm going to object for the
3  record along the lines of what we talked about
4  yesterday.
5          MR. HABER:  I accept that.
6          MR. SHOEMAKER:  Some of those responses are
7  obviously attorney-client privileged.  The extent I
8  even allow him to answer any of those will be on the
9  basis that it would be for the limited purpose of this
10 deposition without waiving --
11         MR. HABER:  Agreed.
12         MR. SHOEMAKER:  -- any objection to that
13 overall, and I will probably make some specific
14 objections to it as we go through, but you may answer.
15         MR. HABER:  That's agreed, and I'm trying to
16 skirt around actual substantive instructions and
17 counseling and legal advice as opposed to -- which is
18 why I couched that in what was his reaction to that.
19 I'll accept on a question by question basis you may or
20 may not instruct him to answer --
21         MR. SHOEMAKER:  Okay.
22         MR. HABER:  -- and you have the continued
23 privilege.
24         MR. SHOEMAKER:  That's fine.  You may answer.
25         I believe the question was what was John's

*Deposition of William Andrews*

[Sheet 8, Page 29]

1    reaction, is that correct?

2        Q.    (By Mr. Haber)  What was his reaction when you

3    communicated that Al Beamer was a shareholder?

4        A.    I don't recall.

5        Q.    What was your understanding beyond Al Beamer

6    being a shareholder at National based upon -- well, let

7    me back up.  You sat in on Tony Rivera's deposition.

8    You sat in on a lot of depositions, I assume, correct?

9        A.    Correct.

10       Q.    As a representative of NETCO?

11       A.    Yes.

12       Q.    As the corporate representative, correct?

13       A.    I don't know.

14       Q.    Well, you didn't enter an appearance as a

15   lawyer in the case in Cincinnati, did you?

16       A.    I don't think so.

17       Q.    Okay.  As you sat through these depositions,

18   what was your understanding of Al Beamer's role with

19   National beyond being a shareholder?

20       A.    He was one of the principals deciding the

21   direction of the company.

22       Q.    Anything else?

23       A.    I believe he supplied the computer system.

24       Q.    Anything else?

25       A.    He was part of the management team.

[Page 30]

1        Q.    Anything else?

2        A.    No.

3        Q.    During the course of your sitting in on these

4    depositions and participating in that litigation in

5    Cincinnati, did you hear evidence that Al Beamer had

6    contacted any customers of NETCO?

7        A.    I don't recall hearing any such evidence.

8        Q.    During your involvement in that litigation,

9    sitting in on depositions, sitting in on hearings, did

10   you uncover any evidence that Al Beamer had utilized

11   business strategies or methodologies of NETCO for his

12   own benefit?

13            MR. SHOEMAKER:  Specifically for his own

14   benefit, or are you asking for the benefit of National?

15            MR. HABER:  Either one.

16       A.    I can't recall if I heard any -- any evidence

17   at the depositions to that effect.

18       Q.    (By Mr. Haber)  Did you hear any evidence that

19   Al Beamer stole lists of actual or potential customers

20   or databases that reflected those customers?

21       A.    I don't recall hearing any testimony to that

22   effect at the depositions.

23       Q.    Did you uncover any evidence of that?

24       A.    Not that I'm aware of or not that I recall.

25       Q.    And all I'm asking for right now is what you

[Page 31]

1    recall and what you're aware of.  I understand there was

2    a whole -- there's five bankers' boxes or more full of

3    documents somewhere that may or may not reflect

4    something that's different from your memory.  I'm just

5    asking you the best you can remember based on your

6    supervision of this litigation, is there any evidence

7    that you're aware of that was uncovered that Al Beamer

8    used his knowledge as to the identity of key industry

9    insurance underwriters for the benefit of National or

10   himself?

11       A.    I seem to recollect that Al had a relationship

12   with a Commonwealth agency representative, but --

13       Q.    Well, you understood that that relationship

14   with Commonwealth predated NETCO, right, or did you not

15   understand that?

16       A.    I guess I didn't think about it then, but it

17   makes sense that that would have been the case.

18       Q.    Are you aware of Al Beamer using either for

19   his own personal benefit or for the benefit of National

20   any proprietary information including product, sales,

21   service, finances, marketing, and merchandizing

22   information?  Let me slow that down.  Are you aware of

23   Al Beamer through evidence uncovered in this -- in that

24   other litigation utilized any proprietary information

25   regarding products of NETCO, the sales of NETCO, the

[Page 32]

1    services of NETCO, or the finances of NETCO or their

2    marketing or merchandizing?

3        A.    I don't recall any such evidence being

4    uncovered by me, or I don't recall seeing any specific

5    evidence during that litigation.

6        Q.    You were present in Cincinnati on the day that

7    Al Beamer was deposed?

8        A.    Yes.

9        Q.    Did you speak with Al Beamer privately during

10   that day at the law offices of Frost & Jacobs?

11       A.    A couple times.

12       Q.    What can you recall from those conversations

13   when you spoke to him privately, and by privately I mean

14   just the two of you without his counsel present.

15       A.    Yeah.  I think the first conversation occurred

16   in the waiting area, the foyer, and that got a little

17   heated because Al told me that his opinion was that this

18   was a nuisance case and that John's just looking to

19   settle, and I told him that it's my opinion the case is

20   valid substantively and that viewing it as a nuisance

21   suit is a mistake.

22       Q.    What else was discussed during this first

23   conversation?

24       A.    I don't think anything else.  I don't recall

25   anything else.

*Deposition of William Andrews*

[Sheet 9, Page 33]

1  Q.  How did it end?  You said it got a little
2  heated.  How did it end?
3  A.  We just -- it was time to go into the
4  deposition, I believe.
5  Q.  So then you went into Al Beamer's deposition?
6  A.  Yes.
7  Q.  You sat through the entire deposition?
8  A.  Uh-huh.
9  Q.  Yes?
10  A.  I believe so.
11  Q.  You need to answer verbally.  When was the
12  next time, then, that you spoke with him privately?
13  A.  I believe during the deposition we took a
14  break.
15  Q.  And what happened?
16  A.  I told him we should try to settle this case.
17  Q.  What else did you tell him?
18  A.  That conversation was all about trying to
19  settle the case.  That was it.
20  Q.  How were you proposing settling the case?
21  A.  At that point it was more of a general
22  discussion about whether or not his side, National,
23  would be interested in resolving the case, and it was my
24  feeling that the best result would have been to settle
25  it early because long-time friendships were being

[Page 34]

1  destroyed, and we were spending an awful lot of money.
2  Q.  How long did this conversation last?
3  A.  I don't know.  Ten minutes; somewhere about
4  there, I would guess.  It was four years ago.  It was
5  relatively short.
6  Q.  Was one of the demands for resolution of this
7  that National disband?
8  A.  No.  There were no demands.  It was all
9  about -- the conversation was a general conversation
10  about let's get people in the mindset of getting this
11  settled because it makes no sense to litigate.
12  Q.  Did you ever discuss with Mr. Beamer during
13  either of these private conversations at the time of his
14  deposition his continuing employment at TTC?
15  A.  No.
16  Q.  Did you tell him that John Baumgart would talk
17  to his brother about terminating him if he didn't get
18  rid of National?
19  A.  No.
20  Q.  Did you tell him that NETCO would exploit the
21  familial relationship between John and Bill Baumgart and
22  arrange for his termination?
23  A.  No.
24  Q.  At all times while you were at the offices of
25  Frost & Jacobs on December 2nd, were you acting as a

[Page 35]

1  representative of NETCO and John Baumgart for purposes
2  of that litigation?
3  A.  Was December 2nd the date of the deposition?
4  Q.  Yeah.
5  A.  Yes.
6  Q.  In your discussions with Al Beamer in trying
7  to resolve or get the parties thinking about resolving
8  it, were you acting in your capacity as general counsel
9  and as a representative of NETCO?
10  A.  Yes.
11  Q.  Were you authorized to have those discussions
12  by Mr. Baumgart?
13  A.  Yes.
14  Q.  And by Mr. Baumgart I meant, of course, John
15  Baumgart.
16  A.  John Baumgart.
17  Q.  How did the second private conversation with
18  Al Beamer conclude?
19  A.  I don't recall how the conversation concluded.
20  Q.  Was Mr. Beamer represented by counsel at that
21  deposition?
22  A.  Yes.
23  Q.  How is it that you ended up speaking with him
24  privately without his attorney present?
25  A.  I asked if we could speak together privately.

[Page 36]

1  Q.  Were there any other private conversations
2  that you had with Mr. Beamer on the day of his
3  deposition?
4  A.  Not that I recall.
5  Q.  When is the next time you spoke with
6  Mr. Beamer?
7  A.  I don't recall.
8  Q.  Do you recall what the substance of that
9  conversation was?
10  A.  I don't recall what the next conversation with
11  Al Beamer was.
12  Q.  Do you recall ever speaking with Al Beamer
13  privately again, either by telephone or in person?
14  A.  Yes.  By telephone.
15  Q.  Okay.  Tell me what you recall about that
16  telephone conversation.
17  A.  Al asked me if he was still working for Bill
18  because Bill would not return his phone calls.
19  Q.  So Al called you?
20  A.  Al called me, I believe.  Yeah.  I wouldn't
21  have called Al.
22  Q.  Where did he call?
23  A.  I believe at Frost & Jacobs.
24  Q.  This would have been after the deposition?
25  A.  Yes.

*Deposition of William Andrews*

[Sheet 10, Page 37]

1     Q.   You did not call Al Beamer?

2     A.   I don't believe I did.

3     Q.   And what did you tell him when he called you

4 and asked if he still worked for Bill Baumgart?

5     A.   That he needed to talk with Bill Curphey.

6     Q.   Why did you tell him that?

7     A.   Because he needed to talk with Bill Curphey.

8     Q.   Well, how did you know he needed to speak with

9 Bill Curphey?

10    A.   Because I didn't know what he wanted to know.

11    Q.   Had you spoken to Bill Curphey during that

12 period of time?

13    A.   Yes.

14    Q.   When did you speak with Bill Curphey as it

15 relates to your conversations on the day of Beamer's

16 deposition and the telephone call?

17    A.   Sometime in between.

18    Q.   Tell me about your conversations with Bill

19 Curphey.

20    A.   Bill Curphey called me to learn about the

21 lawsuit in Cincinnati.

22    Q.   Where did he call you?

23    A.   I don't recall.

24    Q.   Was it back in Chicago, or was it in

25 Cincinnati?

[Page 38]

1     A.   I don't recall.

2     Q.   What did you tell him about the lawsuit?

3     A.   I told him that it was ongoing, it involved Al

4 Beamer, a former employee of his, Damian Sichek, and

5 Tony Rivera.

6     Q.   A former employee of whose?

7     A.   Bill Baumgart's.

8     Q.   So when you meant his, you didn't mean Bill

9 Curphey?

10    A.   Right. I'm sorry. Bill Baumgart's employee.

11    Q.   Okay.

12    A.   I gave him the procedural status of the case

13 at that time.

14    Q.   Did Mr. Curphey tell you anything during that

15 conversation regarding Mr. Beamer's employment at TTC?

16    A.   I don't think he addressed Al's employment.

17    Q.   Did you ever speak with Bill Baumgart in early

18 December 1999?

19    A.  I was on a conference call.

20    Q.   Who was a participant of that conference call?

21    A.   John Baumgart, David Skidmore, Bill Baumgart.

22    Q.   Was Curphey on that conference call?

23    A.   I don't recall.

24    Q.   What was discussed during that conference

25 call? First of all, was it after Al's deposition that

[Page 39]

1 the conference call took place?

2     A.   I believe so.

3     Q.   What was the purpose of that conference call?

4     A.   I don't know if the conference call had a

5 purpose. It may have been that we were all in the room

6 together when Bill and John were talking, so we were put

7 on speaker phone.

8     Q.   Was John in Cincinnati at that time?

9     A.   Yes.

10    Q.   Was this around the time that John was

11 deposed?

12    A.   I don't know.

13    Q.   What was discussed with Bill Baumgart? I'm

14 assuming that you -- let me back up. I'm assuming that

15 John Baumgart, yourself, and David Skidmore were all in

16 the same room --

17    A.   That's right.

18    Q.   -- and Bill Baumgart was in Florida?

19    A.   Right.

20    Q.   And there was -- presumably you were at Frost

21 & Jacobs?

22    A.   Yes.

23    Q.   Who called who?

24    A.   I don't remember.

25    Q.   What was discussed?

[Page 40]

1     A.   The existence of National and the identity of

2 its principals.

3     Q.   What do you recall Bill Baumgart saying?

4     A.   I don't recall any specific language, any

5 words, but I remember he was upset that Al was involved.

6     Q.   Did he say why?

7     A.   He was -- it was my understanding that he was

8 told by Al that he wasn't involved.

9     Q.   Okay. And that understanding came from that

10 conversation?

11    A.   Yes.

12    Q.   Did he say anything about the fact that he was

13 upset because Al was competing with him in Ohio?

14    A.   Well, that was the point, I believe, that he

15 asked Al if he was competing against him in Ohio, and he

16 was told no.

17    Q.   Do you know what business Bill Baumgart had in

18 Ohio in December of 1999?

19    A.   No.

20    Q.   What else do you recall from that

21 conversation?

22    A.   I believe Bill was concerned about Damian

23 Sichek's involvement.

24    Q.   Why?

25    A.   Because Damian was a former employee and had

*Deposition of William Andrews*

1    relationships with Bill's current employees.

2        Q.    Was Damian subject to a non-compete, to your

3    knowledge?

4        A.    I don't know.

5        Q.    Where was Damian -- when Damian worked for

6    TTC, do you know where he worked from?

7        A.    No.

8        Q.    What else was discussed that you recall during

9    this conference call?

10       A.    That's all I remember from it.

11       Q.    Is it fair to say this conference call

12   occurred sometime between Al Beamer's deposition and Al

13   Beamer's termination from TTC?

14       A.    It was definitely between Tony Rivera's

15   deposition and I would assume Al Beamer's termination,

16   but I'm not sure.  I don't know when Al left TTC.

17       Q.    Was it before or after your conversation with

18   Bill Curphey?

19       A.    I don't remember.

20       Q.    Any other conversations that you were involved

21   in with Bill Baumgart in December of 1999 prior to

22   Mr. Beamer being terminated from TTC?

23       A.    No.

24       Q.    Any conversations that you had with

25   Mr. Curphey other than the one you've already described

1    prior to Mr. Beamer being terminated?

2        A.    Yeah.  We talked one more time, I think.  We

3    talked again.

4        Q.    And what was the subject of that conversation?

5        A.    He was looking for another update to see what

6    was going on in Ohio.  I think the reason he was looking

7    for -- well, he was obviously interested on a number of

8    levels, but what he wanted, I believe, was some

9    background information about the Ohio litigation because

10   he said that Al was starting to kick up his heels.  I'm

11   not sure whether he used those words or not, but Al was

12   getting -- kicking up his heels is the best way I can

13   put it -- in Florida.

14       Q.    This would have been after Al was terminated?

15       A.    Yes, that I recall.

16       Q.    So as you recall, there was one conversation

17   with Bill Curphey prior to his termination, and then you

18   spoke with him again after Al Beamer's termination?

19       A.    Right.

20       Q.    Other than that conversation that you've just

21   described where Al was kicking up his heels, did you

22   have any other conversations with Bill Curphey regarding

23   Al Beamer's employment?

24       A.    No.

25       Q.    At some point in December of 1999 a settlement

1    agreement which is marked as Plaintiff's Exhibit I was

2    circulated to the parties in the Rivera matter.  Did you

3    ever see that settlement agreement?

4        A.    Yes.

5        Q.    Paragraph 24 on page 13, the last sentence,

6    includes a provision that Al Beamer will covenant not to

7    sue TTC.

8        A.    What paragraph?

9        Q.    Paragraph 24.

10       A.    Are we looking at the same one?

11       Q.    The last sentence.  I'm doing it from memory,

12   but I think I'm right.

13       A.    You're right.

14       MR. SHOEMAKER:  You are.

15       A.    You're right.  It just didn't look like it

16   belonged there.

17       Q.    (By Mr. Haber)  Well, that's an interesting

18   point.  That sentence in there that Al -- that the whole

19   agreement is conditioned upon Al Beamer covenant --

20   covenanting not to sue TTC, why is that language in

21   there, if you know?

22       A.    Because we wanted the agreement conditioned

23   upon his covenant not to sue TTC.

24       Q.    Who is we?

25       A.    I would say the team, the plaintiff team which

1    included me, David Skidmore, Pat Walsh, Katie Morgan --

2        Q.    Why would you --

3        A.    -- John Baumgart.

4        Q.    Why did you care whether he sued TTC down in

5    Florida arising out of the termination of his

6    employment?

7        A.    As I recall, this arose when I was talking

8    with Bill Curphey the second time, and I don't recall

9    who brought it up, whether it was me or Bill Curphey or

10   Pat Walsh or David Skidmore, but it was what if we could

11   just wrap everything up and throw it in; let's see what

12   happens.

13       Q.    Did Curphey participate in a conference call

14   with David Skidmore and yourself and Pat Walsh?

15       A.    Not that I recall.

16       Q.    Are you aware of whether Curphey ever spoke to

17   anybody other than yourself on the plaintiff's team?

18       A.    No.

19       Q.    Is it your recollection that Pat Curphey asked

20   for that to be included or you suggested that it would

21   be included?

22       MR. BEAMER:  Bill Curphey.

23       Q.    (By Mr. Haber)  I'm sorry.  Bill Curphey.

24       A.    I don't recall.

25       Q.    Did you ever tell Al Beamer that John Baumgart

*Deposition of William Andrews*

[Sheet 12, Page 45]

1    had negotiated a deal with Bill to terminate his
2    employment from TTC?
3        A.    No.
4        Q.    Did that ever happen, that John negotiated a
5    deal with Bill to terminate Al Beamer?
6        A.    Not that I'm aware of.
7        Q.    Did you ever tell Al Beamer that John Baumgart
8    would spend any amount of money necessary to get him?
9        A.    No.
10       Q.    Did you ever tell him something to that effect
11   at least with respect to spending any amount of money?
12       A.    No.
13       Q.    Did you ever advise anybody that the language
14   in the agreement regarding TTC was a deal-breaker if it
15   was not included?
16       A.    No.
17       Q.    Do you know whether any attorney on behalf of
18   NETCO would have advised with your approval or someone
19   else's approval attorneys for National that it was a
20   deal-breaker if it was not included?
21       A.    No.
22       Q.    What have you reviewed in preparation for your
23   deposition here today?
24       A.    The complaint that you filed against me.
25       Q.    Anything else?

[Page 46]

1        A.    Can I ask Greg something real quick?
2        Q.    Ordinarily, no, but I don't stand on ceremony.
3    I'm more than happy. I don't care if you ask.
4        A.    Was that an amended complaint? No, it was a
5    counterclaim.
6        Q.    There was a complaint and a counterclaim if
7    that helps. There's no amended complaint.
8        A.    There's no amended complaint.
9        Q.    So you read the counterclaim?
10       A.    Yes.
11       Q.    Other than the complaint and the counterclaim,
12   did you review anything else?
13       A.    The order from the court in Cincinnati for the
14   permanent injunction or the preliminary injunction.
15       Q.    Which one was it, do you know?
16       A.    I don't know if there were -- if there was a
17   permanent, so maybe a preliminary. I think it was the
18   order upon NETCO's motion for a preliminary injunction,
19   but the judge drafted it as a permanent injunction. One
20   of the orders.
21       Q.    Okay. At all times in your dealings with Al
22   Beamer after his employment ended and your deals with
23   Bill Baumgart, your dealings with Bill Curphey, were you
24   acting as a representative of and in your official
25   capacity for NETCO?

[Page 47]

1        A.    After his employment?
2        Q.    After Al's employment terminated in April of
3    '99, after he resigned. All of your subsequent dealings
4    with Al Beamer, with Bill Curphey, with Bill Baumgart as
5    it relates to Al Beamer was in your official capacity as
6    a representative and authorized agent of NETCO?
7        A.    It was in my capacity as an officer of NETCO.
8        Q.    Did you authorize the motion to show cause
9    filed against all of the defendants and filed against Al
10   Beamer, and we got in a debate at the prior deposition,
11   but there was a motion to show cause why individuals
12   should be held in contempt. Included within that motion
13   to show cause was Al Beamer. Did you authorize the
14   filing of that civil -- of that motion to show cause?
15       A.    I don't remember authorizing it --
16       Q.    Okay.
17       A.    -- but I certainly would have.
18       Q.    Even as it relates to Al Beamer?
19       A.    Yes.
20       Q.    Why did you think Al Beamer was in contempt of
21   a court order?
22       A.    Because he was the principal of a company that
23   was violating the order, and nothing was being done
24   about it.
25       Q.    What was his capacity -- when you say he was a

[Page 48]

1    principal, I mean, we all understand there are some
2    legal terms of art. What is your understanding of his
3    title with National?
4        A.    I don't know what his title was.
5        Q.    And when you say he was a principal, what is
6    the basis of that, because he was a shareholder?
7        A.    Well, the -- it was my understanding that
8    there were never shares issued in National --
9        Q.    Okay.
10       A.    -- so I don't know whether he was a
11   shareholder or not. He was one of the principals
12   meaning one of the management team that hold -- held
13   some sort of ownership interest, I would suppose.
14       Q.    What did Al Beamer directly or indirectly
15   authorize or participate in that was in contempt of the
16   order, to your knowledge?
17       A.    The continued solicitation of NETCO customers.
18       Q.    And you contend that that was done with the
19   knowledge of Al Beamer?
20       A.    Yes.
21       Q.    Okay. What NETCO customers were solicited
22   with the knowledge of Al Beamer?
23       A.    Off the top of my head from four years ago, I
24   will say New Century. That's not fair. I can't do this
25   off the top of my head. I don't -- I don't recall.

*Deposition of William Andrews*

[Sheet 13, Page 49]

1    Q.    That's fine.  Is it your testimony that you
2  would have authorized -- I know you said you don't
3  remember authorizing it, but you certainly would have
4  authorized a motion to show cause filed against both the
5  company, National, and the individuals.  The basis for
6  your testimony that you would have authorized it is that
7  you feel that any shareholder or principal, as you've
8  defined it, of that corporation should be held liable if
9  they continued to solicit?
10    A.    I'm going to have to go off the record for a
11  second here.
12    Q.    See if you can answer my question first, and
13  then I'll let you go off the record and clarify any way
14  you want to after that.
15    A.    I don't know if I can answer your question
16  without violating the attorney-client privilege.
17    Q.    Okay.  Then please go ahead and consult with
18  your counsel.
19    A.    Thank you.
20        MR. HABER:  Do you want to do it outside?
21        MR. SHOEMAKER:  This is fine.
22        (There was a discussion off the record.)
23        THE WITNESS:  Ask the question again, please.
24        MR. HABER:  Read it back.
25        (The preceding question was read back as

[Page 50]

1  requested.)
2    A.    It was my understanding that the principals of
3  a closely held entity such as this could be held
4  responsible for failing to have its company comply with
5  the order, and that understanding was based upon
6  conversations with counsel.
7    Q.    The advice of counsel?
8    A.    That I cannot really go into the specifics of.
9    Q.    That's fine.
10        MR. HABER:  Why don't you give me a second
11  with Mr. Beamer, and we may be done.
12        MR. SHOEMAKER:  Sure.
13        (A short break was taken.)
14    Q.    (By Mr. Haber)  Mr. Andrews, when you left
15  NETCO, were you subject to any form of non-competition
16  agreement?
17    A.    Yes.
18    Q.    Is it similar in language to the one that is
19  referenced in Defendant's Exhibit C?
20    A.    Yes.
21    Q.    You then went to work for another company in
22  the title insurance field?
23    A.    Yes.
24    Q.    Was any effort made by NETCO to prohibit you
25  from doing that for a period of six months?

[Page 51]

1    A.    No, because it was -- my involvement was
2  limited solely to the commercial business.
3    Q.    So the market that you were focusing on was
4  the distinguishing factor?
5    A.    I would assume so.
6    Q.    Did you speak with John Baumgart before you
7  left regarding that?
8    A.    Yes.
9    Q.    All right.  So it's more than just an
10  assumption.  He told you that as long as you were
11  staying in the commercial area, I don't have a problem
12  with it?
13    A.    Yes.
14    Q.    And then you were there for two years, so your
15  six months had expired at that point, and you were free
16  to go out and enter whatever market you so choose with
17  your new business, correct?
18    A.    Under the terms of that provision, that
19  particular -- paragraph 6, if that's what you're talking
20  about.
21    Q.    Well, are you under the impression that you're
22  under -- that any other restrictive covenant prevents
23  you from entering the title insurance agency market in
24  any area?
25    A.    No, but I think if I started to compete with

[Page 52]

1  the same formula, the same methods, I would be looked at
2  pretty closely to see whether or not I was using the
3  NETCO information.
4    Q.    What formula are you talking about?  What's
5  the NETCO formula?
6    A.    It's like the Coke formula.  It's very closely
7  guarded.
8    Q.    Right.  Tell me what that is, and we'll
9  consider this confidential for purposes of protecting
10  their formula.
11    A.    Well, there are -- there are ways that NETCO
12  does business in order to turn around searches, turn
13  around title commitments within a certain amount of
14  time, the way they approach their customers, try to
15  leverage business out of their customers, the national
16  customers down into the local markets.  I think if I got
17  some big financial backing after me, behind me, and went
18  after John in a way that sort of mimicked NETCO, they
19  would very seriously consider looking at me to see
20  whether or not I was using their processes and methods.
21  So no, I don't feel like I'm out there free as the wind.
22    Q.    Well, when you use the term formulas and
23  methods, I mean, are those basically the same thing?
24  Are you talking about the way they do business?
25    A.    Yes.

*Deposition of William Andrews*

[Sheet 16, Page 61]

1  the structure -- and I don't want to get into the
2  compensation at the moment -- about the structure of
3  this business?
4          MR. SHOEMAKER:  I'm going to object that it's
5  asked and answered, and part of the answer is the
6  financial portions of it.
7          MR. HABER:  I'll be happy to include it,
8  but --
9          MR. SHOEMAKER:  Subject to that, if you have
10  anything else besides the general structure that you've
11  already answered to, you are free to -- to ask it.
12      A.    I think the -- the autonomy and the types of
13  decisions and the levels of decisions allocated to the
14  different management levels is different from every --
15  the other places I have -- I am familiar with.
16      Q.    (By Mr. Haber)  Okay.  Were you at regular
17  management meetings?
18      A.    Yes.
19      Q.    And at those management meetings were you
20  privy to all of the financial information of the
21  company?
22      A.    I don't know.  I believe so.  We were given a
23  lot of financial information.  Whether that was all that
24  was available, I don't know.
25      Q.    At these management meetings were you made --

[Page 62]

1  were you personally made privy to business strategies
2  and methodologies for servicing the marketplace?
3      A.    Yes.
4      Q.    And those business strategies, what did they
5  entail?
6      A.    They entailed discussions of where the overall
7  marketplace was going, what the market leaders on the
8  customer side were planning, and how NETCO would respond
9  to that, the financial resources to respond to that, the
10  best way to structure the relationship with the
11  underwriters to respond to that, and how to -- how to
12  procedurally get the company organized to respond to
13  those changes.
14      Q.    Is the title insurance market relatively fluid
15  or in flux; there's changes, regulatory changes,
16  business changes, interest rate changes?
17      A.    All of those things change.
18      Q.    Business strategies that would have been
19  relevant in 1999 may not be relevant today in 2003?
20      A.    It's possible.
21          MR. HABER:  Okay.  You have the right to
22  review the transcript if it's typed up or you can waive
23  that right.  My guess is Greg's going to tell you to
24  waive.
25          MR. SHOEMAKER:  No.  We'll read.  That's

[Page 63]

1  fine.
2          MR. HABER:  That's what I meant.
3          MR. SHOEMAKER:  We'll read it, but you can
4  send it to me.

[Page 64]

1                    C E R T I F I C A T I O N

2

3          I, Traci Butz, Certified Shorthand Reporter within and
4      for the State of Missouri, DO HEREBY CERTIFY that
5      pursuant to notice/agreement between the parties, the
6      aforementioned witness came before me at the time and
7      place hereinbefore mentioned, and having been duly sworn
8      to tell the whole truth of his knowledge touching upon
9      the matter in controversy aforesaid; that he was
10      examined on that day, and his examination was taken in
11      shorthand and later reduced to printing; that signature
12      by the witness is not waived and said deposition is
13      herewith forwarded to the taking attorney for filing
14      with the Court.
15          IN WITNESS WHEREOF, I have hereunto subscribed my name
16      this 10th day of November, 2003.

17

18

19

20                              _____
                                Traci Butz
21                              Certified Shorthand Reporter

22

23

24

25

# DEFENDANTS' ATTACHMENT 5

1                 UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OHIO
2                      WESTERN DIVISION
3                 CASE NO. C-I-02-013
4
AL BEAMER, et al,
5
        Plaintiffs,
6
  vs.
7
NETCO, INC., et al,
8
        Defendants.
9       ----------------------------------/
10
11
12
13               DEPOSITION OF FRANK SKRYD
14                      November 20, 2003
            10:57 a.m. to 11:24 a.m.
15
          Transcontinental Title Company
16             2605 Enterprise Road, Suite 150
          Clearwater, Florida   33759
17
18       ----------------------------------------
19
20
21
22      REPORTED BY:
AUDREY LANDRY
23      Notary Public
State of Florida at Large
24      Esquire Deposition Services - Tampa, Florida
813-221-2535 (800-838-2814)
25      Job No.:  N586079C

Defendants'
Attachment
5

Page 2

1   APPEARANCES:
2
3       RICHARD C. HABER, ESQUIRE
    Reminger & Reminger
4       1400 Midland Building
    101 Prospect Avenue West
5       Cleveland, Ohio 44115-1093
    (216) 687-1311
6
        Attorney for Plaintiff, Al Beamer
7
8
    GREGORY A. SHOEMAKER, ESQUIRE
9       McMahon, Berger, Hanna, Linihan,
    Cody & McCarthy
10      2730 North Ballas Road, Suite 200
    St. Louis, Missouri  63131
11      (314) 567-7350
12          Attorney for Defendant, NETCO
13
14      PATRICK DIGNAM, ESQUIRE
    NETCO
15      401 Fountain Lakes Boulevard
    St. Charles, Missouri 63301
16      (636) 925-8640
17
        Attorney for Defendant, NETCO
18
19      WILLIAM E. CURPHEY, ESQUIRE
    William E. Curphey & Associates, P.C.
20      2605 Enterprise Road East, Suite 155
    Clearwater, Florida  33759
21      (727) 726-8624
22          Attorney for Transcontinental
23
24
25

Page 3

1           INDEX
                PAGE
2
3   Direct Examination by Mr. Haber............. 4
4   Certificate of Oath........................ 19
5   Certificate of Reporter.................... 20
6
7
8
9
            EXHIBITS
10
NO.   DESCRIPTION                PAGE
11
12
2 Equity Title Agency of Ohio, Inc.
13      Minute Book  TTC-38  K101-1..........8
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1           The deposition of FRANK SKRYD was taken
2   pursuant to Notice by counsel for the Plaintiff
3   on November 20, 2003, commencing at 10:57 a.m. at
4   Transcontinental Title Company, 2605 Enterprise
5   Road, Suite 150, Clearwater, Florida.  Said
6   deposition was reported by Audrey Landry, Notary
7   Public, State of Florida at Large.
8       - - - - - - - - - -
9   WHEREUPON:
10          FRANK SKRYD,
11  a witness, having been duly sworn to tell the
12  truth, the whole truth and nothing but the truth,
13  was examined and testified as follows:
14          DIRECT EXAMINATION
15  BY MR. HABER:
16      Q   Mr. Skryd, my name is Rich Haber.  I'm an
17  attorney representing Al Beamer in a lawsuit that's
18  been filed against John Baumgart and NETCO up in
19  Cincinnati.  For the benefit of the court reporter,
20  would you state your full name, spell your last name?
21      A   Frank John Skryd, S-K-R-Y-D.
22      Q   Mr. Skryd, I know that you've been deposed
23  before, so I won't belabor the ground rules.  You just
24  need to give me verbal responses to my questions, and
25  if at any time I ask you a question you don't

Page 5

1   understand, I'd ask you to stop me and ask me to
2   restate the question so you do understand.  Is that
3   fair?
4       A   Yes.
5       Q   If you don't know the answer to my question,
6   just tell me you don't know.  Okay?
7       A   Okay.
8       Q   Don't guess or speculate, unless I ask you to
9   give me your best estimate.
10      A   Okay.
11      Q   Where do you currently reside?
12      A   Palm Harbor, Florida.
13      Q   What's the address there?
14      A   5550 Oak Ridge Drive, Palm Harbor, Florida,
15  34685.
16      Q   You're currently employed by Transcontinental
17  Title Company?
18      A   Correct.
19      Q   In what capacity?
20      A   Vice president.
21      Q   What are your job responsibilities?
22      A   Main job, technology communications.
23      Q   When did you become a vice president?
24      A   I don't know the exact date.  '91, '90.
25      Q   So you've held the same position since 1990

Page 6

1  or 1991?
2      A   Correct, I believe.
3      Q   When did you first meet Al Beamer?
4      A   I don't know. Probably when I first started
5  working with the company, shortly right after.
6      Q   Did you work with Al Beamer when you started
7  working with the company?
8      A   Yes, but not directly when I first started
9  working with the company.
10     Q   What is your understanding of the job
11 responsibilities of Al Beamer in the 1998, 1999
12 time frame?
13     A   1999 he was -- he worked with computers; also
14 was working with other projects we had, in terms
15 of -- I think he was licensed in the State of
16 Tennessee, for us. He was instrumental in different
17 aspects and different projects we had ongoing.
18     Q   I'm sorry, I didn't quite understand what
19 types of projects you were talking about. What was
20 this with regard to Tennessee?
21     A   I believe he was one of our -- he was
22 licensed for us in the State of Tennessee.
23     Q   Licensed?
24     A   Correct.
25     Q   Licensed in what?

Page 7

1      A   You need a license to do business in the
2  State of Tennessee.
3      Q   And you think Mr. Beamer was licensed to do
4  business in the State of Tennessee as a title agency?
5      A   We needed someone licensed and I think he was
6  our person that was licensed for that state.
7      Q   What type of projects did he perform other
8  than with respect to your computer system?
9      A   He helped out in terms of starting other
10 divisions, like search division and so forth like
11 that.
12     Q   Search division does what, title searches?
13     A   Correct.
14     Q   Do you think that Al Beamer did his job well?
15     A   Sometimes.
16     Q   And sometimes he didn't do his job well?
17     A   The computer stuff sometimes. He did his job
18 fairly well.
19     Q   What kind of problems did you have with the
20 computer stuff?
21     A   It was just occasional bugs.
22     Q   Bugs in the program?
23     A   Correct.
24     Q   What role, if any, did you have with a
25 company called Equity Title Agency of Ohio?

Page 8

1      A   I helped to start that.
2      Q   What did you do to help start it?
3      A   I worked with John Rosso in setting that up.
4      Q   What did you do to set it up, though? You
5  said you worked with John Rosso. What exactly did you
6  do?
7      A   We worked to establish their license and so
8  forth and I helped to setup the -- you know, check out
9  the computer system, so forth.
10     Q   Were you an officer?
11     A   Yes, I believe.
12     Q   Were you the secretary?
13     A   Yes, I believe I was.
14     Q   In front of you, Florida Exhibit 2, is a
15 minute book from Equity Title Agency of Ohio. Would
16 you look, as an example, at the back page.
17     A   Yes, that's my signature. It's not much of a
18 signature.
19     Q   That's what I was going to ask you. That's
20 your signature?
21     A   Yes, unfortunately that's a pretty bad
22 signature.
23     Q   Do you know who Virginia Bertram is?
24     A   No, I do not.
25     Q   Do you know when this business was sold?

Page 9

1      A   No, I do not.
2      Q   Do you know who it was sold to?
3      A   Yes, Christopher Hayes.
4      Q   Anyone else?
5      A   Not to my knowledge.
6      Q   At the back page, if you start with the back
7  page and then work your way back four pages, there's a
8  document bearing the Bates Stamp TTC-66. Do you have
9  that?
10     A   66?
11     Q   Down at the bottom.
12     A   Yeah.
13     Q   That has your signature on it and it's dated
14 February 1st, 1997; correct?
15     A   Correct.
16     Q   And it reflects a conference call where you,
17 John Rosso and William Baumgart participated and that
18 there was an approval to sell the stock to Chris Hayes
19 and Mark Hanna for 1.4 million dollars.
20     A   Okay.
21     Q   My question is, do you recall any other
22 meeting where that issue was discussed by the
23 shareholders after February 1st, 1997?
24     A   No, I do not.
25     Q   Do you believe that any formal decision by

3 (Pages 6 to 9)

Page 10

1  the company to sell the stock to Mr. Hayes and
2  Mr. Hanna was formalized in minutes of meetings of the
3  board of directors?
4      A   State that again?
5      Q   Do you believe that any decision to sell the
6  shares of stock was memorialized in minutes of
7  meetings of the board of directors, signed by you?
8      A   No.
9      Q   Was there subsequent meetings of the
10 shareholders that were not memorialized?
11     A   I don't recall.  This is 1997.
12     Q   I understand.
13     A   It's hard to -- I mean, that's my signature
14 but I don't recall the meeting.
15     Q   Do you have any knowledge as to why the
16 articles of incorporation and early minutes of the
17 shareholder meetings would reflect that they occurred
18 in 1993 if, in fact, they did not occur in 1993?
19     A   No.
20     Q   Do you have any knowledge as to whether these
21 documents were backdated?
22     A   No, I do not.
23     Q   How long did you perform services or computer
24 support work for Equity Title Agency, if you recall?
25 In other words, how long were you working at that

Page 11

1  business?
2      A   At this business?
3      Q   Yeah, how long did you provide services to
4  this company?
5      A   I don't really recall when we did -- we would
6  just actually check out the business to see if things
7  were running correctly.  You know, take a trip at that
8  time like every other month.  I really actually don't
9  really even recall.
10     Q   You'd go up there once a month, your best
11 guess?
12     A   That's my best guess and that became less
13 than that.
14     Q   Your best guess for how long a period of time
15 did you go up to Greenville, Ohio to check out their
16 computer system, was it a year, two years?
17     A   It could have been a year.
18     Q   Did Mr. Beamer have any involvement with that
19 company, Equity Title Agency of Ohio?
20     A   No.
21     Q   Did you install his software on that system?
22     A   No.
23     Q   Were you the individual that computed -- let
24 me back up.  While Mr. Beamer was employed with
25 Transcontinental Title Company, and while his company

Page 12

1  did business with Transcontinental Title Company, did
2  you personally compute his quarterly or monthly bonus
3  payments?
4      A   Occasionally.
5      Q   Did any of his quarterly or monthly bonus
6  payments include revenue generated at Equity Title
7  Agency of Ohio, to your knowledge?
8      A   I don't recall.
9      Q   When did you first learn that Al Beamer was
10 being terminated?
11     A   I don't even recall actually.
12     Q   Was it before he was terminated?
13     A   No.
14     Q   How long after he was terminated?
15     A   I don't recall.
16     Q   Was it within a week or two?
17     A   I don't know.
18     Q   Who told you?
19     A   I don't remember who told me, actually.
20     Q   Do you know why he was terminated?
21     A   No.
22     Q   Has anybody told you why he was terminated?
23     A   No.  I don't know.  It's a long time ago.
24     Q   Do you think that somebody may have told you,
25 you just can't remember the reasons now?

Page 13

1      A   Possibly.
2      Q   Did you ever talk to Al Beamer about his
3  termination?
4      A   I don't know.
5      Q   Did you tell Al Beamer that a deal had been
6  struck between Bill and John Baumgart to terminate
7  him?
8      A   No.
9      Q   How do you remember that?
10     A   Because I didn't have any knowledge.
11     Q   Is it possible that you and Mr. Beamer spoke
12 regarding his termination?
13     A   I don't know.
14     Q   Have you spoken to him since his termination?
15     A   Yes.
16     Q   How many times?
17     A   I don't know.
18     Q   Do you have an estimate?
19     A   I know once.
20     Q   What's that?
21     A   I know once I spoke to him once.
22     Q   What do you recall about that one occasion
23 when you spoke to him?
24     A   He wanted to play basketball.
25     Q   Did you play basketball?

Page 14

```
 1    A   No.
 2    Q   Have you seen Al Beamer since then, since he
 3  was terminated?
 4    A   That one time for sure.
 5    Q   Well, you saw him on the occasion that he
 6  wanted to play basketball?
 7    A   Yes, I ended up seeing him for dinner for a
 8  brief short period of time.
 9    Q   So instead of playing basketball with him,
10  you had dinner with him?
11    A   Right.
12    Q   You don't recall talking about the
13  circumstances of his termination?
14    A   No.
15    Q   Do you recall what year that conversation
16  was?
17    A   No.
18    Q   Do you know whether, when Bill Baumgart
19  bought Equity Title Agency of Ohio, whether there was
20  a deal in place that he would sell the company back to
21  the managers after a period of time?
22    A   No.  When he initially bought it, no.
23    Q   I'm sorry, I may have asked you this but I
24  don't recall.  Do you who Virginia Bertram is?
25    A   I don't recall that name.
```

Page 15

```
 1    Q   Did you ever tell Al Beamer that Ian Gorman
 2  told you that there was a deal struck between Bill and
 3  John Baumgart?
 4    A   No.
 5    Q   Were you ever in Bill Baumgart's office when
 6  he was on the telephone with John Baumgart discussing
 7  Al Beamer's employment?
 8    A   No.
 9    Q   Who is Tony Rivera?
10    A   Tony Rivera, I believe he works with Damion
11  or worked -- correct.
12    Q   He worked with Damion?
13    A   Right.
14    Q   Give me Damion's last name for the record?
15    A   Sichak.
16    Q   Do you know where they worked?
17    A   I don't know.  I can't recall the name of
18  that company.
19    Q   Where did you learn that they worked
20  together?
21    A   Speaking with Damion.
22    Q   Do you keep in touch with Damion?
23    A   Rarely.
24    Q   Has Bill Baumgart ever told you why Al Beamer
25  was terminated?
```

Page 16

```
 1    A   I don't know.  I think this was a long time
 2  ago.
 3    Q   It was December of 1999.
 4    A   Okay.
 5    Q   Has something happened in the interim that
 6  affects your ability to recall?
 7    A   No.
 8    Q   Are you under any medication, as we sit here
 9  today, that affects your ability to recall?
10    A   No.
11    Q   As we sit here today, you don't recall
12  whether anybody ever told you the reasons why
13  Al Beamer was terminated?
14    A   Correct.
15    Q   You don't recall ever having any conversation
16  with Al Beamer other than the one occasion where you
17  had dinner with him?
18    A   Clarify?
19    Q   Sorry.  After he was terminated from his
20  employment, you don't recall any conversation with
21  Al Beamer, other than the dinner that you described
22  previously?
23    A   No.
24    Q   And you don't remember any of the discussions
25  that you had with Al Beamer during dinner?
```

Page 17

```
 1    A   No.  It was on a personal nature.
 2    Q   But nothing to do with Transcontinental
 3  business?
 4    A   No.
 5    Q   Nothing to do with Al Beamer's employment?
 6    A   No.
 7    Q   Nothing to do with litigation in Cincinnati?
 8    A   No.
 9    Q   Did you ever talk to him about working with
10  Al Beamer in the future?
11    A   Working with him?  No.
12    Q   When did you start working for
13  Transcontinental Title Company?
14    A   1990.
15    Q   Do you have any ownership interest?
16    A   No.
17    Q   Do you have any ownership interest in any
18  business owned by Bill Baumgart?
19    A   No.
20    Q   Do you have any option to become an owner at
21  some later date?
22    A   No.
23    Q   Have you been employed uninterrupted since
24  1990 or '91 by Transcontinental?
25    A   Yes.
```

5 (Pages 14 to 17)

Page 18

1  Q   Are there ever occasions when you have been
2  terminated from your employment and then brought back?
3  A   No.
4  Q   And you've held the same job title since 1990
5  or 1991?
6  A   Yeah.  That exact date, I'm not exactly sure.
7  Q   What is your educational background?
8  A   Degree in finance from the University of
9  Florida.
10  Q   When did you graduate?
11  A   1988.
12  Q   Where did you work before you started working
13  at Transcontinental?
14  A   I worked at the Board of Trade in Chicago and
15  then came back and worked a couple of odd jobs, was
16  going back to school, and then worked here.
17     MR. HABER: I don't have any other questions.
18  You have the right to review the transcript or you
19  can waive that right, it's up to you.
20     MR. CURPHEY:  You can just waive it.
21
22
23
24
25

Page 19

1     CERTIFICATE OF OATH
2
3  STATE OF FLORIDA   )
4  COUNTY OF HILLSBOROUGH)
5
6
7
8     I, the undersigned authority, certify that
9  the witness in this matter personally appeared
10  before me and was duly sworn on the 20th day of
11  November, 2003.
12
13     WITNESS my hand and official seal this 2nd
14  day of December, 2003.
15
16
17
18
19     _____
       Audrey Landry
       Notary Public
20     State of Florida at Large
       My Commission Number: DD147274
21     Expires: 10/17/06
22
23
24
25

Page 20

1     CERTIFICATE OF REPORTER
2
3  STATE OF FLORIDA   )
4  COUNTY OF HILLSBOROUGH)
5
6     I, Audrey Landry, certify that I was
7  authorized to and did stenographically report the
8  deposition; that a review of the transcript was
9  not requested; and that the foregoing pages are a
10  true and complete record of my stenographic notes
11  taken during said deposition.
12
13     I further certify that I am not a relative,
14  employee, attorney, or counsel of any of the
15  parties, nor am I a relative or employee of any
16  of the parties' attorneys or counsel connected
17  with the action, nor am I financially interested
18  in the action.
19
20     Dated this 2nd day of December, 2003.
21
22
23     Audrey Landry
       Notary Public
24     State of Florida at Large
       My Commission Number: DD147274
25     Expires: 10/17/06

# DEFENDANTS' ATTACHMENT 6

Page 1

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OHIO
 2                   WESTERN DIVISION
 3              CASE NO. C-I-02-013
 4
AL BEAMER, et al,
 5
      Plaintiffs,
 6
  vs.
 7
NETCO, INC., et al,
 8
      Defendants.
 9     -----------------------------------/
10
11
12
13              DEPOSITION OF IAN GORMAN
14                 November 20, 2003
            11:28 a.m. to 11:51 a.m.
15
         Transcontinental Title Company
16            2605 Enterprise Road, Suite 150
           Clearwater, Florida  33759
17
18     -------------------------------------
19
20
21
22     REPORTED BY:
AUDREY LANDRY
23     Notary Public
State of Florida at Large
24     Esquire Deposition Services - Tampa, Florida
813-221-2535 (800-838-2814)
25     Job No.:  N586079D
```

Defendants'
Attachment
6

Page 2

1    APPEARANCES:
2
3    RICHARD C. HABER, ESQUIRE
Reminger & Reminger
4    1400 Midland Building
101 Prospect Avenue West
5    Cleveland, Ohio 44115-1093
(216) 687-1311
6
Attorney for Plaintiff, Al Beamer
7
8
GREGORY A. SHOEMAKER, ESQUIRE
9    McMahon, Berger, Hanna, Linihan,
Cody & McCarthy
10    2730 North Ballas Road, Suite 200
St. Louis, Missouri 63131
11    (314) 567-7350
12    Attorney for Defendant, NETCO
13
14    PATRICK DIGNAM, ESQUIRE
NETCO
15    401 Fountain Lakes Boulevard
St. Charles, Missouri 63301
16    (636) 925-8640
17
Attorney for Defendant, NETCO
18
19    WILLIAM E. CURPHEY, ESQUIRE
William E. Curphey & Associates, P.C.
20    2605 Enterprise Road East, Suite 155
Clearwater, Florida 33759
21    (727) 726-8624
22    Attorney for Transcontinental
23
24
25

Page 3

1            INDEX
            PAGE
2
3    Direct Examination by Mr. Haber............ 4
4    Certificate of Oath........................ 19
5    Certificate of Reporter.................... 20
6
7
8
9
            EXHIBITS
10
NO.    DESCRIPTION            PAGE
11
12        (NO EXHIBITS MARKED)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1        The deposition of IAN GORMAN was taken
2    pursuant to Notice by counsel for the Plaintiff
3    on November 20, 2003, commencing at 11:28 a.m. at
4    Transcontinental Title Company, 2605 Enterprise
5    Road, Suite 150, Clearwater, Florida.  Said
6    deposition was reported by Audrey Landry, Notary
7    Public, State of Florida at Large.
8        - - - - - - - - - -
9    WHEREUPON:
10        IAN GORMAN,
11    a witness, having been duly sworn to tell the
12    truth, the whole truth and nothing but the truth,
13    was examined and testified as follows:
14        DIRECT EXAMINATION
15    BY MR. HABER:
16    Q    Mr. Gorman, my name is Rich Haber and I
17    represent Al Beamer in a lawsuit that's been filed
18    against John Baumgart and NETCO up in Cincinnati,
19    Ohio.  Have you ever been deposed before?
20    A    Yes.
21    Q    On how many occasions?
22    A    I believe once.
23    Q    Briefly, the ground rules are you need to
24    give verbal responses to all of my questions so that
25    the court reporter can accurately record your

Page 5

1    responses.  If you don't know the answer to a question
2    that I ask you, just tell me you don't know.  I don't
3    want you to guess or speculate unless I specifically
4    ask you to do so.  Is that understood?
5    A    Yes.
6    Q    If at any time I ask you a question you don't
7    understand, please stop me, ask me to restate the
8    question so you do understand.
9    A    Okay.
10    Q    What is your current home address?
11    A    3168 Valemoor Drive, Palm Harbor, 34685.
12    Q    What is your current job title with
13    Transcontinental?
14    A    Senior vice president.
15    Q    As a senior vice president, what are your job
16    responsibilities?
17    A    Expansion, compliance.
18    Q    Expansion and compliance?
19    A    Yes.
20    Q    Expansion being identifying new markets to
21    move into?
22    A    Additional states, that kind of thing.
23    Q    And compliance would be what?
24    A    Making sure we're in compliance with the
25    state regulators, underwriters.

Page 6

1   Q  How long have you had these job
2  responsibilities?
3   A  Probably in the last three or four years.
4   Q  And did you have these responsibilities while
5  Al Beamer was still employed by the company?
6   A  No.
7   Q  When did you start working for
8  Transcontinental?
9   A  1989.
10   Q  In what capacity?
11   A  Basically as an order entry person.  And
12  that's when it was known as Equity Title back in
13  Chicago.
14   Q  Did you work in Illinois then?
15   A  Yes.
16   Q  When did you stop working for Equity Title of
17  Illinois?
18   A  1991.
19   Q  Did you then move down to Florida?
20   A  Yes.
21   Q  Did you assist Bill Baumgart in establishing
22  Equity Title Southeast or Southwest, whatever it is?
23   A  Yes.
24   Q  Are you an officer -- you're senior
25  vice president.  Do you have any ownership interest in

Page 7

1  Transcontinental?
2   A  No.
3   Q  Did you have any involvement in the business
4  in Ohio, Equity Title Agency of Ohio?
5   A  No.
6   Q  What was your job title in 1991 or 1992 when
7  Equity Title Southeast was created?
8   A  I believe I was a vice president.
9   Q  What were your job responsibilities at that
10  time?
11   A  Opened offices, staffed offices, that kind of
12  thing, just in the State of Florida.
13   Q  How long did you hold that position?
14   A  I'm guessing two to three years.
15   Q  And then what position did you hold?
16   A  Then kind of the same thing but at additional
17  states.
18   Q  When did you first assume compliance
19  responsibility?
20   A  I would say that would be around 2001.
21   Q  Who had compliance responsibility prior to
22  you?
23   A  I don't know.
24   Q  When did you first meet Al Beamer?
25   A  Back in Chicago.

Page 8

1   Q  How did you meet him?
2   A  Al brought in his computer system.  Prior to
3  that, we weren't using a computer system.
4   Q  Did you continue to work with Al after you
5  came down to Florida?
6   A  In what capacity work with him?
7   Q  Work with him at Transcontinental or
8  Equity Title Southeast, as it was formerly known?
9   A  I didn't actually work directly with him, no.
10   Q  Because you didn't work with the computer
11  system?
12   A  Correct.
13   Q  What did you understand Al Beamer's
14  responsibility to be with Equity Title Southeast and
15  subsequently Transcontinental Title?
16   A  Basically to provide us with a computer
17  software program and to make modifications on it when
18  needed and any new applications.
19   Q  Do you know why Al Beamer was terminated from
20  Transcontinental?
21   A  No.
22   Q  Nobody has told you?
23   A  No.
24   Q  Did you ever speak with Bill Baumgart
25  regarding his termination?

Page 9

1   A  No.
2   Q  Did you ever speak with Frank Skryd regarding
3  his termination?
4   A  No.
5   Q  Did you ever speak with John Rosso regarding
6  his termination?
7   A  No.
8   Q  Did you ever speak with Al Beamer regarding
9  his termination?
10   A  No.
11   Q  When did you learn he was terminated?
12   A  I don't know, to be honest with you.
13   Q  Did you learn he was going to be terminated
14  or did you learn about it after the fact?
15   A  After the fact.
16   Q  Do you know how you learned about it?
17   A  I don't recall.
18   Q  Have you spoken to Al Beamer since he was
19  terminated in December of 1999?
20   A  I don't recall.
21   Q  How long have you lived at your current
22  address?
23   A  Three years.
24   Q  Where were you living in 1999?
25   A  In Odessa, Florida.

3 (Pages 6 to 9)

Page 10

```
 1    Q   Do you remember the address?
 2    A   16161 Craigend Place.  C-R-A-I-G-E-N-D.
 3    Q   Were you present in Bill Baumgart's office
 4  when he was speaking to his brother regarding
 5  Al Beamer's employment?
 6    A   No.
 7    Q   Did you ever tell Al Beamer that you were
 8  present when a conversation was taking place regarding
 9  his employment?
10    A   No.
11    Q   Did you ever tell Al Beamer that you
12  understood there was an agreement between Bill and
13  John Baumgart to terminate Al, and John would
14  reimburse Bill for any expenses?
15    A   No.
16    Q   Did you ever ask anybody why Al Beamer was
17  terminated?
18    A   No.
19    Q   Do you know who Tony Rivera is?
20    A   Yes.
21    Q   Who is he?
22    A   He used to work for John Baumgart and started
23  up his own title company.
24    Q   How did you know he started up his own title
25  company?
```

Page 11

```
 1    A   I don't really know who told me.
 2    Q   What do you know about that title company?
 3    A   Just that I have a friend that works there.
 4    Q   Who is that?
 5    A   Damion Sichak.
 6    Q   Does Damion still work there?
 7    A   I believe so.  I haven't talked to him in a
 8  few months.
 9    Q   When was the last time -- you keep in touch
10  with Damion Sichak?
11    A   Yes, we're friends.
12    Q   Did Bill Baumgart ever tell you that he was
13  upset that Damion Sichak went to work with the company
14  with Tony Rivera?
15    A   No.
16    Q   Did he ever tell you that he was upset that
17  Al Beamer was involved in that company?
18    A   No.
19    Q   Did you review anything before your
20  deposition today, in preparation for your deposition?
21    A   Something that my attorney showed me, yes.
22    Q   Mr. Curphey?
23    A   Yes.
24    Q   Without getting into the substance of what
25  your attorney showed you, was it a typed-written
```

Page 12

```
 1  document or handwritten notes?
 2       THE WITNESS:  Can I answer that?
 3       MR. CURPHEY:  Yeah.
 4    A   It was typed-written.
 5       MR. HABER:  Bill, is there a privilege issue
 6  with regard to what you showed him?
 7       MR. CURPHEY:  Sure.
 8    Q   (By Mr. Haber) Was it something that you
 9  reviewed to refresh your recollection?  You can answer
10  that.
11       MR. CURPHEY:  Yeah, you can answer that part.
12    A   It was just to --
13       MR. CURPHEY:  That's enough.  Yes?
14    A   Yes.
15       MR. HABER:  I think since he reviewed it to
16  refresh his recollection regarding something for
17  his deposition, I'm entitled to know what it is.
18    Q   (By Mr. Haber) What was it that you reviewed?
19       MR. CURPHEY:  You don't have to answer that.
20  It's my work product and you don't have to answer
21  it.
22       MR. HABER:  This was a document that you
23  generated, Bill?
24       MR. HABER:  Yes.
25       MR. HABER:  I beg to differ with you on
```

Page 13

```
 1  whether you would have to provide that, but I'll
 2  take that up with Judge Spiegel.
 3    Q   (By Mr. Haber) Was there more than one
 4  document?
 5    A   No.
 6    Q   How many pages was it?
 7    A   I don't recall.
 8       MR. HABER:  Bill, can you identify it in any
 9  way for descriptive purposes without disclosing
10  the contents, for purposes of any motion I may
11  want to file?
12       MR. CURPHEY:  I don't know how you'd describe
13  it.  It was notes.
14       MR. HABER:  I don't know either, that's why
15  I'm asking.
16       MR. CURPHEY:  It was work product.  It was
17  notes that --
18       MR. HABER:  Typed-written notes?
19       MR. CURPHEY:  Computer-generated.  There are
20  no typewriters anymore.
21       MR. HABER:  Sure there are.  Give me a second
22  with my client.
23       (Recess Break).
24       MR. HABER:  Before we go off the record, as
25  with the issue with Mr. Baumgart, I imagine this
```

4 (Pages 10 to 13)