# DEFENDANTS'
# ATTACHMENT 7

Defendants'
Attachment
7

COPY

ENTER

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

JUL 3 1 2000

ARTHUR M. NEY, JR. JUDGE

NATIONAL EQUITY TITLE
AGENCY, INC.

              Plaintiff

    vs.

ANTONIO R. RIVERA
       and
NATIONAL REAL ESTATE TITLE
AGENCY, INC.

          Defendants

:    Case No. A9906815

:    (Judge Ney)

:

:

:

:    FINDING OF FACT AND
       CONCLUSIONS OF LAW

:

:

This matter came on to be heard by the Court without the intervention of a jury on the plaintiff's motion for a preliminary-permanent injunction which was consolidated for a trial by entry December 8, 1999.

The trial on the plaintiff's motion for injunctive relief began on April 19, 2000 and continued from time to time to May 1, 2000.

In consideration of the testimony of witnesses, exhibits, arguments of counsel, and closing briefs of the parties, the Court finds that the motion for a permanent injunction is well taken and it is hereby granted as to the defendants Antonio R. Rivera and National Real Estate Title Agency, Inc..

FINDINGS OF FACT

1.  The complaint of the plaintiff National Equity Title Agency, Inc. ("Netco") was filed November 9, 1999.

2.  The Court issued a temporary restraining order on November 10, 1999.

3. The matter was set for a status report as to the temporary restraining order on November 24, 1999. On said date the status report was continued until December 8, 1999 and on said date the temporary restraining order was continued to December 10, 1999.

4. On December 8, 1999 the Court consolidated the hearing on the preliminary and permanent injunction by entry filed on said date.

5. On December 10, 1999 the parties advised the Court that the matter was set for mediation on December 27, 1999 on which date the Court was advised approximately one hour after the mediation began that the parties were unable to mediate their dispute.

6. On January 24, 2000 the Court conducted a hearing on the various motions filed by the parties and continued the hearing on the balance of some of the motions until February 7, 2000.

7. On February 7, 2000 at the request of the parties, the hearing on the balance of the various motions were continued until February 8, 2000.

8. On April 17, 2000 the Court heard motions filed by the defendant and after ruling on said motions the matter for the hearing on the preliminary-permanent injunction was continued until April 19, 2000.

9. On April 19, 2000 the Court began the hearing on the plaintiff's motion for the preliminary and permanent injunction which as indicated aforesaid was consolidated for hearing. The hearing on the injunctive release was held on April 19, 2000, April 20, 2000, April 21, 2000, April 24, 2000, April 25, 2000, April 26, 2000, April 28, 2000 and May 1, 2000.

10. At the hearing on the injunctive relief, the plaintiff Netco presented testimony from 8 witnesses and presented 49 exhibits all of which were admitted into evidence.

11. At the hearing, the defendant Rivera and National Real Estate Title Agency, Inc. ("National") presented the testimony of 5 witnesses and presented 8 exhibits all of which were admitted into evidence.

12. Defendant Rivera began working with Netco in 1994 and according to his testimony he had no experience before said time in any title work.

13. In 1997 Netco promoted Rivera to Vice President and he ran Netco's Ohio operation until he left their employment on August 26, 1999.

14. On February 6, 1998 Rivera and Netco entered into an employment contract the consideration for which was his promotion to Vice Present and a raise in salary of at least $10,000.00.

15. The employment contract entered into by the plaintiff Netco and the defendant Rivera on February 6, 1998 contained the following paragraphs which in essence provides as follows:

> Paragraph 6 - Competition:
> For a period of 6 months after the termination of employee's employment with Netco for any reason [a] employee shall not sell to, contact, solicit, or deal with any Netco customers, including, but not limited to those customers that are lenders, bankers, brokers or finance companies [collectively, "Netco customers"] with respect to any products or services that are competitive with one or more products or services of Netco; [b] employee will not render services for a new or existing competitor of Netco with respect to products or its services that are competitive with those of Netco, within the geographical area in which Netco does business, if such services involve sales, solicitations or dealings with any Netco customers; [c] employee will not establish its own business as a competitor of Netco with respect to products or services that are competitive with those of Netco within the geographical area in which Netco does business if such business involves sales, solicitations or dealings with any of Netco's customers; and [d] employee shall not hire,

solicit, induce or attempt to induce any employee or independent contractor of Netco to leave its employee or engagement, engage in any competing business, or to otherwise aid or assist any person or company that is or intends to be in competition with Netco.

Paragraph 9 - Termination of Employment:

Employee's employment with Netco is "at will." Employee's employment under this agreement may be terminated by either party for any reason whatsoever at any time. Upon termination of employment, employee shall [1] deliver to Netco all writings, records, data, memoranda, contracts, orders, brochures, sales literature, card rates, production materials and other documents, whether or not obtained from Netco and including but not limited to confidential information, which pertains to or were used by employee in connection with employment by Netco; and [2] not remove, retain, copy or utilize any confidential information, privileged or proprietary data, or other property of Netco or its customers. ... .

Paragraph 12 - Governing Law:

The parties agree that this agreement shall be construed and governed by the laws of the State of Illinois, as such laws are applied to agreements executed, delivered and performed wholly within the State of Illinois.

16. During the hearing on the preliminary-permanent injunction, the defendant admitted under oath that he violated sub-paragraph [c] under paragraph 6 entitled Competition in which paragraph the employee agreed that he would not establish his own business as a competitor of Netco.

17. Defendant Rivera also testified under oath that he was aware of paragraph 3 entitled Confidential Information contained in the agreement of employment dated February 6, 1998 relative to the dissemination of any confidential information he may have acquired during his period of employment with Netco and he further testified that he did not violate said paragraph 3 relative to confidential information.

18. During the hearing on the injunctive relief requested by the plaintiff Netco, the defendant Rivera testified that he did not establish a competing company until after he had resigned, yet, in accordance with a deposition taken of the defendant Rivera under

oath he said he had agreed to establish a competing company on August 13, 1999 approximately 13 days before he resigned from Netco.

19. On or about August 24, 1999, two days before the defendant Rivera resigned his employment from Netco, he faxed a letter to a Mr. Ralph A. Miller, a lawyer in Cleveland, Ohio requesting said lawyer to advise him as to whether or not his employment agreement was enforceable. Mr. Miller wrote to Mr. Rivera on August 27, 1999 that said contract was enforceable in Ohio.

20. Under paragraph 6 subsection D of the employment contract of February 6, 1998, the defendant Rivera had agreed not to attempt to hire or hire Netco employees. At the trial, the witness Eduardo Carillo testified he left Netco and went to work for the defendant Rivera and National on or about November 1, 1999. At the hearing, the witness Gannon Craig testified that he was approached by the defendant Rivera for the purposes of leaving Netco and coming to work for him.

21. The defendant Rivera also admitted doing business with at least 22 of Netco's customers which were listed on Netco's Exhibit No. 39 and further had contacted or solicited the entities listed on Netco's Exhibit No. 19 for the purpose of getting the approval to do their business.

22. The witness, John Baumgart, the owner and CEO of Netco, testified that it took years to establish the necessary customer relationships to become profitable and that Netco has committed between $500,000 and $700,000 per year to develop and maintain customers in its Ohio business in addition to approximately $500,000 that Netco spends a year courting nationwide customers. Netco became profitable during the third quarter of 1999, at which time Rivera resigned.

23.  The witness, Maria Sagrati, called as if on cross examination by the plaintiff also testified that the title insurance business is a relationship business and that the key to the title insurance business is to develop good relationships with customers.  The witness Sagrati also testified on cross examination by the plaintiff that "she didn't care if her contacts are Netco customers or not."

24.  The witness Sagrati also testified that she entered into an employment contract with the defendant National on October 18, 1999 and after reviewing plaintiff's Exhibit No. 39 she admitted that she had conducted closings or taken orders from at least 18 of the customers of Netco shown on plaintiff's Exhibit No. 39.

25.  David Soler, a witness for the defendant, who is an Assistant Vice President of Money Services of Ohio, testified that if a title insurance company provides good service between the broker, the lender and the title company that these relationships will be long termed and sustained.

26.  The defendant Rivera testified that he had prepared and submitted a business plan on or about October 27, 1999 which business plan listed the plaintiff Netco as being a major competitor.  This business plan was not disclosed to the plaintiff until much later during the various motions to compel discovery and it clearly indicates that the biggest strength is that competitors have built relationships with many clients throughout the years.

27.  The defendant Rivera testified that he increased the sales personnel in Netco from 3 to 5; that he had increased Netco sales by 320%; and had made personal sales to Netco's customers; and managed and trained the various sales people working for Netco.

28.  The defendant Rivera filed an application with the Stewart Title Guarantee Company for appointment as a title insurance policy issuing agent and signed said application personally as President of the defendant National.  As is indicated in plaintiff's Exhibit No. 19, Stewart Title Guarantee Company issued approximately 23 closing letters to the defendant National between November 2, 1999 and January 6, 2000.

29.  The defendant Rivera testified that he knew who Netco's customers were in Ohio and which ones were the most profitable; in addition, the defendant Rivera was again shown the plaintiff's Exhibit No. 39 which indicated thereon that each of the customers listed thereon ordered title insurance from Netco and/or received title insurance policies from Netco.

30.  The defendant Rivera, as Vice President, had access to Netco's confidential information in that he was responsible for giving new employees a copy of Netco's Employee Handbook and attended quarterly meetings where officers of Netco would discuss and review documents containing confidential and proprietary information regarding Netco's customers, financial performance, operations and strategic plans.

31.  The defendant Rivera filed Articles of Incorporation with the Secretary of State of Ohio on August 31, 1999 and on October 21, 1999 he and Al Beamer, Damian Sichak and James A. Erwin entered in a pre-organizational subscription agreement.

32.  The defendant Rivera incorporated the defendant National, served as its promoter, gathered the investors together, hired the employees, and became its President. The defendant Rivera is the only employee of National who is licensed to sell or issue insurance and he, not the defendant National, has a contract with the underwriter which allows Rivera to issue title insurance.

33. The witness Sichak, Vice President of the defendant National, testified that he invested into defendant National even though he knew said company may have problems with the non-compete clause in the defendant Rivera's employment contract. He also testified that he was involved with two of Netco's customers namely Money Services and Money Stations on two occasions since the Court issued its temporary restraining order on November 10, 1999. At the conclusion of his testimony, this witness indicated "You could just take Tony Rivera's contract and just ball it up and throw it away."

34. At the November 10, 1999 TRO hearing, Netco represented that a company named Equicredit, the only customer mentioned at the hearing, was a major customer.

35. During the testimony of Gannon Craig, called by the defendant as if on cross-examination, Mr. Craig was shown defendant's Exhibit No. 32 which showed that only 1.28 percent of plaintiff's orders were actually placed by Equicredit.

36. Defendant's Exhibit No. 32 is the plaintiff's monthly reports and is critical in that under Illinois law, what largely determines whether an employer has a legally protected "near permanent" interest in a customer is the continuity, duration and extent of the employer's dealings with that customer.

37. Of the 534 companies appearing on plaintiff's first customer list, 290 of them do not appear on the monthly order reports of having placed even one order. Of the 366 entities shown as "customer" on those order reports, only two have been solicited or placed orders with defendant National Real Estate Title Agency. These two are Money Station, a Kentucky based mortgage broker that placed 36 of the 6,856 orders on those reports and American Equities, with 5 orders.

38. William Andrews, a witness called by the defendants as if on cross-examination, testified that Wholesale Lenders have a limited list of title agencies that they will receive services from. Firstar for instance, is an example of Netco being on their approved list which means that their employees can use Netco as a title agency. Being on an approved list does not make that company a customer.

39. The witness Andrews further testified that the defendant Rivera did not return a monthly report for March, 1999.

40. The defendant's witness David Siller, an Assistant Vice President of the Cincinnati office of Money Services of Ohio, testified that they had used the plaintiff Netco only once for title work and that Money Services of Ohio was not a Netco customer.

41. The witness Siller further testified that the title agency business is a highly competitive business and that his company gets solicited two or three times a week by various companies trying to get their business.

42. The defendant's witness Ken Hatfield, Assistant Vice President, Wholesale Division of Firstar Bank testified that Firstar has no contract to do only business with Netco and that the defendant National is on their approved list. Mr. Hatfield further testified that in Ohio Firstar has anywhere from 200 plus or minus wholesale closings and 250 plus or minus retail closings per month.

## CONCLUSIONS OF LAW

Under Illinois law, a restrictive covenant is enforceable if it is reasonable and protects legitimate business interests.

An employer has a protected interest justifying post-employment restrictions and covenants by former employees if the restrictions and covenants involve confidential information or trade secrets OR customer relations that are near permanent.

The first question before the Court involved whether or not the employment contract entered into by the defendant Rivera and the plaintiff Netco on February 6, 1998 containing restrictive covenants, is reasonable and protects legitimate business interests. The Court is of the opinion that the employment contract is reasonable and does protect legitimate business interests, and is enforceable. The defendant Rivera himself was so informed by his attorney Ralph A. Miller by letter dated August 27, 1999.

The second question before the Court is whether or not the defendant Rivera breached the contract. The defendant Rivera admitted under oath that he had breached sub-paragraph 6(c) under paragraph 6 of the contract, in that he established his own business as a competitor of Netco. The evidence clearly establishes that the defendant Rivera also breached sub-paragraph 6(a) and 6(b) of paragraph 6 of the contract, in that within six months after terminating his employment from Netco, he contacted, solicited, sold to and dealt with plaintiff Netco's customers that are lenders, bankers, brokers or a financial company, and that he rendered services for a new competitor of the plaintiff Netco with respect to products or services that are competitors with those of Netco. The evidence is also clear that the defendant Rivera violated sub-paragraph 6(d) of paragraph 6 of the contract and that he attempted to hire Gannon Craig and hired Eduardo Carillo. The Court is of the opinion that the defendant Rivera breached the employment contract of February 6, 1998.

The third question before the Court involved whether or not the restrictions and covenants in the February 6, 1998 employment contract prohibited the defendant Rivera from acquiring confidential information of the plaintiff Netco when he was employed by Netco and then use this information to incorporate, organize, set up and run defendant National, and whether or not plaintiff Netco's had a near-permanent relationship with its customers so as to be a protected interest of the plaintiff Netco.

The defendant Rivera and National are of the opinion that even though the contract of employment is enforceable under Ohio law, and even though they breached the terms of the contract, they are not liable since under Illinois law, the plaintiff Netco has not shown that the defendants used any confidential information nor has Netco acquired a near-permanent relationship with any of its customers.

As to utilizing Netco's confidential information, the defendant Rivera never worked in the title insurance business before he was employed by Netco. The defendant Rivera knew who were Netco's customers; which ones were the most profitable; he attended quarterly meetings of Netco's directors and other officers where discussions were held concerning Netco's operations; reviewed documents containing confidential and proprietary information of Netco's customers, financial performance, operations and strategic plans; he incorporated the defendant National within one week after resigning from Netco: entered into a preorganizational agreement within two months after resigning from Netco; and used his knowledge of Netco's business to start up and run the defendant National.

The basic test applied by Illinois courts in determining the enforceability of a restrictive covenant is "whether the terms of the agreement are reasonable and necessary

to protect legitimate business interests of the employer, a determination which necessarily turns on the facts and circumstances of each case." *Office Mates 5, North Shore, Inc., v. Hazen*, 599 N.E.2d 1072, 1080, 234 Ill. App.3d 557 (1992). As such, Illinois courts have recognized two situations where an employer has a legitimate business interest justifying the enforcement of a covenant not to compete: (1) where the customer relationships are near permanent and but for the employees' association with the employer, the employee would not have had contact with the customers; and (2) where the former employee acquired trade secrets or other confidential information through his employment and subsequently tried to use it for his own benefit. *Outsource International, Inc. v. Barton*, 192 F.3d 662, 666 (7th Cir. 1999).

1. Near Permanent Relationship Test:

The Illinois courts have developed two tests for determining whether or not an employer has a near permanent relationship with its customers or clients. One line of cases adhere to the "nature of the business" test set forth in *Office Mates 5, North Shore, Inc., v. Hazen*, 599 N.E.2d 1072 (1992). Another line of cases analyzed the near permanent relationship according to the seven factor test set forth in *Agrimerica, Inc. v. Mathes*, 524 N.E.2d 947, 170 Ill. App.3d 1025 (1990).

"Generally, the near-permanency test turns in large degree on the nature of the business involved, and certain businesses are just more amendable to success under it." *Lawrence and Allen, Inc. v. Cambridge Human Resource Group*, 685 N.E.2d 434, 444, 92 Ill. App.3d 131 (1997). For example, a near-permanent relationship with clients is inherent in the provision of professional services. *Springfield Rare Coin Galleries, Inc.*

*v. Mileham*, 620 N.E.2d 479, 489, 250 Ill. App.3d 922 (1993). Conversely, a business

engaged in ordinary sales generally will not enjoy near permanent relationships with its

customers. *Lawrence and Allen*, 685 N.E.2d at 444. Likewise, "a near-permanent

relationship is generally absent where the nature of the plaintiff's business does not

engender customer loyalty by providing a unique product or personal service and

customers utilize many suppliers simultaneously to meet their needs." *Office Mates 5*,

599 N.E.2d at 1081-1082. As a result, the near-permanency test turns in large degree on

the nature of the business involved, and certain businesses, such as professional or

pseudo-professional practices enjoy a relatively high degree of success under this test.

*Id.* at 1081.

In instances when a business falls squarely within one of these categories the

factors set out in *Agrimerica* need not to be addressed. However, as in this instance,

> [W]hen a business is lacking some of the characteristics of
> a category, has characteristics inconsistent with the
> category in which it would otherwise be placed, or for
> some other reason does not fall squarely within one of the
> two categories, the *Agrimerica* factors may be helpful to
> the Court in determining whether the near-permanency test
> has been met.

*Springfield Rare Coin Galleries, Inc.*, 620 N.E.2d at 490. Based upon the arguments

made by the parties, the evidence presented at the hearings, the testimony given by the

witnesses. and the exhibits admitted to the Court. this Court is of the belief that the title

insurance business engaged in by Netco and National does not squarely fall within either

of the two categories previously identified. Therefore, this Court will determine whether

Netco's relationships with its customers was near-permanent using the factors set out in

*Agrimerica. Inc. v. Mathes.* 557 N.E.2d 357, 199 Ill.App.3d 435 (1990).

The Illinois courts have identified seven factors which are relevant in determining whether a covenant with an employee not to compete upon termination is enforceable. When deciding if a "near-permanent" relationship exists between employer and its customers Illinois courts may consider: (1) the number of years required to develop a clientele; (2) the amount of money invested to acquire clients; (3) the degree of difficulty acquiring clients; (4) the extent of personal customer contact by the employee; (5) the extent of the employer's knowledge of its clients; (6) the duration of the customer's association with the employer; and (7) the continuity of the employer-customer relationships. *Id.* at 363. Under this test an employer is not required to show that the customer relationship is perpetual or indissoluble, or that a near-permanent relationship exists with each customer. *LSBZ, Inc. v. Brokis*, 603 N.E.2d 1240, 1248, 237 Ill. App.3d 415 (1992).

Application of the first objective factor, the length of time required to develop clientele, favors Netco. Netco has been involved in the title insurance business nationwide since 1987. Furthermore, it established its title insurance business in Ohio in 1996. Tr. at 758 (J. Baumgart). In 1997, Rivera was named Vice President and placed in charge of Netco's Ohio operations. Tr. at 407 (A. Rivera). During this period of time, Netco's Ohio operations remained unprofitable until the third quarter of 1999. Tr. at 758 (J. Baumgart). Rivera quit his employment with Netco on August 26, 1999. *Id.* According to National's business plan the strength of their competition (which includes Netco) "is that they have built relationships with many clients throughout the years." (Plaintiff's Exhibit No. 12). Therefore, the factual scenario in this case establishes that Netco spent years developing a clientele in the Ohio market, given the number of years it

took Netco to develop the necessary employer-customer relationships to achieve a profit, as well as the acknowledgement within National's business plan of Netco's efforts developing relationships with its clients.

The second objective factor, the amount of money invested to acquire clients, likewise favors Netco's claim of having established a near-permanent relationship with its customers. Netco has invested a substantial amount of money to acquire clients in its Ohio market. As John Baumgart, the owner and CEO of Netco, testified, it took Netco years to establish the necessary customer relationships to become profitable. Furthermore, Netco committed between $500,000 to $700,000 per year to develop and maintain customers in its Ohio business. This amount was spent in conjunction with an additional $400,000 to $500,000 spent yearly by Netco attracting customers nationwide.

This allocation of funds by Netco establishes a significant investment on the business' part to acquire a clientele within the Ohio market. This is similar to the case of *Millard Maintenance Service Co. v. Bernero*, 566 N.E.2d 379, 207 Ill. App.3d 736 (1990), in which a near-permanent employer-customer relationship was found, because the record established that the employer "devoted substantial resources to developing and maintaining a clientele." *Id.* As a result of the evidence presented at the hearings and the testimony of the witnesses it appears that the second factor weighs heavily in Netco's favor.

The third objective factor, the degree of difficulty in acquiring clients, favors Netco. As the defendant's witness David Soler, an Assistant Vice President of the Cincinnati office of Money Services of Ohio testified, the title agency business is a highly competitive business. Again looking at National's business plan, it indicates that

"(b)usiness of these companies is booming. All of our direct competitors have increased their order volume and market shares significantly." (Plaintiff's Exhibit No. 12).

Nevertheless, even with the substantial financial investment made by Netco over the previous years, Netco was only able to establish a one percent interest in the Ohio market. This lends credibility to Netco's claim that the title insurance industry is highly competitive and that it is difficult to acquire long term relationships without substantial investments of time and money. Furthermore, testimony at trial indicates that although the title insurance industry is very competitive, Netco's business did manage to become profitable since it was first established in Ohio in 1996. Thus, Netco has been able to establish a clientele enabling it to become profitable over the course of the last few years in a very competitive industry.

The fourth factor concerns the extent of personal customer contacts by the employee. According to the testimony of Gannon Craig, an account executive with Netco, an essential aspect of Netco's sale force is to develop and maintain close relationships with Netco customers through personal visits, entertaining, and troubleshooting any problems associated with Netco's customers. Specifically, John Baumgart, Netco's CEO explained, "It is 'not easy' to develop relationships with customers because it requires travel and Netco has to visit them on a constant basis." Tr. at 755-58, 781 (J. Baumgart).

In order to better address its customers needs, Netco instituted a two-tiered sales force, with a local sales force being responsible for a particular territory (e.g., Ohio) and the national sales force focusing on the wholesale lenders throughout the country. Tr. 630-40 (G. Craig). This demonstrates that Netco made extensive efforts to foster close

personal customer relations with its employees through the establishment of its local sales force. Rivera, as Vice President of Netco, was in charge of Netco's Ohio operations.

Rivera further admitted in his testimony that he knew who Netco's customers were in Ohio and which ones were the most profitable. Considering Rivera's firsthand knowledge as to the operations of the Ohio branch of Netco, he possessed an extensive understanding of how to quickly establish a business competitive to Netco. Therefore, his position required that he maintain close personal contacts with Netco customers.

The fifth objective criteria, the extent of the employer's knowledge of its clients, continues to favor the plaintiff. Although Netco has not established that it possesses knowledge of its client's special needs or wants, it has specifically established a local sales force to become extensively familiar with the wants and needs of its clients. This fact is further supported by Rivera's previous role in the operations of his former employer. Acting as Netco's Vice President, Rivera was one of Netco's agents and a member of its local sales team. He was required as Vice Present to attend quarterly meetings to discuss and review documents containing information regarding Netco's customers, financial performance, operations and strategic plans. This information (compiled by Netco's local sales force) that provided the national office with the ability to study the Ohio market and determine a strategy to make the operations more successful and profitable. Therefore, Netco's national operations did have an extensive knowledge of its clients' wants and needs through the information provided by the local offices.

The sixth factor, duration of the customer's association with the employer, favors Netco on the basis of National's business plan and Maria Sagrati's testimony. Under precedents set out by the Illinois courts,

> Employer need not prove a near-permanent relationship exists with every potential customer, or show that the customer relationship is perpetual or indissoluble, rather if overall such a relationship with people in the area exists, then the covenant is enforceable within the (reasonable) geographic scope contained in the contract.

*Loewen Group Int'l., Inc. v. Haberichter,* 165 Fd.3d, 1998 WL 796076, **5 (7th Cir. 1998).

Three items weigh in Netco's favor regarding this sixth factor. First, David Soler, a witness for the defendant, who is the Assistant Vice President of Money Services of Ohio, testified that if a title insurance company provides good service between the broker, the lender and the title company, then these relationships will be long-term and sustained. Second, Miss Sagrati admitted that the key to the title insurance industry is good customer relationships. Tr. at 606-07 (M. Sagrati). Third, and most significant, is Rivera's acknowledgement in National's business plan that their competitors' greatest assets are that "they have built relationships with many clients throughout the years." (Plaintiff's Exhibit 12 at 2). Therefore, plaintiff's assertion that Netco did have long lasting associations with its customers appears accurate.

The seventh objective factor, the continuity of employer-customer relationships, appears from the testimony to be linked directly with those relationships developed between the individual title insurance agents and the customers. The Court addresses this seventh factor, keeping in mind that Illinois precedent does not require that these customer relationships be both long term and exclusive or that the employer show near permanency with each customer. *Preferred Meal Systems, Inc. v. Guse.* 557 N.E.2d 506, 514, 199 Ill. App.3d 170 (1990). Therefore, a continuous ongoing relationship is not necessary to establish continuity of the employer-customer relationships.

Netco has actively encouraged close relationships between its agents and Netco customers. The product of these efforts has been the establishment of the long lasting relationships between Netco and its customers, which leads to the conclusion that they would likely continue to do business with the customers in the future.

Here, under the seven factors set out in *Agrimerica*, this Court is able to find that a near-permanent relationship exists between Netco and its customers. Therefore, the Court may now consider the second part of the near-permanent relationship test: whether "but for" the employee's association with the employer, he would have had contact with the customers. *Outsource Int'l. Inc. v. Barton*, 192 F.3d 662, 666 (7th Cir. 1999).

According to defendant Rivera, he began working for Netco in 1994. Furthermore, according to this testimony he had no experience in the title insurance industry before that time. When considering the second part of the near-permanent test e.g., determining whether "but for" Rivera's association with Netco, he would not have had contact with the customers that he had obtained from Netco after he left its employ.

National's business plan alludes numerous times to knowledge Rivera obtained and developed while working for Netco, as well as conveying his desire to rely upon contacts with title services customers he obtained while working as Netco's Vice President in charge of its Ohio operations. It is obvious that the "but for" element of the near-permanent test has been met by Netco. Had it not been "but for" Netco's good name and substantial resources, Rivera could not have solicited customers, with whom he had previously dealt with as Netco's Vice President in charge of Ohio's sales, on behalf of his competing company National. Even with an extraordinary sales staff, it is unlikely that National could have acquired customers with the same speed without Rivera's

"current contacts with title service customers," "reputation of principles," "technical

expertise" and "experience in [the] industry." (Plaintiff's Exhibit 12 at 3).

During the hearing on the preliminary-permanent injunction, the defendant,

Rivera, admitted under oath that he did in fact violate paragraph 6 of the employment

contract he entered into with the plaintiff Netco on February 6, 1998. Specifically, that

> (c) Employee will not establish its own business as a
> competitor of Netco with respect to products or services
> that are competitive with those of Netco within the
> geographical area in which Netco does business if such
> business involves, solicitations or dealings with any of
> Netco's customers.

(Plaintiff's Exhibit 1 at 2). Additionally, under paragraph 6 subsection D of the

Employment Contract of February 6, 1998, the defendant Rivera agreed not to attempt

to hire or to hire Netco employees. At the hearing, the witness Eduardo Carillo testified

that he left Netco and went to work for defendant Rivera and National on or about

November 1, 1999. Also at the hearing, the witness Gannon Craig testified that he was

approached by the defendant Rivera for the purposes of leaving Netco and coming to

work for a competitive entity.

Based upon the aforementioned factors, this Court concludes that a near-

permanent relationship exists between Netco and its customers. Furthermore, Rivera

would not have had contact with Netco's customers had it not been "but for" his

relationship with Netco. Therefore, Rivera breached his employment contract with Netco

and the restrictive covenant is enforceable in this situation.

2.    Confidential Information and Trade Secrets.

"A restrictive convenant may be enforced if the employee learned trade secrets or confidential information while in the plaintiff's employ and subsequently attempted to use it for his or her own benefit." *Springfield Rare Coin Galleries*, 620 N.E.2d 479, 485, 250 Ill. App.3d 922 (1993).  In making this determination this Court considers that as Vice President of the Ohio operations, Rivera had access to Netco's confidential information and/or trade secrets.  Furthermore, he was responsible for giving new employees a copy of Netco's employee handbook and attending quarterly meetings where officers of Netco would discuss and review documents containing confidential and proprietary information regarding Netco's customers, financial performance, operations and strategic plans.

Through his experience of running the operations and sales of Netco, Rivera admits to developing an operation system while employed by Netco.  Therefore, as demonstrated by the substantial financial investment made by Netco into the Ohio operations, as well as information Rivera was able to obtain during the course of his employment with Netco, he was able to use this experience in his startup title company in order to avoid mistakes others often make.  (Plaintiff's Exhibit 12). See e.g., *Lyle R. Jager Agency, Inc. v. Steward*, 625 N.E.2d 397, 403, 253 Ill. App.3d 631 (1993) (where a near-permanent customer relationship was found based upon confidential information to exist between an insurance agency and its customers).  Although National and its sales staff may have been able to obtain many of the contracts with title insurance brokers without its contacts prior to working in the industry, this Court believes it is quite

unlikely that National could have acquired the accounts it did, had it not been for the added benefit of its employees' previous dealings with Netco customers.

The record shows that Netco put considerable effort into developing a work force and keeping data as to strategy within the tiers of upper management. Furthermore, although employees of Netco may have had access to its customers, without the additional information Rivera acquired as Vice President of the Ohio operations in the meetings to develop strategies on how to make the territory more profitable, the usefulness of the above reference information would have been minimal. As such, Rivera used confidential information and trade secrets he obtained while in Netco's employee in order to establish this competing entity known as National. Therefore, Netco prevails on the merits of this test and the restrictive covenant may be enforced.


3. Duty of Loyalty

The defendant Rivera gave two inconsistent statements. The first statement was given under oath by the defendant Rivera in his deposition in which he said he had agreed to establish a competing company on August 13, 1999, which was approximately 13 days before he resigned from the plaintiff Netco. At trial the defendant Rivera stated that that was incorrect, that he didn't agree to establish a competing company until after he had resigned from the plaintiff Netco.

The testimony is clear from the witness Gannon Craig, who testified under oath that the defendant Rivera approached him in the spring of 1998 indicating at that time that he, Rivera, wanted to start his own business and he wanted Gannon Craig to come with him.

The witness Eduardo Carrillo testified in the plaintiff's case as if on cross-examination that he left Netco and went to work for the defendant National at the request of Rivera.

A person employed to work for another incurs certain obligations to his or her employer. An employee has a duty of loyalty to the employer, which arises out of the employer-employee relationship.

An employee also has an obligation of utmost good faith to the employer. Thus, an employee is required to refrain from engaging in practices harmful to the interest of the employer, the employee must not act in antagonism, or serve a private interest in opposition to the employer's interests. *See, Connelly v. Balkwill* (1954), 160 Ohio St. 430, 52 Ohio Op. 329, 116 N.E.2d 701. *Gillam v. Roadway Express, Inc.* (1965), 1 Ohio App.2d 548, 30 Ohio Op. 2d 582, 206 N.E.2d 34.

In accordance with the evidence before the Court and the cases in support thereof, the Court finds that the defendant Rivera did breach his duty of loyalty to the plaintiff Netco.


4.  <u>National is a Proper Defendant</u>

The defendant Rivera incorporated National, set up the pre-organizational agreement with three other people, gathered investors, hired employees, acts as its President, and runs National as a title insurance business.

The defendant Rivera also solicited the Stewart Title Guarantee Company for appointment as the title insurance policy issuing agent and signed said application personally as President of the defendant National.

Defendants Rivera and National are incapable of being separated in this case because the fact is quite clear that Rivera conducted his title insurance business through National, which he incorporated, for the purpose of engaging in the title insurance business. The defendant National can not operate without defendant Rivera, since Rivera is the title insurance policy issuing agent. Defendant Rivera's actions are reflected in the daily operations of defendant National. The operations of National are so connected with Rivera that it is impossible to distinguish between those made by Rivera or the corporate entity National. Thus, National is a proper defendant in this action.

The Court does hereby grant a permanent injunction against the defendants Rivera and National for a period of six months beginning from the date the Court receives a judgment entry from the plaintiff relative to the Court's Findings of Facts and Conclusions of Law.

The permanent injunction shall be as follows:

    a.   The defendants Rivera and National are restrained from disclosing any of plaintiff's confidential and proprietary business information or trade secrets to any third party.

    b.   The defendants Rivera and National are restrained from misappropriating or threatening to misappropriate any of plaintiff's confidential and proprietary business information or trade secrets.

    c.   The defendants Rivera and National are hereby ordered to return all of plaintiff's confidential and proprietary business information and trade secrets, and all copies thereof to plaintiffs immediately.

A TRUE COPY
ATTEST GREGORY HARTMANN
CLERK OF THE HAMILTON COUNTY
COURT, HAMILTON COUNTY, OHIO
_____, DEPUTY

# DEFENDANTS' ATTACHMENT 8

Defendants'
Attachment
8

ENTER

DEC 2 9 2000

ARTHUR M. NEY, JR. JUDGE

## COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO

NATIONAL EQUITY TITLE
AGENCY, INC., d/b/a "NETCO"          :          Case No. A9906815

          Plaintiff                 :          (Judge Ney)

          vs.                       :

ANTONIO R. RIVERA                   :          JUDGMENT ENTRY
          and
NATIONAL REAL ESTATE TITLE
AGENCY, INC.                        :

          Defendants               :

     This matter came before the Court on the plaintiff's motion for contempt, both

criminal and civil, against Antonio Rivera, National Real Estate Title Agency, Inc., Maria

Sagrati, Damian Sichak, James Erwin and Al Beamer.

     The plaintiff's motion for civil and criminal contempt was for a violation of the

Court's temporary restraining order issued November 10, 1999 and the Court's

permanent injunction issued August 10, 2000.

     At the beginning of the proceedings the Court determined that the plaintiff's

motion for contempt did not rise to the level of a criminal contempt and therefore denied

any such motion by the plaintiff.

     However, the Court ordered that the motion for contempt would proceed under

the plaintiff's civil contempt motion.

     The proceedings began at 2:00 p.m. on November 13, 2000 and continued in the

afternoons up to and including November 17, 2000. The plaintiff produced the testimony

of nine witnesses and the Court admitted twelve of the plaintiff's exhibits into evidence.

At the conclusion of the plaintiff's case, Beamer presented a motion for a directed verdict which the Court denied, following which Beamer rested his case. At the conclusion of the plaintiff's case, Erwin moved the Court to overrule the motion for contempt following which it was denied and Erwin rested his case. The defendants Rivera and National Real Estate Title Agency, Inc. moved the Court for a directed verdict which was denied following which both defendants rested their case. Sagrati and Sichak presented motions for a directed verdict which motions were denied and they rested their case.

In lieu of closing arguments, the Court ordered the parties to submit written briefs beginning December 1st and ending December 14th, all of which were filed in accordance with the Court's instructions.

The burden of proof in a civil contempt action is "CLEAR AND CONVINCING EVIDENCE." Carroll v. Detty (1996), 113 Ohio App.3d 708 and Young and Co. v. Kelly (1990), 68 Ohio App.3d 287.

Based upon the testimony of nine witnesses, all of the exhibits that were admitted into evidence and all of the evidentiary matters presented to the Court during all the many proceedings that have been held since November 10, 1999 including the parties' closing briefs, the Court finds that the plaintiff has failed in its burden of clear and convincing evidence as to the contempt motions against James Erwin and Al Beamer and the plaintiff's motion for contempt as to those two parties is hereby denied.

The Court further finds that the plaintiff has met its burden by clear and convincing evidence as to the contempt motions against Antonio Rivera, Damian Sichak,

2

Maria Sagrati, and National Real Estate Title Agency, Inc. in that they have violated the Court's temporary restraining order and/or preliminary injunctions.

The Court finds that based on the testimony of the nine witnesses, the exhibits which were received into evidence and all the evidentiary matters presented to the Court during all the many proceedings that have been held since November 10, 1999 that National Real Estate Title Agency, Inc., Antonio Rivera, Damian Sichak and Maria Sagrati have violated this Court's temporary restraining order and/or permanent injunction a number of times and that in accordance with Section 2705.05 and 2727.12 Ohio Revised Code, the three individual parties are facing a substantial period of incarceration and a substantial fine, and the corporation is facing a substantial fine.

The Court is also of the opinion that the plaintiff since November of 1999, originally acted in a dilatory manner and did not comply with this Court's order of disclosing to the parties its customer list until early February 2000. The Court is also aware of the fact that Antonio Rivera was fully aware of the plaintiff's customers and even admitted under oath that he violated his employment contract.

The Court orders that National Real Estate Title Agency, Inc., Antonio Rivera, Damian Sichak and Maria Sagrati pay a fine of $5,000.00 each to be payable on or before January 16, 2001 to the Clerk of Courts of Hamilton County Ohio to be used by said Clerk at his discretion.

Under the authority of Franklin County Sheriff v. Midwest Fireworks (1984), 1984 Ohio App. LEXIS 10287, the Court has the authority to impose a substantial period of incarceration and a substantial fine on each of the parties but because of the fact that

3

there are mitigating circumstances involved in this matter, the Court has ordered only a fine as indicated aforesaid.

If National Real Estate Title Agency, Inc., Antonio Rivera, Damian Sichak and Maria Sagrati, do not pay the aforesaid $5,000.00 fine each by January 16, 2001 to the Clerk of Courts, the Court will consider the imposition of the penalties permitted under Section 2705.05 and 2727.12, Franklin County Sheriff, supra.

Dated: 12/29/2000

Arthur M. Ney, Jr., Judge
Court of Common Pleas
Hamilton County, Ohio

4

A TRUE COPY
ATTEST GREGORY HARTMANN
CLERK OF THE HAMILTON COUNTY
COURT, HAMILTON COUNTY, OHIO
_____ , DEPUTY

# DEFENDANTS' ATTACHMENT 9

Defendants'
Attachment
9



COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

—————————————————

NATIONAL EQUITY TITLE AGENCY, INC.
d/b/a NETCO,

                Plaintiff,

        vs.                         CASE NO.
                                    A9906815
ANTONIO RIVERA, et al.,

                Defendants.

—————————————————

DEPOSITION OF:   ROBERT ALLEN BEAMER
TAKEN:           By the Plaintiff
                 Pursuant to Subpoena Duces Tecum
DATE:            December 2, 1999
TIME:            Commencing at 4:05 p.m.
PLACE:           Offices of:
                 Frost & Jacobs LLP
                 2500 PNC Center
                 201 East Fifth Street
                 Cincinnati, Ohio  45202-4182

BEFORE:          Wendy L. Raymer, RPR
                 Notary Public - State of Ohio

---

to be submitted to the witness for his examination and
signature, and that signature may be affixed out of the
presence of the notary public no later than 7 days after
submission to the witness.

                - - -

                I N D E X

ROBERT ALLEN BEAMER                    PAGE

CROSS-EXAMINATION BY DAVID A. SKIDMORE, JR.

                EXHIBITS

Plaintiff's Exhibit Number              Marked
1 - Order Granting Temporary Restraining Order  44
2 - Preorganization Subscription Agreement   52
3 - Employee Agreement                  60

                - - -

---

APPEARANCES:

        On behalf of the plaintiff:

                David A. Skidmore, Jr., Esq.
                        of
                Frost & Jacobs LLP
                2500 PNC Center
                201 East Fifth Street
                Cincinnati, Ohio  45202-4182

                William P. Andrews, Jr., Esq.
                        of
                NETCO, Inc.
                415 North LaSalle Street
                Suite 402
                Chicago, Illinois  60610

        On behalf of the defendants:

                Mark R. Fitch, Esq.
                        of
                Fitch & Spegal
                3752 Edwards Road
                Suite 1
                Cincinnati, Ohio  45209

                - - -

        S T I P U L A T I O N S

        It is stipulated by and among counsel for the
respective parties that the deposition of ROBERT ALLEN
BEAMER, a witness herein, may be taken at this time by the
plaintiff as upon cross-examination pursuant to the Ohio
Rules of Civil Procedure, and pursuant to subpoena; that the
deposition may be taken in stenotypy by the notary
public-court reporter and transcribed by her out of the
presence of the witness; that the transcribed deposition is

---

                ROBERT ALLEN BEAMER
of lawful age, a witness herein, being first duly sworn as
hereinafter certified, was examined and deposed as follows:

                CROSS-EXAMINATION
BY MR. SKIDMORE:

        Q.   Good afternoon, Mr. Beamer.  We met previously
off the record.  My name is David Skidmore.  I represent the
plaintiff, NETCO, in a lawsuit that's been filed against Mr.
Rivera and National Real Estate.  Let me go through a few
ground rules of the deposition.  One is, you need to answer
the questions truthfully, just as if you were in the
courtroom testifying; do you understand that?

        A.   Yes.

        Q.   Do you understand you're under oath today?

        A.   Yes.

        Q.   If you need to take a break at any point,
that's fine; I would just ask that you answer the question
that's pending, okay?

        A.   Sure.

        Q.   You need to answer audibly with words rather
than gestures or uh-huhs or uh-uhs, so the court reporter
can take it down, okay?

        A.   Yes.

        Q.   If you don't understand me, you should please

ACE REPORTING 513-241-3200

21

1 would depend upon how much he needed help with the computer
2 systems; is that fair?
3     A.    True.
4     Q.    After you left your employment at NETCO, Mr.
5 Beamer, May, June, July, August, how often did you speak
6 with Tony Rivera, if at all?
7     A.    Oh, once a month, maybe.
8     Q.    And why were you speaking to Mr. Rivera once a
9 month during the summer of 1999?
10    A.    As friends.
11    Q.    How did you hear that Mr. Rivera had quit his
12 employment at NETCO?
13    A.    I believe he called me.
14    Q.    And do you remember when that was?
15    A.    I think it was the weekend after he quit, so
16 that's sometime near the end of August.
17    Q.    Did he indicate to you in any of his telephone
18 conversations in April, May, June, July, August, before he
19 quit, that he was considering quitting his job at NETCO?
20    A.    No.
21    Q.    Were you surprised when -- so I take it in this
22 phone call at the end of August that he told you he had
23 quit, correct?
24    A.    Yes.

22

1     Q.    Did he talk to you at all about the potential
2 of quitting before he actually did it?
3     A.    No. I hadn't talked to Tony for quite a while
4 before he quit, and then he called me. Conversations before
5 that about NETCO would have been just general whining-type
6 stuff that all of us do about our jobs, but I -- I was very
7 surprised that he quit.
8     Q.    Can you tell me, if you remember, about what
9 Rivera was whining about before he told you that he had
10 quit?
11    A.    No, I really don't remember.
12    Q.    What did Tony tell you -- pardon me. What did
13 Mr. Rivera tell you when he told you that he had quit, other
14 than he had quit?
15    A.    He told me that he had -- this is quite a while
16 ago. As I recall, that he had finally gotten fed up with
17 his treatment by the NETCO superiors, John and Ed, and that
18 the night before he had had a conversation with John where
19 John had described himself as a God and Tony as a peon.
20         And he said that the incident that finally --
21 the one minor straw that finally broke his back was the
22 check printer that he had asked to be replaced a bunch of
23 times, and kept getting the response that no, we can't
24 afford it, or no, we're not going to pay for that. And when

23

1 it ruined a bunch of checks for the umpteenth time, he
2 finally had had it and just walked out.
3     Q.    Was this the one -- did you ever hear a report
4 that he threw a printer against the wall?
5     A.    Yes.
6     Q.    Is it your understanding this was the printer
7 that he threw against the wall?
8     A.    I don't know if it was thrown against the wall
9 or dropped on the floor or what happened. It involved a
10 printer.
11    Q.    Did Tony -- pardon me. Did Mr. Rivera indicate
12 to you what he was -- what it was about the treatment by his
13 superiors that he didn't like?
14    A.    At that point I'm not sure exactly what we
15 talked about as to the specifics. I remembered he talked
16 about the phone call with John, and the printer that they
17 wouldn't fix. I'm not sure at that point what other
18 specifics we talked about.
19    Q.    At any time before this conversation, Mr.
20 Beamer, did Mr. Rivera ever talk to you about entering into
21 a relationship to form a title insurance company partnership
22 or agency?
23    A.    Prior to --
24    Q.    The conversation where he told you that he had

24

1 quit NETCO.
2     A.    No.
3     Q.    When did Mr. Rivera first bring up the topic
4 with you of -- let me lay the foundation first. You are a
5 shareholder in a corporation with Mr. Rivera, correct?
6     A.    Yes, I am.
7     Q.    That's called National Real Estate?
8     A.    Yes, it is.
9     Q.    And that's a title insurance agency?
10    A.    Yes.
11    Q.    It's in the same business as NETCO?
12    A.    It's -- it's a title insurance agent, as NETCO
13 is a title insurance agent, yes.
14    Q.    Are you aware of any services or products that
15 National Real Estate offers that NETCO doesn't offer in the
16 Cincinnati area?
17    A.    Yes. NETCO tries to avoid doing purchase
18 deals, and National Real Estate, our plan is to be able to
19 handle purchase deals.
20    Q.    You mentioned a plan. Is there a business plan
21 at National Real Estate?
22    A.    No, not any written one.
23    Q.    Was there ever a written business plan at
24 National Real Estate?

29

```
1        Q.      Have you had any discussions with Bill Baumgart
2   about this lawsuit, or potential settlement of this lawsuit?
3        A.      Bill told me on Monday --
4               MR. FITCH:  I'm going to object on hearsay.  I
5   know your question didn't set it up to elicit that
6   response, but --
7               MR. SKIDMORE:  Again, in this deposition I'll
8   give you a continuing objection on hearsay grounds
9   for every question.
10              MR. FITCH:  Thank you.
11       A.      On -- was that Tuesday?  I got to Florida on
12  Monday afternoon -- Bill at some point said that John and Ed
13  Cook were going to be in the office that afternoon, and that
14  he thought that this case should be settled.  And I said I
15  agreed, and he said, "Would you mind if I put together a
16  meeting with you and I and John and try and get this thing
17  settled?"  And I said, "That would be fine".  And that
18  meeting never happened.  I saw John and Ed, I shook John --
19  or I shook Ed's hand, I said, "Congratulations on having
20  your baby," and that's the extent of my conversations with
21  John or Ed.
22       Q.      Were you ever told why that meeting didn't take
23  place?
24       A.      No.
```

30

```
1        Q.      Do you have any reason to believe that John
2   Baumgart asked Bill Baumgart to set that meeting up with
3   you?
4        A.      I don't know the mechanics of --
5        Q.      Did you have a noncompete agreement with NETCO?
6        A.      Yes.
7        Q.      And you negotiated over that agreement,
8   correct?
9        A.      Yes, I did.
10       Q.      Did you represent yourself in that?
11       A.      Yes.
12       Q.      Did you negotiate with Mr. Andrews regarding
13  that agreement?
14       A.      Yes.
15       Q.      Did you go back and forth with various drafts
16  on the language?
17       A.      To some of the issues, yes.
18       Q.      Do you remember which issues you went back and
19  forth on with Mr. Andrews?
20       A.      The issues that I was concerned about were
21  related to my computer programs.  And as I said previously,
22  I've got Titleworx programs at -- I've had them at 60 or 80
23  different title offices.  I couldn't -- in the standard
24  NETCO employment agreement, as it would have -- as they were
```

31

```
1   expecting other people to sign, it would have said that
2   Titleworx was my work product at NETCO, and therefore I
3   couldn't sell it to anyone else, but that wasn't the -- that
4   was understood and agreed all through the time that I was at
5   NETCO, and before and after that, NETCO could not claim
6   proprietary rights to my Titleworx programs.
7        Q.      When did you first -- well, it would be fair to
8   say that you're in business with Mr. Rivera, right?
9        A.      I'm --
10       Q.      How would you describe your business
11  relationship with Mr. Rivera right now?
12       A.      We both are owners of National Real Estate
13  Title Agency, and I provide software for it.
14       Q.      When did you first consider becoming involved
15  in a business with Mr. Rivera?
16       A.      I don't know exactly.  Sometime this fall.
17       Q.      Can you pinpoint a date for me?
18       A.      No.  It was sort of a developing thing.
19       Q.      But it was after Mr. Rivera told you that he
20  was quitting NETCO; is that right?
21       A.      Yes.
22       Q.      Did he suggest to you at some point in those
23  phone calls after that -- well, let me change -- how many
24  face-to-face meetings have you had with Mr. Rivera between
```

32

```
1   August 26th, 1999 and November 1, 1999?
2        A.      Three.
3        Q.      Can you put a date on the first one for us?
4        A.      It was, like, a couple weeks after he quit.
5        Q.      Where was that meeting?
6        A.      In Chicago.
7        Q.      At Lou Mitchell's?  Did you go to meet in a
8   restaurant with Mr. Rivera at Lou Mitchell's in the Loop?
9        A.      Lou Mitchell's?  I don't know the name Lou
10  Mitchell's, but we went to a restaurant.
11       Q.      Did you go to -- did you meet Mr. Erwin at this
12  meeting?
13       A.      That was -- that could have been Lou
14  Mitchell's.  I don't know the name of the company, but, yes,
15  we did meet with Mr. Erwin.
16       Q.      That was the meeting that you had -- let me --
17  regardless of the name of the restaurant, you had a meeting
18  with -- that Tony Rivera set up with -- where James Erwin
19  met you at a restaurant in the Loop in Chicago?
20       A.      Yes.
21       Q.      And you don't remember the name of that
22  restaurant?
23       A.      No.
24       Q.      Did you discuss at that meeting at the Chicago
```

45

1 talk to Tony Rivera about the retraining order?
2        A.    I'm sure we talked on the afternoon that the
3 restraining order was granted.
4        Q.    What did Mr. Rivera tell you about it?
5        A.    That it restrained National Real Estate Title
6 and Tony himself from soliciting business with any NETCO
7 customer.
8        Q.    Did he tell you that it restrained Maria
9 Sagrati?
10       A.    We — as I recall it, we didn't talk about
11 Maria.
12       Q.    Did he -- did Mr. Rivera indicate to you that
13 National Real Estate Title was going to comply with the
14 court's order?
15       A.    Certainly.
16       Q.    Have you ever heard from anyone, other than Mr.
17 Fitch, that National Real Estate has not complied with the
18 court's order?
19       A.    No.
20       Q.    Have you ever heard that there are allegations
21 that National Real Estate has not complied with the court's
22 order?
23       A.    Yes.
24       Q.    Who have you heard that from?

46

1        A.    Tony.
2        Q.    What did Mr. Rivera tell you about that?
3        A.    He said that there was a — an order placed
4 with National Real Estate from a customer who had apparently
5 placed an order with — an order or two or three with NETCO
6 approximately a year ago, and that now there was the
7 allegation that by us -- by National Real Estate Title
8 accepting the orders from — from this customer, that we
9 were in violation of the temporary restraining order.
10       Q.    Did Mr. Rivera indicate to you that he knew
11 that this customer had done work with NETCO before?
12       A.    No. In fact, he said the opposite, that he had
13 no idea that — and would have no reason to have any idea
14 about a customer that sent in one or two orders out of
15 10,000 that they received over a course of a year.
16       Q.    After your meeting in the — after your
17 breakfast meeting at the Loop in Chicago, what was your next
18 face-to-face conversation with Mr. Rivera?
19       A.    I think he came down to St. Louis and we played
20 golf, stuff like that.
21       Q.    When was that?
22       A.    I would guess sometime in early to mid
23 October. I'm not sure exactly.
24       Q.    Did you talk about entering into a business

47

1 with Mr. Rivera on the golf course, or at any time during
2 that visit in St. Louis?
3        A.    We talked about that as being a possibility,
4 yes.
5        Q.    What did you talk about?
6        A.    We talked about the mechanics of opening up a
7 title insurance agency, what would be necessary to do that
8 as far as filings with the state, and underwriters, and all
9 of that kind of thing.
10       Q.    What mechanics?
11       A.    The licensing issues and things like that.
12       Q.    Have you ever been deposed before, Mr. Beamer?
13       A.    I don't believe so. I'm sitting on the wrong
14 side.
15       Q.    What was the next face to face that you had
16 with Mr. Rivera between the time he told you he quit NETCO
17 and the time that he — and November 1, 1999?
18       A.    I went out to Cincinnati at the point that Tony
19 had found an office space that he wanted to consider
20 leasing, and I walked around the office space with Tony and
21 the real estate broker, rental agent, whatever he was.
22       Q.    When was that?
23       A.    It was in October. I would guess somewhere
24 around the 15th.

48

1        Q.    Have you ever been employed by National Real
2 Estate?
3        A.    Have I been employed by --
4        Q.    Right.
5        A.    No.
6        Q.    Have you ever held any sort of title with
7 National Real Estate, other than shareholder?
8        A.    Not that I know of, no.
9        Q.    And other than providing capital to National
10 Real Estate — you provided $20,000 in capital to National
11 Real Estate, correct?
12       A.    Yes.
13       Q.    You also provided them a computer program,
14 correct?
15       A.    Yes.
16       Q.    Did you provide either goods -- any other type
17 of goods or services to National Real Estate, other than the
18 $20,000 and the computer program?
19       A.    Yes.
20       Q.    What?
21       A.    I provided consulting services as to, again,
22 the things that were necessary to set up a profitable,
23 successful title insurance agency.
24       Q.    And have you been paid for those services?

49

1    A.    Not in money, no.

2    Q.    In stock?

3    A.    I haven't received the stock, but the agreement

4 is to pay me in stock for those services, yes.

5    Q.    Is there a written agreement to provide you

6 with stock for your services?

7    A.    Yes.

8    MR. SKIDMORE: That's a document that we

9 haven't seen yet, Mr. Fitch.

10    MR. FITCH: I'll make a note of it, and I'll

11 inquire.

12    Q.    Have you produced that document to your

13 counsel?

14    A.    I didn't know that it wasn't around.

15    Q.    What?

16    A.    I didn't know that it hadn't been produced.

17    Q.    Do you have a copy of that document yourself,

18 Mr. Beamer?

19    A.    Not with me.

20    Q.    Do you have one at home?

21    A.    I don't have a copy of a signed version, and

22 I'm not sure that I have a copy of the final version, but I

23 have --

24    Q.    Is there a final version?

50

1    A.    I signed one.

2    Q.    Were there drafts going back and forth?

3    A.    Yes.

4    Q.    And who were you negotiating with?

5    A.    James Erwin.

6    Q.    Was he representing the corporation?

7    A.    No. He was -- it's a subscription agreement

8 among the shareholders.

9    MR. FITCH: I'm sorry, I believe we have

10 produced a subscription agreement.

11    MR. SKIDMORE: Yeah. We haven't gotten a

12 signed subscription agreement. We have gotten a

13 subscription agreement.

14    Q.    Is that what you're referring to?

15    A.    Yes.

16    Q.    Okay, I'm sorry. Did you provide any other

17 goods or services to National Real Estate other than a

18 computer program, $20,000, and consulting?

19    A.    At this point, yes, I've bought some computer

20 equipment that's being used there, and the agreement is that

21 I will be paid back in stock, or possibly in money, for the

22 office equipment and stuff like that that I bought on my

23 own.

24    Q.    Anything else?

51

1    A.    No, that's it.

2    Q.    That agreement you just referred to, is that a

3 written agreement?

4    A.    Subscription agreement.

5    Q.    Well, is that the subscription agreement you're

6 talking about again?

7    A.    Yes.

8    Q.    Who does Mr. Rivera report to at National Real

9 Estate?

10    A.    The stockholders and the board of directors.

11    Q.    Who reports to Mr. Rivera?

12    A.    It's a little bit more informal than that at

13 this point. It's more of four equals than it is reporting

14 to anybody.

15    Q.    Who are the four equals?

16    A.    James and Damian and Tony and I.

17    Q.    Because each of you hold voting shares,

18 correct?

19    A.    Yes.

20    Q.    Ms. Sagrati is a regional vice president, and

21 Mr. Carrillo reports to Mr. Rivera, correct?

22    A.    Yes.

23    Q.    Mr. Sichak is the vice president, reports to

24 Mr. Rivera, correct? Maybe that's different because he's a

52

1 shareholder.

2    A.    Yeah, I don't -- there was a requirement for

3 certain formalities for us to have a president, and Tony was

4 selected to be the president. But as far as a chain of

5 command, with Tony at the top and Damian reporting to him,

6 that's not the way that I see it.

7    Q.    Who selected Mr. Rivera as president?

8    A.    The four of us.

9    Q.    Why did you select Mr. Rivera as president?

10    A.    Because he was the only one in Cincinnati at

11 that point.

12    Q.    He was the person who put the corporation

13 together, too, right?

14    A.    Well, he had filed the corporation papers.

15    Q.    He was the person who got the four of you

16 together?

17    A.    He is the one that -- yeah, I guess he put

18 it -- he put the people together. As to who put the

19 corporation together, it has been more James than it has

20 been Tony.

21    Q.    Fair enough. But he was the person who got the

22 four shareholders together?

23    A.    Yes.

24    (Plaintiff's Exhibit No. 2 was marked for