**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| AL BEAMER, et al. | ) | CASE NO. C-1-02-013 |
| | ) | |
| Plaintiffs, | ) | JUDGE SPIEGEL |
| | ) | |
| vs. | ) | |
| | ) | **PLAINTIFFS' MEMORANDUM IN** |
| NETCO, INC., et al. | ) | **OPPOSITION TO DEFENDANTS'** |
| | ) | **MOTION FOR SUMMARY** |
| Defendants. | ) | **JUDGMENT** |
| | ) | |

I.      **INTRODUCTION**

        This Court should deny Defendants' Motion for Summary Judgment, as numerous factual

and triable issues exist for the jury.  Indeed, the majority of Defendants' 48-page Summary

Judgment Memorandum in Support consists of a factual juxtaposition of the different versions of

events told by Mr. Beamer and various defense witnesses at deposition.  These varying facts

alone justify this Court's denial of Defendants' Motion for Summary Judgment.  Just as

significant as Defendants attempts to downplay these jury issues, however, is Defendant

misstating and misanalysis of the law applicable to Mr. Beamer's claims.  Significantly:

- 18 U.S.C. § 1033 does not apply to Mr. Beamer or TMC, because neither is
  involved in the "business of insurance" as defined by the statute;

- Ohio law makes it clear that an at-will contract can be tortiously interfered with if done so without justification;

- Otherwise tortious actions taken to run an individual or a company out of business are not privileged or otherwise protected; and

- Filing baseless contempt of court charges to leverage an advantage in litigation can constitute cognizable abuse of process.

For these reasons, which are more fully described below, Plaintiffs respectfully request that this Court deny Defendants' Motion for Summary Judgment in its entirety.

## II.     STATEMENT OF FACTS

### A.     The Parties.

Al Beamer formed Title Marketing Company ("TMC") in the late 1980s. (Beamer dep. at p. 22). Since its inception, TMC has sold computer software that produces title insurance documents. (Beamer dep. at pp. 22-23). Title agents purchase the software and then use it to accept title orders, produce title insurance forms, title commitments, and title policies. (Beamer dep. at p. 23). Mr. Beamer plays no role in the creation of the documents or the provision of title insurance, but merely provides the computerized forms, databases, and software to streamline the process for title agents. (Beamer dep. at pp. 22-23). Currently, Mr. Beamers runs Title Marketing Company out of his home with the assistance of his wife. (Beamer dep. at p. 5-6, 8, 22).

Brothers Bill and John Baumgart started various title companies in and around the Midwest and Florida from 1987 through 1992. (John Baumgart dep. at p. 10-16; Bill Baumgart dep. at p. 8). In 1990, Bill Baumgart took sole control of the Florida company, while John Baumgart retained control of the Midwest companies. (John Baumgart dep. at p. 18). John Baumgart's various Midwest companies, in 1994, became known as NETCO. (John Baumgart dep. at p. 58). NETCO's Ohio operations began in 1996. (John Baumgart dep. at p. 87). By

1999, NETCO's operations included Missouri, Illinois, Wisconsin, Indiana, Kentucky, Ohio, Texas, and Michigan.  (John Baumgart dep. at pp. 25-27).  NETCO provides title services specifically in the refinance market, dealing primarily with lenders or entities that provide loan products for residential mortgage customers.  (John Baumgart dep. at p. 69).  John Baumgart is currently NETCO's Chief Executive Officer.  (John Baumgart dep. at pp. 7-8).  William Andrews served as its general counsel from November 1997 through August 2001.  (Andrews dep. at pp. 8, 11).

The Florida company owned and operated by Bill Baumgart ultimately became known as Trans Continental Company ("TTC").  (John Baumgart dep. at p. 18-20; Bill Baumgart dep. at pp. 5-6).  TTC has been licensed to do business in Ohio since 2000.  (Bill Baumgart dep. at p. 24).

In addition to TTC, Bill Baumgart also acquired an Ohio company, Southeast Equity Title.  (Beamer dep. at pp. 87, 98-99).  Southeast Equity Title is a title insurance agency engaged primarily with realtors.  (Beamer dep. at pp. 100-01).  Bill Baumgart purchased the company in the mid-1990s and sold it in July 2000.  (Bill Baumgart dep. at pp. 11-12).  Southeast Equity Title operated solely in and around Greenville, Ohio, and never used Mr. Beamer's title insurance software.  (Beamer dep. at pp. 100-02).

**B.**    **The Relationship between Al Beamer and NETCO/TTC.**

In or around 1989, John Baumgart, while doing business in St. Louis for one of NETCO's predecessor companies, learned of Mr. Beamer's title insurance software system and signed a contract with him for the use of his software.  (Beamer dep. at p. 28; John Baumgart dep. at p. 28).  This use started in NETCO's St. Louis office and then expanded to other offices in and around the Midwest.  (Beamer dep. at p. 28).  In or around May 1993, Mr. Beamer

became NETCO's Executive Vice President of Information Systems.  (Beamer dep. at p. 32, 44-45, 53; John Baumgart dep. at p. 21).  In this role he dealt primarily with the company's computers and information systems, in addition to implementing his title insurance production software for NETCO's customers.  (Beamer dep. at pp. 29-30, 67-68).

Mr. Beamer maintained a similar relationship with TTC, as its Executive Vice President of Information Systems.  (Beamer dep. at p. 53, 56).  Mr. Beamer began as an employee of TTC, changed to an independent contractor in July 1996, and reverted to an employee in 1999.  (Beamer dep. at p. 88-92).

Mr. Beamer formally resigned his position from NETCO in April 1999.  His relationship with TTC, however, continued.  (Beamer dep. at p. 62, 93-95; John Baumgart dep. at p. 25).

C.    **Mr. Beamer's Relationship with Antonio Rivera, and NETCO's Lawsuit Against Rivera and National.**

In the summer of 1999, another former employee of NETCO, Antonio Rivera, approached Mr. Beamer with a proposition for a new title insurance company.  (Beamer dep. at pp. 124-25).  At that time the talks were informal and they did not discuss Mr. Beamer investing in this new company.  (Beamer dep. at p. 126).  In October 1999 Mr. Beamer and Mr. Rivera again discussed the formation of an Ohio title insurance company, which at that time Mr. Beamer decided to invest as a minority investor.  (Beamer dep. at pp. 128-33).  That company, which became known as National, opened on November 1, 1999, in and around Cincinnati, Ohio.  (Beamer dep. at pp. 73, 148, 173).  The totality of Mr. Beamer's investment in National consisted of his title insurance forms software and 25% of the company's start-up capital.  (Beamer dep. at p. 134-37).  Mr. Beamer's only duties for National were to provide his software and input forms.  (Beamer dep. at p. 146).

– 4 –

On November 9, 1999, NETCO filed suit against Mr. Rivera and National in the Hamilton County, Ohio, Court of Common Pleas. That lawsuit concerns National's competition with NETCO in Ohio in violation of certain contractual clauses between Rivera and NETCO. Critically, neither Mr. Beamer nor TMC were Defendants or otherwise parties to that lawsuit.

D.     **Mr. Beamer's Termination from TTC.**

Within one month of NETCO's filing of suit against Rivera and National, TTC terminated Mr. Beamer's employment. That termination was caused by pressure from John Baumgart to his brother, Bill, as a direct result of John Baumgart's participating in the litigation against Rivera and National. In fact, Bill Baumgart told Mr. Beamer on several occasions that his brother was pressuring him to terminate Mr. Beamer. (Beamer dep. at pp. 178-79). The first of these conversations took place approximately one month prior to the termination, and immediately prior to the filing of the *NETCO v. Rivera/National* lawsuit, and included comments from Bill Baumgart that his brother was upset that National was competing with him in Ohio and that he wanted Bill to terminate Mr. Beamer to harm National and its business. (Beamer dep. at p. 183). That conversation was repeated on at least one or two other occasions. (Beamer dep. at pp. 184-85). The last conversation between Bill Baumgart and Mr. Beamer relating to pressure from John Baumgart to terminate Mr. Beamer's employment occurred on December 1, 1999, the day immediately prior to Mr. Beamer's deposition in the *NETCO v. Rivera/National* lawsuit. (Beamer dep. at pp. 184-87).

Despite the pressure from his brother, at that time, Bill Baumgart not only told Mr. Beamer that he was happy with his job performance, but that he hoped their relationship would continue for a long time and that Mr. Beamer was partly behind TTC's success. (Beamer dep. at pp. 186). At the same time, Bill Baumgart told Mr. Beamer that John Baumgart had made a

special trip to Florida to convince him to terminate Mr. Beamer's contract. (Beamer dep. at pp. 186-87). Critically, Bill Baumgart did not ask Mr. Beamer if National was competing with TTC, and never told Mr. Beamer that if he were competing his employment would be terminated. (Beamer dep. at pp. 110-11). Instead, Bill Baumgart assured him that any issue of competition between National and NETCO was between Mr. Beamer and John Baumgart. (Beamer dep. at p. 108). Nevertheless, less than one week later Bill Baumgart terminated Mr. Beamer's employment, extensively because he learned that Mr. Beamer was a part owner of National.

The events that led to the termination of Mr. Beamer's contract with TTC, however, are much more nefarious than John Baumgart asking his brother to terminate Mr. Beamer's employment, and speak volumes to the unscrupulous business practices of the Baumgart family and their companies. In fact, the plot began to be hatched at Mr. Beamer's deposition in the *NETCO v. Rivera/National* lawsuit.

During a break at his deposition, NETCO's general counsel, William Andrews, spoke to Mr. Beamer and told him that John Baumgart had instructed Mr. Andrews to inform Mr. Beamer that John Baumgart was in the process of orchestrating Mr. Beamer's termination from TTC unless Mr. Beamer immediately disbanded National. (Beamer dep. at pp. 179, 189, 190). Mr. Andrews further told Mr. Beamer that John Baumgart would spend any amount of money necessary to ruin Mr. Beamer and his company regardless of any legal merits to the claims. (Beamer dep. at p. 209). Mr. Beamer next heard from Mr. Andrews several days later, on December 6, 1999, at which time Mr. Andrews informed him the deal had been struck, Mr. Beamer had been terminated, and that he should contact Mr. Curphey, an attorney for Bill Baumgart. (Beamer dep. at pp. 179, 192). Mr. Curphey, in turn, informed Mr. Beamer again

that he had been terminated, and that he could not speak personally to Bill Baumgart. (Beamer dep. at p. 179).

Following his termination from TTC, Mr. Beamer received a proposed settlement agreement relating to the *NETCO v. Rivera/National* lawsuit, a lawsuit to which he was not even a party. That settlement agreement proposed that he waive any claim against TTC relating to his termination and release his right to sue TTC. (Beamer dep. at pp. 196-97). That settlement agreement is consistent with Mr. Curphey's comment in the December 6 conversation that any issues between Mr. Beamer and TTC needed to be resolved in the National litigation. (Beamer dep. at p. 201). Further, NETCO's attorneys stated on at least one occasion that Mr. Beamer's unwillingness to waive claims against TTC was a "deal-breaker", stalling settlement negotiations in the National litigation. (Beamer dep. at pp. 214-15). Although Mr. Beamer contacted both Andrews and Curphey to try to save his job with TTC, Curphey informed him that the issue was out his hands and that he was only following Bill Baumgart's orders. (Beamer dep. at pp. 201-03).

In further support of the collusion between the Baumgart brothers regarding Mr. Beamer's employment with TTC, Mr. Beamer has been told by various TTC employees (including Frank Skryd and Ian Gorman) that John Baumgart had promised his brother that he would reimburse him for any costs incurred in terminating Mr. Beamer's employment from TTC. (Beamer dep. at pp. 180-82, 205-07).

### E.    NETCO's Contempt of Court Proceedings Against Mr. Beamer.

Prior to the settlement offer in the National litigation relating to Mr. Beamer's claims against TTC, and after Defendants had successfully arranged for Mr. Beamer's termination from TTC, NETCO, through its attorneys, filed motions to hold Mr. Beamer in civil and criminal

contempt of court in the *National v. Rivera* case.  (Beamer dep. at pp. 211-13).  Mr. Beamer was forced to retain personal counsel and expend considerable costs to defend these baseless and retaliatory motions.  (Beamer dep. at pp. 211-13).  Ultimately, after Mr. Beamer's significant efforts in defending himself, the court agreed with him and overruled the motions.  (Beamer dep. at pp. 211-13).

## III.   LEGAL ARGUMENT

### A.      The Summary Judgment Standard.

Summary judgment is only proper if the evidentiary materials presented "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."    Fed. R. Civ. P. 56(c).  The party moving for summary judgment (in this case, Defendants) bears the initial burden of showing the lack of a genuine issue as to any material fact; the evidence submitted must be viewed in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists.  *Adices v. S. H. Kress & Co.*, 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).  "The burden on the moving party may be discharged if the moving party demonstrates that the non-moving party has failed to establish an essential element of his or her case for which he or she bears the ultimate burden of proof at trial."  *Morales v. American Honda Motor Co.* 71 F.3d 531, 535 (6th Cir. 1995).  Once the moving party meets this burden, it then becomes the burden of the non-moving party to present additional evidence beyond the pleadings in support of his position.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 105 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The court may only grant summary judgment if there is sufficient evidence favoring the moving party for a trier of fact to return a verdict for the moving party.  *Id.* at 249.

B.    **Defendants' Own Recitation of Facts Demonstrates Genuine Issues Properly Left for the Jury to Decide.**

Where two versions of facts are presented (the proverbial two-sides-of-the-same-coin) and a court must choose one to grant summary judgment, then summary judgment is simply not proper. *Jackson v. Hoylman*, 933 F.2d 401 (6th Cir. 1991). This axiom is in part true because the credibility of witnesses is a jury question not properly amenable to resolution at the summary judgment stage. *Baker v. Sunny Chevrolet, Inc.*, 349 F.3d 862 (6th Cir. 2003). Typically, a judge faces this issue when comparing the facts presented by the moving party to the facts presented by the non-moving party. In this case, however, *the very face of Defendants'* Motion for Summary Judgment presents two very different versions of events, so much so that Defendants themselves have essentially put forth genuine issues of material facts for the jury.

The following table illustrates the conflicting and disputed essential facts that appear on the fact of Defendants' Motion:[1]

| Fact Favoring Mr. Beamer | vs. | Fact Favoring Defendant |
|---|---|---|
| According to Mr. Beamer, John Baumgart pressured his brother Bill Baumgart to terminate Mr. Beamer from his employment with Transcontinental. (¶ 140).[2] | vs. | John Baumgart did not ask Bill Baumgart to fire Mr. Beamer. (¶ 157). |
| According to Mr. Beamer, Bill Baumgart had several conversations with Mr. Beamer where he told Mr. Beamer that John | vs. | John Baumgart never asked Bill Baumgart to terminate Mr. Beamer, and did not instruct anyone on his behalf to speak to |

---

[1] All citations in this table refer to the numbered paragraphs in Defendants' *Statement of Uncontroverted Material Facts.*

[2] Defendants attempt to extricate themselves from Mr. Beamer's recitiation of tortious interference by arguing that the Court should simply ignore his version of events. (*See Defendants' Memorandum in Support* at pp. 38-39). This remedy is not supported by Sixth Circuit precedent, which dicates that issues of credibility of determinations of the veractity of two competing versions of events are issues left for a jury's resolution at trial, not a judge's resolution at summary judgment. *See Baker, supra*; *Jackson, supra*.

| | | |
|---|---|---|
| Baumgart was pressuring him to terminate Mr. Beamer. (¶ 141). | | Bill Baumgart about terminating Mr. Beamer or to tell Mr. Beamer that if he did not disband National he would be terminated from Transcontinental. (¶ 160). |
| According to Mr. Beamer, a few weeks prior to this time he voluntarily told Bill Baumgart that he had an ownership interest in National and that he provided all computer software for National. (¶ 146). | vs. | Bill Baumgart later told John Baumgart that he had talked to Mr. Beamer and asked him if he owned an interest in the company, and Mr. Beamer said that he did not. (¶ 165). |
| According to Mr. Beamer, Bill Baumgart told Mr. Beamer that he was happy with Mr. Beamer's performance, he hoped their relationship would continue a long time, and that Mr. Beamer was a part of the success of Transcontinental. (¶ 147). | vs. | Bill Baumgart told Mr. Beamer that he had heard rumors that Mr. Beamer was a part owner of National and that this would be a serious problem if true. (¶ 155). |
| According to Mr. Beamer, Bill Baumgart told Mr. Beamer that he had told John Baumgart that Mr. Beamer was an employee of Transcontinental, he would continue to be, he was an important part of Transcontinental's success and he did not want to hear anything else regarding National. (¶ 149). | vs. | Bill Baumgart felt that Mr. Beamer owning this company was a significant conflict of interest, and he did not want to do business with someone who had proprietary information regarding his company and was competing against him. (¶ 158). |
| According to Mr. Beamer, Bill Baumgart never told Mr. Beamer that if Mr. Beamer were competing with him that he would be terminated. (¶ 153). | vs. | Bill Baumgart told Mr. Beamer that he had heard rumors that Mr. Beamer was a part owner of National and that this would be a serious problem if true. (¶ 155). |
| According to Mr. Beamer, Mr. Andrews spoke to him at a break in his deposition and told him that John Baumgart had asked him to tell Mr. Beamer that John Baumgart was in the process of working out a deal where Mr. Beamer would be terminated from Transcontinental unless Mr. Beamer had National immediately disbanded; there were no witnesses to this conversation, as Mr. Andrews had asked that they be left alone and that Mr. Fitch, Mr. Beamer's attorney, not participate. (¶ 173). | vs. | Neither John Baumgart, nor his agents, negotiated a deal with Bill Baumgart that resulted in Mr. Beamer's termination. (¶ 176). Mr. Andrews did not discuss Mr. Beamer's continued employment with Transcontinental during these discussions, did not tell Mr. Beamer that John Baumgart would talk to his brother about terminating him if National did not close, did not say that NETCO would exploit the family relationship to arrange for his termination, and did not say that John Baumgart would spend any amount of money to get him. (¶ 179). |

| | | |
|---|---|---|
| According to Mr. Beamer, Mr. Andrews told him that John Baumgart would spend any amount of money necessary to get Mr. Beamer regardless of the legal merits of the claim. (¶ 174). | vs. | John Baumgart never said anything about "getting" Mr. Beamer. (¶ 177). |
| According to Mr. Beamer, Mr. Andrews called him on December 6, 1999 and told him the deal was struck (he was terminated) and that he should contact Mr. Curphey, an attorney for Bill Baumgart. (¶ 181). | vs. | Mr. Andrews did not tell Mr. Beamer that John Baumgart negotiated a deal with Bill Baumgart to terminate his employment. (¶ 188). Mr. Andrews told Mr. Beamer to speak to Mr. Curphey because he did not have the knowledge that Mr. Beamer wanted to know. (¶ 189). Bill Baumgart never had any conversations with Mr. Andrews regarding Mr. Beamer's termination. (¶ 191). |
| According to Mr. Beamer, he was told by Mr. Fitch that NETCO's attorneys told Mr. Fitch that Mr. Beamer's unwillingness to waive any claim against Transcontinental was a "deal-breaker" and that settlement negotiations in the National matter were unsuccessful due to the release clause. (¶ 199). | vs. | Mr. Andrews never told anyone that the covenant not to sue Transcontinental was a "deal-breaker" if not included. John Baumgart never told anyone that the proposed covenant with Transcontinental was a "deal-breaker," and he certainly would have settled the National litigation without that covenant if the rest of the terms were the same. (¶¶ 203-04). |
| According to Mr. Beamer, various Transcontinental employees told him there was a deal that John Baumgart would reimburse Bill Baumgart for any costs incurred in terminating Mr. Beamer's employment. According to Mr. Beamer, he called Frank Skryd, an employee of Transcontinental, in early 2000 and Mr. Skryd said that Ian Gorman, another employee of Transcontinental, was in a room when Bill Baumgart was on the phone with John Baumgart during the deal to reimburse Bill Baumgart for costs. (¶¶ 205-06). According to Mr. Beamer, he had another conversation with Mr. Skryd and Mr. Gorman when they met for a lunch meeting in 2000 or 2001. At this lunch, Mr. Beamer said that he could not believe that Bill Baumgart had made this deal with John Baumgart, and Mr. Gorman said that | vs. | Mr. Gorman has never spoken with Bill Baumgart, Mr. Skryd or Mr. Beamer regarding Mr. Beamer's termination. Mr. Gorman was never present in Bill Baumgart's office when Bill Baumgart spoke to John Baumgart regarding Mr. Beamer's employment. Mr. Gorman has never told Mr. Beamer that he was present when a conversation was taking place regarding his employment, or that he understood that there was an agreement between Bill Baumgart and John Baumgart to reimburse Bill Baumgart for any incurred expenses resulting from Mr. Beamer's termination. (¶¶ 212-14). Mr. Skryd never told Mr. Beamer that a deal had been made between John Baumgart and Bill Baumgart to terminate him, or that Mr. Gorman told him that such a deal had been struck. Mr. Skryd was never in Bill |

| | | |
|---|---|---|
| he could not believe it either, which was all Mr. Gorman said on the subject. (¶¶ 209-10). | | Baumgart's office when he was on the phone with John Baumgart discussing Mr. Beamer's employment. Mr. Skryd does not recall speaking to Mr. Beamer about the circumstances of his termination at a dinner, but does recall that they did not discuss business or litigation at this dinner. (¶¶ 216-18). |
| According to Mr. Beamer, Mr. Fitch told him that he had been told by someone with respect to the contempt motion that this issue was going to be made criminal and made bigger so as to get Mr. Beamer, and that Mr. Beamer would go to prison as a result. (¶ 225). According to Mr. Beamer, he was told by Mr. Fitch that NETCO's attorneys claimed on one occasion that they were going to go to a prosecutor and seek criminal charges on the basis of trade infringement, but he was never charged. (¶ 228). | vs. | Mr. Andrews does not remember if he authorized the contempt motion, but thought Mr. Beamer was in contempt of the Court Order as he was a principal of a company that was in violation of the order and nothing was being done to stop the violation. Mr. Andrews understood that principals of a closely-held entity could be held responsible for failing to have their company comply with a court order. (¶¶ 226-27). |

The existence of these diametrically opposed material facts demonstrates that a genuine issue remains for a jury to determine.

      C.    **Defendants are not Entitled to Judgment as a Matter of Law on Mr. Beamer's Tortious Interference Claim.**

      1.    **18 U.S.C. § 1033 does not Void Mr. Beamer's Contract with TTC because Neither Mr. Beamer nor TMC are involved in a "Business of Insurance."**

Federal law regulates that "[a]ny individual who has been convicted of any criminal felony involving dishonesty or a breach of trust, or who has been convicted of an offense under this section, and who willfully engages in the business of insurance whose activities affect interstate commerce or participates in such business, shall be fined as provided in this title or imprisoned not more than 5 years, or both." 18 U.S.C. § 1033(e)(1)(A). That statute further defines the term "business of insurance" as either "the writing of insurance, or the reinsuring of

risks, by an insurer, including all acts necessary or incidental to such writing or reinsuring and the activities of persons who act as, or are, officers, directors, agents, or employees of insurers or who are other persons authorized to act on behalf of such persons." 18 U.S.C. § 1033(f)(1)(A)-(B).[3]   While Defendants accurately cite those portions of the statute, they omit the critical statutory definition of "insurer" contained in the same law. "The term 'insurer' means any entity the business activity of which is the writing of insurance or the reinsuring of risks, and includes any person who acts as, or is, an officer, director, agent, or employee of that business." 18 U.S.C. § 1033(f)(2).

Thus, even taking Defendants' statutory argument at face value, and assuming that Mr. Beamer was involved in the "writing of insurance", their argument should be dismissed because neither Mr. Beamer, nor any of the Defendants, is an insurer. Mr. Beamer sells computer services that print forms. Defendants, while being title agencies, merely act as the intermediary that brings the customer to the underwriters. By Defendants' own admissions, the underwriters are the primary insurers, and the title insurance agencies are merely the conduits that bring customers to the insurer. (Beamer dep. at pp. 22-23).

Further, Plaintiff has nothing whatsoever to with the writing of insurance policies. He is a computer person. He sells computer software to title agencies. The agents then use the software sold by Mr. Beamer to accept title orders, and produce the insurance forms and policies that are sold to the customers. All Mr. Beamer does is provide computerized forms, databases,

---

[3] Admittedly, nearly 20 years ago, Mr. Beamer pled guilty to a felony (interstate transportation of stolen checks), served a prison sentence of one and half years, and served an additional six months in a halfway house. (Beamer dep. at pp. 9-10, 15-16, 232-33). Defendants, however, knew of this history prior to their contractual relationship with Mr. Beamer. It was fully disclosed throughout their business dealings and prior to the start of any employment or business relationships between Mr. Beamer and either of the Baumgarts or their companies. It is disengenious for Defendants to now try to use Mr. Beamer's criminal past to void a contract into which they entered with knowledge of that criminal past.

–13–

and software to the agencies to make the operations of the agents and the underwriters more efficient. (Beamer dep. at pp. 22-23). He has nothing whatsoever to do with the insurance end of the business. Therefore, 18 U.S.C. § 1033 does not apply to Mr. Beamer and cannot void his contract with TTC.

### 2. The at-will Status of Mr. Beamer's Contract is Irrelevant to his Tortious Interference Claims.

The tort of interference with business relationships occurs when a person, without privilege, induces or otherwise purposely causes a third person not to enter into or continue a business relationship with another, or not to perform a contract with another. *A & B-Abell Elevator Co. V. Columbus/Central Oh. Buildling & Constr. Trades Council*, 651 N.E.2d 1283 (1995). The elements of tortious interference with the contract are: (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, syllabus ¶ 1 (Ohio 1999).

Defendants inaccurately summarize the state of Ohio law on the issue of at-will contracts and tortious interference claims. Indeed, the seminal case on tortious interference, *Fred Siegel Co., L.P.A. v. Arter & Hadden*, makes it clear that one can premise a claim of tortious interference on an at-will contract such as the contract at issue in this case. In the words of the Supreme Court of Ohio, where the other elements of tortious interference are met, only the "establishment of the privilege of fair competition … will defeat a claim of tortious interference where the contract is terminable at will." *Id.* at syllabus ¶ 4.

Thus, it is not as cut and dry, as Defendants posit, that simply because Mr. Beamer's contract with TTC may have been at-will disposes of his tortious interference claim. Instead, we must look to whether Defendants' conduct is otherwise privileged or justified, despite the

–14–

contract's supposed at-will status.

**3.    Defendants' Actions in Terminating Mr. Beamer is Neither Privileged nor Justified.**

**a.    Fair Competition.**

Establishment lack of justification for the tort of tortious interference requires proof that the defendant's interference with the contract was improper. *Fred Siegel Co., L.P.A.*, 707 N.E.2d 853 at syllabus ¶ 2. In determining whether an actor has acted improperly by intentionally interfering with a contract or prospective contract of another, consideration should be given to the following factors: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interest sought to be advanced by the actor, (5) the social interest in protecting the freedom of the actor and the contractual interest of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties. *Id.* at syllabus three.

In this case, there is no privilege or justification. Any actions taken by Defendants were not in the name of competition, but were instead in an attempt both to gain leverage in a lawsuit to which Mr. Beamer was not a party, and to punish Mr. Beamer out of malice for investing in a competing company. At a minimum, issues of fact exist as to whether Defendants terminated the contract out of malice.

Bill Baumgart told Mr. Beamer on several occasions that his brother was pressuring him to terminate Mr. Beamer because of the *NETCO v. Rivera/National* lawsuit. (Beamer dep. at pp. 178-79, 183-87). The last of these conversations took place on December 1, 1999, the day immediately prior to Mr. Beamer's deposition in the *NETCO v. Rivera/National* lawsuit. (Beamer dep. at pp. 184-87). During a break in that deposition, NETCO's general counsel, William Andrews, spoke to Mr. Beamer and told him that John Baumgart had instructed Mr.

–15–

Andrews to inform Mr. Beamer that John Baumgart was in the process of orchestrating Mr. Beamer's termination from TTC unless Mr. Beamer immediately disbanded National. (Beamer dep. at pp. 179, 189, 190). Mr. Andrews further told Mr. Beamer that John Baumgart would spend any amount of money necessary to ruin Mr. Beamer and his company regardless of any legal merits to the claims. (Beamer dep. at p. 209). Several days later, TTC terminated Mr. Beamer. (Beamer dep. at p. 179).

Actions taken to "get" someone are not actions taken in furtherance of fair competition between companies, but are actually taken out of spite, malice, revenge, and retaliation. Further, while Bill Baumgart denies both that his brother pressured him in any way and that he gave into any pressure to terminate Mr. Beamer's contract, it remains that immediately prior to the contract Bill Baumgart re-affirmed Mr. Beamer's job performance and expressed hopes for a long and fruitful business relationship. (Beamer dep. at p. 186). Within a week, however, after Mr. Beamer provided deposition testimony and the *NETCO v. Rivera/National* lawsuit, Bill Baumgart, for reasons he continues to deny, terminated a relationship with which he was otherwise more than satisfied. (Beamer dep. at pp. 184-87).

The justification of fair competition presumes that businesses have a right to compete with each other, but also that the actions they take are motivated by the competition. In this case, because of the relationships between the parties, competition could not be an issue. There is absolutely no competitive advantage for NETCO to gain in the termination of the Beamer/TTC contract. Relevant to this case, NETCO operated in Ohio, and TTC in Florida. Mr. Beamer's new company, National, also operated in Ohio. While there may be an issue of competition between NETCO and National, TTC, and Mr. Beamer's employment therewith, cannot have any role to play in this competition.

The underlying facts in this case, however, show that there is, at a minimum, a jury question as to the motivation of Bill Baumgart's actions in terminating the contract, and whether John Baumgart procured that termination out of revenge and spite. Therefore, Defendants' Motion for Summary Judgment on this claim should be denied.

### b. Truth.

In Part III.B., *supra*, Plaintiff sets forth more than a dozen key, material differences in fact that are at issue in this case. These key differences in Plaintiff's and Defendants' versions of facts defeat Defendants' attempt to gain summary judgment by arguing that *truth* bars Mr. Beamer's tortious inference claim. Clear issues of fact exist on what the *truth* is in this case, and therefore Defendants are not entitled to judgment as a matter of law on the basis of the privilege of truth.

### 4. Plaintiffs do not Rely on Hearsay in Support of the Tortious Interference Claim.

The Federal Rules of Evidence define hearsay as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The Rules make it clear, however, that a "statement offered against a party" that is "the party's own statement, in either an individual or a representative capacity," or "a statement by a party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship…" is not hearsay. Fed. R. Evid. 801(d)(2)(A), (D).

Defendants argue that statements by John Baumgart, Defendant NETCO's CEO (*see* John Baumgart dep. at pp. 7-8), and William Andrews, Defendant NETCO's then-General Counsel (*see* Andrews dep. at pp. 8, 11), are inadmissible hearsay. Any statements made by either John Baumgart or Mr. Andrews, however, cannot constitute hearsay, as they are

admissions of a party-opponent admissible under Fed. R. Evid. 801(d)(2). *See*, *e.g.*, *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 134 (3[d] Cir. 1997), *cert. denied*, 522 U.S. 1116, 118 S. Ct. 1052, 140 L. Ed. 2d 115 (1998) (admitting statements of the defendant's CEO as non-hearsay admissions of the defendant's agent); *Purgess v. Sharrock*, 33 F.3d 134, 144 (2[d] Cir. 1994) (ruling that an attorney's statements are admissible as admissions of a party-opponent).

In addition to admissions being excluded from the definition of hearsay, the federal rules of evidence also exclude statements that go solely to a declarant's intent or state of mind, and not for the truth of the matter asserted. Thus, for example, courts have refused to exclude on hearsay grounds statements relating to alleged tortious interference with a contract because the statements were not offered for their truth, but for the intent of and effect on the contracting party. *See Rotec Indus., Inc. v. Mitsubishi Corp.*, 163 F. Supp. 2d 1268, 1272 (D. Or. 2001). In this case, any statements made by Bill Baumgart are not hearsay because Plaintiff is not offering them for their truth, but instead for Bill Baumgart's intent and motivation in terminating Mr. Beamer's TTC contract, in addition to the effect John Baumgart's commandments had on his brother. Thus, these statements are not inadmissible hearsay and do not bar Plaintiffs' tortious interference claim.

Indeed, Defendants' hearsay argument is nothing more than a veiled attempt to obtain a summary judgment ruling on the credibility of witnesses. As discussed above, this function is properly left to the jury at trial.

**D.** **Defendants Are Not Entitled to Judgment as a Matter of Law on Plaintiffs' Abuse of Process Claim.**

To sustain a prima facie showing of abuse of process, one must establish: "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not

designed; and (3) that direct damage has resulted from the wrongful use of process." *Yaklevich v. Kemp*, *Schaeffer and Rowe Company, LPA*, 626 N.E. 2d 115, syllabus ¶ 1 (Ohio 1994). In this case, the abuse consisted of the institution of contempt proceedings by Defendants against Mr. Beamer in a lawsuit to which he was not a party. Specifically, prior to the settlement offer in the *NETCO v. Rivera/National* litigation relating to Mr. Beamer's claims against TTC, and after Defendants had successfully arranged for Mr. Beamer's termination from TTC, NETCO, through its attorneys, filed motions to hold Mr. Beamer in civil and criminal contempt of court. (Beamer dep. at pp. 211-13). Mr. Beamer was forced to retain personal counsel and expend considerable costs to defend these baseless and retaliatory motions. (Beamer dep. at pp. 211-13). Ultimately, after Mr. Beamer's significant efforts in defending himself, the court agreed with him and overruled the contempt motions. (Beamer dep. at pp. 211-13).

One illustrative case as to the unlawfulness of Defendants' conduct in filing baseless contempt charges against Mr. Beamer to gain a competitive advantage is *Hildreth Manufacturing v. Semco, Inc.*, 785 N.E. 2d 774 (Ohio Court App. 2003). Hildreth and Semco were competitors in the manufacture of beryllium copper plunger tips. Hildreth alleged that Semco filed an unfair competition lawsuit against it to interfere with Hildreth's ability to lawfully conduct a competing business. The court of appeals reversed the trial court's dismissal of an abuse of process claim, and held that such conduct could constitute an abuse of process.

*The Hildreth* opinion is significantly more on point with the allegations in this case than the cases cited by Defendants in their memorandum in support. For example, *American Process Design v. DeBoer* deals with the termination of a current employee during the pendency of litigation related to a non-competition agreement. That case is not on point because Mr. Beamer's abuse of process claim does not relate to his termination; TTC had already terminated

his employment when the contempt charges were filed. *Tilberry v. McIntyre* deals with a motion for sanctions against an attorney who committed malpractice to try to leverage a settlement of the underlying malpractice claim. That case is not on point because Mr. Beamer was not a party to the underlying litigation, and therefore no permissible purpose could exist for trying to leverage a personal settlement from him. Finally, *Molton Metal Equipment v. Metaullics Systems* deals with a lawsuit by a competitor against a former employee for theft of trade secrets. Clearly, Defendants' attempt to analogize *Molton Metal Equipment* to this case misses the mark; NETCO neither sued Mr. Beamer personally in the underlying litigation, nor accused him of stealing trade secrets.

This case involves none of the scenarios cited by Defendants. Indeed, it appears that Defendants mistakenly confused the tortious interference and abuse of process theories. Mr. Beamer is not alleging that the contempt proceedings instituted by Defendant resulted in the termination of his contract with TTC. To the contrary, these are separate and distinct issues. Instead, the abuse of process claim seeks re-numeration for expenses Mr. Beamer incurred for defending against proceedings levied for an impermissible motive (*i.e.*, spite and revenge). For these reasons, this Court should deny Defendants' Motion for Summary Judgment on the abuse of process claims.

## IV.    <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiffs submit that there exists genuine issues of material fact on each claim, and respectfully request that this Court deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

s/Richard C. Haber
RICHARD C. HABER (0046788)
JONATHAN T. HYMAN (0068812)
Reminger & Reminger Co., L.P.A.
1400 Midland Building
101 Prospect Avenue, West
Cleveland, Ohio 44115
Ph: (216) 687-1311
Fax: (216) 687-1841
rhaber@reminger.com
jhyman@reminger.com
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 19, 2004, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

s/Richard C. Haber
RICHARD C. HABER (0046788)
JONATHAN HYMAN (0068812)
Reminger & Reminger Co., L.P.A.
1400 Midland Building
101 Prospect Avenue, West
Cleveland, Ohio  44115
Ph:   (216) 687-1311
Fax: (216) 687-1841
rhaber@reminger.com
jhyman@reminger.com
*Attorneys for Plaintiffs*